Exhibit 1

**EXHIBIT 1**

## DECLARATION OF ELEANOR McCULLEN
## IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Eleanor McCullen, upon oath and affirmation, hereby deposes and says:

1.     I make this declaration upon my personal knowledge of the facts, and I am competent to testify to the facts stated herein.

2.     I am a 71 year-old mother and grandmother.  I am resident of Chestnut Hill, Massachusetts.  I have never been arrested or threatened with arrest.

3.     I have degenerative arthritis in my left knee which at present makes it difficult to walk or move about.

4.     I oppose the practice of abortion because of my religious and moral beliefs that induced abortion is the deliberate destruction of innocent human life.

5.     I am aware that, on or about November 13, 2007, the Commonwealth of Massachusetts amended Mass. Gen. L. chapter 266: Section 120E1/2(b) and that law now prohibits most persons from standing or entering a fixed buffer with a radius of 35-feet (hereafter, "zone") around the entrances, exits, and driveways of reproductive health care facilities that perform abortions unless the person is using the sidewalk or street right-of-way adjacent to the facility solely for the purpose of reaching a destination other than the facility.

6.     The meaning of the term "solely for the purpose of reaching a destination other than the facility" is unclear to me.  I do not know whether the Act prohibits me from walking through the zone to talk with a person on the opposite side, or prohibits me from walking through the zone to get to the store in the next block, or prohibits me from walking through the zone with my baby carriage to locate myself in a stationary place on the opposite side.  In each of these

-1-

instances my desire is to use the zone to reach a destination other than the facility but it is not my sole purpose. I steer clear of the zone because I do not want to be arrested.

7.    For the past seven years I have, on a weekly basis, provided information to persons entering or passing by the Planned Parenthood abortion facility at 1055 Commonwealth Avenue, Boston (hereafter, "clinic"). The clinic is located at the corner of Commonwealth Avenue and Alcorn Street. The front entrance to the clinic is located directly off a 25-foot wide public sidewalk through a recessed walkway approximately 10 feet long. Men and women entering the front of this facility must walk across the public sidewalk to do so.

8.    I usually arrive by 7:15 a.m. and often am by myself until 8:00 a.m. Often for these 45 minutes I am the only one available to provide information about alternatives to abortions and to counsel women and men entering the clinic.

9.    Police are almost always present at the clinic on days when I am there, and have been for the past seven years.

10.    On or after November 14, 2007, a sign was posted and a line was marked in yellow paint in a 35-foot radius around the entrances of the clinic. The radius of the zone encompasses nearly the entire sidewalk in front of the clinic. At the tip of the radius there is approximately 12 inches or so of sidewalk before the paved street begins. The zone takes up all of the sidewalk and extends approximately 6 feet into Alcorn Street parallel to Commonwealth Avenue. It extends approximately 12 feet around the corner going down Alcorn Street.

11.    When at Planned Parenthood I peacefully attempt to persuade men and women not to abort their babies by providing information to help them make an informed decision. I offer practical help and educational materials as well as referral information to those entering and exiting the front of the clinic. On numerous occasions women seeking abortion changed their

minds as a result of the information and counseling I provided. My experience has taught me that counseling is most effective when offered in a normal conversational tone and in a friendly and gentle manner. My experience has been that it best to stand near the path of pedestrians.

12.     My intended audience is mothers and fathers who are confused or dismayed by their pregnancies and seek to abort their child as a way to quickly resolve their self-perceived dilemma. My primary focus is the emotional and physical well-being of the mother.

13.     Most women that I speak with tell me they do not want an abortion but feel they have no viable alternative. After speaking with me a short time, many women will voluntarily step into my car for further counseling.

14.     Several women coming out of the clinic immediately after undergoing an abortion have commented to me that they regretted aborting their child. They put their head on my shoulder and sob, saying, "I can't believe I did it." Witnessing the genuine sorrow expressed by these women strengthens my resolve to provide information and counseling to women before an abortion takes place.

15.     Prior to enactment of the zone, my customary routine when counseling or distributing literature was to stand still or walk back and forth on the public sidewalk near the path of passersby close to the recessed walkway leading to the clinic entrance. I always tried to speak to people in a normal conversational tone so as not to alarm or make them uncomfortable. If a person indicated he/she was willing to speak with me I would move closer but no more than within one or two feet. It was my personal experience that, unless my proffer of literature was placed near their hands, most passersby would not make the effort to take it. This area is now squarely inside the zone.

16.     I did not yell although there were times I had to raise my voice in order to be heard over vehicular traffic, trains, and other ambient noise. I also found that eye contact and a smile are very important to put people at ease. In order to effectively communicate orally, I always tried to speak from a conversational distance, usually no more than six or eight feet.

17.     I have never blocked, impeded, or harassed any pedestrian, clinic client, or anyone else, nor have I ever engaged in any violence or breach of the peace.

18.     Since the 35-foot buffer took effect there have been several occasions when clinic clients entered the marked zone at the clinic from the side opposite where I was standing. I was unable to navigate around the zone before the clients entered the facility because the arthritis in my left knee hampers my mobility. I thus was unable to effectively communicate my message. I believe this would be true even if I did not have arthritis in my knee.

19.     On several occasions I saw clinic clients approaching from a northerly direction on Commonwealth Avenue. I began conversations with them offering free assistance including an ultrasound and pointed out alternatives to abortion. The clients listened and responded in an encouraging tone while continuing to walk with me. However, when we reached the yellow buffer line I was forced to stop. The clients continued walking and shortly thereafter I was no longer able to communicate with them in a conversational tone or place literature near their hands. I then had to raise my voice and lost credibility with the person to whom I was speaking.

20.     On several other occasions women would approach the clinic from the south. Because I generally stood on the north side of the zone I could not reach them before they entered the clinic. I had no opportunity to speak with them in a conversational tone nor was I close enough to place literature near their hands.

21.     I also am unable to reach persons who walk up Alcorn Street and to enter the front door of the clinic when on the opposite side of the zone.  There is no way I can move around the zone before they enter the front door.  I believe this would be true even if I did not have arthritis.

22.     In order to see the clinic entrance, the 35-foot buffer forces me to stand at the tip of the radius of the buffer which is about 12 inches from the curb.  This forces me to stand near or in the street with my back toward traffic placing me in danger of the moving vehicles behind me, which I cannot see.

23.     On several occasions after the zone was marked I was standing at the edge of the zone on Alcorn Street conversing with clinic clients and was almost struck by vehicles turning in from Commonwealth Avenue.  This was particularly true when other cars were coming up Alcorn Street toward Commonwealth Avenue because there is not enough room for both vehicles and people.

24.     In the seven years I provided information to passersby on the public sidewalk at the clinic I witnessed several clinic "escorts" surround, cluster, walk with, chatter, and/or talk to clinic clients.  I heard escorts say things like, "you don't have to listen to [him, her, them]," or "don't pay any attention to [him, her, them]," or "don't listen to [him, her, them]," or "you don't have to listen to [him, her, them]."  It was obvious to me that escorts were referring to pro-life advocates like me when making these statements.  Escorts raised and lowered their arms to prevent me from placing literature near the hands of clinic clients.  Some women leaving the clinic told me the clinic guard took the literature I gave them and they were unable to look at it.

25.     It was quite obvious to me from things they said and did that escorts were encouraging men and women to exercise their "choice" because they would smile and say things like, "just come with us," or "we have help," or "we'll help you get inside."  Escorts are easily

-5-

identifiable because they always wear blue vests marked with the words, "PLANNED PARENTHOOD ESCORT."

26. It is extremely difficult for me to win the attention of people approaching the clinic when two or three escorts surround them, smile, and mumble or talk. This is especially so now that I must remain up to 35 feet away from them.

27. It is extremely difficult for me to identify, from a distance of 35 feet or more, persons intending to enter the clinic because people often use the public sidewalk to go to other destinations. The zone thus makes it very difficult for me to identify and communicate to my intended audience before they enter the clinic. It is imperative that I be able to provide information and counseling to women and men before an abortion is performed.

28. Subsequent to the zone being marked by a yellow line, I saw persons who had accompanied women seeking abortion come out of the front of the facility and stand idly within the zone to smoke cigarettes, make phone calls, talk, or for no apparent purpose.

29. On Tuesday, December 18, 2007, I went to the clinic and saw a large pile of snow in front of the clinic (it had snowed a week earlier). It was obvious to me that the snow had been pushed out of the middle of the street toward the curb by a plow. The snow covered about 5 feet of the street measuring outward from the curb. I could not access any portion of the sidewalk directly in front on the clinic entrance because the snow was right up to the curb.

30. The snow banks, ice, and slush on the sidewalk and streets made it extremely dangerous and nearly impossible for me to maneuver around the zone, particularly on Alcorn Street and near the driveway located off the public sidewalk on the other side of the clinic. The vehicular traffic on Commonwealth Avenue and Alcorn Street made attempts to move around the zone even more dangerous.

31.     Subsequent to the passage of the 35-foot buffer law I have refrained from entering the marked zone at the clinic out of fear I would be arrested and incarcerated.  In order to help women make an informed choice I desire to orally communicate in a conversational tone and distribute literature inside the zone but cannot do so without risking arrest and incarceration.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated this _28_ day of December, 2007.

Eleanor McCullen