# Exhibit 2

# EXHIBIT 2

## DECLARATION OF JEAN BLACKBURN ZARRELLA IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Jean Blackburn Zarrella, upon oath and affirmation, hereby deposes and says:

1. I make this declaration upon my personal knowledge of the facts, and I am competent to testify to the facts stated herein.

2. I am an 81 year-old mother and grandmother. I reside in Lynnfield, Massachusetts.

3. I oppose the practice of abortion because of my religious and moral beliefs that induced abortion is the deliberate destruction of innocent human life. I began actively opposing abortion in 1985.

4. I have been providing men and women with information about abortion and abortion alternatives since 1988. I would estimate that, as a direct result of the information and counseling I provided, at least 100 women who came to abortion clinics with the intent to abort left without going inside.

5. I am aware that, on or about November 13, 2007, the Commonwealth of Massachusetts amended Mass. Gen. L. chapter 266: Section 120E1/2(b) and that law now prohibits most persons from standing or entering a fixed buffer with a radius of 35-feet (hereafter, "zone") around the entrances, exits, and driveways of reproductive health care facilities that perform abortions unless the person is using the sidewalk or street right-of-way adjacent to the facility solely for the purpose of reaching a destination other than the facility.

6. The meaning of the term "solely for the purpose of reaching a destination other than the facility" is unclear to me. I do not know whether the Act prohibits me from walking

through the zone to talk with a person on the opposite side, or prohibits me from walking through the zone to get to the store in the next block, or prohibits me from walking through the zone to locate myself in a stationary place on the opposite side. In each of these instances my desire is to use the zone to reach a destination other than the facility but it is not my sole purpose. I steer clear of the zone because I do not want to be arrested.

7. Once or twice a month for the past two years I have provided information to persons entering or passing by the Planned Parenthood abortion facility at 1055 Commonwealth Avenue, Boston (hereafter, "clinic"). The clinic is located at the corner of Commonwealth Avenue and Alcorn Street. The front entrance to the clinic is located directly off a 25-foot wide public sidewalk through a recessed walkway approximately 10 feet long. Men and women entering the front of this facility must walk across the public sidewalk to do so.

8. Police are almost always present at the clinic when I am there, and have been for the past two years.

9. On or after November 14, 2007, a sign was posted and a line was marked in yellow paint in a 35-foot radius around the entrances of the clinic. The radius of the zone encompasses nearly the entire sidewalk in front of the clinic. At the tip of the radius there is approximately 12 inches or less of sidewalk before the paved street begins. The zone takes up all of the sidewalk and extends approximately 6 feet into Alcorn Street parallel to Commonwealth Avenue. It extends approximately 12 feet around the corner going down Alcorn Street.

10. When at Planned Parenthood I peacefully attempt to persuade men and women not to abort their babies by helping them make an informed decision. I offer practical help and educational materials as well as referral information to those entering and exiting the front of the clinic. On numerous occasions women seeking abortion changed their minds as a result of the

information and counseling I provided. My experience has taught me that counseling is most effective when offered in a normal conversational tone and in a friendly and gentle manner. Eye contact is essential. I find it best to stand near the path of pedestrians.

11.     My intended audience is persons seeking, approving, or performing abortions.

12.     Prior to enactment of the zone, my customary routine when counseling or distributing literature was to stand still on the public sidewalk near the path of passersby close to the recessed walkway leading to the clinic entrance. I always tried to speak to people in a quiet conversational tone so as not to alarm or make them uncomfortable. If a person indicated he/she was willing to speak with me I would move closer but no more than within one or two feet. It was my personal experience that, unless my proffer of literature was placed near their hands, most passersby would not make the effort to take it. This area is now squarely inside the zone.

13.     I did not yell although there were times I had to raise my voice in order to be heard over vehicular traffic, trains, clinic agents, and other ambient noise. I also found that eye contact and a smile are very important to put people at ease. In order to effectively communicate orally, I always tried to speak from a conversational distance, usually no more than six or eight feet.

14.     I have never harassed anyone nor have I ever engaged in any violence or breach of the peace. I have never prevented a clinic client from accessing an abortion facility.

15.     Since the Act took effect there have been dozens of occasions when clinic clients entered the marked zone at the clinic from the side opposite where I was standing. I was unable to navigate around the zone before the clients entered the clinic. I thus was unable to effectively communicate my message.

16. When standing on the opposite side of the zone, I am unable to reach persons who walk up Alcorn Street and then enter the front door of the clinic. There is no way I can move around the zone before they enter the front door.

17. If I were to stand directly in front of the clinic entrance at the tip of the radius of the buffer zone I would be forced to stand in the street with my back toward traffic. I don't do this because I would place myself in danger of the vehicular traffic on Commonwealth Avenue.

18. In the 19 years I have been providing information to passersby on the public sidewalks at abortion clinics I repeatedly witnessed clinic "escorts" surround, cluster, walk with, yell, make noise, chatter, and/or talk loudly to clinic clients. I heard escorts say things like, "you don't have to listen to [him, her, them]," or "don't pay any attention to [him, her, them]," or "don't listen to [him, her, them]," or "[he, she, they] is/are the crazy," or "those people are crazy." It was obvious to me that escorts were referring to pro-life advocates like me when making these statements. I also saw escorts bump, push, and shove pro-life advocates. This even happened to me.

19. It was quite obvious to me from things they said and did that escorts were encouraging men and women to exercise their "choice" because they would say things like, "we'll help you," or "we'll help you get inside." Escorts are easily identifiable because they always wear vests identifying them as escorts.

20. It is extremely difficult for me to win the attention of people approaching the clinic when escorts are in close proximity to them, especially when the escorts yell, make noise, mumble, or talk loudly.

21. It is extremely difficult for me to identify, from a distance of 35 feet or more, persons intending to enter the clinic because people often use the public sidewalk to go to other

destinations. The zone thus makes it very difficult for me to identify and communicate to my intended audience before they enter the clinic. It is essential that women seeking abortion know that help is available.

22. Subsequent to the zone being marked by a yellow line, on or after November 14, 2007, I saw escorts in blue vests marked with words "PLANNED PARENTHOOD ESCORT" standing idly on the public sidewalk and street inside the zone. I saw them drink coffee and in conversation with each other. They did these things inside the zone even when clinic clients were not present.

23. Subsequent to the zone being marked by a yellow line, I saw persons accompanying women seeking abortion come out of the front of the facility and stand idly within the area encompassed by the zone to smoke cigarettes, make phone calls, talk, or for no apparent purpose.

24. Subsequent to the passage of the 35-foot buffer law I have refrained from entering the marked zone at the clinic out of fear I would be arrested and incarcerated. I desire to orally communicate in a conversational tone and distribute literature inside the zone but cannot do so without risking arrest and incarceration. I am not willing to take that risk.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 29th day of DECEMBER, 2007.

Jean Blackburn Zarrella