# Exhibit 4

**EXHIBIT 4**


**DECLARATION OF ERIC CADIN**
**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Eric Cadin, upon oath and affirmation, hereby deposes and says:

1.     I make this declaration upon my personal knowledge of the facts, and I am competent to testify to the facts stated herein.

2.     I am 27 years-old and a resident of Weymouth, Massachusetts.  I am a pre-med student at Harvard University.  I work as an emergency services assistant at Brigham and Women's Hospital.

3.     I have never been arrested or threatened with arrest.

4.     I oppose the practice of abortion because of my religious and moral beliefs that induced abortion is the deliberate destruction of innocent human life.  I believe that life begins at conception.

5.     I am aware that, on or about November 13, 2007, the Commonwealth of Massachusetts amended Mass. Gen. L. chapter 266: Section 120E1/2(b) and that law now prohibits most persons from standing or entering a fixed buffer with a radius of 35-feet (hereafter, "zone") around the entrances, exits, and driveways of reproductive health care facilities that perform abortions unless the person is using the sidewalk or street right-of-way adjacent to the facility solely for the purpose of reaching a destination other than the facility.

6.     The meaning of the term "solely for the purpose of reaching a destination other than the facility" is unclear to me.  I do not know whether the Act prohibits me from walking through the zone to talk with a person on the opposite side, or prohibits me from walking through the zone to get to the store in the next block, or prohibits me from walking through the

zone to locate myself in a stationary place on the opposite side. In each of these instances my desire is to use the zone to reach a destination other than the facility but it is not my sole purpose. I steer clear of the zone because I do not want to be arrested.

7.      For the past two years I have provided information to persons entering or passing by the Planned Parenthood abortion facility at 1055 Commonwealth Avenue, Boston (hereafter, "clinic"). The clinic is located at the corner of Commonwealth Avenue and Alcorn Street. The front entrance to the clinic is located directly off a 25-foot wide public sidewalk through a recessed walkway approximately 10 feet long. Men and women entering the front of this facility must walk across the public sidewalk to do so.

8.      Police are sometimes present at the clinic when I am there, and have been for the past two years.

9.      On or after November 14, 2007, a sign was posted and a line was marked in yellow paint in a 35-foot radius around the entrances of the clinic. The radius of the zone encompasses nearly the entire sidewalk in front of the clinic. At the tip of the radius there is approximately 12 inches or so of sidewalk before the paved street begins. The zone takes up all of the sidewalk and extends approximately 6 feet into Alcorn Street parallel to Commonwealth Avenue. It extends approximately 12 feet around the corner going down Alcorn Street. In addition, there is a 35-foot zone marked around the rear entrance to the facility. The rear zone encompasses nearly the entire street (Gardner Street) adjacent to the rear entrance.

10.     When at Planned Parenthood I peacefully attempt to persuade men and women not to abort their babies by helping them make an informed decision. I offer practical help and educational materials as well as referral information to those entering and exiting the clinic. On several occasions women seeking abortion changed their minds as a result of the information

and counseling I provided.  My experience has taught me that counseling is most effective when offered in a normal conversational tone and in a friendly and calm demeanor.  I find it important to stand near the path of pedestrians.

11.     My intended audience is persons seeking, approving, or performing abortions.  I especially like to speak with persons who earlier had accompanied women seeking abortion when they come out of the front of the facility to smoke cigarettes, make phone calls, talk, or just hang out.  I cannot do this at present because these people normally stand inside the zone.

12.     Prior to enactment of the zone, my customary routine when counseling or distributing literature was to stand stationary on the public sidewalk near the path of passersby close to the recessed walkway leading to the clinic entrance.  I always tried to speak to people in a normal conversational tone so as not to alarm or make them uncomfortable.  When a person indicated he/she was willing to speak with me I would move closer but no more than within one or two feet.  It was my personal experience that, unless my proffer of literature was placed near their hands, most passersby would not make the effort to take it.  This area is now squarely inside the zone.

13.     I did not yell although there were times I had to raise my voice in order to be heard over vehicular traffic, trains, clinic agents, and other ambient noise.  I also found that eye contact and a smile are very important to put people at ease.  In order to effectively communicate orally, I always tried to speak from a conversational distance, usually no more than six or eight feet.

14.     I have never blocked, impeded, or harassed any pedestrian, clinic client, or anyone else, nor have I ever engaged in any violence or breach of the peace.

15.     Since the Act took effect there have been several instances when clinic clients entered the marked zone at the clinic from the side opposite where I was standing.  I was unable to navigate around the zone before the clients entered the facility.  I thus was unable to effectively communicate my message or provide them with educational material.

16.     On several occasions after the zone was marked I was standing at the edge of the zone on Alcorn Street and was almost struck by vehicles turning in from Commonwealth Avenue.  I also witnessed other people at the edge of the zone almost being struck by vehicles.

17.     In the two years I provided information to passersby on the public sidewalk at the clinic up to the present I repeatedly witnessed clinic "escorts" surround, cluster, walk with, chatter, and/or talk at clinic clients.  I also witnessed them talk in a manner designed and intended to prevent clinic clients from hearing me.  I heard escorts say things like, "you don't have to listen to [him, her, them]," or "don't pay any attention to [him, her, them]," or "don't listen to [him, her, them]," or "[he, she, they] is/are the crazy," or "those people are crazy."  It was obvious to me escorts were referring to pro-life advocates like me when making these statements.  Escorts often raised and lowered their arms so as to prevent me from placing literature near the hands of clinic clients.

18.     I have witnessed escorts mocking pro-life advocates such as myself. I heard escorts say things like, "abortion is legal," "it's important for women to have a choice," "we have help," or "we'll help you get inside."  Escorts are easily identifiable because they always wear blue vests marked with the words, "PLANNED PARENTHOOD ESCORT."

19.     It is extremely difficult for me to win the attention of people approaching the clinic when escorts are in close proximity to them, especially when the escorts surround and talk at them.

20.    It is extremely difficult for me to identify, from a distance of 35 feet or more, persons intending to enter the clinic because people often use the public sidewalk to go to other destinations.  The zone thus makes it very difficult for me to identify and communicate to my intended audience before they enter the clinic.  It is essential that men and women receive information and counseling before an abortion is performed

21.    Subsequent to the zone being marked by a yellow line, on or after November 14, 2007, I saw escorts in blue vests standing idly on the public sidewalk and street inside the zone, including its outermost edge.  I saw them drink coffee and engage in conversation with each other.  They did these things inside the zone even when clinic clients were not present.

22.    Subsequent to the zone being marked by a yellow line, I saw persons who had accompanied women seeking abortion come out of the front of the facility and stand idly within the area encompassed by the zone to smoke cigarettes, make phone calls, talk, or for no apparent purpose.

23.    Subsequent to the passage of the 35-foot buffer law I have refrained from entering the marked zone at the clinic out of fear I would be arrested and incarcerated.  I desire to orally communicate in a conversational tone and distribute literature inside the zone but cannot do so without risking arrest and incarceration.  I am not willing to take that risk.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this __23__ day of December, 2007.


_____
Eric Cadin