**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

| | | |
|---|---|---|
| **ELEANOR McCULLEN, JEAN** | ) | |
| **BLACKBURN ZARRELLA,** | ) | |
| **GREGORY A. SMITH, CARMEL** | ) | |
| **FARRELL,** and **ERIC CADIN,** | ) | |
| | ) | **Civil Action No._____** |
| Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MARTHA COAKLEY,** Attorney | ) | |
| General for the COMMONWEALTH OF | ) | |
| MASSACHUSETTS**,** | ) | |
| | ) | |
| Defendant. | ) | |

_____

**PLAINTIFFS' PROPOSED MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

_____

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

FACTS ................................................................................................................. 5

ARGUMENT ....................................................................................................... 8

I.   PLAINTIFFS ARE ENTITLED TO PRELIMINARY RELIEF ..................................... 8

   A.  Likelihood of Success on the Merits ......................................................... 9

   B.  Plaintiffs Face Irreparable Harm ............................................................... 9

   C.  The Threatened Harm to Plaintiffs is Greater than any Potential Harm
      to Defendants that may Result from an Injunction ..................................... 10

   D.  Entry of a Preliminary Injunction Will Serve the Public Interest ............... 14

II.  THE ACT IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED ................... 15

   A.  The Act Targets Traditional Public Forums ............................................... 16

   B.  The Act Infringes Speech at the Core of the First Amendment ................... 17

   C.  The Act Flunks the Time, Place, and Manner Test ..................................... 18

      1.  The legal standard ............................................................................. 18

      2.  Analysis of buffer zone cases ............................................................. 20

         a.  *Madsen v. Women's Health Center* .............................................. 20

         b.  *Schenck v. Pro-Choice Network, Inc.* ........................................... 20

         c.  *Hill v. Colorado* ........................................................................ 22

         d.  Other buffer cases ..................................................................... 23

      3.  The Act fails the *Ward* time, place and manner test ........................... 24

         a.  The Act is unconstitutional on its face ....................................... 24

      **b.  The Act is unconstitutional as applied** ...............................................................30

  **D.  The Act is Substantially Overbroad** ...........................................................................31

  **E.  The Act is an Unlawful Prior Restraint** .......................................................................36

  **F.  The Act Violates a Panoply of First Amendment Rights** ..............................................38

  **G.  The Act Constitutes Viewpoint Discrimination and Violates the Right to Equal Protection of the Law** .........................................................................................40

  **H.  The Act is Unconstitutionally Vague** ............................................................................46

**III. THE LEGISLATIVE RECORD WAS INSUFFICIENT AS A MATTER OF LAW** .....48

  **A.  The Evidentiary Record was Stale** ...............................................................................48

  **B.  Claims that the Predecessor Act was Vague were Unreasonable** ...............................51

  **C.  The Asserted Purpose for the Act was not a Significant Interest** ...............................52

  **D.  The Act is Greatly Under-Inclusive** .............................................................................53

**CONCLUSION** ............................................................................................................................54

# TABLE OF AUTHORITIES

## Cases

*Aptheker v. Secretary of State*,
378 U.S. 500 (1964)......................................................................................33

*Arkansas Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987)......................................................................................41

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*
490 F.3d 1 (1st Cir. 2007)............................................................................36

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 68 (1963)........................................................................................36

*Bell v. Wolfish*,
441 U.S. 520 (1979)......................................................................................28

*Bl(a)ck Tea Society v. City of Boston*,
378 F.3d 8 (1st Cir. 2004).....................................................................*passim*

*Board of Education of Westside Community Schools (District 66) v. Mergens*,
496 U.S. 226 (1990)......................................................................................38

*Boos v. Barry*,
485 U.S. 312 (1988)..............................................................................*passim*

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)..............................................................16, 31, 32, 35

*Brown v. Hot, Sexy and Safer Productions, Inc.*,
68 F.3d 525 (1st Cir. 1995)..................................................................35, 39

*Capitol Square Review and Advisory Board v. Pinette*,
515 U.S. 753 (1995)......................................................................................38

*Carey v. Brown*,
447 U.S. 455 (1980)..............................................................11, 12, 17, 25

*Casey v. City of Newport*,
308 F.3d 106 (1st Cir. 2002)........................................................................19

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)................................................................................39, 40

*Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley*,
454 U.S. 290 (1981)................................................................................38, 39

*City of Chicago v. Morales*,
527 U.S. 41 (1999)...................................................................... *passim*

*Clark v. Jeter*,
486 U.S. 456 (1988)................................................................................42

*Connick v. Myers*,
461 U.S. 138 (1983)................................................................................11

*Cox v. New Hampshire*,
312 U.S. 569 (1941)................................................................................17

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*,
70 F.3d 1474 (6th Cir. 1995)..................................................................14

*Edwards v. City of Santa Barbara*,
150 F.3d 1215 (9th Cir. 1998) ...............................................................24

*Elrod v. Burns*,
427 U.S. 347 (1976).............................................................................9, 13

*Employment Division, Department of Human Resources of Oregon v. Smith*,
494 U.S. 872 (1990)..............................................................................39, 40

*Engel v. Vitale*,
370 U.S. 421 (1962)................................................................................38

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975)............................................................................16, 37

*Fantasy Book Shop, Inc. v. City of Boston*,
652 F.2d 1115 (1st Cir. 1981)..............................................................36, 37

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998)................................................................................45

*Frisby v. Schultz*,
487 U.S. 474 (1988).................................................................... *passim*

*G&V Lounge, Inc. v. Michigan Liquor Control Commission*,
23 F.3d 1071 (6th Cir. 1994) .................................................................14

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ................................................................................... 11

*Gary S. v. Manchester School District*,
    374 F.3d 15 (1st Cir. 2004) ..................................................................... 39

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ....................................................................... *passim*

*Hague v. CIO*,
    307 U.S. 496 (1939) ............................................................... 4, 11, 16, 18

*Harper v. Virginia Board of Elections*,
    383 U.S. 663 (1966) ................................................................................. 42

*Heffron v. International Society for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981) ....................................................................... *passim*

*Hill v. Colorado*,
    530 U.S. 703 (2000) ....................................................................... *passim*

*Homans v. City of Albuquerque*,
    264 F.3d 1240 (10th Cir. 2001) ............................................................... 14

*In re Halkin*,
    598 F.2d 176 (D.C. Cir. 1979) .................................................................. 9

*In re Perry*,
    859 F.2d 1043 (1st Cir. 1988) ................................................................... 9

*International Caucus of Labor Commissions v. City of Montgomery*,
    111 F.3d 1548 (11th Cir. 1997) ............................................................... 18

*International Society for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) ................................................................................. 34

*Katrina Halfpap, et al. v. City of West Palm Beach, Florida*,
    No. CV-05-80900 (S.D. Fla. filed on April 11, 2006) ............................ 24

*Kent v. Dulles*,
    357 U.S. 116 (1958) ................................................................................. 33

*Kirkeby v. Furness*,
    52 F.3d 772 (8th Cir. 1995) ..................................................................... 14

*Kolender v. Lawson,*
        461 U.S. 352 (1983)............................................................................33

*Kovacs v. Cooper,*
        336 U.S. 77 (1949)........................................................................12, 36

*Lamb's Chapel v. Center Moriches Union Free School District,*
        508 U.S. 384 (1993)..........................................................................38

*Lee v. Weisman,*
        505 U.S. 577 (1992)..........................................................................38

*Lehman v. City of Shaker Heights,*
        418 U.S. 298 (1974)..........................................................................34

*Loper v. New York City Police Department,*
        999 F.2d 699 (2d Cir. 1993)................................................................33

*Lovell v. Griffin,*
        303 U.S. 444 (1938)..........................................................................18

*Madsen v. Women's Health Center, Inc.,*
        512 U.S. 753 (1994)..........................................................1, 20, 26, 36, 37

*Mangual v. Rotger-Sabat,*
        317 F.3d 45 (1st Cir. 2003)................................................................10

*Martin v. Struthers,*
        319 U.S. 141 (1943)..........................................................................28

*Massachusetts v. Oakes,*
        491 U.S. 576 (1989)..........................................................................16

*McDaniel v. Paty,*
        435 U.S. 618 (1978)..........................................................................40

*McGuire v. Reilly,*
        260 F.3d 36 (1st Cir. 2001)......................................................... *passim*

*McGuire v. Reilly,*
        386 F.3d 45 (1st Cir. 2004)......................................................... *passim*

*McGuire v. Reilly,*
        544 U.S. 975 (2005)............................................................................5

*McIntyre v. Ohio Elections Commission*,
514 U.S. 334 (1995)................................................................32, 33

*Members of City Council v. Taxpayers for Vincent*,
466 U.S. 789 (1984)......................................................... *passim*

*Moore v. City of Van*,
238 F. Supp. 2d 837, 853 (E.D. Tex. 2003)....................................15

*Murdock v. Pennsylvania*,
319 U.S. 105 (1943)................................................................18

*Murillo v. Musegades*,
809 F. Supp. 487 (W.D. Tex. 1992)...............................................15

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)................................................................39

*NAACP v. Button*,
371 U.S. 415 (1963)................................................................38

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)........................................................11, 38, 39

*Narragansett Indian Tribe v. Guilbert*,
934 F.2d 4 (1st Cir.1991).............................................................8

*National Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)................................................................33

*New York State Club Association v. City of New York*,
487 U.S. 1, 11 (1988)................................................................15

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)............................................................11, 17

*Organization for a Better Austin v. Keefe*,
402 U.S. 415 (1971)................................................................28

*Papachristou v. City of Jacksonville*,
405 U.S. 156 (1972)................................................................33

*Perry Education Association v. Perry Local Educators' Association*,
460 U.S. 37 (1983)........................................................16, 17, 25

*Phelps-Roper v. Nixon*,
   __ F.3d __, 2007 WL 4258633 (8th Cir. 2007) ..............................................14

*Planned Parenthood of Central Missouri v. Danforth*,
   428 U.S. 52 (1976)..........................................................................................33

*Police Department of Chicago v. Mosley*,
   408 U.S. 92 (1972)....................................................................................17, 42

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992)........................................................................................41

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
   487 U.S. 781 (1988)........................................................................................38

*Rosenberger v. Rector & Visitors of University of Virginia*,
   515 U.S. 819 (1995)........................................................................................40

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
   102 F.3d 12 (1st Cir.1996)................................................................................8

*Roth v. United States*,
   354 U.S. 476 (1957)........................................................................................11

*Rust v. Sullivan*,
   500 U.S. 173 (1991)........................................................................................10

*Sammartano v. First Judicial District Court*,
   303 F.3d 959 (9th Cir. 2002) ..........................................................................14

*San Antonio Independent School District v. Rodriguez*,
   411 U.S. 1 (1973)............................................................................................42

*Schenck v. Pro-Choice Network of Western New York, Inc.*,
   519 U.S. 357 (1997)................................................................................ *passim*

*Schneider v. State (Town of Irvington)*,
   308 U.S. 147 (1939)..............................................................................17, 18, 26

*Secretary of State of Maryland v. J.H. Munson Co.*,
   467 U.S. 947 (1984)........................................................................................16

*Southeastern Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975)........................................................................................36

*Stanley v. Georgia*,
394 U.S. 557 (1969)...................................................................................28

*Steffel v. Thompson*,
415 U.S. 452 (1974)...................................................................................10

*Sund v. City of Wichita Falls*,
121 F. Supp. 2d 530 (N.D. Tex. 2000) ......................................................15

*Talley v. California*,
362 U.S. 60 (1960).....................................................................................18

*Thornhill v. Alabama*,
310 U.S. 88 (1940).....................................................................................32

*Turner Broadcasting System, Inc. v. FCC*,
512 U.S. 622 (1994).............................................................................40, 41

*United States v. Albertini*,
472 U.S. 675 (1985)...................................................................................19

*United States v. Grace*,
461 U.S. 171 (1983).......................................................................... *passim*

*United States v. O'Brien*,
391 U.S. 367 (1968)...................................................................................37

*United States v. W.T. Grant Co.*,
345 U.S. 629 (1953)...................................................................................26

*University Books and Videos, Inc. v. Metropolitan Dade County*,
33 F. Supp. 2d 1364 (S.D. Fla. 1999) ........................................................15

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982).............................................................................31, 46

*Village of Schaumburg v. Citizens for a Better Environment*,
444 U.S. 620 (1980)...................................................................................32

*Virginia v. American Booksellers Association*,
484 U.S. 383 (1988)...................................................................................16

*Virginia v. Black*,
538 U.S. 343 (2003)...................................................................................17

*Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)..............................................................................................32

*Virginia v. Hicks*,
539 U.S. 113 (2003)........................................................................................16, 32

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989).................................................................................. *passim*

*Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*,
536 U.S. 150 (2002)........................................................................................18, 32

*Widmar v. Vincent*,
454 U.S. 263 (1981)..............................................................................................38

*Williams v. Fears*,
179 U.S. 270 (1900)..............................................................................................33

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)..............................................................................................40

## **Statutes**

18 U.S.C.A. § 248 ...........................................................................................13, 50

Mass. Gen. Laws ch. 265: section 13...........................................................................13

Mass. Gen. Laws ch. 265: section 35...........................................................................13

Mass. Gen. Laws ch. 265: section 43...........................................................................13

Mass. Gen. Laws ch. 266: section 120.................................................................. *passim*

Mass. Gen. Laws ch. 269: section 1............................................................................13

Mass. Gen. Laws ch. 272: section 53...........................................................................13

## **Other Authorities**

Massachusetts Senate Journal, October 23, 2007 .........................................................51

Massachusetts House Journal, October 25, 2007..........................................................51

Restatement (Second) of Torts, §228(1).....................................................................45

William Blackstone, 1 Commentaries on the Laws of England (1765) .........................................33

**INTRODUCTION**

This lawsuit challenges the constitutionality of Mass. Gen. Laws ch. 266: Section 120E1/2(b), as amended (hereafter, "the Act"), which creates a fixed 35-foot buffer zone outside of Massachusetts abortion clinics.  The Act criminalizes speech on public streets and sidewalks outside abortion clinics even when that speech is entirely peaceful, and even when it is welcomed and invited by a willing listener. A law of general applicability creating a fixed buffer of this scope is ***unprecedented*** and casts an ominous pall on fundamental rights and liberties.

Plaintiffs are five Massachusetts residents who have spent a collective 47 years peacefully offering free help, information, and support to women who might otherwise think they have no choice but to have an abortion.  Over the years, Plaintiffs offered help and information to literally thousands of women entering abortion clinics, many of whom eagerly accepted such help and information and, as a result, chose to give birth rather than abort.

The Act is dramatically different and egregiously more restrictive than the carefully tailored buffer zones previously upheld by the Supreme Court and First Circuit.  The Act applies to all speakers—including those who, like Plaintiffs, have spent many years engaging in peaceful speech without incident—and precludes all speech in the zone, even speech to a willing listener who wants to hear about available support and alternatives to abortion.  This is in stark contrast to Supreme Court decisions in which buffer zones (to the extent they were upheld) were directed at specifically-identified individuals, and were justified based on prior failures by the enjoined individuals to obey less restrictive court orders, *see Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) and *Schenck v. Pro-Choice Network of Western New York, Inc.*, 519 U.S. 357 (1997), as well as  statutory buffer zones that restricted speech to only ***unwilling*** listeners but permitted speech to all willing listeners.  *See Hill v. Colorado*, 530 U.S. 703 (2000) and *McGuire*

*v. Reilly*, 260 F.3d 36 (1st Cir. 2001) (hereafter, *McGuire I*).  *See also McGuire v. Reilly*, 386 F.3d 45 (1st Cir. 2004) (hereafter, *McGuire II*).

In upholding the Colorado statute that created a floating buffer zone prohibiting speech to **unwilling** listeners, the Supreme Court emphasized repeatedly that it preserved the speaker's ability to offer leaflets and display signs inside the zone, *Hill*, 530 U.S. at 726-27; to remain in one place inside the zone without giving ground, *id.* at 707, 726-27; to speak to even unwilling listeners from a conversational distance of eight feet, *id.* at 726-27; and to speak without limitation to willing listeners, *id.* at 707-09.  The buffer zones upheld in *Madsen*, *Schenck*, *Hill*, and *McGuire I* and *II*, therefore, were all narrowly-tailored either to particular individuals (*Madsen* and *Schenck*) or to unwanted speech at close distances of eight feet or less (*Hill* and *McGuire*).

In contrast to these narrowly-tailored buffer zones, the Act creates a complete prohibition on peaceful speech[1] within a 35-foot zone on public streets and sidewalks outside abortion clinics.  The Act criminalizes such speech regardless of whether the speaker has ever before broken the law, or the speech is welcomed by a willing recipient.  Gone is the ability to speak from a conversational distance.  Gone is the ability to stand in one place to peacefully speak or hold a sign.  Gone is the ability to offer leaflets near the path of passersby.  Apparently frustrated by a total inability to secure convictions on only a handful of prosecutions brought over a period of seven years for alleged violation of the former buffer law,[2] the Commonwealth simply cast off restraint and abandoned any effort to narrowly tailor its speech restrictions, deciding it was easier to ban from the public way all speech no matter how peaceful or welcomed by its audience.  The

---

[1] *See, e.g.*, Deposition of Police Captain William B. Evans (hereafter, "Captain Evans Depo."), pp. 36, 55, attached hereto as Ex. 1.

[2] *See* Declaration of William Cotter (hereafter, "Cotter Decl."), ¶ 6, attached as Ex. 6 to Motion for Preliminary Injunction.

First Amendment forbids such an approach.  Indeed, speech restrictions like this have ***never*** been deemed constitutional by any state or federal court.

As set forth in more detail below, the Act suffers from a host of maladies, each of which is constitutionally fatal.  The Act is an impermissible time, place, and manner regulation because it is not narrowly-tailored, does not serve a substantial government interest, and does not leave open ample alternative avenues of communication, *infra* at 18-31;  is substantially overbroad, *infra* at 31-35; constitutes an impermissible prior restraint, *infra* at 35-38; infringes free exercise of religion, *infra* at 38-40; is content-based and viewpoint discriminatory in violation of both the First Amendment and the Equal Protection Clause, *infra* at 40-45; is unconstitutionally vague, *infra* at 45-48; and is woefully unsupported and insupportable in light of the legislative history and Massachusetts' total failure to prove that a single person has ***ever*** violated the prior, more limited buffer law, *infra* at 48-54.  For these reasons, the Act is unconstitutional and should be enjoined immediately.

## BACKGROUND

In 2000, the Commonwealth passed the Massachusetts Reproductive Health Care Facilities Act, Mass. Gen. Laws ch. 266, § 120E1/2 (hereafter, "Predecessor Act" or "floating buffer").[3]  The Predecessor Act created a fixed buffer zone within an 18-foot radius around

---

[3] Subsection (b) of the Predecessor Act stated,

(b) No person shall knowingly approach another person or occupied motor vehicle within six feet of such person or vehicle, unless such other person or occupant of the vehicle consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of 18 feet from any entrance door or driveway to a reproductive health care facility or within the area within a rectangle not greater than six feet in width created by extending the outside boundaries of any entrance door or driveway to a reproductive health care facility at a right angle and in straight lines to the point where such lines intersect the sideline of the street in front of such entrance door or driveway. This subsection shall not apply to the following:-

reproductive health care facilities ("facilities" or "RHCFs").  It further created a floating six-foot buffer zone around any person in that 18-foot area. Within that six-foot floating buffer zone it was "impermissible for a person to 'knowingly approach another person . . .' without consent 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling.'"  *See McGuire II*, 386 F.3d at 48 (1st Cir. 2004).

In a constitutional challenge thereto, the federal district court entered a preliminary injunction barring its enforcement on the ground that the floating buffer was facially unconstitutional.  On appeal, the First Circuit vacated the preliminary injunction, concluding that the plaintiffs did not have a likelihood of success on the merits of a facial challenge because the floating buffer was largely patterned after the statute upheld in *Hill v. Colorado*, 530 U.S. 703. *See McGuire I*, 260 F.3d at 36, 51.  In doing so, the First Circuit acknowledged that, "[b]y addressing political speech on public streets and sidewalks, the Act plainly operates at the core of the First Amendment."  *Id.* at 43 (citing *Hague v. CIO*, 307 U.S. 496, 515 (1939)).  The First Circuit remanded the case to the district court for fact-finding to determine whether the floating buffer had been unconstitutionally applied.  The district court entered summary judgment for the defendants after finding no constitutional violations.  The district court's ruling was affirmed by

---

(1) persons entering or leaving such facility;

(2) employees or agents of such facility acting within the scope of their employment;

(3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

*McGuire I*, 260 F.3d at 51, Appendix A.

the First Circuit.  *See McGuire II*, 386 F.3d 45.  The plaintiffs' petition for certiorari was denied. *McGuire v. Reilly*, 544 U.S. 974 (2005).

In 2007, the Massachusetts legislature took action on a new bill, SB 1353, that amended Mass. Gen. Laws ch. 266: Section 120E1/2(b) by repealing the floating buffer and substituting the Act in its place.  Passed as an emergency measure in late October, the Act was signed into law on November 13, 2007 and took effect immediately.  This action followed.

## FACTS

Plaintiffs are pro-life advocates motivated to oppose the practice of abortion because of their religious and/or moral beliefs.  *See* Declarations of Eleanor McCullen, ¶ 4; Jean Blackburn Zarrella, ¶ 3; Carmel Farrell, ¶ 3; Eric Cadin ¶ 4; and Gregory A. Smith, ¶ 3; all of which are attached to Motion for Preliminary Injunction (hereafter, "Motion") as Exhibits 1-5, respectively. Plaintiffs regularly travel to the public ways adjacent to reproductive health care facilities in Massachusetts to peacefully provide information about abortion alternatives and to offer assistance and support to persons entering and/or exiting the facility.  McCullen Decl., ¶¶ 7-16; Zarrella Decl., ¶¶ 4, 7-11; Farrell Decl., ¶¶ 6-11; Cadin Decl., ¶¶ 7-11.  As part of their ministry and/or peaceful pro-life advocacy, Plaintiffs offer secular and/or religious literature to persons approaching reproductive health care facilities (hereinafter "clinic clients") to educate and inform clinic clients and others that alternatives to abortion are available, such as adoption and other means of support, including financial and/or emotional support. McCullen Decl., ¶¶ 11, 15; Zarrella Decl., ¶¶ 10-12; Farrell Decl., ¶¶ 6-7; Cadin Decl., ¶¶ 10-12.  In addition to distributing literature, Plaintiffs engage in other peaceful expressive activities including religious artifact display, oral advocacy, counseling, singing, worship, and/or prayer.  McCullen Decl., ¶¶ 7, 11-16; Zarrella Decl., ¶¶ 7, 11-13; Farrell Decl., ¶¶ 6-7; Smith Decl., ¶ 6; Cadin Decl., ¶¶ 7, 10-13.

5

Plaintiffs Farrell and Smith often pray the Rosary with others to more effectively communicate their message.  Farrell Decl., ¶ 11; Smith Decl., ¶¶ 6-11.

Plaintiffs desire to orally communicate with clinic clients and passersby from a distance in which they can speak in a normal conversational tone and make eye contact.  McCullen Decl., ¶ 16; Zarrella Decl., ¶ 10; Farrell Decl., ¶ 7; Cadin Decl., ¶¶ 10, 12.  Because in most instances they cannot identify clinic clients until they actually approach the reproductive health care facility, Plaintiffs and other pro-life advocates must station themselves on the public ways near the path of pedestrians and in close proximity to facility entrances and driveways in order to effectively provide information.  McCullen Decl., ¶¶ 15, 27; Zarrella Decl., ¶¶ 12, 21; Cadin Decl., ¶¶ 12, 20.  On many occasions, clinic clients and/or their companions willingly received oral communications and written materials.  McCullen Decl., ¶¶ 11, 13-15; Zarrella Decl., ¶¶ 4, 10; Farrell Decl., ¶ 7; Cadin Decl., ¶ 12.

Plaintiffs and other pro-life advocates often encounter opposition from pro-choice advocates who surround, yell, make noise, chatter, and/or talk loudly to clinic clients for the purpose of disrupting or drowning out pro-life speech.  McCullen Decl., ¶¶ 24-25; Zarrella Decl., ¶¶ 18-19; Cadin Decl., ¶¶ 17-18.  When this happens, pro-life advocates cannot be heard unless they are in close proximity to their intended audience. McCullen Decl., ¶ 26; Zarrella Decl., ¶ 20; Cadin Decl., ¶ 19.

On or about November 14, 2007, a sign was posted and a line was drawn in yellow paint in a 35-foot radius around the entrances to Allston-Brighton Planned Parenthood, 1055 Commonwealth Avenue, Boston, which is located at the corner of Commonwealth Avenue and Alcorn Street (hereafter, "Allston-Brighton Planned Parenthood").  McCullen Decl., ¶ 10; Cadin Decl., ¶ 9.  The marked zone covers all but 12 inches of the public sidewalk directly in front of

6

the facility and adjacent to Commonwealth Avenue. *Id.* The zone extends approximately 6 feet into Alcorn Street parallel to Commonwealth Avenue and approximately 12 feet around the corner down Alcorn Street. *Id.* In addition, there is a 35-foot zone marked around the rear entrance to the facility. Cadin Decl., ¶ 9. The rear zone encompasses nearly the entire street (Gardner Street) adjacent to the rear entrance. *Id.* The zones prevent Plaintiffs from effectively providing information to their intended audience. McCullen Decl., ¶¶ 18-21, 26-27; Zarrella Decl., ¶¶ 15-17, 20-21; Cadin Decl., ¶¶ 15, 19-20.

Sometimes Plaintiffs must stand or walk in the street in order to avoid transgressing the zone. McCullen Decl., ¶¶ 22-23; Cadin Decl., ¶ 16. In several instances, Plaintiff McCullen was almost struck by vehicles entering Alcorn Street as she stood just outside the zone. McCullen Decl., ¶ 23. Plaintiff Cadin, too, was almost struck. Cadin Decl., ¶ 16. Cadin also witnessed other instances in which people nearly were struck by vehicles turning onto Alcorn Street. *Id.*

Immediately after significant snow accumulations, the streets adjacent to Allston-Brighton Planned Parenthood are plowed. McCullen Decl., ¶ 29. The snow is pushed to the side of the street next to the public sidewalk creating large snow banks. *Id.* The snow, ice, and slush make it extremely difficult to maneuver around the zone and also create a serious safety hazard. McCullen Decl., ¶¶ 29-30.

On or after December 7, 2007, a zone was marked in a 35-foot radius around the two driveways of the office building housing Women's Health Service, 822 Boylston Street, Brookline (hereafter, "Women's Health Service"). Farrell Decl., ¶ 8. The zone encompasses the entire public sidewalk within 35 feet of the edge of each driveway as well as most of Reservoir Road directly in front of the driveways. *Id.* On December 27, 2007, Plaintiff Farrell called Lt. McDermott of the Brookline Police Department and pointedly asked whether she would be

subject to arrest if she engaged in pro-life activities inside the zone.  Farrell Decl., ¶ 15.  Lt. McDermott responded by saying, "You have ample room where you are.  I wouldn't push it if I were you."  *Id.*  Farrell understood Lt. McDermott's response as meaning she would be subject to arrest if she engaged in pro-life activities inside the marked zone.  *Id.*  The marked zone at this location bars Farrell from standing or walking within 35 feet of the outer edge of the driveways and, consequently, makes it impossible for her to stand on the sidewalk next to the driveway where she can effectively proffer literature.  *Id.*, ¶ 16.  The zone prevents her from providing literature to persons entering or exiting the driveway and from speaking in a normal conversational tone to persons entering or exiting the driveway.  *Id.*

Plaintiffs desire to engage in oral communications, literature distribution, religious artifact display, and prayer inside the zone but have refrained, and will continue to refrain, from doing so out of fear they will be arrested so long as the buffer zone law is in effect. McCullen Decl., ¶ 31; Zarrella Decl., ¶ 24; Farrell Decl., ¶ 17; Cadin Decl., ¶ 23; Smith Decl., ¶ 15.

## ARGUMENT

## I.      PLAINTIFFS ARE ENTITLED TO PRELIMINARY RELIEF.

Plaintiffs are entitled to preliminary injunctive relief if they show: (1) a substantial likelihood of success on the merits; (2) a significant potential for irreparable harm in the absence of immediate relief; (3) that the ebb and flow of possible hardships are in favorable juxtaposition (i.e., that the issuance of an injunction will not impose more of a burden on the nonmovant than its absence will impose on the movant); and (4) that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest. *McGuire I*, 260 F.3d at 42 (citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991)).  *See also Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004).  As shown below, Plaintiffs easily meet this standard.

**A.      Likelihood of Success on the Merits.**

To determine the likelihood of success on the merits, the Court looks to the substantive law.  *See, e.g.*, *McGuire I*, 260 F.3d at 42-51; *Bl(a)ck Tea Soc'y*, 378 F.3d at 11-15. The substantive law in this case is found in the Bill of Rights and federal case law.  As will be shown in Sections II and III below, Plaintiffs have a substantial likelihood of success on the merits.

**B.      Plaintiffs Face Irreparable Harm.**

Plaintiffs provide information and counseling to persons entering or passing by reproductive health care facilities that provide abortions. *See supra*, pp. 5-7.  Their ability to communicate with their intended audience has been severely restricted and even nullified by the Act.  *See id.*  "A burden on protected speech always causes some degree of irreparable harm." *Bl(a)ck Tea Soc'y*, 378 F.3d at 15 (citing *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) ("the loss of First Amendment rights for even minimal periods of time unquestionably constitutes irreparable harm").  "Without question, the right to free speech includes the right to timely speech on matters of current importance."  *In re Perry*, 859 F.2d 1043, 1047 (1st Cir. 1988). Every day human lives are lost to abortion, making each day that passes in which Plaintiffs are denied the right to free speech additional irreparable harm.  *See id.* at 1047 (citing *In re Halkin*, 598 F.2d 176 (D.C. Cir. 1979)).  If the 8-foot floating buffer analyzed in *Hill* "unquestionably lessened" the "ability to communicate effectively with persons in the regulated zones," 530 U.S. at 715, the 35-foot fixed buffer at issue here is much more burdensome and grievous.

The public sidewalks and streets immediately outside abortion clinics are the last opportunity for men and women to receive information and counseling before an abortion is performed. "Nowhere is the speech more important than at the time and place where the [abortion] is about to occur."  *Hill*, 530 U.S. at 788 (Kennedy, J., dissenting). *See also id.* (the

"zone in which young women enter a building is not just the last place where the message can be communicated. It likely is the only place."). When intended actions have immediate, permanent, and irrevocable consequences relating to life and death, it is crucial that information relevant thereto be timely proffered and received at the last line of defense. This is especially true when the timely receipt of relevant information about abortion and abortion alternatives has the potential to avert a lifetime of pain and regret. *See* Declarations of Esther Ripplinger, Sherri Lewellyn, Molly White, Marlynda Augelli, Magdalena Sam Castro, and Susanna Brennan, attached to Motion as Exhibits 7-12, respectively. Thus, not only Plaintiffs but women contemplating abortion face irreparable harm because their right to receive information is infringed by the Act. *See Rust v. Sullivan*, 500 U.S. 173, 203 (1991) (noting that women have the "right to receive information concerning abortion and abortion-related services").

The irreparable harm facing Plaintiffs is plain: the Act is in effect and Plaintiffs are forbidden to enter the zone on pain of criminal sanctions, including incarceration. *See* Gen. L. chapter 266: Section 120E1/2(d). The chilling effect is actual and concrete.[4] Plaintiffs desire and have desired to engage in constitutionally protected activities in locations prohibited by the Act. *See supra*, p. 8. **The irreparable harm here is not merely *potential* but *real and substantial, actual and immediate*.** Plaintiffs thus satisfy the irreparable injury prong of the *McGuire I* test.

### C. The Threatened Harm to Plaintiffs is Greater than any Potential Harm to Defendants that may Result from an Injunction.

The balance of harm prong of the *McGuire I* test also weighs in Plaintiffs' favor. First, Plaintiffs' speech activities are entitled to the highest level of constitutional protection, e.g.,

---

[4] A chill on free speech occasioned by a reasonable fear of arrest and/or a reasonable likelihood of prosecution confers standing to sue. *See Steffel v. Thompson,* 415 U.S. 452, 475 (1974); *McGuire II*, 386 F. 3d at 59; *Mangual v. Rotger-Sabat*, 317 F.3d 45, 56-60 (1st Cir. 2003).

"speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)).  *See also Carey v. Brown*, 447 U.S. 455, 467 (1980).  "The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Connick*, 461 U.S. at 145 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957) and *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964)).  "'[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.'" *Connick*, 461 U.S. at 145 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)).  That is why our constitutional system embraces a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co.*, 376 U.S. at 270.  The Act thus poses grave harm, not only to Plaintiffs, but to all citizens who wish to utilize the public forums placed off-limits by the Act.

Second, Plaintiffs desire and intend only to peacefully exercise their right to free speech on the public ways.  *See supra*, pp. 5-6.  Streets and sidewalks are "quintessential" public forums for speech.  *See, e.g.*, *Frisby v. Schultz*, 487 U.S. 474, 481 (1988); *United States v. Grace*, 461 U.S. 171, 179 (1983) ("Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities, and are clearly within those areas of public property that may be considered, generally without inquiry, to be public forum property"); *Carey*, 447 U.S. at 460 (same).  "[T]ime out of mind," such locations have been used for "assembly, communicating thoughts between citizens, and discussing public questions."  *Boos v. Barry*, 485 U.S. 312, 318 (1988); *Hague*, 307 U.S. at 515 ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the

public . . . [and have], from ancient times, been a part of the privileges, immunities, rights and liberties of citizens").

Third, "[s]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." *Carey*, 447 U.S. at 460 (citation omitted). The Supreme Court has been clear that a public forum occupies "a 'special position in terms of First Amendment protection'" and "the government's ability to restrict expressive activities [in it] 'is very limited.'" *Boos*, 485 U.S. at 318 (quoting *Grace*, 461 U.S. at 180, 177). "It goes without saying that 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Grayned v. City of Rockford*, 408 U.S. 104, 119 n.40 (1972) (citation omitted).

Finally, the First Amendment protects the right of every citizen to "'reach the minds of willing listeners and to do so there must be opportunity to win their attention.'" *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) (quoting *Kovacs v. Cooper*, 336 U.S. 77, 87 (1949)). In *Hill v. Colorado*, the Supreme Court characterized as a potentially "serious" burden an 8-foot interval placed on the ability to distribute handbills "to some unwilling recipients." 530 U.S. at 727. The Court left the provision intact after concluding the statute did not prevent a leafleter from standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians could easily accept. *Id.* at 727-28. Such is not the case here because, unlike the Colorado statute, the Act prevents Plaintiffs and most third parties from stationing themselves inside the zone near the path of pedestrians. The Act also prevents Plaintiffs from speaking to their intended audience from a normal conversational

distance, another aspect of protected speech emphasized in *Hill*.  530 U.S. at 726-27.  These very serious constitutional violations are ongoing and cannot be remedied without an injunction.

As demonstrated *supra*, the deprivation and chill on Plaintiffs' federally protected rights **unquestionably** constitutes irreparable harm.  *See Elrod*, 427 U.S. at 373-74.  On the other hand, the Commonwealth will suffer no substantial harm if the Act is enjoined because it still will possess the means to protect its legitimate interests in peace and public safety.  For example, Mass. Gen. Laws ch. 266: Section 120E1/2(e) makes it unlawful to obstruct, detain, hinder, impede or block another person's entry to or exit from a reproductive health care facility.  Plaintiffs do not challenge this subsection.  *See* Complaint, ¶ 15.  Similarly, the Freedom of Access to Clinic Entrances Act, 18 U.S.C.A. § 248, makes it unlawful to, by force or threat of force or by physical obstruction, intentionally injure, intimidate or interfere with or attempt to injure, intimidate or interfere with any person obtaining or providing reproductive health services, or to damage or destroy the property of a reproductive health care facility.  *See id*.

Several other state statutes, too, serve to protect the State's legitimate interests in managing or eliminating unruly public conduct by criminalizing behavior such as unlawful assembly (chapter 269: Section 1); breach of the peace and disorderly conduct (chapter 272: Section 53); assault or battery (chapter 265: Section 13A -13K); throwing or dropping objects on the public way (chapter 265: Section 35); stalking (chapter 265: Section 43); criminal harassment (chapter 265: Section 43A); and obstructing entry to or departure from medical facilities (chapter 266: Section 120E).  The combination of these and other laws will adequately protect, not only the peaceful sidewalk travel of pedestrians, but also women seeking reproductive health services.  Moreover, the peaceful exercise of First Amendment rights in quintessential public forums can **never** harm the State's **legitimate** interests.

The Commonwealth's ill-advised decision to revamp and significantly broaden the buffer zone is particularly unwarranted because, despite a regular police presence and constant videotaping in the seven years since the floating buffer zone upheld in *McGuire* took effect, the Commonwealth has literally ***never*** proven that a single person has made a single unwanted speaking approach outside of an abortion clinic. *See supra* at 3. For the foregoing reasons the State will not be unduly burdened by issuance of a preliminary injunction. Thus, the balance of hardship weighs decisively in Plaintiffs' favor.

### D.     Entry of a Preliminary Injunction Will Serve the Public Interest.

Given the irreparable injury Plaintiffs already have suffered and continue to suffer compared with the lack of any substantive harm to the Commonwealth, the public interest will be served by issuance of a preliminary injunction. "[F]reedom of expression, especially freedom of political expression, is vital to the health of our democracy." *Bl(a)ck Tea Soc'y*, 378 F.3d at 15. For this reason, "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) (citing *Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001)). *See also Phelps-Roper v. Nixon*, __ F.3d __, 2007 WL 4258633 at *2 (8th Cir. 2007) ("it is always in the public interest to protect constitutional rights"); *Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) ("the public interest, as reflected in the principles of the First Amendment, is served by free expression on issues of public concern"); *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) ("the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties"); *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("it is always in the public interest to

prevent the violation of a party's constitutional rights"); *Moore v. City of Van*, 238 F. Supp. 2d 837, 853 (E.D. Tex. 2003) ("It is in the public's interest to protect rights guaranteed under the Constitution"); *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 554 (N.D. Tex. 2000) ("The public simply has no interest in effectuating an unconstitutional law"); *Univ. Books and Videos, Inc. v. Metro. Dade County*, 33 F. Supp. 2d 1364, 1374 and n.4 (S.D. Fla. 1999) ("public interest always is served when constitutional rights, especially free speech, are vindicated"); *Murillo v. Musegades*, 809 F. Supp. 487, 497-98 (W.D. Tex. 1992) ("The public interest will be served by protection of plaintiffs' constitutional rights").

Plaintiffs satisfy all four prongs of the test set forth in *McGuire I* and *Bl(a)ck Tea Society*. Thus, they are entitled to preliminary injunctive relief.

## II.    THE ACT IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED.

Facial challenges to regulations are permissible where speech protected by the First Amendment is at stake.  *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 11 (1988). "There are two quite different ways in which a statute or ordinance may be considered invalid 'on its face' – either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'"  *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984). Plaintiffs challenge the Act on both grounds.  A law that fails the time, place, and manner test on its face is unconstitutional.  *See*, *e.g.*, *Hill*, 530 U.S. at 725-30*; Ward v. Rock Against Racism*, 491 U.S. 781, 791, 797-803 (1989); *Frisby*, 487 U.S. at 485-88; *Grace*, 461 U.S. 176-84; and *Heffron*, 452 U.S. at 647-48.

A law is overbroad where it "sweeps within [it] . . . what may not be punished under the First and Fourteenth Amendments."  *Grayned*, 408 U.S. 114-15.  "The [overbreadth] doctrine is

15

predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear of criminal sanctions." *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989). In "the First Amendment context, litigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (citing *Sec'y of State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 956-57 (1984)). Indeed, the "danger of [the] statute is in large measure, one of self-censorship; a harm that can be realized without an actual prosecution." *Am. Booksellers*, 484 U.S. at 393.

Where, as here, the law is challenged both on overbreadth and vagueness grounds, the Court must make a preliminary inquiry about the statute's effect on constitutionally protected activity. To mount a successful facial overbreadth challenge requires that "the overbreadth of a statute . . . not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). *See also Virginia v. Hicks*, 539 U.S. 113, 119 (2003). Similarly, in a facial vagueness challenge the litigant must show that the potential chilling effect on protected expression is "both real and substantial." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). As shown below, the overbreadth and vagueness of the Act are both real and substantial.

### A.     The Act Targets Traditional Public Forums.

As a threshold matter, the Act operates only in and upon public streets and sidewalks, areas that "'have immemorially been held in trust for the use of the public.'" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague*, 307 U.S. at 515). *See*

*also Grace*, 461 U.S. at 179-80 (holding that sidewalks adjacent to United States Supreme Court are traditional public forums); *Carey*, 447 U.S. at 460 (residential streets and sidewalks are traditional public forums); *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941).  "[Government] authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated."  *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 160 (1939).  Of course, the state must also permit its citizens to use streets and sidewalks "to impart information through speech or the distribution of literature," for these are "fundamental personal rights and liberties" that lie "at the foundation of free government by free men."  *Id*. at 160-61.  Therefore, "[i]n such places, the government's ability to permissibly restrict expressive conduct is very limited."  *Grace*, 461 U.S. at 177.  *See also Perry*, 460 U.S. at 45 (The "rights of the state to limit expressive activity" in traditional public forums "are sharply circumscribed.")   "In these quintessential public forums, the government may not prohibit all communicative activity."  *Perry*, 460 U.S. at 45.

**B.    The Act Infringes Speech at the Core of the First Amendment.**

"The First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'"  *Boos*, 485 U.S. at 318 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. at 270).  The First Amendment is applicable to the States through the Fourteenth Amendment.  *Virginia v. Black*, 538 U.S. 343, 358 (2003).  "The right to free speech, of course, includes the right to attempt to persuade others to change their views."  *Hill*, 530 U.S. at 716.  Peaceful  displays likewise are constitutionally protected.  *See Boos*, 485 U.S. at 318; *Carey*, 447 U.S., at 467; *Grace*, 461 U.S. 171; *Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972).

Like picketing and oral communications, "[p]amphleteering and the distribution of literature constitute expressive activity protected by the First Amendment." *Int'l Caucus of Labor Comms. v. City of Montgomery*, 111 F.3d 1548, 1550 (11th Cir. 1997) (citing *Talley v. California*, 362 U.S. 60, 63-64 (1960); *Grace*, 461 U.S. at 176-77; *Schneider*, 308 U.S. at 162; and *Lovell v. Griffin*, 303 U.S. 444 (1938)). This includes distribution of religious literature:

> "[H]and distribution of religious tracts is an age-old form of missionary evangelism-as old as the history of printing presses. It has been a potent force in various religious movements down through the years . . . . This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits. It has the same claim to protection as the more orthodox and conventional exercises of religion. It also has the same claim as the others to the guarantees of freedom of speech and freedom of the press."

*Watchtower Bible and Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 161-62 (2002) (quoting *Murdock v. Pennsylvania*, 319 U.S. 105, 108-09 (1943)). Finally, the First Circuit has already concluded that, "[b]y addressing political speech on public streets and sidewalks, [the Act] plainly operates at the core of the First Amendment." *McGuire I*, 260 F.3d at 43 (citing *Hague*, 307 U.S. at 515). *See also Hill*, 530 U.S. at 715 ("leafletting, sign displays, and oral communications are protected by the First Amendment"). There is no question, then, that First Amendment rights are impacted by the Act.

### C. The Act Flunks the Time, Place, and Manner Test.

#### 1. The legal standard.

"Reasonable restrictions as to the time, place, and manner of speech in public fora are permissible, provided that those restrictions 'are justified without reference to the content of the regulated speech, . . . are narrowly-tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information.'" *Bl(a)ck Tea Soc'y*, 378 F.3d at 12 (quoting *Ward*, 491 U.S. at 791). "[T]he requirement of narrow tailoring is

satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). "To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799. "A [regulation] is narrowly-tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485 (citing *Taxpayers for Vincent*, 466 U.S. at 808-10). *See also Ward*, 491 U.S. at 800 n.7 ("the essence of narrow tailoring . . . focuses on the source of the evils the [government] seeks to eliminate . . . and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils"). "A complete ban can be narrowly-tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Frisby*, 487 U.S. at 485.

The burden is on government to bring forth facts proving the regulation restricts no more speech than necessary. *See Casey v. City of Newport*, 308 F.3d 106, 115 (1st Cir. 2002) (citing *Ward*, 491 U.S. at 802). Further, where, as here, the regulation bans an entire mode of communication, the First Circuit requires the government to bear the burden of demonstrating why less restrictive alternatives are inadequate. *Id*. This is particularly true where existing laws are sufficient to meet the government's concerns. *Id*. The state cannot meet its burden here.

2. **Analysis of buffer zone cases.**

a. *Madsen v. Women's Health Center*

The first two instances in which the United States Supreme Court analyzed buffer zones at abortion clinics concerned injunctions. In 1994, in *Madsen v. Women's Health Center*, the Court upheld a state-court issued injunction that created a 36-foot buffer zone on the public ways surrounding an abortion clinic. 512 U.S. at 776. The large buffer area was crafted by a state court after its effort to tailor a narrower injunction proved futile and the court "seemed to have few other options to protect access given the narrow confines around the clinic." *Id.* at 758-59, 769. Importantly, the injunction was limited to a single clinic. *Id.* at 757-58. The injunction was designed to prevent further violations of court orders on a record of repeated and egregious lawless conduct where the "number of people congregating varied from a handful to 400," *id.* at 758, and "repeatedly had interfered with the free access of patients and staff." *Id.* at 769. However, the Court struck down that portion of the buffer that extended to private property, stating, "absent evidence that petitioners standing on the private property have obstructed access to the clinic, blocked vehicular traffic, or otherwise unlawfully interfered with the clinic's operation, this portion of the buffer zone fails to serve the significant government interests." *Id.* at 771. The Court went on to say, "[w]e hold that on the record before us the 36-foot buffer zone as applied to the private property to the north and west of the clinic burdens more speech than necessary to protect access to the clinic." *Id.*

b. *Schenck v. Pro-Choice Network, Inc.*

The next case, decided in 1997, was *Schenck*, 519 U.S. 357, another injunction. Prior to entry of the injunction, four medical clinics were subjected to "numerous large-scale blockades in which protestors would march, stand, kneel, sit, or lie in parking lot driveways and in

doorways." *Id.* at 362.  "Protesters trespassed onto clinic parking lots and even entered the clinics themselves, crowded around cars or milled around doorways and driveway entrances in an effort to block or hinder access to the clinics." *Id.* at 362-63.  "Protesters sometimes threw themselves on top of the hoods of cars or crowded around cars as they attempted to turn into parking lot driveways." *Id.* at 363.  "Sometimes protesters used more aggressive techniques, with varying levels of belligerence: getting very close to women entering the clinics and shouting in their faces; surrounding, crowding, and yelling at women entering the clinics; or jostling, grabbing, pushing, and shoving women as they attempted to enter the clinics." *Id.*  "Male and female clinic volunteers who attempted to escort patients past protesters into the clinics were sometimes elbowed, grabbed, or spit on." *Id.* "Sometimes the escorts pushed back." *Id.*  "Some protesters remained in the doorways after the patients had entered the clinics, blocking others from entering and exiting." *Id.*  The size of the protests overwhelmed police resources, and the protestors often would leave before police came and return after they left. *Id.*  The district entered a TRO and, finding that the TRO was ineffective, entered a broader injunction after 12 days of testimony. *Id.* at 364-68.

Finding that "*Madsen* bears many similarities to this case," the Court applied the reasoning and holding of *Madsen*.  *Schenck*, 519 U.S. at 371, 376.  Noting that, like *Madsen*, the lawless conduct contained in the record was "extraordinary," *id.* at 382, the Court opined:

> As in *Madsen*, the record shows that protesters **purposefully or effectively blocked or hindered people from entering and exiting the clinic doorways, from driving up to and away from clinic entrances, and from driving in and out of clinic parking lots. Based on this conduct**--both before and after the TRO issued--the **District Court was entitled to conclude that the only way to ensure access was to move back the demonstrations away from the driveways and parking lot entrances.** Similarly, sidewalk counselors--both before and after the TRO--followed and crowded people right up to the doorways of the clinics (and sometimes beyond) and then tended to stay in the doorways, shouting at the individuals who had managed to get inside. In addition, as the

21

District Court found, defendants' harassment of the local police made it far from certain that the police would be able to quickly and effectively counteract protesters who blocked doorways or threatened the safety of entering patients and employees. **Based on this conduct**, the District Court was entitled to conclude that protesters who were allowed close to the entrances would continue right up to the entrance, and **that the only way to ensure access was to move *all* protesters away from the doorways.** Although one might quibble about whether 15 feet is too great or too small a distance if the goal is to ensure access, we defer to the District Court's reasonable assessment of the number of feet necessary to keep the entrances clear. See *Madsen*, 512 U.S., at 769-770, ("[S]ome deference must be given to the state court's familiarity with the facts and the background of the dispute between the parties even under our heightened review").

*Schenck*, 519 U.S. at 380-81 (italics in the original) (bold and underline added).

Although it upheld the fixed buffer, **the Court struck down a 15-foot floating buffer on the ground that it prevented speakers from communicating at a normal conversational distance and handing leaflets to people entering or leaving the clinic**. *Id.* at 377. "This is a broad prohibition, both because of the type of speech that is restricted and the nature of the location. Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum." *Id.* (citing *Boos*, 485 U.S. at 322; *Grace*, 461 U.S. at 180).

### c.     *Hill v. Colorado*

Seven years ago, in *Hill v. Colorado*, the Supreme Court considered a law of general applicability regulating the location of free speech on public streets and sidewalks outside of health care facilities. In *Hill*, the Court framed the issue as "whether the First Amendment rights of the speaker are abridged by the protection the statute provides for the **unwilling** listener." 530 U.S. at 708 (emphasis added). The Court analyzed the statute to determine whether it reflected "an acceptable balance between the constitutionally protected rights of **law-abiding speakers**

and the interests of **unwilling listeners**" by examining "the competing interests at stake." *Id*. at 714 (emphasis added).

In upholding the statute, the Court concluded it was narrowly-tailored to restrict only unwanted speaking approaches. *Id*. at 707-08, 727-28.  In doing so the Court emphasized the following factors: **the law applied to all speakers**, regardless of their position on abortion, *id*. at 708, 723-24; the law applied outside of all facilities where incoming patients might be upset by unwanted approaches, rather than just a subset of those facilities, *id*. at 715, 728-29; **the law clearly distinguished between unwanted speech--which was limited--and speech to willing listeners, which remained unlimited**, *id*. at 707-09; **the law allowed even unwanted speech to occur inside the zone from the still-conversational distance of 8 feet,** *id*. at 726-27 (citing *Schenck*, 519 U.S. at 377)**;  the law permitted a speaker to stand still inside the zone and speak without restriction**, *id*. at 727; and **the law permitted a speaker to stand still inside the zone and display signs and/or offer leaflets and handbills**, *id*. at 726-27. Citing all of these aspects, the Supreme Court found it to be a neutral, narrowly-tailored restriction **on only unwanted speech**.

### d.    Other buffer cases.

Shortly after the High Court's decision in *Hill*, Massachusetts adopted the Predecessor Act – a similar limitation on ***unwanted*** speaking approaches.  That act was upheld by the First Circuit in *McGuire I and II*.  Noting that the act was patterned after the statute upheld in *Hill*, the *McGuire* court emphasized the speech restrictions only limited speakers from approaching un-consenting listeners and neither prevented speakers from holding their ground nor required them to retreat from passersby. *McGuire I*, 260 F.3d at 41, 40, 46.  The First Circuit described the Predecessor Act as "less commodious" than the statute upheld in *Hill*. *Id*. at 49.

Plaintiffs are aware of only one law of general applicability subsequent to *Hill* that created a fixed buffer of more than 15 feet around health care facilities. That law, adopted by the City of West Palm Beach, Florida, created a 20-foot fixed buffer zone on the public ways around health care facilities. Relying upon *Hill*, *Schenck*, *Madsen*, *Frisby*, and *Ward*, the Federal District Court for the Southern District of Florida preliminarily enjoined its enforcement.[5] *See* Order, *Katrina Halfpap, et al. v. City of West Palm Beach, Florida*, No. CV-05-80900 (S.D. Fla. filed on April 11, 2006), attached hereto as Ex. 2. A pre-*Hill* law that prohibited only *demonstrations* within an 8-foot fixed buffer zone was upheld by the Ninth Circuit on the ground it complied with the requirements laid down in *Schenck*. *See Edwards v. City of Santa Barbara*, 150 F.3d 1215, 1216 (9th Cir. 1998).

The foregoing cases teach that buffer zones around health care facilities are permissible so long as they allow speakers to speak from a conversational distance, *i.e.*, no more than 15 feet; allow leafleters to stand near the path of passersby so they can place their leaflets near the hands of both willing and unwilling recipients; permit speakers and leafleters to stand stationary within the zone without having to give ground; treat all speakers alike regardless of viewpoint; and are not so restrictive that they prevent speakers from winning the attention and reaching the minds of their intended audience.

### 3. The Act fails the *Ward* time, place, and manner test.

#### a. The Act is unconstitutional on its face.

Setting the framework for analyzing the Act, it is important to keep in mind several guiding precepts. First, "[s]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the

---

[5] The preliminary injunction remains intact. The plaintiffs are awaiting the court's ruling on their motion for summary judgment filed in May, 2007.

purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." *Carey*, 447 U.S. at 460 (citation omitted). *See also Frisby*, 487 U.S. at 486 ("in traditional public forum, 'the government may not prohibit all communicative activity'") (quoting *Perry*, 460 U.S. at 45). Second, public forums occupy "a 'special position in terms of First Amendment protection'" and "the government's ability to restrict expressive activities [in them] 'is very limited.'" *Boos*, 485 U.S. at 318 (quoting *Grace*, 461 U.S. at 180). Third, "[i]t goes without saying that 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place'" *Grayned*, 408 U.S. at 119 n.40. Fourth, the regulations must not be so restrictive that they prevent speakers from winning the attention and reaching the minds of listeners. *Hill*, 530 U.S. at 728. Finally, the Act must be analyzed with an eye toward determining whether it constitutes "an acceptable balance between the constitutionally protected rights of law-abiding speakers" and the persons it seeks to safeguard by examining "the competing interests at stake." *Hill*, 530 U.S. at 714.

Applying these precepts, the Act fails the time, place, and manner test because it punishes expressive conduct that cannot be punished. *See Taxpayers for Vincent*, 466 U.S. at 796. First, the Supreme Court already has concluded that the First Amendment protects the right of speakers to communicate with their intended audience from a normal conversational distance, **and distances of 15 feet or more, as a matter of law, do not allow for normal conversation.** *Hill*, 530 U.S. at 726-27; *Schenck*, 519 U.S. at 377. The Act places speakers as much as 35 feet away from their intended audience. This fact alone renders the Act facially unconstitutional. Even injunctions, which are designed to prevent an adjudicated wrongdoer from repeating the wrongful conduct, must be narrowly-tailored so as not to unnecessarily infringe First

Amendment rights.[6]  *See Schenck*, 519 U.S. at 377-79 (striking down injunction imposing 15-foot floating buffer because it "burden[ed] more speech than is necessary to serve the relevant governmental interests," and excluded communications from a "normal conversational distance").  The Act is a law of general applicability, not an injunction.  It applies to the public at large, and not only to adjudicated wrongdoers enjoined from future wrongful conduct.

Moreover, it is virtually impossible for some persons standing on one side of the zone to walk around the zone to speak or handbill to persons coming toward the clinic from the opposite side.  Plaintiff McCullen, for example, has degenerative arthritis in her left knee that extremely limits her mobility and prevents her from quickly walking around the zone at the Allston-Brighton Planned Parenthood.  McCullen Decl., ¶¶ 3, 18-21.  Plaintiff Zarrella is 81 years old and, while in good health, still finds it difficult to maneuver around the zone at Allston-Brighton Planned Parenthood.  Zarrella Decl., ¶¶ 2, 15-16.  These two examples demonstrate how the Act not only severely burdens speech but often makes it impossible to reach the intended audience.

Second, it is axiomatic that leafletting and solicitation cannot be completely banned from public places.  *See, e.g.*, *Madsen*, 512 U.S. at 769; *Frisby*, 487 U.S. at 486; and *Schneider*, 308 U.S. at 162-163.  *Hill* recognized that an 8-foot floating buffer was a hindrance to leafleters but concluded the hindrance was sufficiently mitigated because the statute permitted leafleters to

---

[6] The injunctions in *Madsen* and *Schenck* were upheld in light of the respective court records, which demonstrated "extraordinary" and "pervasive" lawless conduct.  *See Madsen*, 512 U.S. at 763; *Schenck*, 519 U.S. at 362-67, 369.  "'[A]n injunction issues only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law, and that there is a "cognizable danger of recurrent violation.'" *Madsen*, 512 U.S. at 766 n.3 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).  Unlike laws of general applicability, injunctions may curtail a greater amount of First Amendment activity because they are designed to remedy prior unlawful conduct.  Put another way, a repeat offender forfeits a portion of his liberty through his own misconduct.

station themselves inside the buffer zone near the path of passersby.  530 U.S. at 727.  Likewise, the *McGuire II* court found that "[t]he challenged statute permits speech or conduct within the six-foot zone so long as it is consented to by the person approached."  386 F.3d at 49.  The Act challenged here, on the other hand, does not permit leafleters to stand stationary inside the zone and exiles them to places up to 35 feet away from their intended recipients, thus making it impossible to proffer literature in close proximity to passersby.

For example, there are reproductive health care facilities in Massachusetts that are located in office buildings, such as Women's Health Service.  *See* Farrell Decl., ¶ 6.  In such instances clinic clients drive their cars into the office parking lot, park, and enter the building without walking on or near the public sidewalk.  *Id.*, ¶ 9.  Consequently, the only opportunity to orally counsel or proffer leaflets to these individuals is when they pull off the street into the driveway.  *Id.*, ¶¶ 9, 16.  Plaintiffs and others cannot possibly do this from a distance of 35 feet.  Thus, in those instances where facilities are located in office buildings or office parks, the Act **effectuates a total ban on oral communications and leafletting.**

Applying the reasoning and holdings of *Hill* and *Schenck* to the foregoing, the Act, as a matter of law, does not permit speakers and leafleters to win the attention and reach the minds of their audience.  Moreover, the increase in distance between the Predecessor Act and the Act challenged here is as much as 29 feet, **nearly a six-fold increase** (35 feet vs. 6 feet).  This falls far short of narrow tailoring.  *See, e.g.*, *Ward*, 491 U.S. at 800 n.7 ("A ban on handbilling, of course, would suppress a great quantity of speech that does not cause the evils that it seeks to eliminate, whether they be fraud, crime, litter, traffic congestion, or noise").

Third, people on public sidewalks and streets do not have a right to avoid all unwanted communication.  *See, e.g.*, *Frisby*, 487 U.S. at 486 (noting distinction in privacy interests

between private residence and public ways); *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 420 (1971) (same). The laws at issue in *Hill* and *Frisby* as well the Predecessor Act recognized this important distinction by prohibiting only un-consented to approaches and/or picketing toward unwilling recipients, and then only in such ways so as to still permit speakers to reach their intended audiences. *Hill*, 530 U.S. at 707-09; *Frisby*, 487 U.S. at 485; *McGuire I*, 260 F.3d at 41, 40, 46. Here, the Act permits no approaches whatsoever because speakers, leafleters, and picketers are completely banned from the zone and, consequently, prevented from providing information to their intended audience. Thus, not only are the free speech rights of speakers infringed by the Act, so, too, are the rights of recipients to receive information. "That individuals have a fundamental First Amendment right to receive information and ideas is beyond dispute." *Bell v. Wolfish*, 441 U.S. 520, 573 (1979) (citing *Martin v. Struthers*, 319 U.S. 141, 143 (1943)). *See also Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas").

Fourth, the Act bans all sorts of non-obtrusive expressive activity and even constitutionally protected liberty interests. For example, the Act prohibits a solitary person from standing stationary in the zone while quietly displaying a sign or handing out literature. It prohibits a solitary person who is wearing a t-shirt that contains a political or religious message from unobtrusively walking back and forth or even standing on the public sidewalk inside the zone. It bans labor picketing and labor organizing. It prohibits a Girl Scout from selling cookies and a young boy from hawking newspapers. It bans Salvation Army kettle-keepers and down-on-their luck panhandlers. It even forbids most persons from standing in the zone for innocent purposes such as smoking a cigarette, making a cell phone call, or waiting for a bus or taxi.

**There simply is no rational basis, let alone substantial government interest, in prohibiting such innocent and inoffensive conduct.**

Finally, the Act creates serious safety hazards.  The average public sidewalk is 5 to 8 feet wide.  Some sidewalks, such as those in the downtown area of larger cities, may be as wide as 25 feet.  In either case, a 35-foot buffer around entrances, exits, and doorways often pushes speakers and leafleters into the street and into the path of vehicular traffic.

For example, the sidewalk in front of Allston-Brighton Planned Parenthood is approximately 25 feet wide.  McCullen Decl., ¶ 7.  The entrance is recessed approximately 10 feet off the sidewalk.  *Id*.  The marked zone in front of the facility leaves only about 12 inches between the zone and the paved street.  *Id*., ¶ 10.  Immediately after significant snowfalls the public works department plows the snow off the center of Commonwealth Avenue and near to the curb, where it is piled high and often takes up significant portion of the gutter.  *Id*., ¶ 29.  Thus, when it snows, not only is the line marking the zone unreadable (because it is under snow) but the snow forces Plaintiffs and others into the street where they are in danger of being struck vehicular traffic.  McCullen Decl., ¶¶ 29-30.

Worse still is that Allston-Brighton Planned Parenthood is located on the corner of Commonwealth Avenue and Alcorn Street.  The zone not only encompasses the entire public sidewalk adjacent thereto, but also extends 6 feet into Alcorn Street.  Thus, persons seeking to communicate with clinic clients from the Alcorn Street side of the zone are forced into the middle of the street to avoid transgressing the zone.  On several occasions Mrs. McCullen, Mr. Cadin, and others were nearly struck by vehicles turning onto Alcorn Street.  McCullen Decl., ¶ 23; Cadin Decl., ¶ 16.  Moreover, by protruding into the street, the zones also decrease the flow of vehicular traffic and create congestion on those portions of public streets occupied by vehicles

and humans. McCullen Decl., ¶ 23.  **Thus, rather than serving the Commonwealth's interest in public safety, the Act disserves it by creating significant safety hazards.**

Like the floating buffer in *Schenck*, the Act here prevents Plaintiffs and others from engaging in speech that "lie[s] at the heart of the First Amendment," such as "communicating a message from a normal conversational distance with people entering or leaving the clinics or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks."  519 U.S. at 377.  While the Commonwealth considered constitutional limitations placed on government when it crafted the Predecessor Act, see *McGuire I*, 260 F.3d at 49 ("the legislature weighed the *Hill* Court's conclusions and formulated a bill to suit"), apparently it did not do so when crafting the Act.  As shown above, the Act is not narrowly-tailored because it does not target the exact "evil" it seeks to remedy, i.e., safe access to abortion clinics or, more broadly, keeping the sidewalks free for safe pedestrian passage.  *See Ward*, 491 U.S. at 791; *Frisby*, 487 U.S. at 485.  Moreover, it disserves the State's interest in public safety by creating serious safety hazards to both pedestrians and vehicles.  Furthermore, because it does not permit speakers to stand stationary inside the zone or sufficiently near the path of passersby, or to speak from a conversational distance, it does not provide ample alternative avenues for effective communication.  *See id.*  The Act flunks all three parts of the *Ward* test and therefore is not a permissible time, place, and manner regulation.  It should be enjoined.

### b.    The Act is unconstitutional as applied.

The Act not only is unconstitutional on its face, but also as applied to Plaintiffs' expressive activities at Allston-Brighton Planned Parenthood and Women's Health Services in Brookline.  As shown in the previous section, the Act severely burdens Plaintiffs' ability to orally communicate and leaflet and creates public safety hazards at these locations.  Even if,

*arguendo*, the Act is not facially unconstitutional, certainly it is unconstitutional as applied to Plaintiffs' expressive activities at these two locations. The legislative record here does not contain the repeated, egregious unlawful conduct that justified the injunctions upheld in *Madsen* and *Schenck*. *See supra*, pp. 20-22. At the very least, the Commonwealth should be enjoined from enforcing the Act at Allston-Brighton Planned Parenthood and Women's Health Services.

### D.   The Act is Substantially Overbroad.

The overbreadth doctrine allows a party to challenge a statute on its face even if the statute would be considered constitutional as applied to that party. *Broadrick*, 413 U.S. at 612. "In such cases, it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes." *Id.* Therefore, the overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quoting *Broadrick*, 413 U.S. at 615). "In order to decide whether the overbreadth exception is applicable in a particular case, [the court weighs] the likelihood that the statute's very existence will inhibit free expression." *Taxpayers for Vincent*, 466 U.S. at 799.

In weighing overbreadth, the first consideration is whether and to what extent the statute reaches protected conduct or speech. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982) ("In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct"). The second is determining the "plainly legitimate sweep" of

the statute, that is, the sweep that is justified by the government's interest. *See Broadrick*, 413 U.S. at 615; *Taxpayers for Vincent*, 466 U.S. at 810.  The third is determining the likely chilling effects of the statute, stated otherwise as the statute's burden on speech.  *See Broadrick*, 413 U.S. at 615; *see also Hicks*, 539 U.S. at 119; *Taxpayers for Vincent*, 466 U.S. at 800 n.19. The last step involves weighing these various factors together, paying particular attention to the burden on speech when judging the illegitimate versus legitimate sweep of the statute.  *Broadrick*, 413 U.S. at 615; *Watchtower Bible*, 536 U.S. at 165.

As to the first consideration, the Act bans from the zone all types (political, religious, educational, informational, conversational, entertainment, etc.) and manner (oral communications, hand-billing, sign display, singing, praying, etc.) of speech.  It reaches not only the abortion-related speech of Plaintiffs but also commercial speech (e.g., sale of Girl Scout cookies, newspapers, lemonade), charitable solicitations (e.g., Salvation Army Santa, National Cancer Society, Save the Whales), labor picketing or organizing (e.g., unionization of clinic employees or demands for better wages/work environment), petition circulating (local, state, or national elections or ballot initiatives/referendums), entertainment (e.g., poetry, dramas, singing, music, painting, etc.), and even panhandling (homeless or down-on-their-luck persons), all of which is speech protected by the First Amendment.[7]  *See, e.g.*, *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976) (commercial speech); *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (charitable solicitations); *Thornhill v. Alabama*, 310 U.S. 88, 104 (1940) (picketing); *McIntyre v. Ohio Elections Comm'n*,

---

[7] The impact on the interests of these third parties is obviously different from the impact on Plaintiffs.  Thus, the overbreadth challenge is properly before the court.  *See Hill*, 530 U.S. at 732; *Taxpayers for Vincent*, 466 U.S. at 801.

514 U.S. 334, 347 (1995) (circulating petitions); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 602 (1998) (music, drama, poetry, painting), and *Loper v. N. Y. City Police Dep't*, 999 F.2d 699, 701-06 (2d Cir. 1993) (panhandling).   These few examples demonstrate the Act's reach toward protected speech is not only substantial but staggering.

Moreover, the Act infringes not only speech protected by the First Amendment but also liberty interests protected by the Fourteenth Amendment.   *See, e.g.*, *Morales*, 527 U.S. at 55 (noting infringement of personal liberty can subject a law to an overbreadth challenge) (citing *Aptheker v. Sec'y of State*, 378 U.S. 500, 515-17 (1964) (right to travel); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 82-83 (1976) (abortion); *Kolender v. Lawson*, 461 U.S. 352, 355, n.3, 358-60, and n.9 (1983) (loitering)).

The "'right to remove from one place to another according to inclination' [i]s 'an attribute of personal liberty' protected by the Constitution." *Morales*, 527 U.S. at 53-54 (quoting *Williams v. Fears*, 179 U.S. 270, 274 (1900) and citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164 (1972)).   "Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage,' *Kent v. Dulles*, 357 U.S. 116, 126 (1958), or the right to move 'to whatsoever place one's own inclination may direct.'" *Morales*, 527 U.S. at 54 (quoting William Blackstone, 1 Commentaries on the Laws of England 130 (1765)).   *See also Kolender*, 461 U.S. at 358 (loitering regulation implicates right to freedom of movement).   A plurality of the Supreme Court has stated that "freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." *Morales*, 527 U.S. at 53.

As already noted, the Act prohibits virtually all persons from standing in or utilizing the zone for any and all purposes other than "reaching a destination other than such facility."  Mass.

Gen. Laws ch. 266: Section 120E1/2(b).   As noted by the Supreme Court, "[a] street is continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment."  *Heffron*, 452 U.S. at 651.  Yet, the Act prohibits a person from standing in the zone for such innocent purposes as smoking a cigarette, making a cell phone call, reading a newspaper, or conversing with a neighbor, friend, or acquaintance.  A person may not stand in the zone to wait for a bus or taxi, to drink a cup of coffee, or even people-watch.  These are just a few of several innocent uses of the public ways banned by the Act.

As for the second consideration, in determining the plainly legitimate sweep of the Act, Plaintiffs assume but do not concede that the Act was designed to protect the health and safety of women seeking reproductive health care services.  Based on the holding of *McGuire I*, Plaintiffs acknowledge such interests are legitimate. *See* 260 F.3d at 44 (Predecessor Act was designed to "promot[e] public health, preserv[e] personal security, and afford[ ] safe access to medical services").  Even so, the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.  *See, e.g.*, *Grayned*, at 116-17; *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302-03 (1974).  The forums at issue here are "quintessential" forums for speech.  *See Frisby*, 487 U.S. at 480; *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 696 (1992).  Thus, even where the interest of the State in safeguarding women seeking reproductive health services is legitimate, it still must not unduly infringe the rights of citizens to peacefully make use of the public ways.

With respect to the third consideration, the chilling effect on protected speech is palpable. The Act bans from the zone all non-travel activity, including expressive activity, and exacts a

penalty of up to three months incarceration and/or a $500 fine for a first offense. *See* Mass. Gen. Laws ch. 266: Section 120E1/2(d). Moreover, police are often present and casting a watchful eye over the zone – obviously a very real chilling effect. McCullen Decl., ¶ 9; Zarrella Decl., ¶ 8; Smith Decl., ¶ 7; Farrell Decl., ¶ 12; Cadin Decl., ¶ 8. Finally, weighing the competing interests, it is plain that the burden visited on virtually all speech does not serve the legitimate interests purportedly underlying the statute. It is difficult to imagine how the health and safety of women seeking reproductive health care is negatively impacted by peaceful leafletting and sign display; the sale of cookies, newspapers, or lemonade; or labor picketing; or charitable solicitations; or petition circulating; or open-air music, or drama, or poetry; or even panhandling.[8] Consequently, the Act impermissibly punishes a "substantial" amount of protected free speech "judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615.

Moreover, just as the Act is overbroad with respect to speech, so it is overbroad with respect to constitutionally protected liberty interests. It is hard to envision how harmless uses such as smoking cigarettes, making phone calls, reading newspapers, drinking coffee, or waiting for a bus interfere with or hamper women's access to reproductive health care services or compromise their safety. Because these non-speech yet innocent uses of the public ways are constitutionally protected, and because prohibiting these uses does not serve the purported interests underlying the statute, the Act is substantially overbroad in violation of the Due Process Clause of the Fourteenth Amendment. Indeed, the sweep of the Act so broadly deprives citizens of well-recognized liberty interests it should "shock the conscience" of the Court. *See Brown v. Hot, Sexy and Safer Prods., Inc*., 68 F.3d 525, 531-32 (1st Cir. 1995).

---

[8] To the degree women seeking reproductive health care are impacted by any of these expressive activities, the impact is no different on them than it would be for anyone else using public sidewalks or streets.

### E.     The Act is an Unlawful Prior Restraint.

A prior restraint exists whenever a law "'limits or conditions in advance the exercise of protected First Amendment activity.'"  *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 20 n.15 (1st Cir. 2007) (quoting *Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115, 1120 (1st Cir. 1981)).  *See also Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552-58 (1975). "'Any system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity.'"  *Garcia-Padilla*, 490 F.3d at 20 n.15 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 68, 70 (1963)).  An unlawful prior restraint exists where the regulation forecloses an entire channel of communication.  *See, e.g.*, *Hill*, 530 U.S. at 733-34 (noting that the Colorado statute was not an unlawful prior restraint because "absolutely no channel of communication is foreclosed").

Here, the Act prevents speakers from communicating from a normal conversational distance and bars leafleters from standing near the path of pedestrians, both of which severely limit access to the intended audience.  It also unnecessarily blocks Plaintiffs' access to **willing listeners** and needlessly makes arduous the ability of **willing recipients** to receive information.  It is the ability to win the attention and reach the minds of people that is the *sine qua non* of free speech.  *See, e.g.*, *Hill,* 530 U.S. at 728*; Heffron*, 452 U.S. at 655; *Kovacs*, 336 U.S. at 87.

Plaintiffs do not argue, as did the petitioners in *Schenck* and *Madsen*, that the prior restraint is unlawful merely because it is content or viewpoint-based.  At issue in those cases, unlike this one, were court-ordered injunctions that remedied prior unlawful conduct occurring in the context of large abortion demonstrations.  *See Schenck*, 519 U.S. at 374 n.6; *Madsen*, 512 U.S. 764 n.2.  Unlike *Schenck* and *Madsen*, the Act is a law of general applicability.  And, unlike the statute in *Hill*, the Act here effectively bans virtually all persons from engaging in every sort

of speech activity within the zone.    Consequently, *Hill*, *Schenck*, *and Madsen* are distinguishable.[9]

"Regulations governing in advance the time, place or manner of expression permitted in a particular public forum are valid if they serve important state interests by the least restrictive means possible."  *Fantasy Book Shop*, 652 F.2d at 1120 (citing *Erznoznik*, 422 U.S. at 209).  A prior restraint is analyzed under the four-part test set forth in *United States v. O'Brien*, 391 U.S. 367 (1968) and is permissible if "'(1) if it is within the constitutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on . . . First Amendment freedoms is no greater than is essential to the furtherance of that interest.'"  *Fantasy Book Shop*, 652 F.2d at 1120 (quoting *O'Brien*, 391 U.S. at 377).

Plaintiffs acknowledge that time, place, and manner regulations are within the constitutional power of government.  They further acknowledge that, as a general matter, peace and public safety are important government interests.  And, while Plaintiffs contend that the Act constitutes viewpoint- and content-based discrimination because it exempts certain classes of persons with pro-choice viewpoints, they do not rely exclusively on such discrimination in their prior restraint analysis.  Rather, it is the failure to meet the requirements of the fourth prong of the *O'Brien* test that renders the Act an unlawful prior restraint; that is, the incidental restrictions on speech **can in no way be considered <u>essential</u>** to further the Commonwealth's interest in peace and safety.  As pointed out *supra*, pp. 13-14, the Commonwealth has several alternative

---

[9] The Supreme Court noted that the injunctions at issue in *Schenck* and *Madsen* raised "prior restraint concern[s]."  *Hill*, 530 U.S. at 733-34.  The Court has intimated that an unlawful prior restraint may exist where, as here, a speech restriction forecloses an entire means of communication and is not a remedy for prior unlawful conduct.  *See Hill*, 530 U.S. at 734; *Schenck*, 519 U.S. at 374 n.6; and *Madsen*, 512 U.S. 764 n.2.

means of protecting its interest in peace and public safety without effectuating a total ban on expressive activity.   "'Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'"   *Riley v. Nat'l Fed'n of the Blind of N.C., Inc*., 487 U.S. 781, 801 (1988) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).   The Act fails the *O'Brien* test and should be enjoined as an impermissible prior restraint on speech.

### F.      The Act Violates a Panoply of First Amendment Rights.

Plaintiffs Smith and Farrell desire to pray the Catholic Rosary out loud within the zone in association with others.   Smith also wishes to display a Crucifix inside the zone.   Smith Decl., ¶¶ 6-11, 15; Farrell Decl., ¶¶ 6, 11.   Prayer is speech protected both by the Free Speech and Free Exercise Clauses.   *See Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 765-66 (1995).   It is, of course, both an "explicit religious exercise" and a "formal religious exercise." *Lee v. Weisman*, 505 U.S. 577, 598, 589 (1992).   *See also Engel v. Vitale*, 370 U.S. 421, 425 (1962).   "[P]rivate religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression."   *Pinette*, 515 U.S. at 760 (citing *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993); *Bd. of Educ. of Westside Cmty. Schs. (Dist. 66) v. Mergens*, 496 U.S. 226 (1990); *Widmar v. Vincent*, 454 U.S. 263 (1981); *Heffron*, 452 U.S. 640).

Speech is more persuasive and powerful when conducted in groups.   "'[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process.'"   *Claiborne Hardware*, 458 U.S. at 907 (quoting *Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley*, 454 U.S. 290, 294 (1981)). Joint expressive activity is particularly important because "'by collective effort individuals can

make their views known, when, individually, their voices would be faint or lost.'" *Claiborne Hardware*, 458 U.S. at 907-08 (quoting *Citizens Against Rent Control*, 454 U.S. at 294).  *See also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly").

Because Smith and Farrell wish to pray the Rosary jointly with others on public sidewalks and streets, the Act implicates rights to free speech, free assembly, free association, and free exercise of religion.  Laws of general applicability that infringe free exercise of religion, standing alone, are reviewed under the rational basis test. *Brown*, 68 F.3d at 538-39 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  *See also Employment Div., Dep't of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990).  However, heightened review applies when free exercise rights are infringed in combination with other fundamental constitutional rights.  *See Smith*, 494 U.S. at 882 (noting that free exercise claim combined with "communicative activity" triggers heightened review).  In such hybrid situations, the standard of review is the compelling interest test. *See Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 17-19 (1st Cir. 2004) (noting that the compelling interest test is the proper standard to review a free exercise hybrid claim); *Brown.*, 68 F.3d at 538-539 (noting that free exercise hybrid claims are not subject to rational basis review).  Though not a hybrid case, *Church of the Lukumi Babalu Aye*, 508 U.S. 520 is instructive.  *Lukumi* cited hybrid cases in support of its penultimate holding teaching that laws impacting free exercise of religion not subject to rational basis must instead be supported by a compelling state interest in order to survive constitutional scrutiny: "To satisfy the commands of the First Amendment, a law

restrictive of religious practice must advance 'interests of the highest order' and must be narrowly-tailored in pursuit of those interests." 508 U.S. at 546 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). *See also Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). "The compelling interest standard that we apply once a law fails to meet the *Smith* requirements is not "water[ed] . . . down" but "really means what it says." *Lukumi*, 508 U.S. at 546 (quoting *Smith*, 494 U.S. at 888).

While the Supreme Court has used the terms "legitimate interest", see *Hill*, 530 U.S. at 715, and "strong interest," see *Madsen*, 512 U.S. at 767-68, to describe the state's interest in protecting the health and safety of women accessing health care facilities, Plaintiffs are aware of no case in which the government's interest was characterized as "compelling." Because the Act does not serve a ***compelling*** state interest it is unconstitutional as applied to Smith and Farrell's group prayer. Moreover, Smith has been praying the Rosary inside a police pen, and under police supervision, for years without causing any problems. *See* Captain Evans Depo., pp.12, 36-39.

### G.    The Act Constitutes Viewpoint Discrimination and Violates the Right to Equal Protection of the Law.

As shown below, the Act at first blush appears to be content-neutral but the exemption granted to reproductive health care facility employees and its agents renders it viewpoint and/or content-based. "[V]ewpoint-based discrimination is a particularly offensive type of content-based discrimination." *McGuire I*, 260 F.3d at 43 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). "Governmental restrictions on the content of particular speech pose a high risk that the sovereign is, in reality, seeking to stifle unwelcome ideas rather than to achieve legitimate regulatory objectives." *McGuire I*, 260 F.3d at 42 (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). "As a general rule, therefore, the

government cannot inhibit, suppress, or impose differential content-based burdens on speech." *Id.* at 42 (citing *Turner*, 512 U.S. at 641-42). "To provide maximum assurance that the government will not throw its weight on the scales of free expression, thereby 'manipulat[ing] ... public debate through coercion rather than persuasion,' *id.* at 641, courts presume content-based regulations to be unconstitutional." *McGuire I*, 260 F.3d at 43. *See also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)). "While courts theoretically will uphold such a regulation if it is absolutely necessary to serve a compelling state interest and is narrowly-tailored to the achievement of that end, *see, e.g.*, *Boos*, 485 U.S. at 321-29; *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231-32 (1987), such regulations **rarely survive constitutional scrutiny**." *McGuire I*, 260 F.3d at 43 (emphasis added).

Viewpoint discrimination need not be overt or even intentional. It exists where "regulation limited to the details of a speaker's delivery results in removing a subject or viewpoint from effective discourse" while permitting other subjects or viewpoints. *Hill*, 530 U.S. at 736 (O'Connor, J., concurring) (citing *Ward*, 491 U.S. at 791). Put another way, a regulation that ***impacts the speech*** of some more than others is content-neutral **so long as *conduct* is regulated in an even-handed manner**. *See id.* at 719 (finding content-neutrality because "the statute's restrictions apply equally to all demonstrators, regardless of viewpoint") (internal quotation marks and citation omitted). But where the regulation **treats *conduct* unequally, and the unequal treatment of *conduct* favors or disfavors one speaker over another**, **the regulation is considered viewpoint or content-based** and reviewed under the heightened standard of strict scrutiny. *See id.* at 738-39. As shown below, **the Act unjustifiably treats the *conduct* of facility employees/agents differently from all other speakers, and <u>the different treatment of *conduct*</u> results in favor toward pro-choice speakers and disfavor**

41

**toward all other speakers.**  It therefore constitutes a content-based restriction on speech and is subject to strict scrutiny review.

In addition to constituting viewpoint or content-based discrimination, the Act also violates the Fourteenth Amendment guarantee to equal protection.  As shown below, facility employees and agents are similarly-situated to other persons with respect to the exercise of expressive activities and personal liberties yet are classified differently by the Act.  Where different classifications impact fundamental rights, such as the First Amendment, the law is subject to strict scrutiny and can survive review only if it serves a compelling state interest and is the least restrictive means of achieving that interest. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("exacting scrutiny"); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973); *Mosley*, 408 U.S. 92; and *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 672 (1966).  **Under strict scrutiny, the presumption of validity usually afforded legislative judgments does not apply and the state carries a "heavy burden of justification" for its unequal treatment**. *Rodriguez*, 411 U.S. at 17 (emphasis added).

By its plain terms, the Act grants unfettered access to the zone by facility employees and its agents while denying similar access to most others.  *See* Mass. Gen. Laws ch. 266: Section 120E1/2(b).  Facility agents, i.e., clinic escorts,[10] express pro-choice viewpoints.  McCullen Decl., ¶¶ 24-25; Zarrella Decl., ¶¶ 18-19; Cadin Decl., ¶¶ 17-18.  They surround, yell, make noise, chatter, and/or talk loudly to clinic clients for the purpose of disrupting or drowning out pro-life speech.  *Id*.  They tell clinic clients not to listen to those "crazies."  *Id*.  Clinic escorts have pushed, shoved, and blocked persons with pro-life viewpoints, and at times flailed their arms to prevent pro-life advocates from placing literature near the hands of clinic clients.

---

[10] Escorts are agents of Planned Parenthood.  *See, e.g.,* Captain Evans Depo., p. 28.

McCullen Decl., ¶ 24; Zarrella Decl., ¶ 18; Cadin Decl., ¶ 17.   While in the zone they drink coffee, smoke, and converse with each other.   Zarrella Decl., ¶ 22; Smith Decl., ¶ 14; Cadin Decl., ¶ 21.   So, too, do companions of clinic clients, another class of persons exempted from the Act.[11]   McCullen Decl., ¶ 28; Zarrella Decl., ¶ 23; Cadin Decl., ¶ 22.   By the Act's explicit terms, virtually all other persons are excluded from the zone for nearly all purposes.

The Predecessor Act was found to be content/viewpoint neutral on the ground that the "differential treatment" was "objectively justified" because "the secondary effects that the [Predecessor] Act was designed to ameliorate include securing public safety in and around RHCFs" and "because clinic employees often assist in protecting patients and ensuring their safe passage as they approach RHCFs."[12]   *McGuire I*, 260 F.3d at 45.   *See also McGuire II*, 386 F.3d at 52-53 ("the purpose of the clinic employee and agent exemption was in order to permit patients to secure peaceful access to clinics") (internal quotation marks and citation omitted).

Unlike the present Act, however, the Predecessor Act permitted all persons to access any part of the zone so long as they did not make unconsented to approaches from a distance of 6 feet

---

[11]   *See* Mass. Gen. L. chapter 266: Section 120E1/2(b).

[12]   The First Circuit found that,

> [t]he legislative history bears witness to this conclusion. Testimony taken before the state senate indicates beyond cavil that the employee exemption will promote the Act's goals because clinic employees often assist in protecting patients and ensuring their safe passage as they approach RHCFs. Indeed, the record contains numerous accounts of incidents in which clinic personnel had to approach patients to protect them from protesters and, sometimes, to prevent physical altercations. Since it is within the scope of their employment for clinic personnel to escort patients in this fashion, and since a primary purpose of the law is to facilitate safe access, the employee exemption serves the basic objectives of the Act. To cinch matters, the legislature rationally could have concluded that clinic employees are less likely to engage in directing of unwanted speech toward captive listeners-a datum that the *Hill* Court recognized as justifying the statute there.

*McGuire I*, 260 F.3d at 46.

or less.  There was, then, a possibility that the zone could become crowded and therefore make navigation by clinic clients difficult, thereby giving support to the finding that escorts actually furthered the act's purpose.  Furthermore, the Commonwealth construed the Predecessor Act as applying equally to all persons, including facility employees and agents. *McGuire II*, 386 F.3d at 64 (noting that a limiting construction can save an otherwise unconstitutional statute).

The same is not true of the present Act.  The present Act ***unnecessarily*** exempts facility employees and agents – clinic escorts in particular – at least to the degree they are permitted to use the zone for purposes other than merely going in and out of the facility.  Because pro-life advocates and virtually all other persons are excluded from the zone, there is no longer any need for clinic clients to be "escorted" through the zone.  Put another way, inasmuch as **there is absolutely no danger of an unwanted approach or overcrowding**, clinic escorts are superfluous; the zone itself fully secures the safety of clinic clients without any need for escorts. Thus, the rationale employed to uphold the employee/agent exemption of the Predecessor Act does not apply here, making *McGuire I and II* distinguishable.  The sole practical purpose, then, of the employee/agent exemption, certainly to the degree it exempts clinic escorts, at least, is to promote a particular side of the abortion debate – the pro-choice view.  This renders the exemption discriminatory and therefore unconstitutional.

Moreover, the Act grants facility employees and its agents a ***total*** exemption from the prohibitions contained in the Act.  Not only may they access the zone for the purpose of escorting clinic clients – which is rendered unnecessary by the Act – they may do anything else that is lawful so long it is within the scope of their employment.  The concept of scope of employment is quite broad;  it includes "conduct 'of the kind [a servant] is employed to perform,' occurring 'substantially within the authorized time and space limits,' and 'actuated, at

least in part, by a purpose to serve the master.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 793 (1998) (quoting Restatement (Second) of Torts, §228(1)).

To the degree a facility employee or agent, i.e., clinic escort, acts at an authorized time and place, i.e., within the zone at the time clinic clients are entering or leaving the facility, and for the purpose of furthering the facility's interest, i.e., client control and management, such persons are free to display signs, distribute literature, stand idle, converse, make phone calls, drink coffee, read newspapers and do a myriad of other things and still be acting within their scope of employment.  Moreover, the facility is in no way hampered by the Act – it has no legal obligation whatsoever to request or order its employees and agents to refrain from engaging in any type of expressive activity.  In this sense, the employee/agent exemption sweeps too broadly and therefore suffers from overbreadth. i.e., it permits employees/agents to engage in speech activities unrelated to client control and management.

Whether by design or simply through effect, the Act grants persons with pro-choice viewpoints free and unrestricted access to the zone while prohibiting most other persons from expressing their views.   This constitutes viewpoint- and content-based discrimination.  Furthermore, the Act permits facility employees/agents to engage in all types of expressive activities, pro-choice or not, yet forbids the same for all other persons.  To the degree that facility employee/agents are not limiting their activities to non-verbal client control and management, they are similarly-situated with all other speakers.  The Commonwealth cannot demonstrate a compelling interest for such disparate treatment and, even if it could, the severe restrictions placed on speech surely are not the least restrictive means of achieving that interest.  For the foregoing reasons, the Act discriminates according to content/viewpoint in violation of the First Amendment and creates impermissible classifications in violation of the Fourteenth Amendment.

### H.      The Act is Unconstitutionally Vague.

Lastly, the Act prohibits most persons from entering or using the zone except "persons using the public sidewalk or street right-of-way adjacent to such facility **solely** for the purpose of reaching a destination other than such facility."  Mass. Gen. Laws ch. 266: Section 120E1/2(b) (emphasis added).  The Act is unconstitutionally vague because a police officer, in many instances, cannot know with any degree of certainty whether a person is utilizing the zone **solely** for the purpose of reaching a destination other than such facility.  It also "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill*, 530 U.S. at 732 (citing *Morales*, 527 U.S. at 56-57).

When vagueness "permeates the text of [ ] a law [infringing constitutional rights] it is subject to facial attack." *See Morales*, 527 U.S. at 55.

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.  Third, but related, where a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms.  Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.

*Grayned*, 408 U.S. at 108-109 (footnotes and internal quotation marks omitted).  "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Village of Hoffman Estates*, 455 U.S. at 499.  In a facial challenge "a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Id*. at 494.

Here, the Act reaches *all* First Amendment conduct. *Every* type of expressive activity is banned from the zone, including oral communications, leafletting, sign display, silent prayer, and peaceful assembly. Indeed, the Act could not have been written more broadly. Moreover, few, if any, people use public sidewalks and streets for the **sole purpose** of destination because there virtually is always a secondary purpose for reaching a destination. Such purpose may be to meet someone, to buy groceries, to catch a bus, to go to work, etc. There are an unlimited number of secondary purposes for using public sidewalks and streets. Moreover, the person merely strolling or jogging is not necessarily going to a particular destination but merely making use of the sidewalks and streets for enjoyment or exercise. Yet, this person's innocent behavior is swept within the ambit of the Act.

Because the reach of the Act is almost limitless, its scope is breathtaking. Does a pro-life advocate who walks through the zone to speak with a person on the side violate the statute if her purpose is get to the other side of the zone to engage in speech? Or is a pro-life advocate who walks through the zone in order to get a cup of coffee from a nearby store in violation of the Act? The five Plaintiffs here, surely people of at least average intelligence, do not know whether certain innocent conduct is outlawed by the Act. *See* McCullen Decl., ¶ 6; Zarrella Decl., ¶ 6; Farrell Decl., ¶ 5; Smith Decl., ¶ 5; Cadin Decl., ¶ 6. The Act thus fails to give citizens adequate notice of what is prohibited. *See Hill*, 530 U.S. at 732; *Morales*, 527 U.S. at 56-57.

The Act also fails to guide law enforcement. In *Morales*, Chicago's anti-gang loitering ordinance was struck down on the ground that police were not given minimal guidance to ascertain whether alleged violators had an "apparent purpose" for being in a particular place.[13] 527 U.S. at 60-61. So it is here. The Act gives police no guidance whatsoever for determining

---

[13] *Morales* permitted a facial challenge to the ordinance on vagueness grounds despite the fact that the ordinance likely applied to the challengers. 527 U.S. at 71-72 (Breyer, J., concurring).

whether a person is using the zone "solely" for the purpose going to a destination other than the abortion facility.

Just as Chicago police did not possess a crystal ball to determine whether an "apparent purpose" existed, *see id*. at 62 (the "'no apparent purpose' standard for making that decision is inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene") neither can Massachusetts law enforcement officers read the minds of citizens to discern whether the sole purpose for walking in or through the zone is to reach a destination other than the reproductive health care facility. Because police must, except in the most obvious circumstances, guess the purpose for using the street or sidewalk, the Act is inherently subjective and necessarily encourages arbitrary and discriminatory enforcement in violation of the Due Process Clause of the Fourteenth Amendment. Moreover, the Act is much worse than the one at issue in *Morales*. The Chicago ordinance at least required disobedience of a dispersal order before an arrest could be made. No such dispersal order is mandated under the Act here. A violation occurs ipso facto so long as a person enters or remains in the zone for any purpose other than those specifically exempted.

## III.    THE LEGISLATIVE RECORD WAS INSUFFICIENT AS A MATTER OF LAW.

Finally, even if a fixed buffer of this breathtaking scope is permissible under some circumstances, it is not permissible here because the legislative record underpinning the Act was insufficient to support harsh restrictions on speech for at least four reasons.

### A.    The Evidentiary Record was Stale.

First, the purported evidence offered in support of the bill consisted mostly of vague and generalized allegations of violence, harassment, blocking, and impeding. It was essentially the very same evidence used to support the original floating buffer that was enacted in 2000. *See*

*McGuire I*, 260 F.3d at 39 (noting that "by the late 1990s, Massachusetts had experienced repeated incidents of violence and aggressive behavior outside RHCFs . . . . [L]egislators . . . received testimony [that] chronicled the harassment and intimidation that typically occurred outside RHCFs").   The factual record thus was stale. The actions of John Salvi, while tragic, occurred in 1994 and have not been repeated.  *See* Cotter Decl., ¶ 7.  Nor have there been any rescues or blockades at Massachusetts abortion clinics since 1992.  *Id*., ¶ 5.  While there is anecdotal testimony in the record alleging harassment, blocking, and impeding of clinic clients by individuals with transparent pro-choice sympathies, *see* Written Testimony, attached hereto as Ex. 3,[14] all such allegations are scant, generalized, vague, and make no mention of the timeframe of such alleged occurrences.  *See id.*  Indeed, much of the record contains conclusory allegations based on speculation or mere opinion, or is unsubstantiated and undocumented hearsay.  *See id.* For example, the Women's Bar Association and state senator Edward Augustus both claimed that Planned Parenthood had received several complaints about buffer zone violations over the past several years.  *See id.*  Yet, no documentary evidence was provided to corroborate these double or triple hearsay allegations.  Even more troubling is the fact that police are usually on site when abortion opponents are present, see McCullen Decl., ¶ 9; Zarrella Decl., ¶ 8; Smith Decl., ¶ 7; Cadin Decl., ¶ 8, yet the record is devoid of police reports, warnings, citations, and arrests.  *See also* Cotter Decl., ¶ 6 (noting he is not aware of any convictions in the past twelve years for pro-life activity at or near abortion clinics).  Finally, many of the anecdotal accounts allege conduct that may be annoying but is not unlawful.   Indeed, much of the conduct complained of by pro-choice sympathizers likely is constitutionally protected.

---

[14] Upon information and belief, the documents attached hereto constitute the entire written factual record underlying the Act.  To Plaintiffs' knowledge, oral testimony was not recorded so transcripts of the hearing on SB 1353 are not available.

As noted *supra*, in the past seven years, despite a regular police presence observing the actions of speakers outside of abortion clinics, the Commonwealth was unable to prove that a *single* unwanted approach occurred outside any Massachusetts abortion clinic.   Nor does it appear that the Commonwealth has been able to prove that anyone has blocked the entrance to an abortion clinic in violation of Mass. Gen. Laws ch. 266: Section 120E1/2(e), or chapter 266: Section 120E, or the Freedom of Access to Clinic Entrances Act, 18 U.S.C.A. § 248.   Similarly, the Commonwealth has not proven a single instance in which an abortion opponent has harassed a person exercising civil rights in violation of Chapter 265: Section 37.   *See* Cotter Decl., ¶ 6.

In order to have a legislative record sufficient to support substantial burdens on First Amendment rights, the evidentiary record must contain recent and identifiable acts of harm. "The question is not whether the government may make use of past experience – it most assuredly can – but the degree to which inferences drawn from past experience are plausible. While a government agency charged with public safety responsibilities ought not turn a blind eye to past experience, it likewise ought not impose harsh burdens on the basis of isolated past events."   *Bl(a)ck Tea Soc'y*, 378 F.3d at 14.

Reliance upon rescues or blockades that last occurred in 1991, or the 1994 shooting by Salvi, was an insufficient basis to support a law enacted more than ten years hence.   Moreover, the scant and vague anecdotal testimony offered does not support the harsh sanctions the Act visits upon all Massachusetts citizens.   Perhaps there are some unruly abortion opponents wandering about Massachusetts whose conduct is legally questionable.   *See, e.g*., Captain Evans Depo, pp. 40-41.   If so, and if such conduct is unlawful, it can and should be redressed by criminal penalties and/or civil injunction targeted at the particular wrongdoers.   Constitutionally, one, two, or even a bunch of bad apples do not make the whole barrel rotten.   Yet that was

precisely the approach taken by the Commonwealth when it adopted a heavy-handed measure that punishes lawful and unlawful conduct alike.  The Act should not be allowed to stand on such flimsy factual footing.

### B.      Claims that the Predecessor Act was Vague were Unreasonable.

Second, many of the written statements in the legislative record in support of the Act stated in conclusory fashion that the Predecessor Act needed revision because it was vague and unenforceable.  *See* Written Testimony.  However, the Predecessor Act was patterned after the buffer law upheld in *Hill* that the High Court concluded was not vague.  On the contrary, the Court heartily endorsed the Colorado law, stating, "one of the section's virtues is the specificity of the definitions of the zones described in the statute."  530 U.S. at 733.  The original floating buffer in Massachusetts contained an even higher specificity of definition.  Indeed, the First Circuit characterized the Predecessor Act as "careful craftsmanship," "clearly marked," and "precisely focused." *McGuire I*, 260 F.3d at 49.  Even after twice examining the original buffer law for constitutional infirmity, the First Circuit found no defect. See *id.* at 51 (vacating preliminary injunction), and *McGuire II*, 386 F.3d at 65-66 (affirming summary judgment).

Moreover, it appears the General Court rejected allegations that the Predecessor Act was unenforceable.  On or about October 23, 2007, the committee on Ethics and Rules recommended that SB 1353 be amended by inserting the words, "The general court hereby finds that law enforcement officials have testified about practical problems related to the enforcement of section 120E 1/2 of chapter 266 of the General Laws[.]" *See* Massachusetts Senate Journal, October 23, 2007, attached hereto as Ex. 4.  The amendment was passed by the Senate and sent to the House.  *Id.*  On or about October 25, 2007, the House referred it to the committee on Steering, Policy and Scheduling.  *See* Massachusetts House Journal, October 25, 2007, attached

hereto as Ex. 5.  The trail ends there.  There is no record the Senate's amendment was accepted

by the House, and the amendment language does not appear in the final bill nor is it in the Act

signed by the Governor.  For these reasons, the alleged vagueness of the Predecessor Act, as a

matter of law, could not have served as a legitimate basis for amending the buffer statute.

### C.        The Asserted Purpose for the Act was not a Significant Interest.

Third, while an inference might be drawn from the Act's bare text that the law was

designed to protect the privacy, health, and/or safety of women seeking reproductive health

services, the bill underlying the Act, SB 1353,[15] asserted three very different facts underlying its

purpose: 1) preservation of public safety is a fundamental obligation of state government; 2)

pedestrians have a right to travel peacefully on Massachusetts streets and sidewalks; and 3)

clearly defined boundaries improve the ability of safety officials to protect the public.  *See*

Senate Bill 1353, as introduced on January 10, 2007, attached hereto as Ex. 6.

It is beyond dispute that all public streets and sidewalks are held in the public trust for

lawful use by the citizenry.  *See Frisby*, 487 U.S. at 481.  Consequently, they "occup[y] a special

position in terms of First Amendment protection" and "the government's ability to permissibly

restrict expressive conduct [in it] is very limited."  *Grace*, 461 U.S. at 177, 180 (holding that the

sidewalks abutting the United States Supreme Court are traditional public forums and,

consequently, all expressive activity cannot be banned there).

Although it undoubtedly serves a *legitimate* state interest, the Act does not serve a

*significant* interest when competing interests are weighed.  The Commonwealth did not have to

make off-limits large sections of the public sidewalk and street to achieve its stated purposes.

---

[15] It is appropriate to look at the bill underlying a statute, and even prior drafts of the bill, to determine its legislative purpose.  *See McGuire, I*, 260 F. 3d at 48 n.3.  *See also id.* at 52-54, Appendix B.

The Commonwealth's legitimate interest in peaceful pedestrian travel is sufficiently protected by laws that prohibit blocking, impeding, and harassment on public streets and sidewalks. Indeed, both the original buffer and the challenged Act prohibit these very things, at least in front of reproductive health care facilities. *See* Mass. Gen. Laws ch. 266: Section 120E1/2(e) (making it unlawful to obstruct, detain, hinder, impede or block another person's entry to or exit from a reproductive health care facility). The General Court easily could have expanded such a law to cover all public sidewalks and streets without unduly interfering with First Amendment rights. Moreover, state and local laws already prohibit many types of unruly public conduct. *See supra*, pp. 13-14. Therefore, the Commonwealth can protect its legitimate interests in pedestrian peace and safety with far less restrictive measures then the one it chose to implement. Indeed, it already has done so.

**D.     The Act is Greatly Under-Inclusive.**

Finally, because the introductory bill stated that the underlying purpose of the Act was to aid pedestrians walking on public streets and sidewalks, the Act is enormously under-inclusive. Pedestrians use public sidewalks and streets all over the Commonwealth, and not merely those adjacent to reproductive health facilities that perform abortions. Indeed, this fact creates a strong inference that the stated purpose for the Act was pretextual, particularly in light of the exemptions given to facility employees and its agents. This suggests the Act's real purpose was to suppress pro-life viewpoints at abortion clinics. *See, e.g.*, *Hill*, 530 U.S. at 738 (O'Connor, J., concurring) (noting distinction between "ostensible" and "real" reasons for enacting a law).

For at least these four reasons the legislative record was insufficient to support the severe burden the Act places on First Amendment rights. The Act should be enjoined.

**CONCLUSION**

For the foregoing reasons Plaintiffs are entitled to entry of a preliminary injunction enjoining enforcement of Mass. Gen. Laws ch. 266: Section 120E1/2(b).

Respectfully submitted,

/s/ Philip D. Moran
Philip D. Moran, MA Bar # 353920
Philip D. Moran P.C.
265 Essex Street, Suite 202
Salem, Massachusetts 01970
Tel: (978) 745-6085
Fax: (978) 741-2572
Email: philipmoranesq@aol.com

Michael J. DePrimo, CT Bar # 402211
Pending admission *pro hac vice*
Attorney at Law
778 Choate Avenue
Hamden, Connecticut 06518
Tel:  (203) 281-1496
Fax: (203) 281-1496
Email: michaeldeprimo@gmail.com

Benjamin W. Bull, AZ Bar # 009940
Pending admission *pro hac vice*
Alliance Defense Fund
15100 N. 90th Street
Scottsdale, Arizona 85260
Tel: (480) 444-0020
Fax: (480) 444-0028
Email: bbull@telladf.org

Kevin H. Theriot, KS Bar # 21565
Pending admission *pro hac vice*
Alliance Defense Fund
15192 Rosewood
Leawood, Kansas 66224
Tel: (913) 685-8000
Fax: (913) 685-8001
Email: ktheriot@telladf.org

Timothy D. Chandler, CA Bar # 234325
Pending admission *pro hac vice*
Alliance Defense Fund
101 Parkshore Drive, Suite 100
Folsom, California 95630
Tel: (916) 932-2850
Fax: (916) 932-2851
Email: tchandler@telladf.org