Exhibit 1

Page 1

```
 1         UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 2
              CIVIL ACTION NO. 00-12279EFH
 3
   - - - - - - - - - - - - - - - - - - -
 4 MARY ANNE McGUIRE, RUTH SCHIAVONE    :
   and JEAN B. ZARRELLA,                :
 5              Plaintiffs              :
   vs.                                  :
 6 THOMAS F. REILLY, ATTORNEY GENERAL OF THE :
   COMMONWEALTH OF MASSACHUSETTS; PHILIP A.  :
 7 ROLLINS, DISTRICT ATTORNEY OF BARNSTABLE  :
   COUNTY, DUKES COUNTY, AND NANTUCKET COUNTY; :
 8 GERARD D. DOWNING, DISTRICT ATTORNEY OF   :
   BERKSHIRE COUNTY; PAUL F. WALSH, JR.,     :
 9 DISTRICT ATTORNEY OF BRISTOL COUNTY;      :
   KEVIN M. BURKE, DISTRICT ATTORNEY OF ESSEX :
10 COUNTY; ELIZABETH D. SCHEIBEL, DISTRICT   :
   ATTORNEY OF FRANKLIN COUNTY AND HAMPSHIRE :
11 COUNTY; WILLIAM M. BENNETT, DISTRICT      :
   ATTORNEY OF HAMPDEN COUNTY; MARTHA COAKLEY, :
12 DISTRICT ATTORNEY OF MIDDLESEX COUNTY;    :
   WILLIAM R. KEATING, DISTRICT ATTORNEY OF  :
13 NORFOLK COUNTY; MICHAEL J. SULLIVAN,      :
   DISTRICT ATTORNEY OF PLYMOUTH COUNTY;     :
14 RALPH C. MARTIN, II, DISTRICT ATTORNEY    :
   OF SUFFOLK COUNTY; AND JOHN J. CONTE,     :
15 DISTRICT ATTORNEY OR WORCESTER COUNTY,    :
              Defendants                    :
16 - - - - - - - - - - - - - - - - - - -

17            WILLIAM B. EVANS, a witness
   called on behalf of the Plaintiffs, taken
18 pursuant to the applicable provisions of the
   Massachusetts Rules of Civil Procedure,
19 before Grace E. Holden, RPR, and Notary
   Public in and for the Commonwealth of
20 Massachusetts, at the offices of Thomas M.
   Harvey, Esq., One Constitution Plaza,
21 Charlestown, Massachusetts, on Wednesday,
   May 22, 2002, commencing at 10:09 a.m.
22
              MELVIN LIPMAN, COURT REPORTER
23                101 TREMONT STREET
                     SUITE 700
24            BOSTON, MASSACHUSETTS 02108
```

Page 2

```
 1 APPEARANCES:

 2
 3 LAW OFFICES OF THOMAS M. HARVEY
   Thomas M. Harvey, Esq.
 4 One Constitution Plaza
   Boston, Massachusetts 02129
 5    on behalf of the Plaintiffs

 6

 7
 8 BOSTON POLICE
   OFFICE OF LEGAL ADVISOR
 9 Betsy J. Facher, Esq.
   One Schroeder Plaza
10 Boston, Massachusetts 02120
      on behalf of the Deponent
11

12

13
   THE COMMONWEALTH OF MASSACHUSETTS
14 Office of the Attorney General
   William W. Porter, Assistant Attorney General
15 One Ashburton Place
   Boston, Massachusetts 02108
16    on behalf of the Defendants
```

Page 3

```
                    I N D E X

Witness           Direct  Cross  Redirect  Recross
WILLIAM B. EVANS
by Mr. Harvey      4 - 94         97 - 98
by Mr. Porter              95 - 96




                    E X H I B I T S

No.    Description                            Page
 1    Photocopy of Mass General Laws,
      Chapter 266, Section 120E-1/2,
      two pages.                                27

 2    PPLM job description protocol,
      two pages.                                63

 3    State Defendants Supplemental
      Disclosures, six pages.                   72

 4    State Defendants Amended and
      Supplemental Responses to
      Plaintiffs' First Set of
      Interrogatories, 15 pages.                86
```

Page 4

1  MR. HARVEY: Do you want to do the
2  usual stipulations? Read and sign, waive the
3  notary?
4  MS. FACHER: That's fine.
5  MR. HARVEY: The usual meaning all
6  objections, except as to the form of the
7  question, reserved until the time of trial
8  and motions to strike are reserved until the
9  time of trial.
10      WILLIAM B. EVANS, having been
11 duly sworn by the Notary Public, testified as
12 follows:
13      DIRECT EXAMINATION
14 BY MR. HARVEY:
15 Q. Can you please state your name?
16 A. William, middle initial B, as in Brian,
17    Evans, E-v-a-n-s.
18 Q. And you're a captain in the Boston Police
19    Department?
20 A. Yes.
21 Q. Captain Evans, my name is Thomas Harvey. I
22    represent the plaintiffs in the case of
23    McGuire et al versus Reilly et al. I'll be
24    asking you some questions today.

Page 9

1  is Superintendent of the Bureau of Field
2  Services.
3  Q. And Planned Parenthood on Commonwealth Avenue
4  comes under your district?
5  A. Yes.
6  Q. As a captain of that district what are your
7  duties?
8  A. My duties are administrative as far as
9  operating the station. I have approximately
10 125 sworn officers as well as civilians
11 working under my command. I direct their
12 daily activities in areas of, you know,
13 crime, crime prevention, partnership with the
14 communities.
15 Q. Do you have any particular duties with regard
16 to abortion clinics or is there just one
17 abortion within your district?
18 A. Yes.
19 Q. Do you have any particular duties with regard
20 to that abortion clinic?
21 A. No duties, specific duties dealing with the
22 clinic, no.
23 Q. Do you have any officers that are assigned
24 specifically to deal with personnel at that

Page 10

1  abortion clinic?
2  A. None. On any given day it could be any
3  officer. There's no one particularly
4  assigned. At night I do have one detective,
5  Detective Russell Grant, who deals with a lot
6  of possible criminal action coming out of
7  that establishment but no, no per se except
8  that one detective.
9  Q. Would he be considered the liaison with
10 Planned Parenthood?
11 A. Yes.
12 Q. Why is that only at night?
13 A. Well, he's a detective and, you know, we, to
14 establish a rapport with Planned Parenthood
15 and rather than them always calling several
16 different offices we have him doing it at
17 night.
18 Q. His name is Russell Grant?
19 A. Russell Grant.
20 Q. Are the detectives all lieutenants or they
21 could be a patrol officer, could be a
22 detective? How does it work?
23 A. All patrolmen. You know, they've never gone
24 above patrol officer. Now we have a test to

Page 11

1  become a rank detective which is just above
2  police officer but I want to say when Russell
3  was appointed I'm sure he's been a detective
4  a long time before actually there was an
5  exam, so.
6  Q. Now, on Saturday morning in front of Planned
7  Parenthood there's more activity than other
8  days. Is that right?
9  A. Yes.
10 Q. Can you describe for us what the activity
11 is? This is 1055 Commonwealth Ave.
12 A. 1055. On an average Saturday we probably
13 have maybe 10 to 15 individuals outside
14 displaying signs and, you know, trying
15 basically to talk to people going in and out
16 of that clinic trying to prevent them from
17 going in there.
18 Q. How often have you been out there on a
19 Saturday morning?
20 A. I've been out there, when it initially came
21 to us back in I think probably 1998 I was
22 out there very frequently, almost every
23 Saturday. Since that time I'm lucky I'm out
24 there once a month.

Page 12

1  Q. How many officers do you have assigned out
2  there on a given Saturday?
3  A. On an average Saturday I would say one,
4  possibly two on an average Saturday. Now,
5  the second Saturday is different.
6  Q. The second Saturday is different how come?
7  A. We have a much larger protest the second
8  Saturday of every month. We get
9  approximately 100 to 150 protesters coming
10 from Brookline, I think where they go to
11 mass, come over from Babcock Street onto
12 Commonwealth Ave and they go outside and they
13 say the rosary and we also have about a dozen
14 usually pro-abortion people who are also out
15 there.
16 Q. Are the pro-abortion people out there on
17 Saturdays when it's not a second Saturday?
18 A. No, I don't usually see them out there.
19 Q. And on a second Saturday how many officers do
20 you typically have assigned there?
21 A. Typically we have a sergeant and four to five
22 officers.
23 Q. Do you have any particular expertise with
24 dealing with abortion protesters?

Page 21

1   about--
2   A. My officers.
3   Q. Exactly.
4   A. Yes, they have.
5   Q. Do you recall any of the circumstances?
6   A. Again, I don't think I did it myself but the
7      circumstances basically would be people just
8      getting up in people's face walking in and we
9      would go up to them and say please don't do
10     that and then usually they cooperate that we
11     don't have to take further action.
12  Q. Have you personally had to warn anybody?
13  A. I don't recall personally, not since the
14     Buffer Zone Law legislation.
15  Q. Prior to this buffer zone legislation we're
16     talking about there were numerous other laws
17     pertaining to activity out in front of the
18     abortion clinics?
19  A. Yes.
20  Q. There was the federal law called FACE?
21  A. Right.
22  Q. There was also a state law regarding access
23     to clinics?
24  A. Right.

Page 22

1   Q. And there are also laws prohibiting assault?
2   A. Sure.
3   Q. And laws prohibiting harassment, criminal
4      laws --
5   A. Yes.
6   Q. -- prohibiting harassment?
7   A. Yes.
8   Q. Has this law added anything at all to the
9      arsenal of law enforcement?
10        MS. FACHER: Objection.
11        MR. PORTER: Objection.
12  Q. You can answer.
13  A. I think it does keep a lot of the, I
14     shouldn't say a lot, some of protesters out
15     of the area of the immediate doorway. You
16     know, I think there's clearly, it's clearly
17     painted on the sidewalk and I think for the
18     most part I think the protesters respect that
19     zone.
20        So my answer would be I think it's
21     helped keep out the clutter in front of the
22     place.
23  Q. Now, there was a period of time when Planned
24     Parenthood was at that location on

Page 23

1      Commonwealth Avenue when the Buffer Zone Law
2      was not in effect. Correct?
3   A. Yes.
4   Q. During that period of time did your
5      department have cause to arrest individuals
6      in front of the clinic or in back of the
7      clinic for criminal violations?
8   A. Yes.
9   Q. Can you tell us what those criminal
10     violations were?
11        MR. PORTER: This is prior to the
12     law?
13        MR. HARVEY: This is the period
14     before the buffer zone legislation was in
15     effect and when Planned Parenthood was at
16     that location.
17        MR. PORTER: On 1055 Commonwealth?
18        MR. HARVEY: 1055, yes.
19  A. We have, I can't recall what the actual
20     charges are. I know the person but I want to
21     say--
22        MS. FACHER: If I can just interject
23     here? I would object to relating any CORE
24     information about individual people who were

Page 24

1      arrested.
2   A. I mean basic maybe disturbing the peace or
3      disorderly person. I want to say it's
4      probably those were the charges.
5   Q. How many times were arrests made?
6   A. Maybe two, two or three. Not many.
7   Q. Were those persons prosecuted?
8   A. Yes.
9   Q. Were they convicted?
10  A. I, quite frankly I didn't follow whatever
11     happened with them.
12  Q. Do you know the officers or can you recall
13     the officers that made the arrests?
14  A. I remember one was done by Sergeant Hobson
15     who is assigned not to me, he's assigned to
16     District 4, the South End. Sometimes when
17     we're shorthanded, again we're areas, the
18     sergeant in that area has to come out. And I
19     know he was one of the officers who arrested
20     one of these individuals.
21  Q. Was the person arrested a pro-life person?
22  A. No.
23  Q. Do you remember the circumstances of what the
24     arrest were?

### Page 25

1  A. I think it was just being disorderly outside
2     the premises. I think the sergeant asked her
3     to do something and I, if I remember
4     correctly, and again I think it was
5     disturbing the peace.
6  Q. Was it somehow related to the abortion clinic
7     to your knowledge?
8  A. Yes. Yes.
9        MR. PORTER: Could you state the
10    sergeant's name again, please?
11       WITNESS: His name is, you want the
12    first name? Larry. Lawrence Hobson.
13 Q. Other than your meeting Ruth, other than your
14    meeting Jean Zarrella at the police station--
15 A. Ruth, isn't it?
16 Q. I'm sorry.
17 A. Ruth.
18 Q. Other than meeting Ruth Schiavone at the
19    police station have you had other occasions
20    to talk with her?
21 A. Outside the clinic I believe I've talked to
22    her a few times.
23 Q. Can you recall those conversations at all?
24 A. No, not really.

### Page 26

1  Q. Has Planned Parenthood ever complained to you
2     about perceived violations of the Buffer Zone
3     Law which police have not taken action on?
4  A. They've made complaints about, sometimes
5     about some bumping and shoving going on
6     outside the clinic, sometimes if people are
7     hanging in their rear driveway inside the
8     buffer zone, and a lot of times when we go
9     down we just try to mediate it and prevent it
10    from escalating.
11 Q. Did Planned Parenthood have complaints during
12    the period when it first began at the
13    location but prior to the buffer zone being
14    in effect?
15 A. Yes.
16 Q. What were the complain at that time?
17 A. Same thing. People blocked the entrance,
18    people getting up in the faces of people
19    going in the back with their vehicles. The
20    back, there's a private way that people enter
21    and exit, you know, people getting up in
22    their face yelling when these people are
23    going into the building. The same type of
24    behavior out front.

### Page 27

1        We had obviously one individual,
2     Barbara Bell, who is, you know, again, I get
3     along, great relationship with her as far as
4     she being very cooperative but there's a
5     separate injunction to keep her 50 feet from
6     it, so when she was around a lot there was
7     constant complaints about keeping her at the
8     distance that she should be at.
9  Q. This is before the buffer zone?
10 A. Before, yes. But there was also complaints
11    about, you know, keeping them away from the
12    doorway.
13 Q. Is the injunction, to your knowledge, still
14    in effect against her?
15 A. Yes, I believe it is. I haven't seen her in
16    quite some time but.
17       MR. HARVEY: I would like to get this
18    marked, please.
19       (Exhibit No. 1 was marked.)
20 Q. Captain, I'm going to give you a minute to
21    review it. I'm going to ask you some
22    questions about it. Starting down there.
23 A. Oh, that, right.
24 Q. I want you to focus on Section 2B.

### Page 28

1  A. Employees or agents, there?
2  Q. At the top of the next page.
3  A. All right. Okay.
4        MR. PORTER: Is that Exhibit 2?
5        MR. HARVEY: Exhibit 1.
6  A. Okay.
7  Q. You've had a chance to read Section 2B of
8     Chapter 266, Section 120E-1/2?
9  A. Yes.
10 Q. Now, there are at Planned Parenthood on these
11    second Saturday mornings, there are Planned
12    Parenthood escorts out there?
13 A. Yes.
14 Q. And the escorts are agents of Planned
15    Parenthood?
16       MR. PORTER: Objection.
17 A. Yes.
18 Q. The objections are just for the record.
19    Unless your attorney tells you not to answer,
20    then you can answer.
21       MS. FACHER: You can answer to the
22    extent that you know.
23 A. Yes.
24 Q. Based on this law are there circumstances

Page 33

1  A. Again, I'm a little, probably in the intent
2     of the law it probably would be, it would
3     be. Whether or not, again, we would enforce
4     something like that, quite honestly we might
5     stop them from doing it; but as far as taking
6     enforcement action, we won't do anything.
7  Q. And on that last example why don't, why
8     wouldn't you enforce that?
9  A. Because our policy for the most part, and we
10    use it with both sides, is to warn them not
11    to do that again and then if they should keep
12    it up, being fair to both sides, which we
13    usually do, we would take enforcement action,
14    but we always first ask them to stop doing
15    that.
16 Q. But your view is the last one would be a
17    violation of the law?
18 A. It would be if they come within that 6 feet
19    and they're, you know, trying to educate or
20    counsel someone, sure.
21 Q. So it depends on what they say whether they
22    violate the law?
23 A. Right.
24 Q. Have you had any discussions with the

Page 34

1     Attorney General's Office about escort
2     behavior?
3  A. Yes.
4  Q. What have the discussions been?
5  A. If I can recall, just what type of behavior
6     they're subject to also and whether they can
7     actually, you know, violate this law.
8  Q. What was the conclusion?
9  A. If, yes, if they step out of the bounds of
10    their employment they would be violating the
11    law, yes.
12 Q. That was the term I used before and you
13    didn't like it.
14      MR. PORTER: Objection, Mr. Harvey.
15    The witness asked and answered the question.
16 Q. You would agree with me then that at least
17    the terminology as used by the Attorney's
18    General's Office is scope of employment.
19    Right?
20      MS. FACHER: Objection.
21      MR. PORTER: Objection. Asked and
22    answered.
23 A. You know, under their instructions of, yes,
24    under the scope of their duties, why don't we

Page 35

1     use their duties out front.
2  Q. All right. And the scope of their duties is
3     not to counsel. Is that right?
4  A. Not to counsel.
5  Q. If they do counsel, that would be outside the
6     scope of their duties?
7  A. I believe it is.
8  Q. So whether they're within the scope of their
9     duties or not depends on the content of their
10    words?
11      MS. FACHER: Objection.
12      MR. PORTER: Objection.
13 A. Their words and their actions.
14 Q. Because they could approach somebody within
15    6 feet and say "hi, I'm here from Planned
16    Parenthood, I'll help you in"?
17 A. Right.
18 Q. And that wouldn't be a violation?
19 A. That's fine.
20 Q. They could do the exact same thing and say
21    abortion is good --
22 A. Right.
23 Q. -- and that would be a violation?
24 A. Sure.

Page 36

1      MR. PORTER: Sorry to interrupt.
2     Captain Evans, can you speak up a little
3     bit? Ever since the HVAC went on I'm
4     struggling. It's old age I think.
5  Q. Have you ever seen an escort take a pamphlet
6     that had been provided from a pro-lifer to a
7     person entering the clinic? Let me restate
8     that question.
9       Have you ever seen a pro-lifer,
10    pro-life protester hand a pamphlet to a
11    person about to enter the clinic?
12 A. Yes.
13 Q. Have you ever seen a Planned Parenthood
14    escort take a pamphlet from a person who was
15    about to enter the clinic?
16 A. I don't ever recall that.
17 Q. What is the general atmosphere that you have
18    observed out in front of the Planned
19    Parenthood abortion clinic since the Buffer
20    Zone Law has been put in effect?
21 A. The general atmosphere?
22 Q. Atmosphere. Is it peaceful? Is it hectic?
23    Is it?
24 A. No. It's, it's peaceful.

Page 37

1  Q. Is it any different from prior to the buffer
2     zone being in effect?
3  A. Just in the positioning of the protesters.
4  Q. The general activity is the same?
5  A. Yes.
6  Q. The positioning means the protesters are now
7     usually outside the zone?
8  A. Yes.
9  Q. Over the period of time since you've been
10    involved in going to the clinic have you seen
11    a lot of screaming?
12        MR. PORTER: Objection.
13        MS. FACHER: Objection.
14 Q. By either side or passersby or anybody out in
15    front of the clinic?
16 A. On the second Saturday without a doubt
17    there's a lot of screaming.
18 Q. And screaming by whom?
19 A. More by the people who are pro-abortion.
20    They yell. They scream. They're very vulgar
21    as opposed to the protesters. The
22    anti-abortion people basically are saying the
23    rosary.
24 Q. Are you talking about escorts or some other

Page 38

1     people when you say vulgarities?
2  A. It's the people, there's about a dozen people
3     on the second Saturday of every month who
4     show up who are pro-abortion. We put them in
5     two separate pens. We have the anti-abortion
6     and we have the pro-abortion. The pro-
7     abortion are all young college age kids who
8     they're the ones yelling the vulgarities.
9  Q. And these pens are next to each other?
10 A. Yes.
11 Q. Are they on the street or on the sidewalk?
12 A. One is on the sidewalk, one is on the street.
13 Q. When you say pens, is this like the metal
14    grating type of thing?
15 A. Exactly.
16 Q. So the yelling and screaming is not at
17    patients about to enter the clinic?
18 A. No.
19 Q. Do you often times or have you often times
20    seen the pro-life protesters yelling and
21    screaming in the face of people about to
22    enter the clinic?
23 A. No.
24 Q. Have you ever seen it?

Page 39

1  A. No. They are yelling at the people who are
2     protesting on the other side.
3  Q. I misunderstood you. Who is yelling at whom?
4  A. The pro-abortion people are yelling at the
5     older people who are protesting at Planned
6     Parenthood. Their obscenities are not at the
7     people going in the clinic, it's at the
8     people who are protesting against Planned
9     Parenthood.
10 Q. So the vulgarities by the pro-abortion people
11    are directed at the prayers?
12 A. Right.
13 Q. My question is regarding the pro-lifers that
14    I think are referred to as sidewalk
15    counselors, the people that are on the
16    sidewalk --
17        MR. PORTER: Objection.
18 Q. -- that talk to the people that enter the
19    clinic.
20 A. Right.
21 Q. My question concerning them is do you often
22    times see or have you often times seen them
23    yelling and screaming in the face of those
24    people about to enter the clinic?

Page 40

1  A. A few of them, yes.
2  Q. How often have you seen that?
3  A. We see two individuals quite often doing it.
4  Q. Who are those two individuals?
5  A. Sheryl Fitzpatrick and Gay Guptil I think is
6     her name. Those are the only two that seem
7     to constantly do it.
8        MR. PORTER: Do you happen to know
9     how to spell her name?
10       WITNESS: Fitzpatrick?
11       MR. PORTER: The other name.
12       WITNESS: Guptil, I want to say it's
13    something like G-u-p-t-i-l-e. Gail.
14 Q. Are they usually located in the front of the
15    clinic or the back of the clinic?
16 A. Most of the times I see them in the back but
17    they're mobile, they're constantly walking
18    from the back to the front, back to the
19    front.
20 Q. When you've seen them yell is it really up
21    close in someone's face?
22 A. They're, yes. I mean not so much yelling but
23    right up in their face bothering them going
24    in and out. I won't say it's yelling. It's

Page 41

1  going right up close to them and basically
2  talking to them. I won't say they're
3  yelling. They're more or less talking to
4  them.
5  Q. Those two would be the exceptions?
6  A. Yeah.
7  Q. Have you ever in your period of time going
8  out there to Planned Parenthood seen any
9  spitting by pro-lifers?
10 A. Never. I wouldn't tolerate spitting.
11 Q. With those exceptions of Gay Guptil and
12 Sheryl Fitzpatrick are the pro-lifers
13 peaceful?
14     MS. FACHER: Objection.
15     MR. PORTER: Objection.
16 A. I would say they are.
17 Q. Have you, again this is referring to you
18 personally, the time that you've been going
19 out there --
20 A. Right.
21 Q. -- have you seen occasions that where people
22 entering the clinic people appear to be upset
23 after speaking with pro-life people?
24 A. Yes.

Page 42

1  Q. How many times have you seen that?
2  A. Quite frequently.
3  Q. And is that in both the front and back of the
4  clinic?
5  A. Mostly in the front. More agitated from them
6  being right bothering them trying to go in.
7  Q. What is it that's said to them that upsets
8  them?
9      MR. PORTER: Objection.
10 A. I don't know. I'm never close enough to
11 actually hear what they're saying. But
12 they're basically riding them from half a
13 block away when they notice that here comes a
14 potential patient. They usually go right up
15 to them and basically go right next to them
16 and they'll talk to them all the way in to
17 where they get by the doorway.
18 Q. Do they offer them pamphlets?
19 A. Sometimes they have pamphlets in their hands.
20 Q. Have you ever seen Planned Parenthood escorts
21 line up abreast of each other right in front
22 of the clinic entrance?
23 A. Can you just clarify that, Tom? What do you
24 mean?

Page 43

1  Q. Sure. Have you ever seen Planned Parenthood
2  escorts line up next to each other shoulder
3  to shoulder right on their property line in
4  front of the door, the entryway to Planned
5  Parenthood?
6  A. Usually they're not shoulder to shoulder.
7  They're basically just hanging around the
8  doorway inside the buffer zone.
9  Q. Do they stay there or do they move around
10 too?
11 A. They're mobile.
12 Q. So what's the typical scenario if someone may
13 recognize a patient down the street coming,
14 what occurs at that point?
15 A. What occurs, Tom, is if they see a potential
16 client, say, coming from a half a block away
17 they'll go out and try to greet them possibly
18 at the edge of the building on Comm Ave and
19 one, an agent will get on each side of that
20 person and walk them through to the doorway
21 and into the premises.
22 Q. What do the pro-lifers do?
23 A. Sometimes they go right up close to the agent
24 and they start talking and maybe they'll put

Page 44

1  out an arm with a pamphlet and they'll stay
2  with them and sort of, you know, dog them
3  per se until they basically now get into the
4  buffer zone area where they back off.
5  Q. Do you ever hear the conversation?
6  A. No. No. For the most part it's, you know,
7  they're right up close to the agent and the
8  person.
9  Q. When you're out there do you typically stay
10 in a car or are you --
11 A. No, I'm out.
12 Q. -- out on the street?
13 A. Out and about. Usually in the street
14 watching the whole scenario.
15 Q. Do you have a place where you typically stay
16 or are you in different places?
17 A. I'm in different places. Sometimes I'm on
18 Comm Ave closer to one end of the building
19 and another time I'm right at the corner of
20 Comm Ave by the Starmarket, so.
21 Q. You're--
22 A. I'm--
23 Q. Sorry.
24 A. I'm not on the sidewalk close enough that I

Page 53

1  Q. Well, they can--
2       MR. PORTER: Objection. He's not
3    finished.
4  Q. Go ahead.
5  A. That other law basically allowed them without
6    blocking their access to actually ride them
7    all the way right into the door. The clinic
8    access law clearly states blocking where, to
9    me, dogging or, you know, hanging on their
10   shoulder is allowed with the old law. This
11   prevents them from actually riding them all
12   the way to the minute they get inside the
13   doorway.
14 Q. But they can still ride them as long as
15   they're not speaking?
16      MR. PORTER: Objection.
17 Q. Under this law. Correct?
18 A. They can, yes.
19 Q. They can. So it's really--
20 A. With their consent.
21 Q. Right. Right. Well, even without their
22   consent, if they're not speaking that's
23   allowed under this law, isn't it?
24 A. Correct.

Page 54

1  Q. So isn't it really the peaceful speaking
2    that's prohibited under this law that wasn't
3    before?
4       MR. PORTER: Objection.
5    Argumentative.
6  A. I'm a little unclear on that.
7  Q. Prior to this law any type of violence was
8    already prohibited by criminal laws, wasn't
9    it?
10 A. Correct.
11 Q. Prior to this law blockading access to
12   clinics was already prohibited?
13 A. Correct.
14 Q. Under this law even without a person's
15   consent another person could get in within
16   6 feet of them and as long as he wasn't
17   speaking there's no violation of the law.
18   Correct?
19      MS. FACHER: Objection.
20 A. As long as there's no--
21 Q. As long as there's no--
22 A. -- blocking, blocking and counseling.
23 Q. So other than peaceful speaking approaches
24   what does this law prohibit that was not

Page 55

1    already prohibited?
2       MR. PORTER: Objection.
3       MS. FACHER: Asked and answered. It
4    was asked before.
5  A. It prohibits them from counseling them all
6    the way up into the door which was the prior
7    practice.
8  Q. Counseling means speaking?
9  A. Telling them not to go in there and, you
10   know, have your baby and.
11 Q. What do they typically say, the pro-life
12   people?
13 A. Well, you know, you know, "don't abort your
14   baby," you know, "have it," "there's people
15   out there who want babies." You know,
16   basically just please don't go in there, God
17   loves you.
18 Q. Have you ever heard a pro-lifer swear at a
19   person about to enter the clinic?
20 A. No, never.
21 Q. Have you ever heard a pro-life person use a
22   racial epithet at a person about to enter the
23   clinic?
24 A. No.

Page 56

1       MR. PORTER: Captain, I'm sorry,
2    speak up a little.
3       WITNESS: I'm sorry. Don't hesitate.
4       MR. PORTER: No, I'm sorry.
5  Q. Have you been to the Attorney General's
6    Office to discuss this law, Buffer Zone Law?
7  A. Yes.
8  Q. How many times?
9  A. Good question. I can remember once. It
10   could have been twice but I remember one
11   clearly.
12 Q. Do you recall who was there?
13 A. Patty Correa, Adam.
14 Q. Adam Simms?
15 A. Simms. And I think there was maybe an intern
16   or something was there at the time. I'm not
17   sure. There was three people.
18 Q. Anyone from Planned Parenthood?
19 A. No. And with me also was Sergeant Cook,
20   James Cook, C-o-o-k, and Sergeant Charles
21   O'Neill.
22 Q. They're under your command?
23 A. Yes.
24 Q. Can you recall what was discussed?

### Page 73

1  MR. HARVEY: Yes.
2  MS. FACHER: I think I have one
3  also. This is where the Captain is
4  designated as the one with knowledge.
5  Q. Captain, I'm showing you Exhibit 3 which is
6     entitled State Defendants Supplemental
7     Disclosures Under Federal Rules of Civil
8     Procedure 26A and I just want to direct your
9     attention to where your name is on page
10    three, 6(g) you are listed there.
11 A. Yes.
12 Q. On the next page, page four, you're listed
13    under 8(a) and 10(b).
14 A. Yeah.
15 Q. And I just want to ask you about that.
16 A. Okay.
17 Q. Now, the Attorney General has designated you,
18    in looking at page three, as a person that
19    has knowledge regarding protester conduct and
20    effect on patients and clinic personnel at
21    Planned Parenthood Boston, and then next to
22    your name under (b) it says (protester
23    conduct).
24    MR. PORTER: Objection. Under

### Page 74

1  Section B, is that where you are?
2  MR. HARVEY: I said G.
3  MR. PORTER: No. Is the main
4  section B?
5  MR. HARVEY: I'm sorry. That's
6  correct, under witnesses.
7  MR. PORTER: So the designation there
8  is the following individuals may have
9  discoverable information relevant to the
10 State Defendants defenses regarding the
11 following topics.
12 MR. HARVEY: Okay.
13 MR. PORTER: May have discoverable
14 information.
15 Q. Okay. Captain, you see on page two (b)?
16    Attorney Porter just pointed that out.
17 A. Yes.
18 Q. Do you have discoverable information
19    regarding protester conduct?
20    MR. PORTER: Objection to the form.
21 Q. Let me strike that.
22    Have you had discussions with the
23    Attorney General's Office regarding possible
24    testimony at a trial?

### Page 75

1  A. Yes.
2  Q. What were the discussions?
3  A. Our discussions, again, were about conduct
4     that has, you know, observable conduct that
5     we've seen outside of 1055 Comm Ave.
6  Q. When did you have those discussions?
7  A. I want to say approximately four to six
8     months, in that period, ago.
9  Q. With whom did you discuss?
10 A. With who from the Attorney General's?
11 Q. Yes.
12 A. Patty Correa, Adam, and there was another
13    girl in there. I don't know if she was a
14    student intern or.
15 Q. Okay.
16 A. And then Sergeant Cook as well as Sergeant
17    O'Neill were present.
18 Q. Okay. And what was the behavior that you
19    talked about as far as testifying?
20 A. About what we see outside the clinic?
21 Q. Yes.
22 A. Was behavior such as the two individuals I
23    had mentioned before, Gail and Sheryl
24    continually being at the back bothering

### Page 76

1  people going into the premises when they're
2  in their motor vehicles; behavior such as
3  wearing Boston Police caps on their head, to
4  the point that some people might interpret
5  them to be police officers is how we thought
6  that posed a problem; and general sometimes
7  pushing and shoving outside regarding the
8  escorts and some of the protesters.
9  Q. Were the discussions limited to the behavior
10    of Sheryl Fitzpatrick and Gay Guptil?
11    MR. PORTER: Objection.
12 A. They wouldn't, no. There was also, those
13    were the two main people that we brought up
14    but general behavior of some of the other
15    protesters was also discussed.
16 Q. What was that behavior?
17 A. Just, you know, being in the buffer zone,
18    sometimes approaching the patients whether
19    they're in the buffer zone or outside the
20    buffer zone, and some, you know, general
21    sometimes pushing and shoving on both sides.
22 Q. And this says, in going on, both before and
23    after the effective date of the buffer zone?
24 A. Yes.

Page 77

1 Q. Have you had occasions to arrest Gay Guptil
2    or Sheryl Fitzpatrick?
3       MS. FACHER: Objection.
4 A. Yes.
5       MS. FACHER: The Police Department's
6    position is we are not authorized to release
7    CORE information about individuals. The
8    identity of individuals who have been
9    arrested, that information has to be released
10   through the Criminal Access Board. We can't
11   release that information.
12      MR. HARVEY: Can we go off the record
13   just a second?
14      (Discussion was held off the record.)
15      MR. HARVEY: Go back on.
16      MS. FACHER: Just to clarify that
17   further on the record. I mean certainly
18   if-- that's our position at this point. If
19   you want to pursue further discussions about
20   how we would obtain that information within
21   the constructs of the law, I am happy to
22   engage in those discussions but at this point
23   we need to protect the CORE information of
24   individuals.

Page 78

1 Q. Captain, you referred to two people that wear
2    Boston Police caps. Have those person ever
3    been arrested?
4       MS. FACHER: Objection.
5 Q. For their activity outside of abortion
6    clinics?
7 A. One of them has.
8 Q. Is that the smaller one or the taller one?
9       MS. FACHER: Objection. I would
10   instruct you--
11 A. How do you know there's a difference?
12      MS. FACHER: I would instruct you not
13   to answer these questions. These are going
14   to identifying the identities of people who
15   have been arrested.
16      My position is that is CORE protected
17   information. I mean if you go about it in
18   any obscure route to identify who of two
19   people who have been named, we're still
20   getting to the same point and I would
21   instruct the Captain not to answer.
22      MR. HARVEY: If I know who they are
23   and everyone else in this room knows who they
24   are how is there a problem with releasing

Page 79

1    their identities?
2       MS. FACHER: You know, I hear your
3    position and I hope that you'll hear mine.
4    I'm standing by my objection and instructing
5    the Captain not to answer.
6       MR. PORTER: My sense is, I don't
7    know the CORE law, I definitely have to defer
8    to Ms. Facher on it, but it says what it
9    says. Right?
10      MS. FACHER: The law, it prohibits us
11   disclosing information and we under the law
12   are not authorized to disclose information.
13   Whether as a practical matter you may know
14   the identity of someone, it doesn't seem to
15   be of any help.
16      MR. PORTER: It doesn't permit you
17   exceptions?
18      MS. FACHER: That's my feeling in
19   understanding the law at this point. If I'm
20   incorrect, I'm happy to amend my position at
21   a later date.
22 Q. Captain, referring to page four under 8(a),
23   have you had discussions with the Attorney
24   General's Office regarding Boston Police

Page 80

1    Department policies and practices on
2    enforcement of the Buffer Zone Law regarding
3    your testimony at upcoming trial?
4 A. Yes.
5 Q. What are you going to be testifying to, if
6    you know?
7       MR. PORTER: Objection.
8 A. I'm going to be testifying to the fact that
9    we're down there watching closely the law and
10   what it states and I'm going to testify that,
11   you know, we do see violations obviously but
12   we try not to arrest anyone. We always try
13   to mediate it and warn and should it reoccur,
14   then we will take enforcement action.
15      So, you know, as far as the practices
16   go, yes, we do watch the enforcement and the
17   conduct down there but we don't take strict
18   interpretation as far as enforcing it.
19 Q. When you say reoccur are you talking about a
20   specific individual?
21 A. Anyone, anyone down there. If we have to
22   speak with them once or twice and then they
23   continue to exhibit that behavior that we
24   asked them not to, then obviously we will

Page 97

1  questions.
2          MR. HARVEY: I just have one.
3          REDIRECT EXAMINATION
4  BY MR. HARVEY:
5  Q. Could you, would you base an arrest, a
6     violation of the Buffer Zone Law based on a
7     person looking down and you assuming that
8     that's not consent?
9          MS. FACHER: Objection.
10 Q. Would that be enough for you?
11         MR. PORTER: Objection.
12         MS. FACHER: Objection.
13 A. It would if all the other requirements of the
14    law were in place.
15 Q. Is it always easy to determine whether a
16    person is looking down or looking away?
17         MR. PORTER: Objection.
18         MS. FACHER: Objection.
19 A. I think it's easy, that's one of the easy
20    things to sort determine here, is consent.
21    I think you can clearly tell when a person is
22    irritated by the approach of the protesters.
23 Q. But if a person is staring straight ahead and
24    doesn't indicate one way or another consent

Page 98

1     isn't an issue, is it?
2          MR. PORTER: Objection.
3  A. Well, I think it is because they're avoiding
4     that person altogether. If there was consent
5     I would think, in my interpretation, they
6     would be looking towards them shaking their
7     head possibly in agreement and putting their
8     hand out to get a flier. I think if you
9     don't pay any attention to that person when
10    they're clearly up right on your shoulder,
11    then I wouldn't think that there's any
12    consent there. I think consent of anything
13    here sometimes can be easily judged by some
14    of the patients going in.
15 Q. It's a matter of interpretation by the
16    officers?
17 A. Yes.
18         MR. HARVEY: All right. I have
19    nothing else. Thank you.
20         MR. PORTER: No more questions.
21    Thank you.
22         (Deposition concluded at 12:30 p.m.)
23
24

Page 99

1
2  COMMONWEALTH OF MASSACHUSETTS)
                                ) ss.
3  COUNTY OF MIDDLESEX           )
4
5
6          I, Grace E. Holden, a Registered
   Professional Reporter and Notary Public
7  within and for the Commonwealth of
   Massachusetts, do hereby certify:
8
9          That WILLIAM B. EVANS, the witness
   whose deposition is hereinbefore set forth,
   was duly sworn by me and that such deposition
10 is a true and accurate record, to the best of
   my knowledge, skills, and ability, of the
11 testimony given by such witness.
12         I further certify that I am not related
   to any of the parties in this matter by blood
13 or marriage and that I am in no way
   interested in the outcome of this matter.
14
           IN WITNESS WHEREOF, I have hereunto set
15 my hand and affixed my Notarial Seal this
   _____ day of June, 2002.
16
17
18 _____
   Grace E. Holden, CSR, RPR, Notary Public
19
20 My Commission Expires:
   November 8, 2007
21
22
23
24

Page 100

1
2                  CERTIFICATE
3
4
5          I, WILLIAM B. EVANS, do hereby certify
6  that I have read the foregoing transcript of
7  testimony and further certify that said
8  transcript is a true and accurate record of
9  said testimony (together with any corrections
10 listed on the attached errata sheet).
11
12         Signed under the pains and penalties of
13 perjury this _____ day of _____,
14 2002.
15
16
17
18
19
20
21
22 _____
           WILLIAM B. EVANS
23
24