Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80900-CIV-MIDDLEBROOKS/JOHNSON

KATRINA HALFPAP, JEAN
SEELINGER, and MARILYN
BLACKBURN,

      Plaintiffs,

vs.

CITY OF WEST PALM BEACH,
FLORIDA,

      Defendant.

_____/

## ORDER

THIS CAUSE comes before the Court upon the Plaintiffs' Motion for Preliminary

Injunction, in which Plaintiffs challenge two City of West Palm Beach ordinances regulating

speech and noise around health care facilities.

The Court has reviewed the Motion, the Response thereto, observed the video and

transcripts of the City Commission Meetings leading to the passage of the challenged ordinances,

and the entire record in this matter. Additionally, the Court held an evidentiary hearing on the

Motion on March 9, 2006.

## INTRODUCTION

This case presents an issue that has drawn the attention of the Supreme Court several

times in recent history – whether free speech rights of abortion protesters are outweighed by

privacy interests of patients seeking pregnancy-related services or by concerns about public

safety. This is not unexpected. Other contentious public issues have come into tension with First Amendment freedoms. *See, e.g., United States v. New York Times*, 403 U.S. 713, 91 S.Ct. 2140, 29 L. Ed. 2d 822 (1971)(Vietnam War); *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L.Ed. 2d 686 (1964)(Civil Rights).

The issue of abortion protest, however, has been uniquely centered in the Court, and the subject of four of its opinions: *Frisby v. Schultz*, 487 U.S. 474, 108 S. Ct. 2495, 101 L. Ed. 2d (1988); *Madsen v. Women's Health Center*, 512 U.S. 753, 114 S. Ct. 2516, 129 L. Ed. 2d (1994); *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 117 S. Ct. 855, 137 L. Ed. 2d 1 (1997); and *Hill v. Colorado*, 530 U.S. 703, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000). Critics, including members of the Court itself, have argued that the law developed in these cases, and particularly *Hill*, have harmed fundamental free speech principles.

Nevertheless, having carefully reviewed and applied the teachings in those cases, I conclude that the City of West Palm Beach Buffer Zone Ordinance at issue here impermissibly restricts protected speech. The size of the City's Buffer Zone exceeds any distance ever approved by the Supreme Court in such a context; the evils which the City identified as bases for the Ordinance are not supported by the record; and the remedy for those evils (even if they were supported by the record) is far from narrowly tailored to address them. Since I find that the Plaintiffs have demonstrated a likelihood of success on the merits as to this issue, the City is preliminarily enjoined from enforcing the Buffer Zone Ordinance.

Although the City's Sound Ordinance is flawed, I believe that it may be possible to narrow its reach through interpretation and therefore decline to enjoin it preliminarily.

## BACKGROUND

Plaintiffs are a group of pro-life / anti-abortion activists who regularly assemble outside the public ways adjacent to Presidential Women's Center, Inc., to express their message that abortion is the killing of a human child, and to offer women information about alternatives to abortion. Plaintiffs offer literature to persons approaching the Center in an effort to persuade them not to have an abortion. Plaintiffs also display signs, engage in prayer, and sometimes use sound amplification devices to promote their messages. Plaintiffs refer to some of their activity as "sidewalk counseling."

The Presidential Women's Center is a licensed health care facility that provides pregnancy-related services, including abortions, and is located at 100 Northpoint Parkway, West Palm Beach, Florida. The vast majority of Center clients approach and enter the facility by car. The Center is patrolled by an off-duty police officer. Volunteer escorts accompany clients from their cars to the front door of the facility.

Defendant is the City of West Palm Beach, Florida (the "City"), a municipal corporation existing under the laws and Constitution of the State of Florida.

On September 26, 2005, the City Commission of the City of West Palm Beach ( the "Commission") enacted the two ordinances challenged herein. Ordinance Number 3875-05 (Code §§78-425) creates a Buffer Zone around health care facilities (the "Buffer Zone Ordinance"). Ordinance Number 3867-05 (Code §§34-38) creates a quiet zone around health care facilities (the "Sound Ordinance").

The Buffer Zone Ordinance provides:

Sec. 78-425. Engaging in prohibited activities near health care facilities.

3

(1)     No person shall engage in protesting, picketing, distributing leaflets or
        handbills, attempting to impede access, or engage in oral advocacy,
        education or counseling activities within a designated public safety buffer
        zone adjacent to a health care facility

(2)     "Designated Public Safety Buffer Zone" shall mean an area twenty (20)
        feet around a health care facility's driveways and entrances from public
        rights-of-way or other public areas immediately adjacent to a health care
        facility.

(3)     "Health Care Facility" means any facility that is licensed, certified, or
        otherwise authorized or permitted by law to administer treatment in this
        state.

As a prelude to the Buffer Zone Ordinance, the Commission recites the issues it

considered in enacting the measure, including rights to privacy and free speech, and public safety

concerns, particularly related to traffic:

WHEREAS, the City Commission of the City of West Palm Beach
("Commission") recognizes the right of its citizens to assemble peaceably and to
demonstrate on matters of public concern; and

WHEREAS, the Commission recognizes the rights of its citizens to privacy and
the right to have safe access to and from all health care facilities; and

WHEREAS, the Commission recognizes that safe access to health care facilities
is a matter of critical importance not only to the individual, but also to the health,
safety and welfare of the citizens of the City; and

WHEREAS, the Commission recognizes the importance of ensuring public safety
and order; and

WHEREAS, the Commission recognizes the importance of promoting the free
flow of traffic on public streets and sidewalks; and

WHEREAS, the Commission recognizes the importance of protecting the
property rights of its citizens; and

WHEREAS, the Commission finds that the provisions of this Ordinance promote
the full exercise of both the right to assemble peaceably and to demonstrate on
matters of public concern, as well as the right to seek and obtain medical care and

procedures; and

WHEREAS, the Commission further finds that this Ordinance advances the City's interests in promoting public safety and order, the free flow of traffic on public streets and sidewalks, and protecting the property rights of its citizens; and

WHEREAS, the Commission therefore declares that it is appropriate to enact legislation establishing designated public safety buffer zones around health care facilities. . . .

The Sound Ordinance provides, in pertinent part that:

No person shall produce, cause to be produced, or allow to be produced, by any means, any unnecessary noise or amplified sound, operate or play any radio, phonograph, stereo set, tape or CD player, television, sound amplifier, or other electronic audio device that produces or reproduces amplified sound on any public street or sidewalk within 100 feet of any portion of a building housing a health care facility or any other institution reserved for the sick or infirmed [sic], provided that the public streets or sidewalks adjacent to such facilities shall be clearly marked by conspicuous signs identifying those areas. "Health care facility" as used in this subsection, includes, but is not limited to, hospitals, physicians' offices, walk-in medical centers, medical diagnostic centers, surgical centers, and facilities which are licensed, certified or otherwise authorized to perform medical procedures in this state and to provide health services. "Health care facility" shall not include residential homes, convalescent homes or other facilities that provide long term residency.

Plaintiffs move to enjoin enforcement of the Buffer Sound Ordinance on the basis that it (1) is over-broad; (2) constitutes an impermissible content-based restriction on speech; (3) discriminates by viewpoint; (4) is not narrowly tailored to protect the governmental interests for which it was purportedly enacted; and (5) does not constitute a valid time, place and manner restriction.

Plaintiffs also argue that the Sound Ordinance should be enjoined because it (1) is over-broad; (2) is void for vagueness; (3) creates strict liability by not providing a *mens rea* requirement; (4) is not narrowly tailored to protect the governmental interests for which it was purportedly enacted; and (5) violates equal protection.

5

## LEGAL STANDARD

It is well established that in order to establish a right to the issuance of a preliminary injunction, Plaintiffs must demonstrate each of the following: (1) a substantial likelihood that they would prevail upon the merits of their claims at a trial of the matter; (2) that they will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to them outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that, if issued, the injunction would not be adverse to the public interest. *Schiavo v. Schiavo,* 403 F. 3d 1223 (11th Cir. 2005); *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998).

The Eleventh Circuit has consistently stated that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established [its] burden of persuasion" as to the four requisites. *McDonalds,* at 1306-07 (internal quotations omitted).

The Eleventh Circuit has also found that "preliminary injunctions [related to] legislative enactments - because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits - must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts." *Northeastern Florida Chapter of Ass'n of General Contractors of America v. City of Jacksonville, Fla.,* 896 F.2d 1283, 1285 (11th Cir.1990), rev'd on other grounds, 508 U.S. 656, 113 (1993).  With this framework in mind, I turn to the facts of this case.

6

## LEGISLATIVE HISTORY

The ordinances challenged here were drafted in response to concerns over events at the Presidential Women's Center.

For several years, individuals opposed to abortion had gathered outside the Presidential Women's Center to voice their opposition to abortion and attempt to dissuade women entering the facility from terminating their pregnancies.

Late on the evening of July 4, 2005, an arson destroyed a portion of the Presidential Women's Center.

On July 11, 2005, the City Commission met, and received substantial public comment regarding the need for legislation creating a public safety buffer zone around entrances to health care facilities, and minimizing the adverse impact of amplified sounds on patients using those facilities.

At the Commission meeting, Mayor Lois Frankel was direct and to the point:

> We don't have to tiptoe around.  There is a health care clinic . . . Presidential Women's Center that has been part of the City for over twenty-five years . . ..
> They provide all kinds of health services for women, including abortions . . . .
> The Question for us tonight as we consider this is: Is there some kind of ordinance that we should consider that would protect the safety of these patients that are going into this clinic?[1]

The City Attorney proposed an eight foot buffer, patterned after the Colorado legislation approved by the Supreme Court in *Hill v. Colorado*,[2] which prohibited anyone within 100 feet of

_____

[1] Transcripts of the City Commission Meeting, July 11 at 13-14.  This Order contains citations to multiple Commission meetings, accordingly, such meetings shall be cited hereinafter as (Tr., date at page number).

[2] 530 U.S. 703 (2000).

the entrance to any health care facility from knowingly approaching within eight feet of a person

without his or her consent. (Tr., July 11 at 17-18). Representatives of the Center, on the other

hand, requested a thirty-foot fixed buffer zone. (*Id.* at 33).

The unsolved arson weighed heavily on the July 11 meeting.

The first speaker, Lillian Tomayo, President and CEO of Planned Parenthood, showed the

Commission pictures of the damaged facility "to help illustrate the atrocity and the crime that

happened last Monday . . . , [t]he arson of Presidential Women's Center was an assault on our

community values, a violation of a sacred trust." (*Id.* at 23-24). She urged the Commission to

enact a buffer zone in response, because the City had tolerated "[f]or too long, these acts of

violence and aggression. . . . Today we come to you and say no mas, no more. Your

consideration and unanimous support for the buffer zone is the first step to reclaiming our

community." (*Id.* at 24).

Louis Silber, the Center's attorney, argued that the "eight-foot sort of soft-bubble"

proposed by the City Attorney was not adequate. He contended that the City should enact a

buffer zone fashioned after the one that "the City of Pensacola has adopted, a thirty foot hard

buffer."[3] He further stated that:

_____

[3] Later in the meeting, the City Attorney stated: "Mr. Silber's correct. The City of Pensacola does have a thirty foot buffer." She went on to point out that the Pensacola ordinance had not been tested in the Courts.

These references to the Pensacola "buffer zone" may have misguided the Commission. Enacted following the murders of abortion clinic staff in the 1990s, the City of Pensacola Ordinance provides for an eight foot zone back from the property line of an abortion clinic that does not apply to sidewalks. City of Pensacola Ordinance 8-1-19 defines a "designated law enforcement area" as "an area eight (8) feet in width within a public right-of-way, immediately adjacent to the property line . . . [and] . . . does not include paved sidewalks intended for pedestrian use." *Id.* at 108 -09.

> [T]he reason we need a thirty foot hard buffer is that, because this past birthday of this great country, a cowardless [sic] act of domestic terrorism was committed in our city. . . . Not only would a buffer reduce the harassment and intimidation that patients have to undergo, but the burning of this clinic demonstrates that there are disturbed people who because of their distorted political or philosophical views, believe they can take the law into their own hands.
>
> Since that has now been proven without a doubt, who among us, who among us can guarantee that these moronic individuals will not show up on a Saturday morning to protest, and this time not just to cause property damage.
>
> If that is even a possibility, then a separation, a buffer between the patients and the protesters is essential. . . . We ask for no more and we deserve no less. Let's pass a thirty foot hard buffer.

(*Id.* at 33-35).

Following Mr. Silber's presentation, the Commission received comment from several persons who serve as volunteer escorts at the Center, and the Center's Director of Counseling. The Commission also heard from individuals who protested at the Center, including some who prayed across the street and others who provided "sidewalk counseling" on the public sidewalks near the entrance and exit to the building. The Commission heard from the City's Chief of Police, who opined that an eight-foot floating buffer would not be effective or enforceable, but that a thirty foot hard buffer would be both. (*Id.* at 99). At the conclusion of the discussion, the City Attorney was directed to prepare a proposed ordinance providing for a fixed buffer zone.[4]

The City's staff prepared two proposals. One would create a public safety buffer zone of eighteen (18) feet around health care facilities' driveways and entrances from public rights-of-way. The other would create a quiet zone (prohibiting amplified sound) within one hundred (100) feet of a building housing a health care facility.

---

[4] *Id.*

9

On September 6, 2005, the Commission took up the proposals at a public hearing.[5] The Commission heard from physicians, clinic escorts, law enforcement, pro-life / anti-abortion protesters, the general public, and attorneys Louis Silber and Marshall Osofsky, who represented the Center but were introduced as "local First Amendment and civil-rights lawyers."

Nicole Blanton, a Center escort, stated that patients are visibly shaken by confrontational protests, including the intrusive use of video cameras and ladders to intimidate patients.[6] Rosemary Deal, also a Center escort, stated that confrontations between patients and the protesters made it difficult for patients to access the facility. She commented that the protesters' use of megaphones to yell amplified threatening and intimidating comments at patients disturbed the patients, and that she personally had observed the resultant anxiety, fear, and confusion on the part of many patients.[7] No patients who had been so affected appeared before the Commission.

Mona Reese, the Center's director for some twenty-five (25) years, testified that she had observed:

> An escalation of an environment that becomes increasingly more hostile, increasingly more dangerous with the stopping of traffic, attempting to access the entrance to our facility. The tactics have been . . . magnified with having megaphones as well as the use of video cameras to intimidate patients.[8]

---

[5] (Tr., Sept.6).

[6] (*Id.* at 34-36).

[7] (*Id.* at 43, 47-48).

[8] (*Id.* at 50-51).

The physicians[9] testified that unnecessarily loud and confrontational protesting has an adverse impact on patients both before and after surgery.  The physicians stated that confrontational encounters result in the need to prescribe larger quantities of general anesthetic agents, because of the patients' enhanced stress levels, and that such increased medicinal dosages expose patients to increased danger of physiological harm from a pulmonary, cardiac and brain perspective.[10]

Dr. Michael Benjamin, Director of Medical Services for Presidential Women's Center, testified that these "nerve shattering"experiences will also necessitate higher dosages of medications to bring patients to normal post-operative levels, and that when the adrenaline caused by the experience ultimately declines, the patients are placed in greater danger by over-medication, because an overly-sedated patient may be disinclined to breathe.[11]

Each of the testifying physicians recommended that the Commission pass legislation which would diminish confrontation and noise levels at medical facilities that conduct surgeries.[12]

_____

[9] Dr. Kevin Chaitoff, former Chief of Anesthesiology and current practitioner at St. Mary's Hospital who is also on the full-time staff at Northpoint Outpatient Surgery Center ("Northpoint"); Dr. Michael Benjamin, Director of Medical Services for Presidential Women's Center; Dr. Richard Sugarman, an ophthalmologist at Northpoint; and Dr. Jeffrey Penner, an orthopedic surgeon who has privileges at Good Samaritan, St. Mary's, Columbia, the Veterans Hospital, and Northpoint.

[10] (Dr. Chaitoff: Tr., Sept. 6th at 17-20; Dr. Penner, *Id.* at 27-31; and Dr. Sugarman, *Id.* at 23-26).

[11] (*Id.* at 17-20).

[12] (*Id.* at 13, 20, 26 & 31).

11

The Commission also heard from several law enforcement and safety experts regarding concerns about traffic hazards posed by the gathering of individuals adjacent to health care facilities. Specifically as to the Center, the Commission received testimony and video tapes showing how demonstrators approach and / or stop moving vehicles entering that facility.[13]

Captain Mary Olsen testified about the increased likelihood of traffic accidents near entrances to health care facilities without the public safety buffer zone.[14]

Officer Shawn Johnson, a traffic homicide investigator and traffic analysis expert, testified about an empirical study (the "Study") he had conducted regarding traffic safety hazards at entrances to various health care facilities.[15] In order to determine how much distance there should be between a pedestrian and a driveway to prevent a collision between an individual on the sidewalk and a car entering a health care facility, Officer Johnson took into account the average speed of pedestrians walking hurriedly; the posted and observed mileage of thousands of motor vehicles at health care facilities; standardized emergency stop reaction times for drivers; and the effect of location-specific roadway friction on those stopping times. Officer Johnson collected and analyzed this information to determine the reaction times associated with various speeds and calculate a total average required stopping distance.

Officer Johnson concluded that there should be a minimum twenty (20) foot buffer zone around the entrances to health care facilities from public rights-of-way in order to avoid the

---

[13] (*Id.* at 130- 148).

[14] (*Id.* at 96-108).

[15] Officer Johnson testified that Captain Olsen asked him to conduct the Study, and that it had been commissioned in August 2005. Transcript of March 9, 2006 Preliminary Injunction Hearing at 88, 92, hereinafter cited as (Hg. Tr. at ___).

dangers presented when pedestrians step in front of motor vehicles in order to engage in protests or leaflet distribution.[16] Officer Johnson stated:

> If we can keep people far enough back from the entrance to the facility, that the person, the driver of the car would be able to safely negotiate into the driveway, and the person that is on the sidewalk, the counselor, would be in a safe area so as to not be struck by a vehicle by trying to cross in front of it. . . . based on all of our examinations . . . we basically came to the conclusion that a 20-foot buffer zone from my recommendation as a minimum, would provide a safe distance for pedestrians . . . on the sidewalk so that the drivers turning into a facility, they wouldn't meet in the crosswalk somewhere and end up having an accident.

(*Id.* at 140, 144-145.)

As to whether the types of traffic and health concerns identified by witnesses were limited to facilities where reproductive health services are provided, additional testimony indicated that Northpoint had once experienced general disruptive protests after a patient died during a (non-abortion) surgery, and that St. Mary's Hospital had at some time in the past experienced employment-related demonstrations.[17]

The Commission asked whether, under the proposed twenty (20) foot buffer, potential demonstrators or those otherwise wishing to engage in protected speech would have ample alternative means of communication. Captain Olsen conducted a demonstration before the Commission to show that persons can be heard while speaking in conversational tones from distances of twenty (20) feet.[18] Additionally, Captain Olsen testified that she had conducted a similar exercise outdoors at around 5:00 p.m., during rush hour traffic, between Banyan

---

[16] (*Id.* at 126-130).

[17] (*Id.* at 105-07).

[18] (*Id.* at 145-146).

Boulevard on the north side of the City's police station and the sidewalk, and that she and

another person were able to hear each other at a normal tone of voice with a distance of twenty

(20) feet between them.[19]

The Commission also heard testimony from several persons wishing to engage in speech

at a distance closer than the twenty (20) feet buffer zone.

Susan Pine told the Commission that "[t]he purpose of us being there is to give women an

informed choice, to let them know where there is help available." She said that an eighteen foot

buffer was not acceptable because "we need to be able to hand these women literature and give

them their options." (*Id.* at 167).

Jim Thoma, a "sidewalk counselor," told the Commission that the buffer zone would not

allow the protesters to deliver their message. He argued that moving individuals such as himself

(who are already standing behind a five-foot wall) eighteen (18) feet away from the Center's

driveway would make it so that:

> the people we are trying to talk to . . . would not be able to hear us. If we raise our
> voice enough so that they could hear us, we would be breaking the second
> ordinance of noise. So we could not converse to them in any way, and they would
> not be able to see us. . . . So moving us back eighteen feet from the people we're
> talking to, twenty feet away would only prohibit us from being able to get our
> message across.

(*Id.* at 182-83).

Thoma pointed out that in the previous five years there had been no accidents when

protesters were present at the clinic, and none of the "sidewalk counselors" had ever been

convicted of any violation. Thoma also pointed out that none of the pictures produced by the

_____

[19] (*Id.* at 143).

14

Center showed anyone stopping a car from the front, but instead showed an individual standing at the side of the car. In most of the pictures, and several of them were of Thoma, the individual was leaning forward with his hands behind his back.

Thoma noted that the July 2005 arson had occurred near midnight when the clinic was closed and no one was present. The arson, said Thoma, was being used by proponents of a buffer zone to provoke emotions, but would not have been prevented by the proposed buffer zone.

Thoma insisted that the people the buffer would harm would be the women who "might want help because there are some." He estimated that five or six women a month decide not to have an abortion after talking with the protesters, and that there is no other way to reach those women. "These, these particular women, who go in, we have no idea who they've talked to, what they know, what they've seen." In response to Commissioner Moss's query whether there were other ways of getting the information out such as television or radio ads, Thoma said:

> But we have no way of knowing whether they've had access to this information or not. . . . I mean, they may have. You know they might, then they might have heard it all. And you'll have immigrants that we have information in Spanish, we have information in Creole. Okay?
>
> My guess is a lot of those people haven't had access to the information. There is [sic] a lot of those people who go there who are of lower incomes for whatever reason. They may just not have gotten to places or heard different things that we offer information from. . . . We can't make anybody who wants to go in there not go in there.

(*Id.* at 197-98).

At the conclusion of the hearing on first-reading of the ordinances, Commissioner Moss moved for approval of Ordinance 387-05, but changing the buffer zone distance from eighteen (18) feet to twenty (20) feet. The motion was adopted unanimously. During the vote, it was apparent that the arson at the Center remained a consideration. Commissioner Mitchell stated:

15

And I don't . . . I don't agree Commissioner Moss that this is about traffic safety. At least, at least . . . I can name probably forty, fifty other streets that I have more concerns with about traffic than that intersection.

I do however, believe . . . it really was instigated . . . [a]nd unfortunately for the group that's here tonight, in my opinion, in my limited knowledge of the situation, it was instigated by a very violent attack that happened at the clinic.

And because of that and only for that reason, I am supporting and I think that twenty feet is not too onerous for the voice to still be heard. . .

But because this is an issue that sparks so much emotion and potentially violence – maybe never, but potentially – and it has been shown at this clinic it is capable of it. Somebody out there is capable of it. I think we can step over that First Amendment line, and so I'm supporting it for that reason.

(*Id.* at 201-02).

On September 26, 2005, at second reading, the ordinances were adopted with little

discussion. (Tr. Sept. 26 at 7-8).


## HEARING ON MOTION FOR PRELIMINARY INJUNCTION

At the hearing on Plaintiffs' Motion for Preliminary Injunction, Plaintiffs presented the

testimony of three witnesses: Susan Pine, Whitney Fulton and Natasha Murdock.

Pine testified that if she were to stand back the required twenty feet from the driveway,

she would not be able to see patients entering the Center; she would not be seen by patients

entering the Center; and she would not be able to engage in any type of conversation with those

patients, especially if she were prohibited from using an amplification device. Pine testified that

her activity at the Center was motivated by personal experience, because she would not have had

an abortion years ago "had there just been someone outside that facility for me that would offer

me the help that I offer others." (Hg. Tr. at 22.) Fulton and Murdock testified that they decided

not to have abortions after having received information from protesters at the Center.

Pine brought a number of photographs to show that there were no signs prohibiting amplified noise around other medical facilities in West Palm Beach. The only facility with a "quiet zone" sign was the Center. Pine also showed, by photograph, that the Center itself has loud speakers attached to the exterior of the building on multiple sides. Pine testified that during the day, the Center would emit amplified warnings to her and other protesters that they were being watched and video-taped, and that law enforcement had been notified of their activities. Pine testified that she could hear those amplified messages from a distance greater than one hundred (100) feet. She also testified that she could hear the loudspeaker at the drive-through window at Wendy's, a restaurant adjacent to the facility.

Pine illustrated her points by reference to photographs of the Center which were introduced into evidence. It was also demonstrated to the Court that attorneys routinely use microphones to ensure that the judge or the jury can hear them, when they are less than twenty feet away from each other in a relatively quiet courtroom.

Plaintiffs introduced approximately one hundred and thirty-two (132) police reports regarding activity at the Center from November 22, 2002 through July of 2005 (the "Police Reports," hereinafter cited as Report dated ___ ), for the most part on Saturdays, the day that protesters are usually present.

Review of the Police Reports demonstrates that the protests have been largely uneventful, with anywhere from six to fifty-four protesters present.[20] A typical Report read, in part, as

_____

[20] At the hearing, Officer Pleasant testified that he believed seventy-two was the highest number of protesters he had counted at the Center. (Hg. Tr. at 44).

17

follows:

> On 2/5/05 at 0730 hours I arrived at 100 Northpoint Pkwy (Presidential Women's Center) in reference to working an extra duty security detail. . .

> At about 0800 hours about 40 people organized to protest the days' scheduled abortions. Approximately 35 people, including a Catholic Priest, gathered on the north side of Northpoint Pkwy across from said business. Their form of protest was peacefully limited to prayer and song. Approx. another five people stood along the sidewalk directly in front of the clinic itself. Although much more verbal towards incoming patients. I did not observe any laws being broken.

(Report dated Feb. 5, 2005).

As to noise, there are a few occasions where the Reports reference the protesters' use of megaphones. There are also a handful of occasions where the Reports make reference to noise from the Center. One Report refers to an escort named Debra Katz playing music loudly;[21] Two others document protesters' complaints that Center volunteers were playing music with a boom box to drown out their prayers.[22]

As to traffic, there was one complaint that Pine was blocking the driveway,[23] one Report that Pine was walking across the driveway in front of vehicles,[24] and one reported incident where Pine tossed a pamphlet into a car, but the driver declined to prosecute.[25] On one occasion, it is reported that Pine engaged a driver in conversation and an officer requested that the driver park

---

[21] Report dated Oct. 19, 2002.

[22] Reports dated Nov. 9, 2002 and Feb. 22, 2003.

[23] Report dated Dec. 2, 2002.

[24] Report dated Nov. 6, 2004

[25] Report dated Apr. 3, 2004.

18

before continuing the conversation.[26]

As to confrontations or other unpleasant interactions, the record is similarly minimal.  In one Report, two clients are said to have complained about Pine.[27]  On another occasion, the Report indicates that a man who accompanied a client to the Center got into an argument with Pine and came within one to one and one-half feet of her; the officer then asked him to remain three to four feet away.[28]  One Report shows that Pine complained that a Center escort was intimidating her and impeding her ability to protest.[29]  Another Report shows Pine complaining that an escort had threatened her.[30]

Only a handful of citations appear in the Reports.  Over a three-year span, there were three instances where a woman, reportedly homeless and from a Tequesta church, walked onto the clinic grounds and was cited for trespassing.[31]  On one occasion, Thoma was arrested following an altercation with the driver of a car leaving the Center.  The driver got out of her car, approached Thoma, and grabbed a piece of paper out of his hand, while yelling at him for writing down her license plate number.[32]  In his Report, the Officer wrote that he feared Thoma might retaliate, and so he grabbed him by the arm.  When Thoma continued to yell and demand to be

---

[26] Report dated Jan. 26, 2003.

[27] Report dated May 8, 2004

[28] Report dated Oct. 9, 2004.

[29] Report dated Nov. 2, 2002.

[30] Report dated Jan. 11, 2004.

[31] *See* Reports dated Jan. 10, 2004; Feb. 14, 2004; and Sept. 13, 2003.

[32] Report dated July 26, 2003

19

released, the Officer arrested him for obstruction without violence. Pine testified that she was once arrested for trespassing, but that the charges were dropped. (Hg. Tr. at 20).

The Court next heard from the City's witness, Officer Richard Pleasant, who has worked an off-duty detail at the Center for some five years.[33]

Officer Pleasant testified that the protesters were capable of being heard from a distance of over twenty feet because the location where they currently congregate is located over twenty feet away from the clinic entrance, and he has observed that patients entering the facility can hear them just fine. At the same time, Officer Pleasant testified that he had never observed patients within the Center being bothered by the sound or noise emanating from outside.

Officer Pleasant testified that he had not witnessed any actual violence or traffic accidents caused by the protesters' presence. He stated that the protesters constantly walk back and forth through the cross-walk at the Center's north entrance / exit, and that he had often observed Pine walk into the driveway as cars were approaching to slow or stop them so that she can hand them something. (Hg. Tr. at 40, 49). With regard to violence, Officer Pleasant testified that he was aware of one incident where Pine was "punched" by one of the clients, and that:

> Most of the time I prevent [instances of violence] from happening or some of the things [Pine] say[s] to them, because it's such a sensitive issue, and I am able to talk them out of going out there and tell them the consequences if they went out there and did something to her.

(Hg. Tr. at 42.)

Captain Mary Santos Olsen described the "twenty-foot normal conversation" demonstration she had made before the Commission. Captain Olsen testified that she requested

---

[33] Officer Pleasant is paid by the Center for these off-duty details. (Hg. Tr. at 56).

20

that studies be done at medical facilities on traffic issues regarding when vehicles and pedestrians are in the same area "after the City Commission requested that we examine some buffer zones or some type of ordinances used by other municipalities..." (Hg. Tr. at 60).

Officer Shawn Johnson, who had conducted the study, reiterated his testimony before the Commission, as to how he determined the distance at which a pedestrian must be set back from a driveway to ensure that he or she would not be likely to be hit by a car approaching and entering the driveway at posted speed limits.[34] He based his twenty foot recommendation upon: (1) the distance a pedestrian could travel walking into an intersection at a normal speed during; and (2) the stopping time of an automobile traveling 35 miles per hour. When questioned by the Court, Officer Johnson agreed that the Study did not reflect the fact that drivers ordinarily wouldn't be approaching an entrance at a road's posted speed, but that because he "had to go with constants that [he] could work with because [he couldn't] take all the different variables into effect of how one person might turn into a facility versus another person so [he] took a constants [sic] that [he] had being the posted speed limit, the emergency stopping distance, and based [his] Study off that." (Hg. Tr. at 72).

When questioned further regarding the speed at which cars ordinarily enter a given driveway, Officer Johnson responded that he had provided calculations for the relevant emergency stop times and distances necessary to effectuate a complete stop (in the event a pedestrian crosses in front of a moving vehicle) for rates of speed in increments of five miles per

---

[34] Officer Johnson actually used the observed speed limits as well as the posted ones. As there was not a material deviation between the two, the Court simply refers to the speeds as the "posted speed limits." Officer Johnson's Report accounted for any such discrepancy between the posted speeds and observed actual speeds.

hour.  Officer Johnson conceded that at five miles per hour, the stopping distance would be "very minimal."  (Hg. Tr. at 79).

When asked about the incidence of traffic accidents involving pedestrians, Officer Johnson testified that in the last two and one-half years he had investigated four fatalities caused by a pedestrian walking in front of moving vehicles – none of which had occurred at the Center. (Hg. Tr. at 85).  Officer Johnson stated that he was not aware of any buffer zones to protect pedestrians from vehicles at schools, malls, churches, stadiums, city parks, city parking lots or residential areas.  (Hg. Tr. at 86).  When asked about the need for safety zones in front of health care facilities in particular, Officer Johnson stated that he was not aware of any specific need for them there, but that he had been requested to conduct the Study only as to health care facilities.

## ANALYSIS & CONCLUSIONS OF LAW

As noted above, the Supreme Court has decided four cases pertaining to abortion protests. Two of those cases involved injunctions issued by trial judges based upon facts of individual cases.  The other two cases dealt with legislatively enacted statutes or ordinances.  While the Court has not considered a provision identical to the City's ordinances, it has considered similar restrictions.  The Court's decisions concerning whether similar restrictions were valid or invalid and the analysis used in reaching those decisions are all very helpful in determining the constitutionality of the City's ordinances here.

*Frisby v. Schultz* involved a facial challenge to a municipal ordinance making it unlawful to engage in picketing before or about the residence or dwelling of any individual within a

22

particular town.[35]  The ordinance was passed after groups of abortion protesters numbering from

eleven to more than forty assembled outside the home of a doctor who performed abortions.

There were at least six occasions on which this gathering would last from one to one and one-half

hours.

In her opinion for the Court upholding the ordinance, Justice O'Connor construed it as

prohibiting only picketing focused on and taking place in front of a particular residence, with

protesters remaining free to enter residential neighborhoods either alone, marching in groups, or

going door to door to proselytize their views or distribute literature.

While the *Frisby* ordinance is quite different from the one before me, Justice O'Connor's

analysis is helpful in deciding this case.  Her opinion confirms that "[an] antipicketing ordinance

operates at the core of the First Amendment by prohibiting [persons] from engaging in protest on

an issue of public concern."  *Frisby,* 487 U.S. at 479.  She also rejected the city's argument that

its residential streets and sidewalks did not constitute a public forum.  She set forth the test for

judging the ordinance as follows:

> In these quintessential public for[a], the government may not prohibit all
> communicative activity.  For the state to enforce a content-based exclusion, it
> must show that its regulation is necessary to serve a compelling state interest and
> that it is narrowly drawn to achieve that end . . . .  The State may also enforce
> regulations of time place, and manner of expression which are content neutral, are
> narrowly tailored to serve a significant government interest, and leave open ample
> alternative channels of communication.

*Id.* at 481(citations omitted).

Finding that as interpreted by the Illinois state courts, the ordinance applied to all

picketing and was therefore content neutral, Justice O'Connor also concluded that since it

_____

[35] *Frisby*, 487 U.S. 474.

applied only to "focused picketing taking place solely in front of a particular residence," ample alternative channels of communication existed. *Id.* at 484. She next moved to assess whether the ordinance served a significant governmental interest. Justice O'Connor's answer to that question is particularly meaningful to an analysis of the ordinances at issue here.

The governmental interest that was found to justify the restrictions of the *Frisby* ordinance was residential privacy – the "unique nature of the home." *Id.* The aspect of residential privacy that was key to the Court's decision was protection of the unwilling listener. "Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different." *Id.* (citations omitted). "The resident is frequently, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech." *Id.* at 487. The Court upheld the ordinance because the nature and scope of the interest left the ban narrowly tailored, and because ample alternative channels of communication were available.[36]

*Madsen v. Women's Health Center* involved a challenge to the constitutionality of an injunction entered by a Florida state court which prohibited anti-abortion protesters from demonstrating in certain places outside of a health clinic.[37] Since aspects of this decision seem to validate provisions similar to those within the City's Ordinance, it is necessary to examine the opinion closely.

In September 1992, the trial judge in *Madsen* permanently enjoined protesters from

---

[36] The Court pointed out that, since its First Amendment analysis was grounded in protection of the unwilling residential listener, a different issue would be presented if a resident used a home for a business or public meeting or invited the presence of protesters.

[37] 512 U.S. 753.