blocking or interfering with public access to the clinic, and from physically abusing persons

entering or leaving the clinic.  Six months later, the clinic sought to broaden the injunction,

complaining that the protesters were still impeding access to the clinic.

The state judge found that despite the initial injunction, protesters continued to impede

access to the clinic by congregating on the paved portion of the street leading to the clinic and by

marching in front of the clinic's driveways.  He found that as vehicles heading toward the clinic

slowed to allow the protesters to move out of the way, "sidewalk counselors" would approach

and attempt to give the vehicle occupants anti-abortion literature.  The number of people

congregating ranged from a handful up to four hundred, and the noise varied from singing and

chanting to the use of loudspeakers and bullhorns.

A clinic doctor testified that as a result of having to run such a gauntlet to enter the clinic,

the patients manifested a higher level of anxiety and hypertension causing them to require a

higher level of sedation in order to undergo the surgical procedures, thereby increasing the

associated risk.  Noise produced by the protesters could be heard within the clinic causing stress

to the patients.  The doctor also testified that those patients who turned away because of the

crowd and returned later increased their health risks by reason of this delay.

The state judge concluded that the original injunction had proved to be insufficient and

amended his prior order so as to enjoin a broader array of activities.  Among the many provisions

of the broader injunction were two which on the surface seem similar to portions of the City's

Ordinance.  The broader injunction prohibited "congregating, picketing, patrolling,

demonstrating or entering that portion of public right of way or private property within thirty-six

feet of the property line of the clinic."  In concluding that the thirty-six foot buffer zone was in

large part valid, the Court in *Madsen* stated:

> The 36-foot buffer zone protecting the entrances to the clinic and parking lot is a means of protecting unfettered ingress and egress from the clinic and ensuring that petitioners do not block traffic on Dixie Way. The state court seems to have had few other options to protect access given the narrow confines around the clinic. The state court was convinced that allowing petitioners to remain on the clinic's sidewalk and driveway was not a viable option in view of the failure of the first injunction to protect access.

512 U.S. at 769. The court continued:

> The need for a complete buffer zone near the clinic entrances and driveway may be debatable, but some deference must be given to the state court's familiarity with the facts and the background of the dispute. . . . Moreover, one of the petitioner's witnesses during the evidentiary hearing before the state court conceded that the buffer zone was narrow enough to place petitioners at a distance of no more than 10-12 feet from cars approaching and leaving the clinic. . . . We also bear in mind that the state court originally issued a much narrower injunction, providing no buffer zone, and this order did not succeed in protecting access to the clinic. The failure of the first order to accomplish its purpose may be taken into consideration in evaluating the constitutionality of the broader order.

*Id.* at 669-70 (citations omitted).

The Court invalidated, however, that portion of the thirty-six foot buffer zone which extended onto the private property on the back and side of the clinic. The Court concluded that there was nothing in the record indicating that the protesters' activities on private property had obstructed access to the clinic nor that they had blocked vehicle traffic on Dixie Way. "Absent evidence that petitioners standing on the private property have obstructed access to the clinic, blocked vehicular traffic, or otherwise unlawfully interfered with the clinic's operation, this portion of the buffer zone fails to serve the significant interest relied upon by the Florida Supreme Court."[38] *Id.* at 771.

---

[38] Justice Scalia, joined by Justices Kennedy and Thomas, dissented from the portion of the judgment upholding parts of the injunction. With respect to the thirty-six foot buffer zone,

26

The state court order prohibited protesters from physically approaching any person

seeking services of the clinic in an area within three hundred feet of the clinic "unless such

person indicates a desire to communicate." That portion of the order was held to be

unconstitutional.

> [I]t is difficult indeed, to justify a prohibition on all uninvited approaches of
> person seeking the services of the clinic, regardless of how peaceful the contact
> may be, without burdening more speech than necessary to prevent intimidation
> and to ensure access to the clinic. Absent evidence that the protester's speech is
> independently proscribable (i.e. "Fighting words" or threats), or is so infused with
> violence as to be indistinguishable from a threat this provision cannot stand. As a
> general matter, we have indicated that in public debate our own citizens must
> tolerate insulting, and even outrageous speech in order to provide adequate
> breathing space to the freedoms protected by the First Amendment. The
> "consent" requirement alone invalidates this provision; it burdens more speech
> than is necessary to prevent intimidation and to ensure access to the clinic.

*Id.* at 774.

The state court order also contained provisions pertaining to sound and images. For

example, it prohibited singing, chanting, whistling, shouting, yelling, use of bullhorns, auto

horns, sound amplification equipment or other sounds or images observable to or within earshot

of the patients withing the clinic during the hours of 7:30 a.m. through noon on Mondays through

Saturdays, and during surgical procedures and recovery periods. It also prohibited use of

bullhorns or sound amplification equipment within three hundred (300) feet of the residence of

---

assuming that there was a legitimate state interest in (1) keeping pedestrians off the paved portion
of Dixie Way; and (2) enabling cars to cross the public sidewalk without slowing down or
coming to a complete stop, he pointed out the injunction could have ordered demonstrators to
stay out of the street (the original injunction had not done that); limited the number of protesters
on the clinic side of driveway or forbidden the picketers to walk on the driveways. *Id.* at 812.
Justice Stevens also concurred in part and dissented in part. He pointed out that the injunction
was aimed at a limited group of individuals who had engaged in illegal conduct. He opined that
a statute prohibiting demonstrations within thirty-six feet of an abortion clinic would "probably
violate the First Amendment." *Id.* at 778.

any of the clinic's personnel.

The Court upheld the noise restrictions agreeing that noise control is particularly important around hospitals and medical facilities during surgery, pointing to language from opinions pertaining to labor disputes:

> Hospitals, after all are not factories or mines or assembly plants. The are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere.

*Id.* at 772 (citations omitted). The Court concluded that the limited noise restrictions the state court's order imposed burdened no more speech than necessary to ensure the health and well-being of the clinic's patients.

However, the Court invalidated the "images observable" provision of the state court's order because, according to the Court, the only plausible reason a patient would be bothered by images observable within the clinic would be if the patient found the expression contained in such images disagreeable. To avoid the images required no more than for the clinic to pull its curtains or for a patient to turn away. The Court found this provision of the injunction to violate the First Amendment.

In *Schenck v. Pro-Choice Network of New York*, the Court again considered the constitutionality of certain aspects of an injunction. Prior to the trial judge entering the injunction in *Schenck*, four medical clinics were subjected to numerous large-scale blockades in which protesters would march, stand, kneel, sit or lie in parking lot driveways or doorways. Protesters used tactics with varying levels of belligerence. For example, they would get very close to women entering the clinics and shout in their faces; or they would jostle, grab, push and

28

shove women as they attempted to enter the clinics. Volunteers who attempted to escort patients past protesters were sometimes elbowed, grabbed or spit on. The district judge found that the local police were unable to respond effectively because the protests were constant and were overwhelming police resources. Whenever officers would arrive, protesters would disperse only to return when the officers left. Additionally, the judge found that the defendants had harassed the police officers verbally and by mail, and that the patients were reluctant to cooperate with the police or prosecutors because they feared reprisal.

As was the case in *Madsen*, the district judge in *Schenck* was required to issue several orders to accomplish a remedy and the facts are therefore somewhat complicated procedurally. But since these facts were significant to the Supreme Court's resolution of the case, it is necessary to examine them carefully.

Shortly after the *Schenck* petitioners filed their complaint, the district court issued a temporary restraining order (the "TRO"). The TRO enjoined protesters from physically blockading the clinics, physically abusing or tortiously harassing anyone entering or leaving the clinics and "demonstrating" within fifteen feet of any person entering or leaving the clinic. The TRO contained an exception to this fifteen foot buffer zone which allowed two sidewalk counselors to engage in "a conversation of a non-threatening nature" with individuals entering or leaving the clinic. However, if the individual indicated either verbally or non-verbally that they did not want the counseling, the counselors had to stop.

The protesters complied with the TRO at first and held peaceful demonstrations instead of the scheduled blockade. After about a month, however, the protests returned to their prior intensity, including aggressive "sidewalk counseling" with occasional shoving and elbowing,

trespassing into clinic buildings and blocking doorways and driveways.  Contempt proceedings

ensued and after twenty-seven days of hearings, the district judge concluded that a finding of

civil contempt was warranted.

After hearing twelve additional days of testimony, the district judge issued an injunction

which largely tracked the TRO, but had several significant changes.  It was substantially broader

and banned any  "demonstrating within fifteen feet from either side or edge of or in front of

doorways, entrances, parking lot entrances, driveways and driveway entrances of such facilities,"

("Fixed Buffer Zones"), or "within fifteen feet of any person or vehicle seeking access to or

leaving such facilities" ("Floating Buffer Zones").  Moreover, although the broader injunction

retained the exception allowing two counselors within the buffer zone, once a person had asked

the sidewalk counselors to stop their counseling, they not only had to stop, but they also had to

retreat fifteen feet from the person they had been counseling and thereafter remain outside the

buffer zones.

Upon review, the Supreme Court sustained the Fixed Buffer Zone but invalidated the

Floating Buffer Zone.  Again, the analysis and reasoning leading to the decision is instructive in

considering the constitutionality of the City's ordinances.  The Court explained that in *Madsen*, it

had upheld the Fixed Buffer Zone in order to ensure access to the clinic due to the demonstrators'

past conduct, and because, giving deference to the trial judges' familiarity with the facts and

specific site, there were few other options to protect that access.  *Madsen*, 519 U.S. at 373.  It had

struck the three hundred foot "no-approach" zone, however, because it was difficult "to justify a

prohibition on <u>all</u> uninvited approaches . . . regardless of how peaceful the contact may be . . . ."

*Id.*(emphasis in original)(citations omitted).

The Court turned to the facts in *Schenck*, again applying its *Madsen* analysis, the Court upheld the Fixed Buffer Zone as "necessary to ensure that people and vehicles trying to enter or exit the clinic property or clinic lots [could] do so." *Id.* at 380. The Court found the necessity evident from the record before it:

> As in *Madsen*, the record shows that the protestors purposely or effectively blocked or hindered people from entering and exiting the clinic doorways, from driving up to and away from clinic entrances, and from driving in and out of clinic parking lots. Based on this conduct – both before and after the TRO issued – the District Court was entitled to conclude that the only way to ensure access was to move back the demonstrations away from the driveways and parking lot entrances.
>
> \*      \*      \*
>
> Based on this conduct, the District Court was entitled to conclude that the protestors who were allowed close to the entrances would continue right up to the entrance, and that the only way to ensure access was to move all protestors away from the doorways. Although one might quibble about whether fifteen feet is too great or too small a distance if the goal is to ensure access, we defer to the District Court's reasonable assessment of the number of feet necessary to keep the entrances clear.[39]

*Id.* at 381 (emphasis in original).

The Court struck, however, the Floating Buffer Zones around people entering and leaving clinics because they burdened more speech than necessary to serve the relevant government interest. The Court noted that the Floating Buffer Zone prevented the defendants – except for two sidewalk counselors as long as they were tolerated by the targeted individual – from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who were walking on the public sidewalks. This was a broad prohibition said the Court both because of the type of speech restricted and the nature of the

---

[39] The Court pointed out that the fifteen foot fixed zone did not apply to the two sidewalk counselors.

location. Specifically, the Court stated that "[l]eafleting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum." *Id.* at 378.

The Court emphasized the practical problems presented to a protester trying to communicate with an incoming or outgoing patient or clinic employee while remaining fifteen feet away at all times. The Court noted, as an example, that the sidewalk outside one of the clinics was seventeen feet wide. This meant that a protester would likely have to be in the street or walk fifteen feet in front of or in back of the person they were seeking to engage. The Court also struck the fifteen foot Floating Buffer Zone around vehicles because it "restrict[ed] the speech of those who simply line the sidewalk or curb in an effort to chant, shout, or hold signs peaceably." *Id.* at 380.

Another aspect of the opinion in *Schenck* merits particular attention; indeed, in his dissenting and concurring opinions, Justice Scalia, again joined by Justices Kennedy and Thomas, points to it as the most important holding: "There is no right to be free of unwelcome speech on the public streets while seeking entrance to or exit from abortion clinics." *Id.* at 386 (Scalia, J., concurring in part and dissenting in part).

> We doubt that the District Court's reason for including that provision – "to protect
> the right of the people approaching and entering the facilities to be left alone" –
> accurately reflects our First Amendment jurisprudence in this area. *Madsen*
> sustained an injunction designed to secure physical access to the clinic, but not on
> the basis of any generalized right "to be left alone" on a public street or sidewalk.

*Id.* Disclaiming the District Court's rationale, the Court upheld the "cease and desist" provisions on the same basis it had upheld the fifteen foot fixed buffer: the past conduct of the protesters.

"These counselors remain free to espouse their message outside the fifteen foot buffer zone, and the condition on their freedom to espouse it within the buffer zone is the result of their own previous harassment and intimidation of patients." *Id.* at 385.

The most recent chapter in the Court's anti-abortion protest jurisprudence is *Hill v. Colorado.* 530 U.S. 703 (2000). At issue in *Hill* was the constitutionality of a Colorado statute which made it unlawful within one hundred feet of the entrance to any health care facility "to knowingly approach" within eight feet of another person, without that person's consent, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling, with such other person . . . ." Colo. Rev. Stat. 51809-122(3) 1999.[40] As described in *Hill*, although the statute prohibits speakers from approaching unwilling listeners, it does not require a standing speaker to move away from anyone passing by. Nor does it place any restriction on the content of any message that anyone may wish to communicate to anyone else, either inside or outside the regulated areas. It does, however, make it more difficult to give unwanted advice particularly handbills or leaflets to persons entering or leaving medical facilities. *Hill*, 530 U.S. at 708.

In considering the constitutionality of the statute, the Supreme Court first examined the competing interests at stake. The Court acknowledged that the primary motivation for the statute was activity at abortion clinics, and further, that the leafleting, sign displays and oral communications of the protesters were protected by the First Amendment. "The fact that the messages conveyed by those communications may be offensive to their recipient does not

---

[40] Another provision of the statute made it a class three misdemeanor "if such person knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a health care facility."

33

deprive them of constitutional protection." *Id.* at 715.  The Court agreed that the public

sidewalks, streets and ways affected by the statute were "quintessential public forums for free

speech." *Id.*

      The Court identified two governmental interests supporting the statute: (1) preservation

of unimpeded access to health care facilities; and (2) avoidance of potential trauma to patients

associated with confrontational protest.  *Id.*  In conducting the interest analysis, the court

emphasized that it is important "to recognize the significant difference between state restrictions

on a speaker's right to address a willing audience and those that protect listeners from unwanted

communication." *Id.*

      The Court sought to determine whether the statute was content-based or content-neutral.

That distinction is important because under First Amendment jurisprudence, this categorization

results in different tests.  If a regulation is content or viewpoint based, and therefore presents the

danger of government suppression of ideas, it is presumptively invalid and can only be justified if

it is found, upon strict scrutiny, to serve a compelling governmental purpose, and is the least

restrictive means of accomplishing that purpose.  Because it concerns only the circumstances of

delivery, and as such it is considered to present less of a danger to protected speech, a content

neutral regulation is judged by a more accommodating standard.  A content-neutral, time, place

and manner restriction must be narrowly tailored to advance a significant state interest, must

leave open ample alternative means of communications, and cannot be sustained if it burdens

substantially more speech than is necessary to further the government's legitimate interests.

*Ward v. Rock against Racism*, 491 U.S. 781 (1989).

      The Supreme Court majority found the Colorado Statute to be content-neutral and

therefore subject to the less restrictive test, citing these reasons:

> First, it is not a "regulation of speech." Rather it is a regulation of the places
> where some speech may occur. Second, it was not adopted "because of
> disagreement with the message it conveys." This conclusion is supported not just
> by the Colorado courts' interpretation of legislative history, but more importantly
> by the State Supreme Court's unequivocal holding that the statute's "restrictions
> apply equally to all demonstrators, regardless of viewpoint, and the statutory
> language makes no reference to the content of the speech." Third, the State's
> intent in protecting access and privacy, and providing the police with clear
> guidelines, are unrelated to the content of the demonstrators speech.

*Id.* at 719-20. As the majority saw the Colorado Statute: "Instead of drawing distinction based

on the subject that the approaching speakers may wish to address, the statute applies equally to

used car salesmen, animal-rights activists, fund-raisers, environmentalists and missionaries." *Id.*

at 723.[41]

The Court then proceeded to apply the content-neutral test to determine whether the

Colorado law was narrowly tailored to serve the governmental issues involved and whether

ample alternative channels of communication were left open. Pointing out that the statute did not

affect a person who was in place holding a sign and contained no restriction on the number or

size of signs, the Court found no adverse effect on the reader's ability to read signs displayed by

demonstrators.

------

[41] Unconvinced that Colorado's health clinics were facing an onslaught of used car
salesmen, Justice Scalia responded that the "Court's confident assurance that the statute poses no
special threat to First Amendment freedoms . . . is a wonderful replication (except for its lack of
sarcasm) of Anatole France's observation that '[t]he law in its majestic equality, forbids the rich
as well as the poor to sleep under bridges." J. Bartlett, FAMILIAR QUOTATIONS 550 (16th Ed.
1992). This Colorado law is no more targeted at used car salesmen, animal rights activists, and
missionaries than French vagrancy law was targeted at the rich." *Hill*, 530 U.S. at 743 (Scalia, J.,
dissenting). In his separate dissent, Justice Kennedy discussed the majority's decision to
examine the Colorado statute under rules applicable to content-neutral regulations as "an affront
to First Amendment principles." *Id.* at 768 (Kennedy, J., dissenting).

With respect to oral statements, although an eight foot separation made it more difficult for a speaker to be heard, the Court found the statute did not preclude such communication. First the Court noted that the statute placed no limit on the number of speakers, or the noise level, including the use of amplification equipment. The Court found that "unlike the 15-foot zone in *Schenck*" the eight foot zone allows normal conversational distance. *Id.* at 796. Moreover, the statute allowed the speaker to remain in place, and others could pass within eight feet without causing the protester to violate the statute. The Court emphasized that only attempts to address unwilling listeners were affected. *Id.* at 797.

The Court viewed the burden on the ability to distribute handbills as more serious. According to the Court "it seems possible" that an eight foot interval could hinder the ability of a leafleter to deliver handbills to some unwilling recipient. *Id.* at 727. The Court pointed out, however, that the statute did not prevent a leafleter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians could easily accept. *Id.*[42]

Finally, the Court noted the unique concerns of health care facilities:

> Persons who are attempting to enter health care facilities – for any purpose – are often in vulnerable physical and emotional conditions. The State of Colorado has responded to its substantial and legitimate interest in protecting these persons from unwanted encounters, confrontations, and even assaults by enacting an exceedingly modest restriction on the speakers' ability to approach.

---

[42] Predictably, Justice Scalia thought that the harm to leafleting was more than simply possible. As he saw it, "leafleting will be rendered 'utterly ineffectual.' A leafleter, whether he is working on behalf of Operation Rescue, Local 109, or Bubba's Bar-B-Que, stakes out the best piece of real estate he can and then walks a few steps towards individuals passing in his vicinity, extending his arm and making it *as easy as possible* for the passerby, whose natural instinct is generally not to seek such distributions, to simply accept the offering." *Id.* at 757 - 58 (Scalia, J., dissenting).

*Id.* at 729.  The Court concluded that the statute was reasonable and narrowly tailored:

> [T]he 8-foot restriction on an unwanted physical approach leaves ample room to
> communicate a message through speech.  Signs, pictures, and voice itself can
> cross an 8 foot gap with ease.  If the clinics in Colorado resemble those in
> *Schenck*, demonstrators with leaflets might easily stand on the sidewalk at
> entrances (without blocking the entrance) and without physically approaching
> those who are entering the clinic, peaceably hand them leaflets as they pass by.

*Id.* at 729-30.

Admittedly, I have discussed these cases at some length.  Rarely, however, in deciding a

case are there four Supreme Court decisions available to provide guidance.  Several observations

can be gleaned from them:

1. With the exception of a private home, the Supreme Court has never upheld
   a fixed and total ban upon abortion protesters within a certain zone
   without a record of past misconduct blocking access to a medical facility
   and a finding that the dimension of the zone was necessary to ensure
   access to the facility.

2. The largest fixed buffer zone approved by the Court was the fifteen foot
   zone in *Schenck* (which permitted two sidewalk counselors to go into the
   zone).  The *Madsen* thirty-six foot buffer zone ran from the property line
   and allowed protesters within ten to twelve feet of cars entering and
   leaving the clinic.

3. The Court has held that streets and sidewalks are quintessential public
   fora, and that there is no right to be free of unwelcome speech on the
   public streets while seeking entrance or exit from abortion clinics.

4. The Court found in *Schenk* and reaffirmed in *Hill* that a fifteen foot zone
   did not allow the speaker to communicate at a "normal conversational
   distance."

5. The Court has held that the First Amendment protects the right of every
   citizen to reach the minds of willing listeners and to do so there must be an
   opportunity to win their attention.

With these observations in mind, I turn to review of the City's ordinances.

The first task is to assess whether the ordinances are content-based or content-neutral.[43] Were I writing on a blank slate, and had I not studied the Supreme Court decision in *Hill*, I would have viewed the Ordinance as content-based. It seems abundantly clear from this record that passage of the ordinances was in response to speech-related activities occurring at a single abortion clinic; was largely motivated by an unresolved arson at that clinic for which the ordinances offer no solution; and was designed to restrict the protest, education or counseling by those who gather in the public spaces adjacent to the clinic in opposition to abortion. Given these circumstances, it is difficult to see how this governmental action ostensibly to protect patients at health facilities from certain types of speech (protest, advocacy, education and counseling) is anything other than a restriction upon content. Even if not expressly limited to abortion, the Ordinance prohibits only political speech – precisely the form of speech that has been most highly valued under our First Amendment jurisprudence because it touches on matters of public concern. After all, if I were to approach a person entering the Presidential Women's

---

[43] The Eleventh Circuit has stated that "in determining whether the purpose of a law is to suppress protected speech, a court may examine a wide variety of materials, including the text of the statute, any preamble or express legislative findings associated with it, legislative history, and studies and information of which legislators were clearly aware." *Ranch House, Inc. v. Amerson,* 238 F.3d 1273, 1280 - 81 (11th Cir. 2001); *See also, Colacurcio v. City of Kent,* 163 F.3d 545, 552 (9th Cir.1998)("We will look to the full record to determine whether evidence indicates that the purpose of the ordinance is to suppress speech or ameliorate secondary effects. In so doing, we will rely on all 'objective indicators of intent, including the face of the statute, the effect of the statute, comparison to prior law, facts surrounding enactment, the stated purpose, and the record of proceedings.'" (citation omitted)), *cert. denied,* 529 U.S. 1053, 120 S.Ct. 1553, 146 L.Ed.2d 459 (2000).

Additionally, "[a]lthough we have indicated that 'there is no constitutional requirement that a city make particularized findings regarding the adverse effects' to be prevented . . . we have never said that a state actor may prevail . . . without pointing to any record evidence suggesting a link between the challenged statute and the advancement of the legislature's alleged content-neutral purpose." 238 F.3d at 1282.

Center to ask for directions to Clematis Street, to remark upon the weather or the playoff hopes

of the Miami Heat, I should not need to concern myself with the off-duty police officer standing

at its entrance. Only if I engaged in the type of speech that regularly occurs on the sidewalks

adjacent to the Presidential Women's Center – abortion protest and counseling – would I face a

realistic chance of being placed under arrest.[44]

Nevertheless, given that the ordinance at issue in *Hill* was deemed content-neutral,[45] it

appears that the City's Buffer Zone Ordinance here should be considered content-neutral and

evaluated accordingly.

As stated above, a content-neutral, time, place and manner restriction must be narrowly

tailored to advance a significant state interest, must leave open ample alternative means of

communications, and cannot be sustained if it burdens substantially more speech than is

necessary to further the government's legitimate interests. *Ward*, 491 U.S. 781.

The issue for the Court, then, is to identify the "evil" the City seeks to remedy, and to

determine whether the City's ordinances are narrowly tailored to remedy that evil. "A statute is

narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to

remedy. *Frisby v. Schultz*, 487 U.S. at 486.

The City identifies two interests for its ordinances: (1) "the rights of its citizens to privacy

---

[44] Although non-abortion protest, education and counseling would also come within the ambit of the ordinances as worded, the City Commission record included reference only to two instances of non-abortion "disruptive" speech before health care facilities at some unspecified time in the past.

[45] The ordinance in *Hill* arguably presented the issue of content neutrality in starker terms than the ordinance here, by making explicit reference in its recitations to those who would protest and counsel against certain medical procedures.

and the right to safe access to and from all health care facilities; and (2) promoting the free flow of traffic on public streets and sidewalks." As further refined by the City's lawyer at argument, the City is seeking to reduce opportunities for collisions between cars and pedestrians and to stop "in your face" confrontations between patients and protesters. (Hg. Tr. at 111-14).

With respect to the City's interest in ensuring safe access to health care facilities and preventing harmful confrontations, it is important to note that unlike the records in *Schenck*, *Madsen*, and even *Hill*, the record in this case does not reflect any blockades of clinic entrances, that anyone's access to health care facilities was actually impeded, or that demonstrations in front of the Center or any other facility "were often confrontational." *Hill*, 530 U.S. at 709. To the contrary, regularly-maintained police reports covering a three-year span of vigilance at the Center indicated that the presence of protesters and counselors on the sidewalks outside the Center was largely uneventful. The only arrest arising out of a confrontation that appears in the Reports occurred after an individual exiting the Center by car stopped her vehicle to confront a protester she believed had written down her license plate number.

With the respect to the City's interest in preventing collisions between cars and pedestrians, the record similarly does not support the existence of any particular traffic hazard in front of the Center or any other health care facility. Officer Pleasant testified that in the five years of his off-duty detail at the Center, he had not witnessed a single accident there. Officer Johnson testified that he knew of no accidents involving cars and pedestrians at health clinics, and testified that the City had not sought to employ buffer zones to promote traffic safety near schools, stadiums, or other large facilities. Indeed, it appears from this record that the Commission sought this "traffic safety study" only after its July 2005 meeting, where, largely in

response to the July 4 arson at the Center, the Commission entertained the question of whether there was "some kind of ordinance that we should consider that would protect the safety of these patients that are going into [the Presidential Women's Center]?"

Even if there were record support for the evils which this legislation was drafted to remedy, the ordinances enacted by the City are not narrowly tailored for that purpose. To the contrary, it is clear that the ordinances burden substantially more speech than is necessary to serve the interests identified by the City, and do not leave open ample alternative means of communication.

The testimony in this case is that virtually all patients and others arrive at the Center by automobile and, as those who live in South Florida can attest, usually with the windows rolled up. The driveway into the clinic property is from a public street, with a sidewalk on the side where the Center is located. Along the sidewalk is a five-foot wall which extends to the driveway. In front of the wall is a short hedge. As a car enters the driveway it proceeds into a parking lot which is on private property where the clinic is located. Protesters are not permitted in the parking lot. The only opportunity for protesters to engage in conversation with clients or approach to hand them a leaflet is as cars pull into the driveway, or, to call to clients from behind the five-foot wall as they get out of their car to enter the clinic.

The City's ordinances would eliminate encounters between the protesters and those individuals as they drive into the Center property by requiring protesters to stay twenty feet back from the driveway. The sound ordinance would then preclude the protesters from using amplified sound to attempt to draw the attention of clients they were not able to communicate with at the driveway.

Despite the elaborate calculations employed to arrive at the recommended twenty-foot buffer zone, it cannot be said that keeping protesters and counselors at this distance from cars turning into a driveway is narrowly tailored to serve the City's interest in traffic safety. Officer Johnson arrived at this figure assuming that a car would enter a driveway at the posted speed limit. Officer Johnson conceded, however, that drivers don't normally turn into driveways going the posted speed limit. He maintained that he was required to use the posted speed limit in his calculations because he did not have data for the speeds at which drivers make such turns.

To assume that an individual would walk into the path of a car traveling at forty-five miles per hour, and then establish a buffer zone based on those wholly unwarranted assumptions, falls dramatically short of narrow tailoring. The absence of narrow tailoring is highlighted by the fact that there was no evidence of collisions between pedestrians and cars in front of the Center or any health care facility of the type the twenty-foot buffer zone was purportedly designed to remedy.

Nor is the buffer zone narrowly tailored to address any concern related to potential blocking of the clinic entrance, which again is not supported by the record.

The City could, of course, craft legislation that is narrowly tailored to ensure that pedestrians do not occupy or block the actual driveway entering the clinic by prohibiting just that. For example, Florida Statute 316.2045(1)-(2) prohibited anyone from "willfully [obstructing] the free, convenient, and normal use of any public street, highway, or road by impeding, hindering, stifling, retarding, or restraining traffic or passage thereon, by standing or approaching motor vehicles thereon, or by endangering the safe movement of vehicles or pedestrians traveling thereon[. . . ] in order to solicit." Although that statute was declared

42

unconstitutional because it was a content-based restriction (by not applying to speech by charities and politicians) that was not narrowly tailored to serve the State's compelling interest in traffic safety,[46] the City could certainly craft content-neutral legislation that directly remedied legitimate safety concerns, and nothing more.[47]

It is difficult to discuss whether a twenty-foot buffer zone is narrowly tailored to serve the City's interest in prevent confrontational exchanges between protesters and clients when there is scant record evidence of such encounters, and no evidence of disruptive confrontations caused by the proximity of protesters to the driveway. In its memorandum in opposition to the motion for injunctive relief, the City cites testimony of physicians about the adverse medical impact of "unnecessarily loud and confrontational protesting," and points out that the ordinance protects individuals obtaining medical care from "unwarranted intrusions of personal space." (Memo at 5, 17). Neither the record before the City Commission nor the legal argument of its counsel, however, offer any explanation as to why a twenty foot buffer zone rather than something akin to the eight foot "no approach" restriction approved in *Hill* and recommended by the City Attorney is necessary to serve this interest. Without any history of disruption of the ability of patients to enter the clinics, there is no factual justification for the claim that the twenty foot buffer zone is narrowly tailored to promote safe access. Furthermore, a twenty foot buffer zone is not narrowly tailored to remedy the "evil" of confrontational or "in your face" protesting. Unlike the

_____

[46] *See Bischoff v. Florida*, 242 F.Supp.2d 1226 (M.D.Fla. 2003).

[47] Although it declined to sever the provisions of the statute, the Court in *Bischoff* noted that Section 1 of Florida Statute 316.2045, standing alone, appeared to be content neutral and did not "have the problems created by the preferences" elsewhere in the statute. 242 F.Supp.2d at 1258, n. 21.

restriction approved in *Hill*, it fails to accommodate the "willing listener" and it does not allow a protester to remain in one place while potential recipients pass by, allowing those individuals the opportunity to hear the message.

The burden the ordinance imposes upon speech is substantial. Counsel for the City argues that "[t]he record before the Commission shows that while Plaintiffs are not permitted to protest within the buffer zone, they can certainly speak in conversational tones with a target twenty (20) feet away and are able to show whatever leaflets they have to offer and an interested patient can walk over easily to take it." (Memo. at 18).

The problem with that argument, of course, is that the Supreme Court has expressly rejected it. The Court held in *Schenck* and reaffirmed in *Hill* that a fifteen foot buffer zone prevented protesters from "communicating a messages from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks." How can a "sidewalk counselor" hope to engage in conversation with a client at twenty feet, if in the quiet of a courtroom we use amplification so that lawyers and jurors can hear each other at distances of less than twenty feet?

For all the reasons Justice Scalia pointed out in *Hill* with respect to an eight foot buffer zone, handing out leaflets or pamphlets would also be virtually impossible at twenty feet, particularly without the option of being able to stand near the path of traffic as *Hill* permits. As explained by Pine, "[t]he other thing is its not being able to distribute literature and sometimes they come over to us, they have to be able to see me, and if I'm 20 feet back on the other side of a five and a half foot wall and bushes, they're not going to see me, and I don't even know if I would if I would be able to, if I would even been allowed to project, they wouldn't know where it

was coming from." (Hg. Tr. at 26).

The City's ordinances leave protesters with very little practicable alternative means of communication. Protesters are not left with the avenue the Colorado statute provided in Hill, where "demonstrators with leaflets might easily stand on the sidewalk at entrances (without blocking the entrance) and, without physically approaching those who are entering the clinic, peacefully hand them leaflets as they pass by." *Hill*, 530 U.S. at 729. As experience in the courtroom also shows, use of pictures and images also becomes exceedingly difficult at a distance of twenty feet. In *Hill*, the Supreme Court found it notable that the Colorado statute did not have noise level limitations and allowed amplification so that communication could take place at an eight foot range. Here, however, the City's Sound Ordinance prohibits "unnecessary noise" and amplification, thereby closing off that avenue as well.

In dissent in *Hill*, Justice Kennedy wrote elegantly of the immediacy of speech, the necessity that thoughts and pleas and petitions not be lost with the passage of time. *Hill*, 530 U.S. at 792 (Kennedy, J., dissenting). On a public sidewalk outside a medical facility that performs abortions, citizens engage in speech that to them relates to immediate questions of morality, religion, life and death. To some, such speech may be persuasive. Indeed, the Court heard from individual women who, upon hearing such speech at the Center, elected not to have an abortion. To others such speech may be disturbing as intrusive on personal matters and medical privacy, or because it offends personal or political convictions related to autonomy. In the end, though, it is speech in a quintessential public forum, and as such must not be silenced or restricted absent a significant state interest for which the government has crafted a narrowly

45

tailored response. The City's twenty foot ban fails this test.[48]

I find that the City's sound ordinance, however, stands on somewhat different footing.

The right to use sound amplification is protected by the First Amendment. *Saia v. People of the State of New York*, 334 U.S. 558, 68 S. Ct. 1148, 92 L. Ed. 1574 (1948).

As with the Buffer Zone Ordinance, I must evaluate whether the Sound Ordinance is content-based or content-neutral. The Ordinance makes no specific reference to any speech or any reference to the content of the message or music being amplified, and there has been no showing that the City adopted the ordinance "because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791. The Supreme Court has on more than one occasion recognized that government possesses a significant interest in noise reduction. *See, e.g., Ward*, 491 U.S. at 796; *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). Accordingly, I find that the Sound Ordinance is content-neutral.

The government's interest in noise reduction is particularly compelling at medical facilities. As physicians told the Commission, loud sounds can be harmful to a patient's care and

---

[48] As I find that Plaintiffs have established a substantial likelihood of success on the merits, in order to satisfy the granting of injunctive relief, they must also establish that: (1) they have no adequate remedy at law; (2) will suffer irreparable harm if an injunction does not issue; (3) the threatened injury it faces outweighs the injury defendant will suffer if the injunction is granted; and (4) that an injunction is in the public interest. *See New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 549 (1976).

Although in theory these elements are distinct, in the First Amendment context they are essentially reduced to the question of whether plaintiff is likely to succeed on the merits. This is because the loss of First Amendment freedoms is presumed to constitute irreparable harm, and irreparable injury establishes that there is no adequate remedy at law. *Id.* Further, because governmental compliance with the First Amendment always serves the common good, the public interest also turns on the merits.

recovery. This is not a new concept. In her 1859 book, Florence Nightingale wrote that noise is "the most cruel abuse of care which can be inflicted on either the sick or the well."[49] A February 27, 1908 *New York Times* article reported that Mark Twain had agreed to serve as President of a Children's Hospital Branch of The Society for the Suppression of Unnecessary Noise, a group which enlisted school children to wear buttons reminding others of the necessity for quiet. Despite these efforts, a recent John Hopkins' study determined that since 1960, average daytime hospital sound levels around the world have risen from fifty-seven decibels to seventy-two; nighttime levels have jumped from forty-two decibels to sixty. All of these numbers exceed the World Health Organization's guidelines, as well as the Environmental Protection Act. While much of this sound is generated within health facilities, requiring changes to hospital construction and design and internal procedures, as well as reducing sound around facilities is certainly salutary.

Nevertheless, I have concerns about two aspects of the City's Sound Ordinance. First, although it was presented to the Commission as a measure "for the purpose of prohibiting amplified noise . . . ," the actual language of the Ordinance seems broader than that. The Ordinance prohibits any person from producing "*any unnecessary noise*" or amplified sound."(emphasis added). This of course raises two questions: (1) what is unnecessary noise and (2) who decides? Is praying the rosary or singing a hymn unnecessary noise? Is the off-duty officer given discretion to decide? After first reading the language of the Ordinance, I was inclined to view it as unconstitutionally vague.

---

[49] Florence Nightingale, NOTES ON NURSING, N.Y. (D. Appleton & Co.)(1860).

47

However, in viewing the video of the Commission proceedings I was struck by how often the Commission was repeatedly told that the Ordinance applied only to "amplified sound." Not only the Ordinance's title, but the Powerpoint presentation by the City's lawyer pointed to *amplified* sound as the evil to be remedied. Moreover, during both the first and second reading of the ordinances, Commissioner Liberti specifically raised the issue:

| | |
|---|---|
| Commissioner Liberti: | Excuse me Ms. McKenna, I want to just make sure we know what we're doing here . . . can the street counselors still pray and talk in a regular voice and get these people to come to them and hand them brochures and continue to convey their message? |
| Ms. McKenna: | Yes. They can do that . . . |
| Commissioner Liberti: | So this is only being overly boisterous with megaphones . . . |
| Ms. McKenna: | It's amplified sound. |

(Tr., Sept. 6 at 210-11). At second reading, Commissioner Liberti again raised the point:

| | |
|---|---|
| Commissioner Liberti: | I want a clarification so everybody understands. There's been some misconception on this particular ordinance, and I want to make it clear. I asked these questions last time we met, and I'll ask our attorney, Ms. McKenna, again. |
| | This does not stop anybody from being twenty feet away from a person from talking, praying, singing, holding up placards or whatever. Their right of free speech to address the issue . . . |
| Mayor Frankel: | Or any issue. |
| Commissioner Liberti: | . . . or any issue has not been impaired. |
| Ms. McKenna: | That, that's correct. |
| Commissioner Liberti: | The, the only thing that you have done beyond the twenty feet is amplified, prohibiting amplified noise |

> around the health care facilities. But certainly,
> normal conversation, praying, that type of thing at a
> distance greater than twenty feet is certainly
> permissible.

(*Id.* at 26 at 5-6).

While the City Attorney's reference to "normal" conversation might raise the same

concerns about definition and discretion as "unnecessary noise," it appears that she is saying that

the Ordinance is directed at amplified sound, i.e., megaphones or loudspeakers, devices that

amplify the voice. For purposes of preliminary relief, and until the City definitively explains its

position in this proceeding, I am interpreting the provision in accordance with that

understanding.[50]

My second concern relates to the public versus private property dichotomy. The record in

this case graphically demonstrates this problem, particularly in view of the City's existing sound

regulations. The Police Reports entered into evidence reflect a practice by personnel at the

Center to use sound to drown out prayers and protests.[51] Moreover, the Center apparently uses

loudspeakers attached to the outside of its building to communicate to persons outside the

facility, the protesters in particular. These practices certainly are inconsistent with the position

that the Center's lawyers espoused to the Commission, and belie the solicitude they profess is

necessary for their clients. The City's newly enacted Sound Ordinance applies only to sound on

---

[50] The Court has discretion to interpret a law in such a way so as to avoid constitutional defects without striking the law, and in fact, an obligation to do so. The Supreme Court has stated that "[w]henever possible, [laws] must be interpreted in accordance with Constitutional principles." *American Power & Light Co. v. Securities and Exchange Commission*, 329 U.S. 90, 108, 67 S. Ct. 133, 143, 91 L.Ed.103 (1946); *American Booksellers v. Webb*, 919 F.2d 1493, 1500 (11th Cir. 1990).

[51] *See* Reports dated Oct. 19, 2002; Nov. 9, 2002; Feb. 22, 2003; and Mar. 1, 2003.

public streets and sidewalks, leaving untouched the Center's own boom-boxes and loudspeakers. This discrepancy should not be tolerated. If it is sound rather than the message, then sound is the evil, regardless of from where or whom it emanates.

The Sound Ordinance seems to exacerbate potential problems found in already existing sound regulation. In one of the Police Reports predating the enactment of the Ordinance, Sergeant Bernhardt documented a complaint by a lawyer for the protesters, who thought it "unfair" that the protesters could not use any type of amplification, yet clinic volunteers could play their boom-boxes loud enough to the point where no person entering the clinic could hear the protester's pray. Sergeant Bernhardt wrote that:

> [a]t the time, one of the volunteers had placed a portable stereo outside of the clinic but within the property line. [The lawyer thought] that this too was a violation of the ordinance and thought that the police department was unjust in its enforcement of the ordinance.

(Report dated Feb. 22, 2003).

The Sergeant stated that he "could hear the music outside the property line of the clinic and advised the volunteers that [the lawyer] had made a complaint about the music." The music continued to play and Sergeant Bernhardt decided to review the ordinance as he had a copy in his car. He wrote:

> Upon reviewing the ordinance Sec. 14-128(c)(1) does state that on private property the sound source can not be audible more than 100 feet from the property line, while Sec. 14-129 states that while on public street, park or sidewalk the allowable distance is ten feet from the source.

*Id.* Sergeant Bernhardt advised the lawyer and the clinic staff of his decision and the music played on.

The City's new Sound Ordinance further restricts sound on public streets or sidewalk –

50

now allowing no amplified sound within one hundred feet of a health care facility. The Center and its volunteers, however, as well as any others on private property, remain free to amplify sound as long as it is not audible one hundred feet *from the property line*. It is certainly arguable that this result does not reflect narrow tailoring, particularly in light of the evil identified by the Commission as requiring a remedy.

Nevertheless, I see no indication from the Commission deliberations that it was aware of this dichotomy and the difficulties presented to its desired result of "turning down the volume" at health care facilities. In addition, my decision to enjoin enforcement of the Buffer Zone Ordinance lessens the need for amplification to convey a message. I therefore decline to enjoin enforcement of the Sound Ordinance pending further briefing. I also request that the City Attorney draw the Commissions' attention to this issue in the event that they wish to address it.

## CONCLUSION

As a nation, our claim to self government is in large part defined by our freedom to speak freely, to persuade and debate issues. Abortion is a divisive and personal issue raising questions of religion, personal choice, and the role of government and the courts. In part because of judicial decisions limiting the role of the legislative branch, much of the debate has been centered at hospitals and clinics where an individual decision is debated in the most personal terms, sometimes with sensitivity, at other times crudely and confrontationally. Freedom of speech is rarely an issue when everyone agrees. Perhaps more than at any other place and any other time, in cases such as this, speech guaranteed by the First Amendment must be protected. Accordingly it is,

51

ORDERED and ADJUDGED that the Plaintiffs' Motion for Preliminary Injunction be

and is hereby GRANTED as to Ordinance Number 3875-05, the so-called Public Safety Buffer

Zone Ordinance.  The City is hereby enjoined from enforcing this Ordinance.  It is further

ORDERED and ADJUDGED that, consistent with the understanding that it pertains only

to "amplified sound," preliminary relief is DENIED as to Ordinance Number 3867-05.

DONE and ORDERED in Chambers, at West Palm Beach, Florida this ___11___ day of

April, 2006.

DONALD MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies furnished to counsel of record