

*The Commonwealth of Massachusetts*

HOUSE OF REPRESENTATIVES
STATE HOUSE, BOSTON 02133-1054

**KAY KHAN**
REPRESENTATIVE
11TH MIDDLESEX DISTRICT (NEWTON)
ROOM 23, STATE HOUSE
———
TEL. (617) 722-2140
FAX (617) 722-2339

Committees:

Vice Chair
Consumer Protection & Professional Licensure

Health Care Financing
State Administration & Regulatory Oversight

May 16, 2007

The Honorable Jarrett T. Barrios
Senate Chair
Joint Committee on Public Safety & Homeland Security
The State House
Boston, MA 02133

The Honorable Michael Costello
House Chair
Joint Committee on Public Safety & Homeland Security
The State House
Boston, MA 02133

Dear Chairman Barrios, Chairman Costello, and Members of the Committee:

I am writing to inform you of my strong support for **S. 1353, An Act Relative to Public Safety,** the so-called "Buffer Zone Bill." I am a co-sponsor of the bill filed by Sen. Barrios, because I believe it is our utmost responsibility to ensure that women seeking abortions receive unfettered access to reproductive health clinics and health care settings, without fear of intimidation or physical attack.

Present law created a 6 foot "bubble zone" within an 18 foot "buffer zone" surrounding reproductive health care clinics. However, due to vague drafting of the 2000 law which permits a person to enter the "bubble zone" with the consent of the individual seeking health care services, the buffer zone law does not presently protect public safety at reproductive health care facilities.

The bill before you today, S. 1353, would establish a fixed thirty-five food buffer zone surrounding the entrances and driveways of all of the reproductive health facilities in the state, providing essential protection for patients and medical personnel outside of the clinics.

In order to protect access to reproductive health services in Massachusetts, I urge the committee to grant S. 1353 a favorable report as expeditiously as possible. Thank you for considering my thoughts on this important legislation.

Sincerely,

*Kay Khan*

KAY KHAN
State Representative

TESTIMONY FOR BUFFER ZONE HEARING

I have been a volunteer at Planned Parenthood since 1973, and an escort at the Boston clinic for the past 10 years. Additionally, I have done counseling and referrals for many years in the Boston clinic. My concern is growing regarding the buffer zone.

1. The protestors are moving closer and closer to the main door. They scream and block the way for the patients to get into the clinic. We fill out police reports almost every week regarding the way they encroach upon the door, but nothing has changed.

2. They get very close to the patients and escorts inside the buffer zone – I have often been spit upon while escorting a patient into the clinic since they got so close to me while shouting their protests.

3. They attempt to hand out brochures to the patients inside the current buffer zone and even when the patient asks them to stay away, they continue with their attempts. It creates a significant amount of stress for the patients who only see a wall of people approaching them and screaming at them. Again, it is very difficult to get inside the door.

4. When it is raining it is exceptionally bad. Many of the protestors are inside the buffer zone with very large umbrellas and have no regard for who they hit with them. I have often been swiped with the points on their umbrellas and have nearly fallen to avoid being hit. One week an escort was nearly hit in the eye with the umbrella.

5. They harass the escorts with verbal abuse and brochures very close to the front door. It is an attempt to get us to quit and to distract us from helping the patients.

6. The guard has to constantly ask them to back off our private property.

7. Having a buffer zone law which is enforced would allow protestors to make their statements without endangering the escorts, the patients, and PPLM employees from entering the clinic.

Testimony by Gail Kaplan

*The Commonwealth of Massachusetts*

HOUSE OF REPRESENTATIVES
STATE HOUSE, ROOM 134 BOSTON 02133-1054

**REP. ALICE K. WOLF**
REPRESENTING THE PEOPLE
OF CAMBRIDGE

STATE HOUSE, TEL. (617) 722-2400
STATE HOUSE, FAX (617) 722-2850
DISTRICT TEL. (617) 868-9653

E-Mail:Rep.AliceWolf@hou.state.ma.us

Vice Chair
Committee on Public Health

Member, Committee on Ways & Means
Member, Committee on Education

May 16, 2007

Joint Committee on Public Safety and Homeland Security
State House
Boston, MA 02133

Dear Chairman Barrios, Chairman Costello, and Honorable Members of the Committee:

I write in support of S.1353, *An Act Relative to Public Safety*.  I am a cosponsor of this bill.

It only takes one visit to a reproductive health center in Massachusetts to see that the current buffer zone law is not effective.  The purpose of the law is to keep women seeking health care from being harassed.

While the law establishes an 18-foot buffer zone, it allows protestors to be within the zone as long as they remain at least 6 feet from anyone entering or exiting the building.  This six-foot "bubble zone" does not prevent harassment of patients and employees.

This bill would establish a 35-foot fixed buffer zone around the entrances of reproductive health centers.  More importantly, the bill clarifies the intentions of the law, adding an additional layer of protections for patients and employees.  All protestors would be forced to remain outside the 35-foot fixed buffer zone.  This added protection will prove instrumental in providing a safe route for woman seeking counseling to enter and exit the building.

I urge the committee to report favorably S.1353, *An Act Relative to Public Safety*.

Sincerely,

Alice K. Wolf
State Representative



### The Commonwealth of Massachusetts

MASSACHUSETTS SENATE
STATE HOUSE,  ROOM  213B, BOSTON 02133
TEL: (617) 722-1291
FAX: (617) 722-1014

GALE D. CANDARAS, ESQ.
STATE SENATOR
1ST HAMPDEN AND HAMPSHIRE DISTRICT
———
CHAIR, COMMITTEE ON MENTAL
HEALTH AND SUBSTANCE ABUSE

VICE-CHAIR, COMMITTEE ON
ELDER AFFAIRS

DISTRICT OFFICE
17 MAIN STREET
WILBRAHAM, MA 01095
TEL. (413) 599-4785
FAX (413) 596-3779
———
gale.candaras@state.ma.us
www.mass.gov/legis/member/gdco.htm

May 15, 2007

The Honorable Jarrett T. Barrios, Chairman
Senate Committee on Public Safety and Homeland Security
The State House, Rm. 309
Boston, MA 02133

The Honorable Michael A. Costello, Chairman
House Committee on Public Safety and Homeland Security
The State House, Rm. 167
Boston, MA 02133

Re:     **S.1353, "An Act Relative to Public Safety," a.k.a. "The Buffer Zone Bill"**

Dear Chairman Barrios and Chairman Costello:

I write in support of S.1353, "An Act Relative to Public Safety." If enacted, this legislation would provide additional protections to those who seek the services of reproductive health care facilities. Existing law mandates a six foot "floating buffer zone" around those entering and leaving such a facility, within an eighteen foot radius of the building. Though this provision is well-intended, its complexity and the vagueness of its language has rendered it ineffective in ensuring the rights of patients. Since the enactment of this law in 2000, despite frequent violations, there have been no successful prosecutions.

The strictly enforced thirty-five foot buffer area proposed by this legislation would achieve several important goals. First, it would serve the needs of law enforcement officials by dictating a clear line between legality and illegality that does not currently exist. A clear and precise declaration of the rights of patients and protesters alike will serve both parties well, and eliminate the ability of ill-intentioned individuals to take advantage of "gray areas" in existing law.

Not unlike the Commonwealth's law forbidding political campaigning within 150 feet of a polling place, this bill will provide individuals the opportunity to gain entry to a protected facility free from the threat of coercion and other intimidating conduct from demonstrators or others intent on inhibiting entry. As legislators, we are acutely aware of

the tactics that some opponents of choice have used to prevent women from seeking medical assistance at clinics. We have witnessed and condemned the violence that occurs in these facilities, which includes assault, battery, and even murder.

Another goal realized by this legislation is the protection of a woman's privacy and her constitutional right to choose. That right is the law of the land and the law of this Commonwealth, and no woman should have to run a gauntlet of opponents to exercise it. Privacy is at a premium in these delicate situations, and giving a woman sufficient space to pass safely into a medical facility should be the minimum amount of protection we provide.

Furthermore, the presence of anti-choice protestors at a clinic, whose goal it is to confront women seeking abortions, suggests to the public that every woman entering said clinic is there to secure said procedure. The ability of demonstrators to confront women directly reinforces that assumption in the arena of public opinion. Whatever a woman's reason for entering such a facility, she should not be subjected to the glare of protestors and demands of sidewalk "counselors."

The interests of members of the medical profession and their staffs are also of concern, and will be protected upon the passage of this important legislation. Reproductive health care facilities provide an expansive range of employment opportunities for physicians, nurses, x-ray technicians, secretaries, laboratory assistants, janitorial staff and the like. With demonstrators literally on the doorsteps on these facilities, patients and prospective employees alike will defect, causing a loss of revenue and imperiling the economic vitality of the clinic, as well as the health of its clients. The ability of health care professionals and their various assistants to provide quality services cannot be subjected to the undue interference and intimidation that result from protests and other demonstrations.

Opponents of this legislation urge that it is unconstitutional under the First Amendment to the United States Constitution as applied to individual states through the due process clause of the Fourteenth Amendment. That argument has no foundation in the applicable precedents of the United States Supreme Court. Indeed, on at least two occasions in recent years, the Supreme Court has upheld injunctive orders that impose buffer zones against anti-choice protesters at reproductive health care facilities. [See *Schenck v. Pro-Choice Network of Western New York*, 117 S.Ct. 855 (1997); and *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994).]

To critical points emerge from *Schenck* and *Madsen*, which have set Supreme Court precedents. In determining the legality of this bill, two crucial questions should be considered: 1. Is the law regulating speech content-neutral? 2. Is the law regulating speech contained in an injunctive order or in an act of the legislature? If the law regulating speech is content-neutral and if it is a product of legislative, rather than judicial, action, the Supreme Court has applied a different and more generous standard than if the law is content-based or imposed by a judge's order.

With respect to content-neutrality, the thirty-five foot buffer zone provision in this legislation is content-neutral. In both *Schenck* and *Madsen*, the Court found the imposition of a buffer zone to be a content-neutral regulation of speech even though it was directed at anti-choice demonstrators. Because the intent of the injunction was to protect women seeking abortions from the harassment and intimidation of protestors, the establishment of the buffer zone was a result of the *conduct* of the demonstrators, not their speech or point of view.

As in *Schenck* and *Madsen*, the purpose of our proposed buffer zone is content-neutral. This legislation is designed to protect the interests of citizens seeking medical assistance at certain health care facilities. Its intent is to allow patients to enter clinics without obstruction or interference, not to suppress the speech of those who oppose the right to choose. This legislation is incidental to the anti-abortion message. As the Court stated in *Madsen*, "[T]he fact that the [law] cover[s] people with a particular viewpoint does not render [it] content or viewpoint based." *Id*.

In *Schenck* and *Madsen*, the United States Supreme Court articulated a different and more generous test of constitutionality for legislative enactments impinging upon speech than for judicial orders of the same nature. That is, if the legislature enacts a law imposing a buffer zone around medical facilities, the courts will give greater deference to legislative judgment than they would a judicially imposed buffer zone. In short, this bill will be measured constitutionally by a different yardstick that is more deferential to legislative will.

The grounds for this distinction are profound, and strike at the heart of inherent differences between legislative and judicial processes. A legislative measure is the cumulative product of the work of many, including those who conceive of and draft a bill, the legislative committee members who consider its implications, and the citizens that have their voices heard in public hearings. At every turn, a piece of legislation is subject to debate, whether in a public forum or on the floors of the House and Senate, and many hundreds, or even thousands, of citizens eventually contribute to its enactment.

Injunctive decrees, unlike legislative mandates, are time and place specific. They are offered as a result of specific events occurring at specific sites and involving specific persons or groups. Such decrees are products of disputes between parties, and the presentation of evidence is limited to the claims alleged and the defenses asserted during pleadings. Participation in the judicial process is restricted to the parties appearing before the court, and unlike legislative proceedings, the general public is not invited to participate.

The resultant injunctive decree reflects the judgment of one person—the trial judge. After all, claims for injunctive relief are tried without juries. A judicial officer may be overwhelmed by the events of the day, and influenced by daily news reports of tumultuous protests at the facility which is the subject of the litigation. The calm deliberation that may ordinarily accompany the judicial judgment may give way to the understandable urge to end disturbances. For this reason, the Supreme Court has observed

that injunctive decrees "carry greater risks of censorship and discriminatory application than do general [legislative enactments]." *Madsen*, 512 U.S. 764.

In light of these considerations, the Supreme Court has applied a less stringent test to determine the constitutionality of content-neutral legislative enactments, which may regulate the time, place and manner for the exercise of speech. We may concede that "reasonable time, place, or manner regulations normally have the purpose and direct effect of limiting expression, but are nevertheless valid." *Clark v. Community for Creative Non-Violence*, 468 U.S. 228, 294 (1984). If they are content-neutral, such legislative regulations will be upheld if they are "narrowly tailored to serve a significant governmental interest and… they leave open ample alternative channels for communication and information." *Id.* 293. [See also *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)]. In sharp contrast, the Court has applied a more "stringent test" to determine the constitutionality of content-neutral injunctive decrees. *Madsen*, 512 U.S. 765. In such cases, such as *Schenck* and *Madsen*, the test is whether the "challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Id.*

"An Act Relative to Public Safety at Health Facilities" imposes a reasonable "place" restriction, which is "narrowly tailored" to advance "significant" interests of government. This testimony earlier identified six governmental interests, any one of which qualifies as "significant" under the Supreme Court's test. Additionally, the thirty-five foot buffer zone is narrowly tailored to serve these interests, leaving plenty of room for protestors to demonstrate within the sight of persons utilizing health care facilities. This legislation clearly satisfies this test, as it employs means—the thirty-five foot buffer zone—that are not "substantially broader than necessary to achieve the government's interest." *Rock Against Racism*, 491 U.S. 800. The measure is valid regardless of whether such interest could be "served by some less speech-restrictive alternative," *Id.*, which is a component of the more demanding constitutional test for judicially imposed injunctive decrees impacting speech.

Furthermore, protestors at health care facilities have at their disposal a variety of other modes of communicating their message to the public, among them news media, advertisements, hand billing and rallies. Indeed, under the auspices of this legislation, demonstrators are fully within their rights to hold signs in the vicinity of protected facilities, provided that they remain thirty-five feet from them. Surely, this bill allows protestors "ample alternative channels" to communicate their message.

Thus, it is of little surprise that the Supreme Court, applying the more lenient test for legislative enactments, has upheld numerous statutes that impose reasonable time, place, or manner restrictions on the exercise of free speech. For example, the Court has sustained statutes that impose a 100 foot buffer zone around polling places to prevent political campaigning on election days, *Burson v. Freeman*, 504 U.S. 191 (1992); a 500 foot buffer zone around foreign embassies to prevent demonstrations of three or more persons that "threaten the security or peace of the embassy," *Boos v. Barry*, 485 U.S. 312, 330 (1998); and an unspecified buffer zone around schools to prevent protestors from

disturbing the educational process. *Grayned v. City of Rockford*, 408 U.S. 104 (1972). Peace, quiet and good order are as important to the function of health care facilities as they are at polling places, foreign embassies and educational institutions.

The Supreme Court's decision in *Burson*, which sustained a 100 foot buffer zone around polling places, is a most compelling example, fully applicable to the legislation in question, of the power of a state legislature to enact buffer zone laws in the face of free speech objections. In *Burson*, the Court upheld the 100 foot buffer zone around polling places, despite the fact that the restriction was content-based, and not content neutral, as is the case with the legislation in question today. Indeed, the comparable Massachusetts statute, M.G.L. Ch. 54, § 65 (1999), imposes a 150 foot buffer zone. Under this statute, an individual exercising their right to vote is entitled to walk the last 150 feet into the polling place undisturbed, and free to contemplate in peace his or her electoral decision. First Amendment rights are abridged in this case for 150 feet. No one may approach or speak to the voter for the purpose of soliciting his or her vote or distributing campaign materials.

Is not the woman seeking medical advice and assistance at a reproductive health care facility entitled to at least the same protection as the average voter? I, and others who have co-sponsored this legislation, am certain that she is. According to Chief Justice William Rehnquist, "The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." *Madsen*, 512 U.S. 772-773.

In closing, I urge the Committee to resist the notion that this legislation is a pro- or anti-choice bill, or that it is intended to silence protestors. This is a public safety measure that accommodates the constitutional rights of both patient and protestor. The bill is aimed at conduct, not speech. It is important to remember that a verbal assault— words which place the targeted person in fear of imminent harm or offensive bodily contact—is a completed crime, not protected speech. I urge the Committee to report this legislation favorably to the General Court.

Very truly yours,

Gale D. Candaras
State Senator

**Testimony of Attorney General Martha Coakley**
**Joint Committee on Public Safety and Homeland Security**
**May 16, 2007**

Good morning.  Thank you, Chairman Barrios and Chairman Costello, and members of the Committee for giving me the opportunity to testify on the important issues related to buffer zones and women's access to reproductive healthcare.  I appreciate the diligent work of the Committee on this issue, and especially Chairman Barrios and Chairman Costello and other members who sponsor Senate Bill 1353, a bill which would create a fixed and clearly defined buffer zone around reproductive healthcare facilities.

This is an important public safety issue.  Over the years, reproductive healthcare facilities have been the scene of mass demonstrations, congestion, blockades, disturbances and even murders.  SB 1353 will help to ensure greater safety along our public ways and sidewalks and prevent violence, harassment and intimidation of women who are attempting to exercise their fundamental right to access health care.

I.     **The Current Buffer Zone Law**

The current law, Massachusetts General Laws chapter 266, section 120E, took effect on November 10, 2000.  It prohibits any person, who is within eighteen-feet of the entrance or driveway to a reproductive healthcare facility, from knowingly approaching another person or vehicle within six-feet, for the purpose of passing a leaflet or handbill, displaying a sign, engaging in oral protest, education or counseling, without that person's consent.  Persons are also prohibited from knowingly approaching another person within a six-foot wide corridor from the facility entrance door or driveway to the street.  The current law is what is commonly referred to as a "floating" buffer zone.

## II.     The Proposed Amendment to the Buffer Zone Law

The proposed bill would amend Chapter 266, section 120E to change the existing floating buffer zone around reproductive health care facility entrances and driveways to a thirty-five foot "fixed" buffer zone.  Specifically, the bill would create this fixed buffer zone by prohibiting any person from knowingly entering or remaining within a public way within thirty-five feet of facility entrances or driveways, or within a corridor created by extending the boundaries of the facility entrance all the way to the street.  As under the current law, the new buffer zone would apply only during business hours.  In addition, certain persons would be exempt from the law, including persons passing through to enter or exit the facility, employees or agents entering the facility, law enforcement or other municipal agents acting within the scope of their employment, or people using the public way to reach another destination.

The penalties for violations of the law would also remain the same.  Specifically, a knowing violation of the law is criminally punishable by a fine of not more than $500 or not more than three months in jail or the house of correction, or both.  Any subsequent offense is punishable by a fine of not less than $500 and not more than $5,000 or not more than two and a half years in jail or the house of correction, or both.  Also remaining unchanged is that the facilities and their patients and prospective patients are entitled to a cause of action against any person who violates the law.

## III.    The Reasons Why a Fixed Buffer Zone is Necessary

Replacing the current floating buffer zone with a fixed buffer zone is appropriate and necessary.  I support the bill's recognition that "clearly defined boundaries improve the ability of safety officials to protect the public."

The vast majority of women who enter these facilities daily receive routine gynecological care, e.g. annual exams, pap smears, birth control and screening tests for breast and cervical cancer. There are certainly others who seek medical procedures that result in termination of pregnancies. For those women, this is a time of particular vulnerability and emotional strain. They are women of all ages, including teenagers, some of whom are accompanied by their parents, grandparents and social workers.

As women approach the facility entrances, they are routinely confronted by protestors who stand inside the existing 18-foot buffer zone. Throughout the week, and especially during the morning hours, protestors routinely gather outside of the entrances and driveways to the facilities, either on the street or sidewalk. On Saturdays, for example, as many as 50-70 protestors appear at the Boston's Planned Parenthood location. These sometimes include groups of schoolchildren who are bussed in from various cities and towns by various anti-abortion organizations.

Facility employees, volunteers, patients and prospective patients are routinely harassed as they try to enter and exit facilities for medical counseling and treatment. For example, at the Boston location, which has a recessed door, protestors are able to stand close to the entrance, with some protestors standing right at the entrance. Demonstrators regularly crowd facility entrances and surround women, facility employees and volunteers with graphic and discomfiting pictures of aborted fetuses, and shout at and taunt them calling them "baby killers" and "murderers."

The current law provides no clearly defined boundary because it is a "floating" buffer zone within a defined radius of eighteen feet, so the buffer zone effectively moves and shifts as people pass along the public way to facility entrances or driveways. Either

ignoring the law, or inadequately measuring the six-foot distance around a moving

person, protestors routinely invade the existing buffer zone in violation of the law.  This

fact alone has made it very difficult if not impossible for police to be able to immediately

or ever determine whether a violation has occurred.

Another problem with the existing law is the inability to discern whether a patient,

her companions, or facility employees have consented to a given protestor's approach.

Some protestors have said that they believed that a patient "consented" because of the

way she made eye contact or because a patient uttered a statement in response to a

protestor's comment (even if that statement was not one of consent).  Often times,

protestors aggressively attempt to thrust leaflets into patients' hands as they enter the

facility, some going so far as to touch or bump up against patients or employees as they

try to access the healthcare facilities.  As a result, patients and employees are forced to

step around or through the protestors as they make their way into the building.  We have

heard of some cases where women arrive at the facilities and then leave because they are

too upset to pass through the gauntlet of protestors.

Protestors also stand and block cars as patients and employees attempt to enter the

driveway or garage entrance to these facilities.  Other times, protestors circle cars and put

their faces against, or in close proximity to, the car windows to scream at and sometimes

videotape people in their cars.  In some cases, protestors throw anti-abortion literature

and leaflets into people's cars as they enter or exit the facilities.  Even more egregious are

the protestors who dress as Boston Police Department officers and approach women and

their companions at close distance, pretending that they are escorting them to the clinic's

entrance, only to taunt them or force leaflets into their hands as they make their way to and from the healthcare facilities.

All of these actions can and do easily spark reaction and response and create an unsafe, dangerous risk along our public ways. The actions directly impede the normal flow of traffic along the Commonwealth's public ways and sidewalks and hinder women's ability to access reproductive healthcare. Given the lack of a clearly defined buffer zone boundary, it has been very difficult, if not impossible, for police officers to monitor the distance these protestors maintain between themselves and the persons approaching the facilities and determine if there has been a violation; in other words, to enforce the law.

## IV.    The Amendment Protects First Amendment Rights

As chief law enforcement officer of the Commonwealth, I am obligated to protect and enforce the rights of all of the citizens of the Commonwealth. Consistent with that obligation, I have an interest in ensuring that citizens' rights to access reproductive healthcare are secure, as well as ensuring that citizens' equally important rights to free speech and peaceful assembly are protected.

I strongly support people's free speech and right to assemble, demonstrate and protest. Those rights have served our Commonwealth and our nation well over the past 225 plus years. The proposed amendment, however, is a proper time, place and manner regulation. It applies only during business hours, which is when the flow of traffic is the greatest. It is designed to maintain a proper flow of traffic and prevent congestion around those facilities. It is content-neutral and narrowly tailored to serve the significant

governmental interest of ensuring public safety in and around reproductive healthcare facilities.   And it leaves opportunity for alternative means of communication.

If the bill is passed, demonstrators will still be able to assemble, hold signs, pray, sit in vigil, chant, counsel, leaflet and shout, simply not within the 35-foot buffer zone. They will still be able to exercise their First Amendment rights.   If patients or prospective patients want to accept literature or converse or engage with protestors, they will still be able to do so.   The only difference is that now it would not be in a way that blocks access along a public way.   This is an important and appropriate legislative balance of competing and equally protected constitutional rights.

Seven years ago, our Supreme Judicial Court reviewed an earlier proposed fixed buffer zone for twenty-five feet and said that it was constitutional.   Other courts across the county have upheld fixed buffer zone laws as reasonable and constitutionally permitted.

V.     **Conclusion**

I appreciate your time.   I urge your support for this amendment.   Thank you.

*The Commonwealth of Massachusetts*

HOUSE OF REPRESENTATIVES
STATE HOUSE, BOSTON 02133-1054

**PAM RICHARDSON**
**REPRESENTATIVE**
6TH MIDDLESEX DISTRICT

Committees on:
Housing
Children, Families and Persons With Disabilites
Mental Health and Substance Abuse

ROOM 448, STATE HOUSE
TEL. (617) 722-2582

May 15, 2007

The Honorable Jarret Barrios, Chair
The Honorable Michael Costello, Chair
Joint Committee on Public Safety & Homeland Security
State House - Room 40

Dear Chairman Barrios and Chairman Costello,

I am writing in support of S.1353 An Act relative to public safety (Buffer Zone Bill). I believe strongly that women should be able to access healthcare without interference or harassment. The current Buffer Zone Law allows protesters to get within six feet of a patient or staff person entering a reproductive health care facility. This is completely inadequate.

A six foot zone does not provide the protection patients and staff need and deserve. In fact, allowing protesters the ability to legally stand just beyond arms length of their target is indefensible, deplorable and completely disrespectful.

It is also the reason so many violations have occurred within the last year. Such inadequate protection sends a message of tolerance for the type of harassment typically demonstrated outside of reproductive health care facilities. It sends the message that the patients and staff entering the facility do not deserve proper protection. Again, this is completely unacceptable.

As legislators, we are accustomed to following election laws and ensuring our campaign volunteers and promotional material are outside of the 150 foot zone assigned to each polling location. We are able to share our campaign message without interfering with a voter's right to vote without interference. People entering health facilities should be given the same respect to make a choice without interference.

Reproductive health protesters should be allowed to voice their opinion outside of health care facilities. However they should not be allowed to harass or interfere with patients and staff. S.1353 offers much needed additional protection and I urge the Committee to report the bill favorably. Thank you.

Sincerely,

Rep. Pam Richardson
6th Middlesex District - Framingham



# National Organization for Women – Massachusetts

1105 Commonwealth Avenue • Suite 201 • Boston, MA 02215 • Phone: 617-254-9130
Fax: 617-254-9134 • E-Mail: massnow@massnow.org • www.massnow.org

Acton Area
NOW

Greater Boston
NOW

Cape Ann /
North Shore
NOW

Lexington Area
NOW

Martha's Vineyard
NOW

MetroWest
NOW

South Shore
NOW

Greater
Springfield
NOW

Worcester
NOW

**TESTIMONY IN SUPPORT OF "AN ACT RELATIVE TO
PUBLIC SAFETY AND HEALTH FACILITIES" –S. 1353**

**Submitted by:**  Terri Febo, Co-President, National Organization for
Women – Massachusetts chapter

**Before the:**  Joint Committee on Public Safety and Homeland Security

**Date:**  May 16, 2007

My name is Terri Febo, and I am co-president of the Massachusetts chapter of the
National Organization for Women. On behalf of our 5,000 members, I am here today in
support of Senate Bill 1353, legislation that would establish a fixed 35-foot "buffer
zone" surrounding the entrances of reproductive health facilities in Massachusetts.

By coming here today to speak in support of this legislation, we are not opposing
anyone's right to free speech. However, women also have the fundamental right to seek
healthcare without harassment and intimidation. Senate Bill 1353 strikes a proper
balance by allowing women a safe space to enter and exit reproductive health care
facilities while still allowing protester's rights to voice their opinions.

Mass NOW is committed to ensuring that women have safe access to basic health care
services, including a full range of reproductive health care. In the 1990s, one of our
tactics was to engage in clinic defense. We stood outside clinics where anti-choice
protesters harassed patients entering and exiting the building. The idea of these counter-
protests was to show patients, staff, passers-by and anti-choice protesters that there
were people who supported women and their decisions about how and when to access
abortion and reproductive health care.

We eventually realized that large groups of people gathered outside of these facilities,
no matter what side they were on, were threatening for people entering and exiting the
building. Patients entering these buildings don't distinguish between pro-choice and
anti-choice protesters, they just see people crowded around the doorway that they need
to walk through to get to their doctor's appointment.

When we realized that this was the effect of our good intentions, we stopped doing
clinic defense. We did not want to contribute to the fear that patients felt when they
were simply trying to access health care.

*Printed in-house.  Labor donated.*

Unfortunately, the other side did not stop. To this day, anti-choice protesters stand outside reproductive health care facilities and shout at and harass people entering and exiting the building. They do this right by the front door, the garage or the parking lot.

The existing law is vague and protesters know that any violations are extremely hard to enforce, so they continue their harassment of women. Creating a fixed 35-foot buffer zone around reproductive health care facilities will ensure that women will have safe, private access to health care services. It is our right to obtain abortion, contraception, routine exams and testing and treatment for sexually transmitted infections without fear and without being confronted by protesters before and after our appointments.

The choice to vote for Senate Bill 1353 gives legislators the opportunity to demonstrate their belief that women should be able to access health care free from harassment and intimidation. I respectfully urge the Committee to issue a favorable report on this legislation so patients can seek basic health care with greater safety and privacy.

Thank you.



NARAL
Pro-Choice Massachusetts

**TESTIMONY BEFORE THE JOINT COMMITTEE
ON PUBLIC SAFETY AND HOMELAND SECURITY
IN SUPPORT OF AN ACT RELATIVE TO PUBLIC SAFETY (S.1353),
BY KELLY O'BRYAN,
POLITICAL DIRECTOR, NARAL PRO-CHOICE MASSACHUSETTS
ON MAY 16, 2007**

Chairman Barrios, Chairman Costello and members of the Public Safety & Homeland Security Committee, thank you for giving me an opportunity to testify this morning.  My name is Kelly O'Bryan and I am the Political Director of NARAL Pro-Choice Massachusetts, a statewide grassroots organization with more than 20,000 members, dedicated to promoting the full range of reproductive choices. I wish to go on record in support of An Act Relative to Public Safety (S.1353), commonly known as the "Buffer Zones Bill."

The Massachusetts Buffer Zone Law, passed in 2000, resulted in a six-foot "bubble zone" within an 18-foot "buffer zone" outside of reproductive health care facilities.  This zone is sometimes demarcated by a white line.  A person cannot knowingly approach another person within a six-foot "bubble zone" unless they obtain that person's consent.

While better than no law at all, the current law has proven extremely difficult to enforce due to its complexity, and because consent is not defined.   As a result, the current law does not adequately protect public safety at reproductive health care facilities.

The new Buffer Zone Bill will establish a fixed 35-foot buffer zone surrounding the entrances and driveways of all of the reproductive health facilities in the state.

I would also like to speak on behalf of reproductive health clinics that support this bill, but could not send representatives to be here today. In December 2006, NARAL Pro-Choice Massachusetts surveyed reproductive health clinics in Massachusetts, including:

- Alternative Medical Care of the North Shore, Lynn
- Caring for Women, Amesbury
- Four Women, Attleboro
- Merrimack Valley Women's Health Services, Methuen
- North Shore Women's Center, Lynn
- Planned Parenthood League of Massachusetts, Greater Boston Center
- Planned Parenthood League of Massachusetts, Western MA Center, Springfield
- Planned Parenthood League of Massachusetts, Central MA Center, Worcester
- Women's Health Center, Hyannis
- Women's Health Services, Chestnut Hill

41 Winter Street • Suite 65 • Boston, MA 02108
www.prochoicemass.org • 617.556.8800 • 617.338.2532 fax

NARAL
Pro-Choice Massachusetts

Six of the ten clinics surveyed describe protestors as a significant problem for patients and staff and two more reported a semi-regular to regular presence of protestors. Of those who reported protestors as a problem, four said that expanding the buffer zone to 35 feet would help address the issue. All the clinics in Massachusetts urge legislative support for this bill.

The following is an example by one clinic reporting significant problems with protestors which could be mitigated by a fixed 35 foot buffer zone:

**Four Women, Attleboro**: The Four Women clinic is located in Attleboro and provides abortion services and general gynecological care. The clinic is at the back of a larger medical office complex. The protestors harass patients and clinic staff by walking back and forth across the entrance of the driveway, which is approximately 100 feet long. Though prohibited from standing in the driveway entrance, they frequently stop there until threatened with police action.  There have been several instances of picketers deliberately walking in front of cars and narrowly avoiding being hit by staff and patients.  Patients have reported feeling too intimidated by the pacing protesters in the driveway entrance and turning back.

Because Four Women is located in a medical office park with several other facilities adjacent to the building, patients and staff of these other offices complain of having to cross this line of protestors.  A 35 foot buffer zone will prevent disruptions in the entrance of the driveway and the street on either side by clearly demarking where protestors can or cannot stand.

These protesters not only impede access to the clinic, but also create safety issues for the general public trying to use the sidewalks, streets or driveways. Obstructing the flow of traffic (both pedestrian and motor vehicle) can result in injury and property damage.  A clearly demarcated fixed Buffer Zone of 35 feet will help patients and staff to feel safer and relations with the other offices and neighboring residences will improve.

I urge the Committee to give this important and common-sense piece of legislation a favorable report.

**Testimony of Liz McMahon, Volunteer for Planned Parenthood**
**On "An Act Relative to Public Safety"**
**May 16, 2007**

Thank you for allowing me to speak to you today. I have been a clinic escort with Planned Parenthood for a little over four years and come before you to offer my strong support for the proposed expansion of the buffer zone.

A variety of important individual rights and interests are involved with the buffer zone issue. A woman's right to safely access medical care, law enforcement interests, and free speech rights can all be fairly balanced through the expansion of the buffer zone.

Many of you here may not be aware of why a bill such as this is necessary, and I want to explain what happens at your local Planned Parenthood every Saturday morning, every week.

There are several long-time protesters who appear in front of Planned Parenthood on Saturday mornings by around 8:00 a.m. They set up signs and posters in front of the building's main entrance on Commonwealth Avenue. Most often, the large posters feature gruesome pictures of dissected fetuses or ultrasound sonograms. There is no reason for these photos other than to scare, humiliate and deter women from entering.

When women approach the building on the sidewalk, protesters fan out and approach them. The protesters make almost no distinction between women on the sidewalk. Many are on their way to the grocery store next door, others are merely passing by. Some are going to the clinic for an annual gynecological exam, for birth control pills, for medical advice, and sometimes for an abortion. All women who pass near the entrance are treated as potential abortion patients.

At first the protesters try to offer alternative medical treatment facilities with pamphlets and forced advice. It seems to an observer that they feel desperate to prevent people from entering the clinic. When simple entreaties fail, protesters start screaming about the horrors within the clinic. One protester who appears regularly spends hours screaming "They're killing babies here!" to every person who passes by.

The clear intent of the vast majority of protesters is to deter people from entering the building at all. The current buffer zone is vague and difficult to enforce. It does not permit protesters to 'approach' anyone without consent in the zone, but it does not speak to standing still in front of the building's entrance and thereby forcing patients to approach them.

May 16, 2007

RE:  Senate Bill 1353

Senator Jarrett T. Barrios, Chair
Representative Michael A. Costello, Chair
Joint Committee on Public Safety & Homeland Security
Room 40
State House
Boston, MA 02133


Dear Senator Barrios and Representative Costello,

My name is Liam Lowney and I am writing to you in support of Senate Bill 1353 wearing two hats. Professionally I serve as the Chief of Victim and Witness Services for Attorney General Martha Coakley. In that capacity, the safety of the public is our greatest concern. As you are aware the Attorney General spoke eloquently on behalf of the Office today. Therefore, I am writing today to speak instead for someone that can't speak for herself: My sister Shannon.

Shannon Elizabeth Lowney was 25 years old when she was killed while working at the Planned Parenthood Clinic in Brookline. I have a rule not to identify my sister by the way she died, so to that end it's important that you understand who she was before December 30, 1994. Shannon was a bright and intelligent young woman. She was 5'9", had long brown hair, and bright blue eyes. Her smile was infectious. She was the quintessential middle child wedged between Meghan and myself. We grew up in Fairfield, Connecticut, and were raised by two public school teachers. Shannon was a musician and an amazing student. She loved to learn. After high school she went on to graduate from Boston College, *Magna Cum Laude*, and had applied to the Boston University School of Social Work at the time she was killed. Each of us were taught that what you do each day matters and it's important to make a difference in the world around you. It is for that reason that Meghan has worked to end homelessness in Connecticut, I work with crime victims, and Shannon went to work for Planned Parenthood.

She was so proud of her job. She worked as the receptionist and a Spanish translator and was the first to welcome clients as they entered Planned Parenthood's doors. She believed deeply that women and children had the right to safe and affordable healthcare. That is why she worked there. She spoke of her work often and was so grateful to have the opportunity to help people each day. She also told us of her frustrations at work. Shannon was the first to open the Clinic each day. It is because of this that the protesters out front named her "Public Enemy #1." Shannon was troubled by this. Her first response was to discuss the differences in opinion. That was always her first response. After listening to their comments she would ask them if they knew that Planned Parenthood offers numerous services. She would explain the need for all of the reproductive health services they offered and ask if they could recognize that. Shannon finally found that she could not have a conversation with them. She found this truly

May 16, 2007

frustrating. As Shannon spoke to my family about her morning routine I remember my father asking, "Well, where do you park? Do they know which car is yours? Could they do something to your car?" The car turned out to be fine, but never did it occur to us that we could lose her. Now we all know.

Almost 13 years later, men and women continue to show up to work at reproductive health clinics each day. They do this and choose to make lower salaries because, like Shannon, they have a desire to help others live healthy lives. In today's environment of skyrocketing health care costs they show up to create an option for the underserved. They seek to make sure that each man and woman is afforded access to quality reproductive health care. Almost 13 years later something else remains the same. Like Shannon, each of these employees walk through protestors calling them names, shield patients from abuse, and, yes, we have even seen their cars and license plates photographed.

I'm not asking you to support Senate Bill 1353 because you feel sympathy for me or my family. I'm asking that you support this bill because it will allow employees the ability to feel safe as they go to a job they should be proud of. It will allow the patients the chance to receive the services and information they need, without feeling ashamed or afraid. I'm asking that you support this bill so that the next time an employee sits down with their family to discuss their new exciting job, they can let them know that not only is their car safe, but they are too.

On behalf of my family, we thank you for your work on this issue and giving me the opportunity to address you today.

Cordially,

Liam T. Lowney
Marshfield, MA
(617) 921-2507



**Planned Parenthood**®
League of Massachusetts

Board of Directors
2006-2007

Janina A. Longtine, M.D.,
*Board Chair*

Sarita Bhalotra, M.D., Ph.D.
*Vice Chair*

Bill Stephenson
*Treasurer*

Jennifer Hawkins
*Clerk*

Emily Amick
David Bechhofer
Diane R. Blake, M.D.
Joan E. Braderman
Lula Christopher
Dharma E. Cortés, Ph.D.
Rev. Kim K. Crawford Harvie
Brit Jepson d'Arbeloff
Pat Deutch
Susan Dickler
Kim Druker Stockwell
Carolyn Erskine
E. Marla Felcher, Ph.D.
Elmer R. Freeman
Heather Fukunaga
Jonathan P. Gertler, M.D.
Ilene Greenberg
Susan Haas, M.D., MSc.
John Henn, Esq.
Elizabeth Lowrey Clapp
Ingrid Mach
Cara McCarthy Hutchins
Jamie Ann Sabino, Esq.
Diane Schmalensee
Suzie Tapson
Charles A. Welch, M.D.
Susan Whitehead
Pace Woods Wilson
R. Lyman Wood
Jeffrey Zegas
Matthew Oppenheimer
*ex officio*

Dianne Luby
*President and CEO*

Headquarters:
1055 Commonwealth Avenue
Boston, MA 02215-1001
Phone: (617) 616-1660
Fax: (617) 616-1665

www.pplm.org

**WRITTEN TESTIMONY**

**JOINT COMMITTEE ON PUBLIC SAFETY AND HOMELAND SECURITY**

**TESTIMONY OF DIANNE LUBY
PRESIDENT AND CEO
PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS**

**MAY 16, 2007**

Dear Chairman Barrios, Chairman Costello, and members of the Committee on Public Safety and Homeland Security:

I am writing on behalf of Planned Parenthood League of Massachusetts, our state's leading provider of reproductive health care, to express our strong support for Senate Bill 1353, *"An Act Relative to Public Safety."* This bill will strengthen the current law by establishing a clear and enforceable 35-foot fixed buffer zone outside of the entrances and driveways of reproductive health facilities. This proposal will protect the privacy, dignity and safety of patients when they are simply trying to get to their doctors appointments, pick up contraceptives, get an HPV shot, or attend an educational or preventive health care session.

The current Buffer Zone Law, while well intended is flawed, makes police work harder, and has been nearly impossible to enforce due to its complexity and the vagueness of the language surrounding consent. All one has to do is stand in front of Planned Parenthood any morning and you can see the existing law being violated, yet there has not been one, not a single successful prosecution to date because of the vagueness of this statute. Patients and staff deserve the protection of a law that is clear to all parties and enforceable by law enforcement and our judicial system.

Planned Parenthood's top priority is the care, privacy and safety of our patients and staff. We know well the horrors of violence in the workplace. An organization is never the same after experiencing what we did at Planned Parenthood. The fear of that violence is an issue we deal with every single day. We spend over $300,000 a year on security in an effort to keep our patients and staff safe. Our terrific, dedicated guards, our security technology, and our metal detectors serve as a daily reminder of the potential dangers we face. It is true that no law could entirely prevent another determined gunman from committing another atrocity, but it is appropriate and necessary to pass a law that will reduce the potential for violence by defusing the in-your-face tension that surrounds our facilities on a daily basis.

We had approximately 55,000 patient visits last year. More than two-thirds of those visits were for non-abortion related services- they were for preventative health care visits. People being responsible for their sexual health.. Regardless of their reason for coming, our patients and visitors are subject to intense, in-your-face harassment. I spend

many Saturday's at our Boston facility, when the activity of protesters is most intense, and I see what goes on first-hand.  I see:

- Protestors screaming at patients and employees inside the current "buffer zone", usually right at the doorway, including language that is judgmental and hurtful
- Protesters photographing and filming into patients and employees' cars and taking photos of license plate numbers to post on websites
- Protesters standing in front of cars and the keypad to the garage to block access, so that they can throw pamphlets and other propaganda into cars entering the garage
- And  most deceptively I've seen protesters dress up wearing Boston Police T-shirts and hats, trying to collect patient contact information, videotaping, and in other ways trying to intimidate those who are simply exercising their legal right to seek confidential medical services

I also see the dignity and the courage of our patients and staff, and especially the courage of our volunteer escorts, who go out there every Saturday morning and experience the harassment first hand, while doing their best to protect others from it.

The current law simply doesn't work.  It relies as you know on a scheme involving a floating, six-foot zone of personal privacy that travels with the person.  What happens in real life, as demonstrated through the images you've already seen, is that the protesters stand right in front of the door, so that patients and staff can't possibly get into the building without going within six feet of the protestors. The protestors then interpret that as consent.

Our Law enforcement officials have done the best they can to work with a flawed statute, and we appreciate their efforts, and the working relationship we have with them.  We appreciate very much the law enforcement community being here in such numbers today to support a stronger, more enforceable law.

We are not trying to prevent anyone from expressing their point of view.  Everyone has a right to be heard.  However, that right has to be balanced against the right to access health care privately, without fear of violence and intimidation, and the current law does not strike the appropriate balance.  Senate Bill 1353 allows both rights to be protected.

For these reasons, on behalf of Planned Parenthood League of Massachusetts, I urge you to give Senate Bill 1353 a favorable report.

Sincerely,

Dianne Luby
President/CEO

**TESTIMONY OF PROF. DWIGHT DUNCAN BEFORE THE
JOINT COMMITTEE ON PUBLIC SAFETY & HOMELAND SECURITY
ON SENATE BILL NO. 1353
CREATING A FIXED BUFFER ZONE AT ABORTION CLINICS
MAY 16, 2007**

Mr. Chairman and Members of the Joint Committee, thank you for the opportunity to

appear before you this morning to testify regarding proposed Senate Bill No. 1353

"relative to access to reproductive health centers." I am Dwight Duncan, professor at

Southern New England School of Law in North Dartmouth. I teach constitutional law,

and I have represented a number of pro-life sidewalk counselors before the courts of the

Commonwealth and the federal courts, including Barbara Bell, Bill Cotter, Mary Anne

McGuire and others.


In particular, I represented Mary Anne McGuire, Ruth Schiavone, and Jean Zarrella in a

suit challenging the existing floating buffer zone in federal court in the case of *McGuire*

*v. Reilly*, 386 F.3d 45 (1st Cir. 2004). The law was upheld by the United States Court of

Appeals for the First Circuit only after the Attorney General and the courts affixed a

limiting interpretation to the Act's exemption for abortion clinic agents and employees

such that the Act's prohibitions would also attach to approaches by abortion clinic agents

and employees for purposes of oral protest, education or counseling. Only thus could the

Act's prohibition of speech in the traditional public forum of the public streets and

sidewalks of the Commonwealth be deemed constitutional rather than a type of viewpoint

discrimination forbidden by the First Amendment to the United States Constitution, as

applicable to the states under the Fourteenth Amendment.

1

I bring this history up to emphasize that the First Amendment requires maximum solicitude for free speech in the traditional public forum of the streets and sidewalks. By purporting to create a fixed thirty-five-foot buffer zone around abortion clinics, the question is whether the restriction is broader than necessary to achieve the undoubted government interest in assuring the safety of pedestrians, or whether it is narrowly-tailored to achieve that objective. *See, e.g., Hill v. Colorado*, 530 U.S. 703 (2000). In that regard, I would ask the legislators on this committee to perform a thought experiment. If the bill proposed such a fixed buffer zone around facilities involved in disputes between labor and management, and thus prevented demonstrating and picketing in front of the affected businesses, would you think it a constitutional abridgement of First Amendment expression? For that matter, this bill would effectively outlaw labor union picketing in front of abortion clinics and any businesses within the affected radius.

There have been some claims that there are incidents in front of abortion clinics which justify this bill. Most notably, there was a *Herald* article on January 15 of this year entitled "Abortion clinics lack buffer zone" written by Michele McPhee (a copy of which is attached as Exhibit A) The article recounted some incidents at the Planned Parenthood abortion clinic in Allston. In my view, this article was replete with falsehoods and unsubstantiated allegations of the kind I believe have become common in order to claim a need for this type of legislation.

For example, it was reported that there was "an Operation Rescue worker busted for assaulting women with his sign." On the contrary, four pro-life demonstrators, a couple

2

of whom I have represented in the past, were the victims of assaults with a sign by a pro-abortion demonstrator on Saturday, August 13, 2005.  The assailant was identified by the Boston Police and later prosecuted in Boston Municipal Court.  (I attach a photo as Exhibit B, and the Police Report as Exhibit C.)

Another incident recounted a man who forced his way into Planned Parenthood "to fight with the security guards, as one guy from Quincy did last June. That guy, 25, tried to kick out the windows of the BPD cruiser after he was arrested." The clear implication was that this was a pro-life demonstrator who had become violent.

But as the Boston Police incident report states, the man was the brother of a Planned Parenthood client, who had accompanied his sister to the clinic, which they "entered together without incident" on June 8, 2006. After he later became disruptive and threatening, he was arrested by Boston Police. (See Police Report, attached as Exhibit D.)

In concluding, I would also note that the proposed Bill maintains the patently discriminatory exemption for abortion clinic "employees or agents." Obviously, such people have to get to and from their place of work.  But those needs would already be met by the exemption for "persons entering or leaving such facility." What the current exemption would do is to allow them to congregate in front of the clinic, cheerlead, swoop down and hustle people into the abortion clinic.  Meanwhile, the pro-life viewpoint must remain thirty-five feet away.  Such patent viewpoint discrimination in the public forum is intolerable and would send the signal that the General Court is the captive

of the abortion industry and willing to sacrifice freedom of expression for business

reasons.



211 Congress Street
Boston, MA 02110
(617) 482-3170
Fax: 617-451-0009
www.aclum.org

May 16, 2007

## STATEMENT OF THE ACLU OF MASSACHUSETTS

### Re: SB 1353: An Act Relative to Public Safety (the "buffer zone" bill)

The American Civil Liberties Union of Massachusetts (ACLUM) is a nonpartisan membership organization with approximately 22,000 members. Since its founding in 1920, ACLUM has vigorously defended the right to free speech on the public streets, and has frequently appeared in the courts of the Commonwealth to defend that right.  At the same time, ACLUM has long been committed to preserving a woman's right to reproductive choice. ACLUM has participated in nearly every major reproductive health care case in Massachusetts over the course of the past thirty-five  years including Moe v. Secretary of Administration and Finance, 382 Mass. 629 (1981). We have also consistently argued, in this context and in others, that constitutional rights can quickly become meaningless if they cannot be exercised without running a gauntlet of violence, intimidation and harassment. Accordingly, ACLUM, as *amicus curiae* in Planned Parenthood League of Massachusetts v. Blake, 417 Mass. 467 (1994) and Planned Parenthood League of Massachusetts v. Operation Rescue, 406 Mass. 701 (1990), supported the position that clinic protestors who had engaged in prior unlawful conduct could be subject to a narrowly crafted injunction imposing reasonable time, place, and manner restrictions on their demonstration activity.

ACLUM deeply believes that the volatile issue of abortion clinic protest must not be resolved by sacrificing either the right to reproductive choice or the right to engage in peaceful protest. Rather, the burden in each case is to arrive at a solution that accommodates both rights, and that does so in a principled way that is consistent with our constitutional tradition. ACLUM has opposed the enactment of various "buffer zone" proposals on the grounds that they are unnecessarily restrictive of freedom of speech and, perhaps more importantly, establish a dangerous precedent for the restriction of protest in other areas.

The activities which are the target of this legislation take place in areas which are "quintessential public forums," Benefit v. City of Cambridge, 424 Mass.

(over)

-2-

918, 926-927 (1997), areas which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. at 515. "[I]n a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989, quoting Clark v. Community for Creative Non-Violence, 469 U.S. 293 (1984).

The difficulty with this legislation, as well as its predecessor, is that it based on the insupportable premise that any expressive activity within a certain distance of the entrance of a reproductive health facility will interfere with the right of access to the clinic, and that it is therefore necessary to prohibit all such activity. Within the buffer zone, the statute would prohibit not only aggressive harassment and physical obstruction, but it would also ban silent witness, and even respectful efforts to distribute information and activities which are supportive of reproductive choice. The reasoning behind this bill is the same reasoning which is all too often used to justify broad restrictions on political protest – such as confining those with dissenting viewpoints to a "protest zone" – out of concern that it *could* interfere with the target of the protest. This is not a restriction which is "narrowly tailored" in any meaningful sense and, as a result, could provide a legal justification for future restrictions on the speech and assembly rights of groups such as trade unions, anti-war and environmental activists, and others.

The overbreadth of the buffer zone legislation underscores the difficulty of formulating general rules affecting freedom of expression. It is precisely for this reason that the ACLU of Massachusetts has taken the position that protection of the right of access to reproductive health care from harassment and intimidation from the opponents of reproductive choice is more appropriately addressed in the courts, where, on the basis of a showing of actual interference by specific individuals or groups, a more narrowly tailored remedy can be crafted and enforced without encroaching on the rights of those whose activities are wholly lawful.