1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2
     * * * * * * * * * * * * * *
3    ELEANOR McCULLEN, et al        *
              Plaintiffs,           *
4                                   *
                vs.                 *        CIVIL ACTION
5                                   *        No. 08-10066-JLT
     MARTHA COAKLEY,                *
6    Attorney General for the       *
     Commonwealth of Mass.               *
7         Defendant.                *
     * * * * * * * * * * * * * *
8
                  BEFORE THE HONORABLE JOSEPH L. TAURO
9                    UNITED STATES DISTRICT JUDGE
                          **DAY ONE**
10                       **NONJURY TRIAL**

11   A P P E A R A N C E S

12           LAW OFFICE OF MICHAEL J. DEPRIMO
             778 Choate Avenue
13           Hamden, Connecticut 06518
             for the plaintiffs
14           By:  Michael J. Deprimo, Esq.

15
             ALLIANCE DEFENSE FUND
16           15192 Rosewood
             Leawood, Kansas 66224
17           for the plaintiffs
             By:  Kevin H. Theriot, Esq.
18

19

20
                                    Courtroom No. 22
21                                  John J. Moakley Courthouse
                                    1 Courthouse Way
22                                  Boston, Massachusetts 02210
                                    May 28, 2008
23                                  10:05 a.m.

24

25

1    **APPEARANCES, CONTINUED**

2

3

              LAW OFFICE OF PHILIP D. MORAN
4             265 Essex Street, Suite 202
              Salem, Massachusetts 01970
5             for the plaintiffs
              By: Philip D. Moran, Esq.
6

7             MASSACHUSETTS ATTORNEY GENERAL'S OFFICE
              One Ashburton Place, 18th Floor
8             Boston, Massachusetts 02108
              for the defendant
9             By: Kenneth W. Salinger, AAG
                  Anna-Marie L. Tabor, AAG
10

11

12

13

14

15

16

17

18

19

20

21                  CAROL LYNN SCOTT, CSR, RMR
                     Official Court Reporter
22               One Courthouse Way, Suite 7204
                  Boston, Massachusetts 02210
23                     (617) 330-1377

24

25

1                          P R O C E E D I N G S

2              THE CLERK:  All rise for the Honorable Court.

3              THE COURT:  Good morning, everybody.

4              COUNSEL:  Good morning, Your Honor.

5              THE COURT:  Sit down, please.

6              THE CLERK:  This is Civil Action No. 08-10066,

7        McCullen versus Coakley.

8              Would counsel please identify themselves for the

9        record.

10             MR. DEPRIMO:  Michael Deprimo for the plaintiff.

11             MR. THERIOT:  Kevin Theriot for the plaintiff.

12             MR. MORAN:  Philip Moran.  Good morning, Your

13       Honor.

14             THE COURT:  Good morning.

15             MR. SALINGER:  Good morning, Your Honor.  Ken

16       Salinger.  I'm an Assistant Attorney General for the

17       Commonwealth for the defendant.

18             THE COURT:  Okay.

19             MS. TABOR:  Anna-Marie Tabor also for the

20       defendant.

21             THE COURT:  Okay.  I am standing because I have got

22       a little sciatica.  Maybe I told you this the last time I

23       was here, and I still have it; but it is getting better, not

24       that you care.

25             (Laughter.)

1          **THE COURT:**  But I don't want you to be startled by

2     me standing up every once in a while.  It isn't like I am

3     going to walk out of the room in protest or anything like

4     that.  So if I am standing, you will understand why.

5          I have read your briefs.  They are very fine,

6     professional job on both sides.  And it is the kind of

7     situation that I can say, well, you know, why don't I just

8     take it under advisement on the record and on the briefs;

9     but I want to give you an opportunity to embellish if you

10    want to on your briefs.

11         You don't have to repeat; but if there are certain

12    points that you want to bang home, this is the occasion for

13    it.  We have all the time that you want so don't feel that

14    you have to be rushed or that you are imposing because you

15    are not.

16         As I say, the briefs fine.  And if you have any

17    other assistance you want to present to me, then I will be

18    very happy to have it.

19         So why don't we start with the plaintiffs.

20         **MR. DEPRIMO:**  Thank you.

21    Good morning, Your Honor.

22         **THE COURT:**  Good morning.

23         **MR. DEPRIMO:**  May it please the Court, this case

24    absolutely can be boiled down to one simple question:

25         Does the government have a significant interest in

1    banning from public streets and sidewalks welcomed and

2    invited speech to willing listeners.  To ask the question is

3    actually --

4              **THE COURT:**  Welcomed and invited?

5              **MR. DEPRIMO:**  Welcomed and invited.

6              **THE COURT:**  Do you know that it is welcome and do

7    you know that it is invited?

8              **MR. DEPRIMO:**  What I am simply saying, Your Honor,

9    is that the statute as drafted captures welcome and invited

10   speech to willing listeners as well as unwelcome and

11   uninvited speech to unwilling listeners.  It captures both.

12             **THE COURT:**  I understand.  Go ahead.

13             **MR. DEPRIMO:**  Your Honor, this law is

14   unprecedented.  There are no federal, state or local laws

15   that I am aware of anywhere in the country that even begin

16   to approach a 35-foot fixed buffer zone on public sidewalks

17   around abortion clinics.

18             The closest that I have seen is a 20-foot fixed

19   buffer zone that was targeted at health care facilities that

20   set forth a fixed buffer zone around the clinic entrances

21   and driveways and entrances of health care facilities in

22   West Palm Beach, Florida.  That particular statute or

23   ordinance was struck down by the Federal District Court

24   sitting in West Palm Beach, Florida on the ground that it

25   was -- it violated the time, time, place and manner test and

1      it was overbroad.

2              The court relied upon Hill v. Colorado, Madsen,

3      Schenck, Frisby and Ward in making these conclusions.

4              The buffer zone here --

5              THE COURT:  The Madsen case, help me out.  That is

6      the Supreme Court decision?

7              MR. DEPRIMO:  Yes, the Madsen case --

8              THE COURT:  And I thought they were involved with

9      the 36-foot.

10             MR. DEPRIMO:  Yes.  The Madsen case --

11             THE COURT:  Isn't that --

12             MR. DEPRIMO:  That's correct.

13             THE COURT:  So more than we are dealing with.

14             MR. DEPRIMO:  Yes.  But very distinguishable

15     because the Madsen case dealt with an injunction.  It wasn't

16     a law of general application as this is here.  And the law

17     down in West Palm Beach, Florida was the law of general

18     application.

19             In the Madsen case, what you had was a very

20     egregious record of unlawful conduct.  As a matter of fact,

21     the Supreme Court characterized the factual record as

22     extraordinary.  You had up to 400 people who were blocking

23     the streets, who were entering the clinic, who were

24     trespassing on private property.  People would lie in the

25     driveway, kneel on the driveway, sit in the driveway so the

1     cars could not pass.

2          Any time there is a -- that the government seeks to

3     restrict speech, you have to look at the facts that warrant

4     the restriction.  In other words, every particular case is

5     different because it depends upon the particular facts.

6          So in Madsen the court found that a 36-foot fixed

7     buffer directed at law breakers, specific individuals who

8     are law breakers was needed in order to prevent future

9     unlawful conduct.

10          The difference between an injunction and a law of

11     general application is this:

12          A person who is enjoined is enjoined because in

13     addition to engaging in speech activities, they have engaged

14     in unlawful conduct.  Essentially they forfeited some of

15     their constitutional rights.

16          One can't complain that they're pushed back when,

17     in fact, it's their own doing because they engaged in

18     trespass or blocking, impeding or what have you.

19          A law of general application is very different

20     because what a law of general application does when we're

21     talking about restricted speech is it actually regulates

22     speech that is lawful.  And there is nothing in the record

23     or at least with respect to the general public.  Certainly

24     many people have engaged in unlawful conduct.

25          So it would seem to me that there is a significant

1     difference between an injunction versus a law of general

2     application.

3            Another thing that seems to me as well, Your Honor,

4     is that if the 36-foot buffer in Madsen was pretty much the

5     bright line as to what government can or cannot do, it seems

6     to me there would be no reason for them to take the Schenck

7     case which examined the 15-foot fixed buffer and the 15-foot

8     floating buffer.

9            It also seemed to have been no reason for the court

10    to accept cert in Hill v. Colorado which examined an 8-foot

11    floating buffer within a fixed hundred feet of health care

12    facilities.

13          **THE COURT:**  Maybe we could assume that the center

14    of interest is the floating buffer.  In other words, that is

15    what triggers the interest and the examination by the

16    Supreme Court is the fact that you have a floating buffer

17    and the arguments that are made about the floating buffer

18    being more difficult to supervise and control and to be able

19    to judge with certainty what it is that might make someone

20    think that they are being accosted within that 15-foot

21    buffer.  And it may be somebody else that is right next to

22    it instead.

23          **MR. DEPRIMO:**  Yes.  It seems to me --

24          **THE COURT:**  Do you understand my question?  Maybe

25    it was a little --

1          **MR. DEPRIMO:**  I think so.  I think what you are

2     saying is that maybe the court examined the floating buffer

3     in <u>Hill</u> to determine whether or not it wasn't vague so that

4     it was actually enforceable by --

5          **THE COURT:**  Yes, because the floating buffer, the

6     problem with the floating buffer -- I am not saying that

7     this is controlling in this case -- but the problem with the

8     floating buffer is that you never know if somebody is

9     walking towards you -- you are probably, what, about ten

10    feet away from me.  Nobody would know for sure whether I am

11    walking toward you or I am walking toward one of your

12    colleagues.  And how could we know?

13         And I think that it may be too simple to say that

14    you are better off having a fixed boundary where everybody

15    knows what the rules are and everybody is guided by that as

16    opposed to this floating buffer.  That sort of troubles me,

17    the floating buffer.

18         **MR. DEPRIMO:**  Right.

19         It seems to me in <u>Hill</u>, Your Honor, the way that

20    the court analyzed the statute in <u>Hill</u> was they considered

21    kind of a balancing test.  They said okay, the interests the

22    government is looking to protect is the unwanted approaches

23    to unwilling listeners.  And you have to balance the

24    interests of these unwilling listeners against the First

25    Amendment rights of speakers.

1          So the court waived that.  And what the court found

2     in Hill was that even though there was an eight-foot no

3     approach zone, the fixed portion itself allowed free access.

4     Anybody could walk in and out of that hundred foot zone.

5     Anybody could stand anywhere within that fixed zone.  They

6     weren't required to retreat.

7          In other words, if I was standing here in the fixed

8     zone and somebody were to walk toward me, there would be no

9     duty on my part to have to step back.  They could walk right

10    next to me and I would have no duty to retreat.

11         The court found that what was significant in that

12    case was the fact that leafleteers, for example, were able

13    to stand right next to the door, right next to the path of

14    pedestrians and they could hand, you know, hand out their

15    literature.  People who were walking by could easily reach

16    out and accept them.

17         They also stated that people could speak from a

18    conversational distance.  I think those two things are

19    actually very significant to the court in Hill.

20         In Schenck the floating buffer zone was struck

21    down.

22         **THE COURT:**  Just to pick up with this

23    conversational tone, here we have as part of the record some

24    evidence that, I take it it is the defendants had two people

25    engaged in conversation 36 or 35 feet away.  And the

1    evidence is that you could hear.  Am I dreaming that or is

2    that in the record?

3            **MR. SALINGER:**  That's in the record, Your Honor.

4    That took place before the legislative hearing, that's

5    correct.

6            **THE COURT:**  Okay.  Good.

7            I always like to make sure that my memory is still

8    sharp.  Go ahead.

9            **MR. DEPRIMO:**  Two problems with that, Your Honor.

10           One is that it took place in the building.  It took

11   place in a hearing room such as this.  The ambient noise in

12   a courtroom or in a hearing room where the Senate was

13   meeting is very different than what you have out in the

14   street.

15           There is no ambient noise here.  The acoustics are

16   good.  My voice can be heard very clearly.

17           When you are out on the street, you are competing

18   with cars, trucks, construction, trains, airplanes.  And, of

19   course, the human voice doesn't carry as far in the open air

20   as does it in a place where you have got four walls.

21           **THE COURT:**  You make a good point.

22           **MR. DEPRIMO:**  Another thing that's very significant

23   about that, Your Honor -- and I confess that in my briefing

24   I mistook this as well -- is that the buffer zone in this

25   case actually creates a buffer zone of a 35-foot radius from

1    any portion of a driveway, entrance or exit which means, for

2    example -- and I'm going to show the Court this photograph

3    here (indicating).

4         This (indicating) actually is a blowup of a

5    photograph that's in the record.  This is document 60-3.

6    It's a photograph of the public sidewalk outside of Women's

7    Health Center in Brookline.

8         The buffer zone in this case, or at least under the

9    statute can extend from the driveway here (indicating) 35

10   feet.  It encompasses the driveway.  And then it extends an

11   additional 35 feet in the other direction.

12        So you have got 35 feet here plus, say, fifteen

13   feet of driveway plus an additional 35 feet.  So the buffer

14   zone here at Women's Health Center is not 35 feet.  It is

15   actually closer to 85 feet.

16        Now, the court in Schenck --

17        **THE COURT:**  The line here goes across and everybody

18   is barred from crossing that line in some effort to

19   communicate; is that it?

20        **MR. DEPRIMO:**  Yes.  Let me make something a little

21   clearer here, Your Honor.  I'm going to show you another

22   photograph.

23        This (indicating) is document 60-5.  This is simply

24   another view of Women's Health Center in Brookline.

25        There are actually two driveways that go in and out

1    of this particular clinic here.  But you can see right here,

2    this is the 35-foot buffer zone (indicating).  So it is 35

3    feet from here (indicating) to the edge of the driveway,

4    across the driveway and then an additional 35 feet down the

5    sidewalk.

6         So no one, no one can enter into this zone here

7    (indicating) and remain or stand.  You can't leaflet.  You

8    can't engage in oral communication.  You can't protest.  You

9    can't counsel.  You can't display signs.

10         **THE COURT:**  You can go only to the entrance?

11         **MR. DEPRIMO:**  I'm sorry, Your Honor?

12         **THE COURT:**  In other words, the limitation goes to

13    the entrance.  This is one line.  This is the perimeter

14    line, the -- what am I trying to say?

15         The bar on somebody like yourself who wants to pass

16    out literature is in between this line and the entrance; is

17    that what you are telling me?

18         **MR. DEPRIMO:**  It's the entrance, the entrance to

19    that --

20         **THE COURT:**  It is not just this side and that side,

21    it is also toward the entrance; right?

22         **MR. DEPRIMO:**  I don't think so.  Let me try to

23    explain this, Judge, so I'm not exactly --

24         **THE COURT:**  Well, how far is this line from the

25    entrance?

1           **MR. DEPRIMO:**  Well, it's not from the entrance.  It

2     is from the driveway.  In this particular setting here, the

3     abortion clinic is located in this (indicating) office

4     building.  So the entrance to the clinic is actually way

5     over here (indicating).

6           I have never been out there so I'm not sure.  I'm

7     guessing it's probably 75 or 100 feet from the public

8     sidewalk.  I would say from here to there (indicating).

9           Where the buffer zone is, it is from the edge of

10    the driveway 35 feet out the sidewalk.  And then from the

11    other edge of the driveway 35 feet out to the sidewalk.  And

12    then in a radius if it was marked -- and I don't know --

13    it's not marked in this photograph but I'm told it is

14    actually marked there now -- but the radius would come out

15    from both points out into the street.

16          Let me show you another photograph that might be of

17    more help in that respect.  This is document No. 65-8.  This

18    is also in the record.  This is a copy or a photograph of

19    the buffer zone outside of the clinic Planned Parenthood on

20    Commonwealth Avenue in Brighton.  Let me put it together

21    with another document.

22          This (indicating) is document 65-11.  And if you

23    put these two together here, you can actually see how large

24    the buffer zone is (indicating).  The buffer zone

25    encompasses the entire area within that yellow line.

1          **THE COURT:**  Okay.

2          **MR. DEPRIMO:**  And actually, Your Honor, there are

3   two buffer zones under the statute.  You have that 35-foot

4   radius.  And then in addition to that buffer zone there is

5   also a rectangular buffer zone that goes from the doorway or

6   the driveway in a direct line out to the street.

7          So in this particular setting here at Planned

8   Parenthood, the actual entrance to the clinic is actually

9   recessed about ten feet off the public sidewalk.  You

10  actually have to walk about ten feet down before you can

11  open the door.

12         So from one point of the buffer zone to the other

13  point of the buffer zone, it's actually about 50 feet

14  across.  So you're encompassing 50 feet of the public

15  sidewalk.

16         The arc as you can see comes almost up to the curb

17  (indicating) of the street.  This is Commonwealth Avenue

18  along here (indicating).  And as the Court can see, as it

19  goes around to Babcock (ph.) Street, it comes around, it

20  actually encompasses a portion of Babcock Street.

21         Now, if you are not a clinic agent or a volunteer

22  or an employee, you are not -- you can't go into the zone to

23  stand for any reason at all.  So clinic agents such as

24  Planned Parenthood escorts or volunteers are allowed free

25  access in the zone.

1          You can see, here's a young lady here (indicating)

2    in a vest standing inside the zone.  And in the other

3    photograph we see a man or a woman, I can't tell which, that

4    is standing in the other fixed buffer zone (indicating).

5          **THE COURT:**  Someone seeking to use that little part

6    of the sidewalk, if they overlap or if they go a bit to

7    their right, you are saying they are in violation?

8          **MR. DEPRIMO:**  I'm sorry, Your Honor?

9          **THE COURT:**  See that little portion of the

10   sidewalk -- no.  Up.  Right there (indicating).  You say

11   that is a part of the sidewalk?

12         **MR. DEPRIMO:**  This whole area is the public

13   sidewalk (indicating).

14         **THE COURT:**  I understand, but that is the only part

15   that isn't covered, that little --

16         **MR. DEPRIMO:**  That is correct.  The zone comes all

17   the way up here (indicating) and about fifteen or twenty

18   inches from the end of the line to the curb.

19   That's actually --

20         **THE COURT:**  So someone seeking to walk down the

21   street would be limited just to that small portion; is that

22   what you are saying to me?  Or someone could walk across the

23   zone as long as they didn't try to encourage anybody one way

24   or the other on this issue?

25         **MR. DEPRIMO:**  The answer to that is it depends.

1   And it depends based upon if you look at the wording of the

2   statute or if you look at the guidance letter that is

3   offered by the Attorney General for this reason.

4       There is an exception in the words of the statute,

5   exception No. 4 says that people can walk through the zone.

6       **THE COURT:**  Can walk?

7       **MR. DEPRIMO:**  Can walk through the zone.

8       **THE COURT:**  May.

9       **MR. DEPRIMO:**  May walk through the zone.  To get

10  from point A to point B if they're going to a destination

11  other than the clinic so long as they do it solely for the

12  purpose of going to another destination.

13      And one of the arguments we made in our briefing

14  and in our complaint was that that is actually vague because

15  a police officer cannot know with any certainty in many

16  circumstances whether or not a person is walking through the

17  zone solely for the purpose of going from one destination to

18  another destination.  It is akin to the no apparent purpose

19  language that was in the statute the case of <u>Chicago v.</u>

20  <u>Morales</u>.

21      **THE COURT:**  The word "solely" isn't used in the

22  statute though; is it?

23      **MR. DEPRIMO:**  Yes, it is.

24      **THE COURT:**  It is.  But is it used in the Attorney

25  Generals' explanation as well?

1          **MR. DEPRIMO:**  I don't think so.  Well, yes, sort

2     of.  Let me try to explain that.

3          The Attorney General's letter says this:  People,

4     anyone actually can walk through the zone to go from one

5     side to the other so long as they have no other purpose for

6     going through the zone except to go from one side to the

7     other.

8          And they specifically state that you can't engage

9     in abortion speech or partisan speech when you are going

10    through the zone.

11         So if, for example, you're a pro life advocate,

12    someone who opposes abortion, and you're standing on this

13    side of the zone here (indicating) and you want to get on

14    the other side of the zone which is 50 feet and you're

15    displaying a sign, you have this particular sign and you

16    want to go from one side to the other, can you carry that

17    sign from one side to the other without being in violation

18    of the statute?  I don't think you can because that

19    particular sign speaks to abortion.

20         What if somebody is wearing a cap or a T-shirt or a

21    button that says I am pro choice or I am pro life or

22    anything like that?  That's speech that is directed to

23    abortion.  The Attorney General's letter specifically says

24    that if you address speech at all concerning abortion or

25    partisan matters, you cannot walk through the zone.  You

1      don't fall within the exemption which means that you

2      actually have to walk all the way around the zone.

3              I think that's pretty clear.  And one of the

4      difficulties with the Attorney General's guidance letter is

5      that it renders the statute content based.  This is not like

6      the old buffer zone, the floating buffer zone which was

7      targeted categories of conduct.

8              The floating buffer zone that Massachusetts had

9      enacted originally was patterned after the statute that was

10     upheld in Hill v. Colorado.  That particular statute said

11     that nobody could display a sign or offer leaflets, oral

12     protest, educate or counsel within eight feet of somebody

13     without consent.  And the court stressed repeatedly that

14     that was not content based because it did not address a

15     particular subject matter.

16             The court said it applied to a person who was

17     selling magazines or newspapers as well as people who were

18     speaking about abortion.

19             In this particular instance here the Attorney

20     General's guidance letter specifically references abortion.

21             And while I'm here, I think the other thing that's

22     important is is the Attorney General likely is going to

23     argue that the First Circuit in McGuire said that that

24     particular language was content neutral.

25             Here's why I think it is distinguishable.  In

1    McGuire the only thing that was at issue there, at least

2    with respect to this particular issue, was whether or not

3    the clinic exemption violated equal protection or was

4    viewpoint based.  And the court found that it was not.

5        The guidance offered by the Attorney General in the

6    McGuire case only defined what it meant to be acting within

7    the scope of somebody's employment.

8        The exemptions here and in McGuire are identical.

9    Now, they were termed differently by the Attorney General in

10   this particular case but as worded they're identical between

11   this statute and the old statute.

12       And the second exemption in the floating buffer

13   statute that was at issue in McGuire stated that clinic

14   employees and agents acting within the scope of their

15   employment were exempted from the provisions in the zone.

16       So the Attorney General came back so, to avoid any

17   kind of viewpoint discrimination or equal protection claim

18   and said, okay, we are going to define the term "scope of

19   employment" simply to mean somebody who is not engaged in

20   any kind of abortion speech or partisan speech but somebody

21   who is simply assisting a patient through the zone.

22       And the First Circuit said that that's a rational

23   basis for having that kind of exemption.  In the original

24   floating buffer statute, which by the way was an 18-foot

25   fixed area, and then within the 18-foot fixed area one could

1    not approach within six feet without consent -- I'm losing

2    my train of thought here.

3          Oh, in that 18-foot area there was no -- like Hill

4    v. Colorado there was no restriction, Your Honor, with

5    respect to people going in and out or standing aside.  So

6    the 18-foot area may have been sort of like this

7    (indicating), you know, it was much smaller.

8          And theoretically that particular buffer zone, that

9    18-foot fixed buffer zone could have gotten very crowded.

10   You know, people could have been in there displaying signs.

11   People could have been there distributing literature.

12   People could have been just standing around.

13         So there certainly could have been a rational basis

14   for the government to say that an escort would actually be

15   assisting a patient in going into the clinic.

16         That's not the case here.  This is a hard buffer

17   zone in this particular instance here.  No one can go inside

18   of that 35-foot zone unless you fall within the exemption.

19         Unlike McGuire, there is no -- it seems to me that

20   there is no public safety concern with respect to patients

21   being able to access the clinic entrance.  This zone is

22   completely free of people.  The only people standing in the

23   zone are the Planned Parenthood escorts.  You take them out,

24   and --

25         **THE COURT:**  Well, the fact that it is safer or the

1    fact that it is more convenient isn't fatal to it; is it?

2        **MR. DEPRIMO:**  No.  Actually what I'm getting at --

3        **THE COURT:**  You seem to be arguing that the added

4    safety benefit of the enlarged circle makes it

5    unconstitutional.

6        **MR. DEPRIMO:**  Well, actually let me address that

7    right now because I think we're directly on point.

8        The original buffer zone, the original floating

9    buffer zone was an 18-foot fixed zone.

10       **THE COURT:**  And this one is 36.

11       **MR. DEPRIMO:**  This one is 35.  So essentially they

12   doubled it.

13       There is no testimony whatsoever in the record that

14   anybody, that anybody said that that 18-foot zone was

15   insufficient.

16       Now, in 2000 the Legislature found that an 18-foot

17   fixed buffer would have been sufficient to address the

18   problems that were before them, which was unwanted

19   approaches.

20       Getting back to the record in 2007.  As I

21   mentioned, there is no testimony from police.  There is no

22   testimony from abortion providers.  There is no testimony

23   from abortion agents.  There is no testimony from the

24   Attorney General.  There is no testimony even from

25   legislators that that 18-foot fixed buffer zone was

1   insufficient to be able to cure the problems that they were

2   seeking to remedy.   Okay.

3   Why is it that they doubled it from 18 to 35 feet?

4   Okay.   That was arbitrary and capricious.   There is no

5   evidence in the record, whether it's testimony or anything

6   else, that indicated 18 feet, an 18-foot fixed buffer zone

7   was insufficient.

8   The only reason it seems to me that they doubled it

9   was because --

10  **THE COURT:**   The 18-foot buffer zone -- make sure

11  that I have got this correct in my mind -- also had the

12  floating buffer zone feature.

13  **MR. DEPRIMO:**   Yes.

14  **THE COURT:**   This is different.

15  **MR. DEPRIMO:**   Yes.

16  Here's my point, Judge.   My point, Your Honor, is

17  this:

18  You take away the floating aspect of the original

19  buffer and you just leave the 18-foot restriction in, it

20  cures all of the problems that were before the Legislature

21  in 2007.

22  **THE COURT:**   Let's say you are right.   So you come

23  back to the question that I asked you, that what you are

24  basing it on is that, assuming there is no floating buffer,

25  you are saying that the fact that they doubled it itself was

1    an unconstitutional act?

2         MR. DEPRIMO:  What I'm saying, Your Honor, is that

3    the -- that in order for this to be legitimate or a

4    permissible time, place and manner regulation, in order for

5    that, for it to even qualify as a time, place and manner

6    regulation it has to be content neutral.  I think it's

7    content based.

8         But assuming for the moment that this is content

9    neutral, even a content neutral regulation of speech must be

10   narrowly tailored to a significant government interest and

11   leave open ample alternative avenues of communication.

12        And my point is is that there was no evidence in

13   the record whatsoever, we are not talking about one iota,

14   one scrap of testimony or any kind of documented evidence

15   that said that an 18-foot fixed buffer zone wouldn't have

16   solved the problem that was being addressed.

17        The police officers testified that the difficulty

18   that they were having --

19        THE COURT:  You are saying that if we were here

20   because the statute was amended to eliminate the floating

21   zone, you wouldn't be here.

22        MR. DEPRIMO:  No, that's not correct, Your Honor.

23   I'd still be here.  I think --

24        THE COURT:  I would miss you if you weren't but, I

25   mean --

1          (Laughter.)

2          **THE COURT:**  You seem to be pointing at the floating

3    buffer, I mean the 18 feet versus 36.  The only real

4    difference then would be, except for the expanded

5    circumference, would be the fact that there is no buffer

6    here.  So I am saying if what they did was keep it at 18

7    feet and took out the buffer, you would have no objection?

8          **MR. DEPRIMO:**  That's not correct.  I still think it

9    would be unconstitutional for this reason:

10          I think the Supreme Court in Schenck and in Hill

11    unequivocally stated that speakers have the right to speak

12    with their attentive audience from a conversational

13    distance.

14          And in Schenck the Court found as a matter of law

15    that fifteen feet was not a conversational distance.  The

16    Court in Hill noted that an 8-foot restriction was less than

17    fifteen feet and allowed for a conversational distance.

18          Eighteen feet, of course, is beyond the fifteen

19    feet so I think even an 18-foot fixed buffer zone would be

20    unconstitutional under Schenck and Hill because it didn't

21    allow for the conversational distance.

22          The point that I am making is is that there was no

23    reason, there is nothing in the record that justifies the

24    Commonwealth from doubling from 18 feet to 35.

25          The key for a time, place and manner analysis is

1    what is the targeted evil.  What does the government seek to

2    remedy with their statute?

3         In their findings and conclusions, in finding

4    No. 20, proposed finding No. 20 and proposed conclusion

5    No. 53, the Commonwealth tells us that what the Legislature

6    found was that the problems they were seeking to remedy --

7    and this is their language -- the problems occurred

8    immediately adjacent to driveways and clinic entrances.

9    They said the problem was, the Legislature found that people

10   were standing very close to the door.  That's their

11   terminology.

12        People were standing very close to the door.  And

13   that was causing a problem because as people entered into

14   the clinic and exited the clinic, because people were so

15   close to the door, people would brush up against the signs.

16   People would be hit by their, you know, would bump into

17   their umbrellas and such.

18        So that's their targeted evil.  Their targeted evil

19   is conduct that occurs immediately adjacent to driveways and

20   immediately adjacent to the clinic entrances.

21        When we are talking about speech, distance has

22   everything to do with whether or not an ordinance is

23   narrowly tailored.

24        As I pointed out earlier, I think, in Hill v.

25   Colorado the court upheld that statute.  And one of the

1    things that they said was that 8-foot floating buffer

2    seriously burdened speech, seriously burdened speech.

3          However, because individuals were allowed to go

4    into the zone and stand in a particular place next to the

5    door, they were still able to stand next to the pathway of

6    pedestrians to hand out their literature which the

7    pedestrian could easily accept.  And they were still able to

8    speak with people from the conversational distance because

9    they had no duty to --

10         **THE COURT:**  You keep talking about "conversational

11   distance."  And just looking again quickly at the Attorney

12   General's brief, paragraph 20 in the substantive paragraphs,

13   there they are talking about not conversational behavior but

14   more startling, you know, yelling, screaming, waving signs.

15         So wouldn't it be reasonable for -- this is with an

16   18-foot perimeter.  Wouldn't it be reasonable for them to

17   think you need double the space to protect the privacy (sic)

18   of those people who want to go in and out without being

19   harassed?

20         **MR. DEPRIMO:**  Well, the interest is not protecting

21   the privacy.  As a matter of fact, one of the difficult --

22         **THE COURT:**  The privacy?  Did I say privacy?

23         **MR. DEPRIMO:**  You said privacy.

24         **THE COURT:**  I didn't mean that.

25         **MR. DEPRIMO:**  Are we talking about safety?

1              **THE COURT:**  Yes.

2              **MR. DEPRIMO:**  I think certainly --

3              **THE COURT:**  Well, safety, safety and fear.  In

4    other words, being put in fear.  If you characterize that as

5    part of safety, I mean, these people have testified, at

6    least in the proposed findings they seem to testify that

7    they were frightened with the demonstration or the waving of

8    the signs and the screaming at them from the 18-foot

9    barrier.

10             **MR. DEPRIMO:**  Your Honor, there is no testimony

11   from any patient at all in the record.  Now, there may be,

12   it may very well be that you have Planned Parenthood saying,

13   testify or you have volunteers testify --

14             **THE COURT:**  Well, there are a number of proposed

15   findings here in this twenty --

16             **MR. DEPRIMO:**  Yes.

17             **THE COURT:**  -- that --

18             **MR. DEPRIMO:**  I'm talking about the actual

19   testimony.

20             The point that I'm trying to make with respect to

21   proposed finding No. 20 and conclusion No. 53 is the

22   location where the problem is.  The location of the problem

23   that they're trying to cure they say is immediately adjacent

24   to the driveway and immediately adjacent to the door.

25             So if you were to look at this photograph here

1    (indicating), Your Honor, for example, the doorway is

2    actually the width of this fixed buffer zone where we have

3    the white lines.

4              (Pause in proceedings.)

5              **THE COURT:**  Go ahead.

6              **MR. DEPRIMO:**  The fixed buffer zone is right here

7    (indicating) where we have these white lines.  This

8    (indicating) is the entranceway to the door.

9              If you move people two or three feet, perhaps, from

10   this buffer zone here (indicating), there is no danger of

11   anybody walking in being hit with a sign, accidentally

12   being -- actually not being hit with it but bumping into a

13   sign or even bumping into an umbrella.

14             One of the difficulties I think that the Attorney

15   General is going to have in trying to argue their case is

16   that it's not merely the secondary effects of speech that

17   they're targeting but the primary effects as well.

18             The secondary effects of the speech are bumping

19   into signs, blocking, impeding, trespass, things of that

20   nature.  Physical harassment, assault, all of those kind of

21   things are secondary effects.

22             But the reaction that somebody has to particular

23   speech is a primary effect.  That's not a secondary effect.

24   That's a primary effect.  As a matter of fact, in the case

25   of Buse v. Gary (ph.), that is exactly what the Court found.

1            In that particular case there was a, I think

2    District of Columbia law that prohibited saying disparaging

3    things about ambassadors and, you know, foreign nationals

4    and stuff.  And the court came back and said that and they

5    claimed, they claimed that that law was targeted at the

6    secondary effects of the speech.  And the court came back

7    and said no, that's the primary effect of the speech.

8    Somebody's reaction is directly related to the content.

9        THE COURT:  But if that is not the intention, the

10   fact that it has that incidental consequence doesn't make it

11   unconstitutional.

12       MR. DEPRIMO:  Oh, that's not incidental though,

13   Your Honor.  If it is the content of the speech, in other

14   words, if --

15       THE COURT:  If it is not the content, in other

16   words, if the intent is not to control the content of the

17   speech but these public safety matters instead, but if in

18   doing so it incidentally impinges speech, that is permitted

19   as I understand the case.

20       MR. DEPRIMO:  I don't believe so, Your Honor, for

21   this reason.  Content --

22       THE COURT:  McGuire doesn't say that?

23       MR. DEPRIMO:  A content neutral time, place and

24   manner regulation is just, it has to be justified without

25   reference to the content of the speech.  And what I am

1    saying is if, if the Commonwealth is concerned about

2    listener reaction, then that is directly related to the

3    content of the speech and that takes it outside of the time,

4    place and manner test.

5        **THE COURT:**  It could be both though, as long as the

6    intent, as long as the intent is for safety, the fact that

7    there is an incidental, coincidental and incidental

8    impingement on the speech is not barred.

9        **MR. DEPRIMO:**  I think this is what --

10       **THE COURT:**  I think McGuire says that; right?

11       **MR. DEPRIMO:**  I don't think it says that.  I think

12   what McGuire says is is that a time, place and manner

13   regulation that is directed toward the secondary effects of

14   speech -- the secondary effects, we are talking about

15   impeding, blocking, assault, criminal harassment, trespass,

16   those kinds of things.  If the law is targeted at remedying

17   those kind of things, the fact that it incidentally burdens

18   speech is of no moment.  That's what it said.

19       **THE COURT:**  Right.

20       **MR. DEPRIMO:**  Okay.

21       **THE COURT:**  That is what I was trying to say but

22   not as articulately as you just did it.

23       **MR. DEPRIMO:**  Well, the difference is, Your Honor,

24   is that reaction to speech is not a secondary effect.

25   Reaction to speech is a primary effect.

1          I say something and it makes you angry.  I say

2     something and it upsets you or I display a sign or I give

3     you a piece of literature.  It's the content of the speech

4     that makes you angry.

5          If I say, "Good morning, Your Honor," you're

6     probably not going to get angry with me.

7          **THE COURT:**  But, see, the way you pose it you can

8     never win the argument.  It is like which came first, the

9     chicken or the egg, that type of thing.

10         **MR. DEPRIMO:**  I am not following you, I'm sorry.

11         **THE COURT:**  Well, I mean, the way you posit the --

12    any time that there is an impact on speech, you say that is

13    the prime purpose of the restriction.  They say the prime

14    purpose of the restriction is safety.  They agree that it

15    also has an impact on speech.  As soon as they say that, you

16    say, well, that trumps everything.  If it has an impact on

17    speech, then that is the trump card.

18         There can't be any impact on speech regardless of

19    what the intent was because if there is an impact on speech,

20    we have to assume that the intent was to control the speech.

21         Aren't you saying that in effect?

22         **MR. DEPRIMO:**  No.  No.  I'm not saying that at all.

23    I think I'm not making myself clear to the Court.

24         What I'm saying is that when a speaker wants to

25    speak, okay, and the government regulates the place of the

1    speech in such a way that it causes an incidental burden on

2    their speech, that is permissible.  Okay.

3           For example, if you move somebody from being right

4    next to the door and you move them back five feet, that is a

5    burden on their speech.  You move them back eight feet, that

6    is a burden on their speech.

7           **THE COURT:**  Then we see whether it is reasonable.

8           **MR. DEPRIMO:**  Yes.  Is that permissible?  The

9    Supreme Court said in <u>Hill</u>, yes, it is permissible.

10          What I'm talking about is not what the speaker, I'm

11   not talking about the impact on the speaker.  I'm talking

12   about an impermissible consideration.  I'm talking about the

13   impact on the listener.

14          What I am saying is is if the government is trying

15   to regulate speech because it upsets the listener, that is

16   not permissible because that's not a secondary effect.

17   That's a primary effect.

18          They're looking at the content of the speech and

19   they're saying that what the speaker is saying is upsetting

20   the listener and we can't have that.  We can't have the

21   listener upset so we are going to regulate the speech in

22   such a way as to push these people back so that the listener

23   is not upset.

24          **THE COURT:**  Suppose it is not the speech but it is

25   the manner in which the speech is portrayed.  In other

1    words, it is done in a way that is at least arguably

2    frightening to those who hear it.  Forget about the message.

3    They just hear the noise, the chatter, see the signs and

4    they find that frightening.  Now, isn't that legitimate

5    police activity to try to correct?

6          **MR. DEPRIMO:**  I think the Supreme Court would say

7    no.  The Supreme Court says that since this must tolerate

8    insulting and even outrageous speech in order to provide for

9    the breathing rooms that are necessary for the First

10   Amendment.

11         As a matter of fact, the court has even gone

12   further.  They said if it is the offensiveness of the speech

13   that is causing the problem, that's the very reason why the

14   speech needs to be protected.

15         **THE COURT:**  But, see, I am not talking about the

16   speech itself.  I am talking about the manner in which the

17   speech -- the manner in which the message is conveyed.

18         **MR. DEPRIMO:**  Somebody screaming, for example.

19         **THE COURT:**  Screaming, yes.  Waving signs.  Putting

20   signs at the window of a car, leaning in and somebody that

21   might be in another setting considered to be an assault.

22         **MR. DEPRIMO:**  I think that that actually would be

23   valid.  I think -- and that's what I think the Supreme Court

24   said.  Basically what the Supreme Court said in Hill was

25   this:

1          There is an aspect of privacy that even reaches

2     public sidewalks.  Okay.  People on public sidewalks can't

3     be shielded from all unwanted speech.  But basically what

4     the Supreme Court is saying is this:

5          There is a certain amount of personal space that

6     people are entitled to.  And if they don't want to hear a

7     message within close proximity, they don't have to do it.

8     And that's what the Hill statute was designed to do.

9          If somebody did not want you to approach and they

10    made that clear, you could not make the approach.  Could you

11    speak to them from eight feet?  Could you yell at them from

12    eight feet?  Could you show them an offensive sign from

13    eight feet?  Yes, you could.  And you could do that under

14    the statute that was at issue in McGuire as well, except the

15    distance was six feet.

16         There was no ban at all with respect to the content

17    of the message.  The Court is correct, it was the manner in

18    which it was done.  It was the fact that it was done in such

19    close proximity that it was causing an offensiveness with

20    respect to personal space.  But it didn't have anything to

21    do with the content of the message.  The Court made that

22    clear.  If it's the content of the message that's offensive,

23    the regulation is no longer content neutral.  It's content

24    based.

25         And if it's content based, then it's a whole

1    different legal standard.

2          Now, the government has to satisfy the strict

3    scrutiny test.  They have to demonstrate compelling interest

4    for the regulation and that the regulation is the least

5    restrictive means of achieving that interest.

6          And as the First Circuit said, content-based

7    restrictions rarely survive constitutional scrutiny.

8          There is no case around an abortion clinic that I

9    am aware of in which speech was ever analyzed under the

10   strict scrutiny standard.

11         So it seems to me that the court upheld it under

12   compelling interest so it seems to me what the court is

13   saying is is that content-based restrictions around abortion

14   clinics simply are not valid.

15         There is no case I am aware of in which a

16   content-based restriction around an abortion clinic was

17   upheld.  Offensive signs, offensive speech, constitutionally

18   protected.  People want to shout, people want to yell.  If

19   they're breaching the peace, arrest them for breaching the

20   peace.  But you can't regulate their speech with a law of

21   general application that puts everybody back simply because

22   of a couple of people who happen to raise their voice.

23         That's the same situation I think that exists in

24   this case with respect to the couple of folks who are

25   wearing the police caps and the police T shirts

1    (indicating).  The problem that the government found in that

2    particular situation is is that when patients drive up and

3    these people with the police cap and the shirt, they wave at

4    them, the patients assume it is a police officer.  And they

5    wave them in and say, you know, yeah, you can come and talk

6    to me.

7          And what the government is saying is that that's

8    essentially a way of duping the patients into allowing an

9    approach that the patient probably didn't want in the first

10   place.  And so these individuals were arrested.

11         **THE COURT:**  Do you disagree?  I mean, would you

12   protect that?

13         **MR. DEPRIMO:**  Well, let me defer to the Court, Your

14   Honor, because the Massachusetts State Court found that that

15   was constitutionally protected, that that conduct was

16   protected by the First Amendment.

17         Captain Evans testified either in his affidavit or

18   in his testimony before the Senate, and I think it was

19   before the Senate, that they actually did try to or actually

20   did issue citations of arrest on these people for

21   impersonating police officers.  And it was thrown out by the

22   court on the grounds that there was First Amendment

23   protected conduct.

24         You cannot, the government cannot specifically

25   target first -- protected First Amendment conduct and say

 1    that's the problem.  And I think that's what happened.  I

 2    think that may be something that one has to look for.  It is

 3    a very creative way of getting somebody to consent.

 4          Did the person in the car consent?  Yes, they did.

 5    So was the person in violation of the law?  No, they

 6    weren't.  They didn't approach without consent.  Very

 7    creative way of getting around the law but it was

 8    constitutionally protected.

 9          That was the only, the only type of illegal conduct

10    that Captain Evans actually pointed to with respect to why

11    they needed a fixed buffer zone outside the abortion

12    clinics.

13          Generally speaking Captain Evans testified that,

14    hey, look, we can't tell whether or not somebody is making

15    an unwanted approach.  It makes it difficult for us --

16          **THE COURT:**  Because of the floating --

17          **MR. DEPRIMO:**  Because of the floating.

18          **THE COURT:**  Which we have eliminated here.

19          **MR. DEPRIMO:**  Which we eliminated here.

20          But my point is, Your Honor, there is no testimony

21    by Captain Evans that there was any kind of unlawful conduct

22    occurring outside the clinic.  He didn't say -- first of

23    all, he said that --

24          **THE COURT:**  It doesn't have to be fresh, it can't

25    be stale, but you can go back to the record that they had in

1  the First Circuit in <u>McGuire</u>.

2         **MR. DEPRIMO:**  Well, to some degree.  In <u>Bl(a)ck Tea</u>

3  <u>Society</u> the First Circuit said that the government can

4  consider past experiences; but, I mean, there has to be a

5  fairly reasonable nexus, a plausible nexus between what

6  happened in the past and what's happened in the future.

7         The point that I would like to make is that the

8  original floating buffer statute was enacted in the year

9  2000.  This fixed buffer statute was enacted in 2007.  There

10  is no evidence that anything happened between 2000 and 2007

11  that warranted the increase in the size of the buffer zone

12  or even the fixed buffer zone but for the fact that the

13  police were having difficulty in enforcing it.  That's it.

14         No testimony whatsoever from either Captain Evans,

15  Detective O'Connell or Lieutenant McDermott who all had said

16  that they're out at the clinics, you know, on a regular

17  basis.

18         Captain Evans said that police were constantly

19  watching protestors on Commonwealth Avenue, Planned

20  Parenthood.  Constantly watching.  Okay.  He was commander

21  there for nine years, I think between 1998 and 2007 or

22  thereabouts.

23         No mention of impeding.  No mention of blocking.

24  No mention of harassing.  No mention of trespassing.  No

25  mention of any kind of illegal conduct other than what he

1     considered the impersonating the police officer which the

2     court found to be protected conduct.

3              The only thing that he found was that we can't tell

4     whether or not somebody is making an unconsented approach.

5     That's all.

6              Detective O'Connell --

7              **THE COURT:**  We can assume that what he is saying is

8     that we need more room to make the decision.

9              **MR. DEPRIMO:**  I think what he's saying is that we

10    can't tell whether or not the approach is unconsented.

11             If we have a fixed buffer zone and the line is

12    fixed and we know that somebody steps from a point outside

13    the buffer zone and goes inside the buffer zone and stands

14    there --

15             **THE COURT:**  And they have no reason to be there?

16             **MR. DEPRIMO:**  Well, but the bright line is that

17    they're violators of the law.

18             **THE COURT:**  Yes.

19             **MR. DEPRIMO:**  You can stand here.

20             **THE COURT:**  But if it is the floating situation,

21    that is when they were hampered.  They couldn't tell where

22    someone was headed.  And so they decide as a remedy for that

23    weakness to expand the perimeter and give us what we now are

24    litigating, this 35-foot perimeter; isn't that basically

25    what happened here?

 1          **MR. DEPRIMO:**  Well, I think what happened here --

 2   what's confusing to me, first of all, is the whole idea of

 3   doubling it from 18 to 35 feet.  My personal view is is the

 4   reason that they did that had nothing to do with any of the

 5   evidence that was before the Legislature.  I think it had to

 6   do with some lawyer pointing out to the sponsor of the bill

 7   that, hey, look, in Madsen the court approved a 36-foot

 8   injunction so anything less than 36 feet is constitutional

 9   so why don't we just make it a 35-foot fixed buffer.  I

10   think that's what happened.  Because there is no evidence

11   that says you need a 35-foot buffer as compared to an

12   18-foot buffer.

13          The only problem, the only problem --

14          **THE COURT:**  There is no case yet that says that 35

15   or 36 feet is too much?

16          **MR. DEPRIMO:**  Well, actually Schenck which was an

17   injunction case said that a 15-foot floating buffer was

18   unconstitutional because it didn't allow for the

19   conversational distance.

20          I think you have to sort of look at those two

21   things, you have to look at that and say that it's

22   impermissible because no conversational distance and you

23   can't leaflet.  You can't stand in a particular place and

24   leaflet.

25          **THE COURT:**  Why don't I give you a chance to catch

1    your breath.  I will certainly listen to anything else you

2    have to say.  I will give you a little rest and give the

3    other side a shot.  Okay?

4              **MR. DEPRIMO:**  Sure.  Thank you, Your Honor.

5              **MR. SALINGER:**  Good morning, Your Honor.

6              **THE COURT:**  Good morning.

7              **MR. SALINGER:**  I'm hoping to do four things this

8    morning, hoping that they'll all be helpful.

9              First is to underscore two key facts or sets of

10   facts that are undisputed.  It is always nice to remember

11   where we have common ground.

12             Second, to correct a couple of statements made by

13   opposing counsel in his opening regarding some of the legal

14   framework.

15             Three is to touch on some of the high points.  I'm

16   certainly not going to repeat everything you have already

17   submitted but you already had some high points regarding

18   specific requirements of the claims asserted by the

19   plaintiffs.

20             And then, fourth, most importantly, ancillary

21   questions the Court has for us.

22             **THE COURT:**  Okay.  Go ahead.

23             **MR. SALINGER:**  Your Honor, those two undisputed

24   facts.  First of all, it appears to be undisputed that the

25   Legislature had a legitimate content neutral purpose for

1    revising this statute.  Indeed, in paragraph 121 of

2    plaintiffs' proposed conclusions of law, the plaintiffs ask

3    the Court to find that the fixed buffer statute was designed

4    to protect the health and safety of women seeking

5    reproductive health care services and that this is a

6    legitimate interest.

7          Now, that's actually a little too narrow.  The

8    Legislature was trying to protect not only patients of

9    clinics but also staff of clinics, volunteers, friends and

10   family of patients, other people walking by.  And plaintiffs

11   themselves make that point in their complaint in paragraph

12   17 when they basically paraphrase the preamble for the

13   Senate bill that became the final statute.  And that is in

14   evidence as Trial Exhibit No. 20.  That talks about the Act

15   being revised in order to preserve public safety by creating

16   clearly defined boundaries.

17         And, finally, and most simply, the Legislature

18   itself said that its purpose in passing this statute was to

19   protect public safety.  That's Trial Exhibit No. 1.  The

20   emergency preamble to the law in question states that the

21   purpose of the revised act was "to increase forthwith public

22   safety at reproductive health care facilities."

23         So that's the purpose.  That's content neutral.

24   And as the First Circuit reminds us in the recent Naser

25   Jewelers case that we cite in paragraph 46 of our proposed

1    findings, a statute that is content-neutral like this one

2    enjoys a presumption of constitutionality.

3         Your Honor, there is a second set of facts that

4    really is undisputed and that's the nature of the

5    legislative record, the legislative facts that the

6    Massachusetts great and general court considered before

7    revising the statute.

8         Part of it, as the Court suggested, was the factual

9    record that the Legislature had created back in April of

10   1999 that the First Circuit credited and discussed at some

11   length in its McGuire opinions which we discuss in our

12   proposed findings at paragraphs 7 to 10.

13        But in addition, this goes to paragraph 20 that

14   Your Honor was discussing with opposing counsel from our

15   proposed findings, there was a hearing in March of 2007

16   before the Legislature's Joint Committee on Public Safety

17   and Homeland Security.  And they got testimony in written

18   form and oral firm and there was a video presented.

19        They got a lot of information that demonstrated

20   that despite the existence of the original act with that

21   floating 6-foot buffer zone within an 18-foot larger area,

22   there continued to be problems of harassment, intimidation,

23   individuals being put in fear at those bottleneck points

24   where folks were trying to enter or exit a reproductive care

25   facility through a door or by driving through the driveway.

1          The subparagraphs in paragraph 20, I know you're

2     familiar with them, but they show that individuals learned

3     that under the original act because there was that approach

4     requirement, they could be wherever they wanted even within

5     the 18-foot zone as long as they didn't approach anyone.  So

6     they learned that they could safely stand right next to or

7     right in front of the door or driveway.  They could block

8     people.  They did so.

9          The Legislature learned that people would block the

10    doors and scream at folks trying to get into the clinic.

11    There was an anecdote by a young patient trying to come to a

12    clinic and her grandfather trying to accompany her got

13    almost knocked down.  There were real public safety

14    problems.  And that record is undisputed because it is what

15    it is.

16         Part of that record, Captain Evans of the Boston

17    Police specifically recommended to the Legislature that they

18    adopt this revised statute with a fixed 35-foot buffer zone

19    just to clear out those bottleneck areas and make them safe

20    so that they were no longer focal points of jousting and to

21    enhance public safety in that way.  That's what the

22    Legislature did.

23         Your Honor, I should just note --

24         **THE COURT:**  Is it your position that 36 feet may

25    not have been necessary but it was a permissible choice for

1      the Legislature to make?

2          **MR. SALINGER:**  Absolutely, Your Honor.  And the

3      U.S. Supreme Court has spoken to this point.  We discuss it

4      in our proposed findings around paragraphs 68 to 73.

5          There was a suggestion by opposing counsel, perhaps

6      he misspoke, that the Legislature is required to use the

7      least restrictive solution.  That's actually 180 degrees

8      wrong.  What the Supreme Court has repeatedly said is that

9      under this three-part test from Ward versus Rock Against

10     Racism, the three parts of content neutrality, narrow

11     tailoring and ample alternative channels of communication,

12     that narrow tailoring prong can be met whether or not the

13     Legislature, or in the case of an injunction the court, has

14     chosen the least restrictive solution.

15         It was striking, Your Honor, in the Burson case,

16     which is not a clinic case, that's the case involving a

17     hundred foot buffer zone around polling places.  An argument

18     was made that, geez, even if you need some sort of buffer

19     zone, a hundred feet is too big.

20         And what the Supreme Court said in Burson is that

21     that issue was not "of constitutional dimension."

22         The First Circuit in the Bl(a)ck Tea Society case

23     relying on the Supreme Court's decision in Ward makes clear

24     that plaintiffs simply cannot come into court and ask this

25     court to second-guess the legislature's judgment about

1    whether the right number was 35 feet or should it have been

2    18 feet or should it have been 42 feet.

3          On this narrow tailoring prong, Your Honor, the

4    reason why this statute is narrowly tailored is, as

5    Mr. Deprimo suggested, because it's focused on the problem

6    that the Legislature is trying to cure:  The problem of safe

7    access to reproductive health care facilities.

8          We suggest, Your Honor, that the Supreme Court's

9    decisions in both the Schenck and the Madsen cases, although

10   they involved injunctions and did not involve statutes, are

11   very instructive on this question of how big is big enough

12   and what does it mean to be narrowly tailored.  Because both

13   of those decisions the court upheld part of an injunction

14   order imposing a fixed buffer zone and struck down another

15   part of an injunctive order.

16         Madsen was the first of the two cases so perhaps I

17   should start there.  In Madsen at issue was an injunction

18   that in part created a 36-foot buffer zone.  That was not 36

19   feet around entrances or driveways like here.  It was 36

20   feet around the entire clinic property line.  Much, much

21   bigger than the fixed buffer zone at issue here.  The court

22   held that that fixed buffer zone was constitutional.  It was

23   narrowly tailored to protect safety around and access to the

24   clinics.

25         In contrast there was also a part of that

1    injunction that sort of like the original act here had a no

2    approach requirement.  You could not approach people who did

3    not want to be approached and that was within a 300-foot

4    area around the clinic.  The court struck that down because

5    that 300-foot area was not narrowly tailored to the problem

6    of safety around and access to the clinic.

7            Similarly in Schenck, Your Honor, part upheld, part

8    struck down.  In Schenck, part of the injunction set up a

9    fixed 15-foot buffer zone around the clinic entrances and

10   driveways.  And the court held that that was constitutional.

11   That was narrowly tailored.

12           The suggestion that Schenck somehow means you have

13   to be able to get within a few feet of individuals no matter

14   where they are in the world in order to have a normal

15   conversation with them can't be squared with the actual

16   holding where the court said no, no, a fixed 15-foot buffer

17   zone is permissible under the Constitution.

18           What the court struck down was that floating

19   15-foot buffer zone because it was not narrowly tailored,

20   because it was moving around.  It was very hard to figure

21   out.  If you were wanting to try to speak with somebody on

22   the sidewalk and they were walking down a 17-foot wide

23   sidewalk, very hard to figure out how to comply with that.

24           So both of those cases given what was upheld versus

25   what was struck down are guidance that when a Legislature in

1      this case, or as in those cases, are faced with a public

2      safety problem at a fixed point, it is constitutionally

3      permissible to clear out the area around that fixed point

4      with the kind of buffer zone legislation that was enacted

5      here.

6              Your Honor, that actually brings me to one of the

7      two --

8              **THE COURT:**  Buffer zone legislation that was

9      enacted here or it was eliminated here?

10             **MR. SALINGER:**  That was enacted here, Your Honor.

11     The fixed 35-foot buffer zone that we are talking about.

12             **THE COURT:**  Okay.  Not floating.  Okay.  Go ahead.

13             **MR. SALINGER:**  Your Honor, the first two things

14     that Mr. Deprimo said, respectfully I have to take issue

15     with them.

16             He first of all characterized the statute at issue

17     here as a ban on certain kinds of speech.  That is not

18     right.  No message is banned.  No speech is banned.  No

19     manner of speaking is banned.

20             What this statute does, just to make sure we are

21     all on the same page here, is it establishes an ability for

22     reproductive health care facilities to clearly mark and post

23     a buffer zone.  If they do that, then -- and they do it no

24     more than 35 feet from their entrance or driveway, then

25     during clinic business hours, nobody is allowed in that zone

1    unless they fall within one of the four exemptions:

2         If they are on their way into the clinic; if

3    they're just crossing through the zone to get somewhere

4    else; if they a municipal employee acting within the scope

5    of their employment; or if they're a clinic employee or

6    agent acting within the scope of their employment.

7         The U.S. Supreme Court in the Hill case

8    specifically pointed out that a buffer zone restriction of

9    this kind does not as a matter of law operate to ban any

10   speech.  What it is is it has the effect of limiting the

11   time or place within speech, within which speech may happen.

12   And so it's under that time, place or manner doctrine that

13   we have to analyze it.

14        This is not a statute that bans speech.

15        Now, the second thing that I must respectfully take

16   issue with, early in his remarks Mr. Deprimo suggested that

17   the Supreme Court's Madsen decision is distinguishable in

18   favor of the plaintiffs because that case involved an

19   injunction and this one involves a statute.

20        Well, factually, of course, that's correct; but he

21   has it sort of backwards here.  In Madsen and then in Hill

22   the Supreme Court has made clear that a statute of general

23   application like in this case is subject to less stringent

24   scrutiny against constitutional claims like these as

25   compared to an injunction.

1          In Madsen the Court made the point one way.   Madsen

2     involved an injunction.   And so the court said, you know,

3     we're going to give this a harder look than we would if it

4     was a statute.

5          A few years later in Hill the court was faced with

6     a statute and they made a point of emphasizing -- and we

7     give the cite in paragraph 44 of our proposed findings.

8          They made a point of emphasizing that because the

9     statute reflects a general policy choice by the State

10    Legislature and it is not targeting the behavior of

11    particular individuals the way an injunction typically does,

12    the statute, the buffer zone statute there, like the one

13    here, is assessed under the less stringent constitutional

14    standards set forth in Ward.

15         So I wanted to make those two corrections.

16         Your Honor, I want to just quickly point out the

17    fact, as you, of course, know because you're the one who did

18    this, the Court at plaintiffs' request has bifurcated this

19    case and we are only dealing with the facial challenge at

20    this point.   The as applied challenge will be dealt with

21    later.

22         And I know that simply because when we read

23    plaintiffs' proposed findings of fact around paragraphs 10

24    up through 42 they provide a lot of detail that comes from

25    their affidavits regarding what they say is going on on the

1   ground at the clinics outside Boston and Brookline.

2           We think it would be inappropriate for the Court to

3   make any of those requested findings because they really go

4   to the as applied challenge.  We haven't had a chance to do

5   our discovery.  We haven't tried to challenge them here

6   because that's been put off for another day.

7           Your Honor, as I suggested a few times, the main

8   claim in this case is the question of whether this is a

9   content-neutral statute that is narrowly tailored and leaves

10  open ample alternative avenues of communication.  That's the

11  Ward test that the First Circuit applied in McGuire.  And it

12  is the test that governs here.

13          I have already touched on one key reason why this

14  statute is content-neutral.  It's content-neutral for the

15  same reason that the original act was found to be

16  content-neutral in McGuire because the legislative purpose

17  for the law is content-neutral.  The purpose is to protect

18  public safety.  As a matter of law, that makes the statute

19  content-neutral.

20          We have noted, Your Honor, in paragraph 47 of our

21  proposed findings that under the Supreme Court's Hill

22  decision --

23          THE COURT:  Let me ask you this:

24          Is there anything that is in the record -- I should

25  really ask plaintiffs' counsel this -- that has changed

1    sense McGuire that might affect the determination as to

2    whether the statute is content-neutral?

3              **MR. SALINGER:**  There were --

4              **THE COURT:**  I will ask him.

5              **MR. DEPRIMO:**  Yes, Your Honor.  Something very

6    significant as a matter of fact.

7              **THE COURT:**  What is it?

8              **MR. DEPRIMO:**  And that is the guidance letter that

9    was issued by the Attorney General.

10             What's very significant is that, as I mentioned

11   earlier, in the McGuire case the court found that the

12   exemption with respect to clinic employees was

13   content-neutral even though it specifically said that

14   employees and agents could not speak about abortion or

15   partisan matters.  Okay.

16             All that did was is simply said if you want to talk

17   about abortion or partisan matters, you don't fall within

18   the exemption.  You're outside of it.

19             Could clinic employees and agents go inside that

20   zone and talk about abortion?  Sure they could.  They could

21   talk about abortion as much as they want.  They can display

22   signs.  They can distribute literature.  They could protest.

23   They could do whatever they want.

24             The only thing they couldn't do, they couldn't

25   approach somebody within six feet without an approach.  So

1    all that did was, that limiting language was simply say this

2    is when you're acting within the scope of your employment.

3    If you are not, then you fall under the general prohibition.

4    If you want to talk about abortion, if you want to get close

5    to the six feet, you need to have consent.

6         In this particular case you have that same language

7    in the second exemption, okay.  We are talking, what they

8    say is the clinic employee and agent, if you want to be

9    within the scope of your employment, you can't talk about

10   partisan matters.  You can't talk about abortion.  Okay.

11        So what does that do?  If you are a clinic

12   employee, okay, you want to talk about abortion or partisan

13   matters, it takes you outside of that exemption.  What does

14   that do?  That drops you down.  That either completely

15   excludes you from the zone altogether or it drops them into

16   exemption No. 4.

17        What does exemption No. 4 say?  People can walk

18   from point A to point B through the zone so long as you

19   don't talk about abortion or partisan matters.  You can talk

20   about the weather.  You can talk about the sports score last

21   night.  You can talk about your grandchildren.  You can't

22   talk about abortion.

23        That is what makes this different from McGuire and

24   from Hill.  Anybody could talk about any subject matter they

25   wanted to.  There was no restrictions whatsoever with

1    respect to subject matter.  Under <u>Hill</u> and under <u>McGuire</u> it

2    was categorized.  No sign display, no leafleting, no oral

3    protest, no education, no counseling within six feet without

4    consent.

5             And the court stressed that it wasn't topical or

6    subject driven because it applied to everybody, okay.  If

7    you wanted to --

8             **THE COURT:**  Okay.  I get what you are saying.

9             What do you say about that?

10            **MR. SALINGER:**  Your Honor, the Attorney General's

11   guidance letters in January of this year are entirely

12   consistent and, indeed, come directly from the First

13   Circuit's decision in <u>McGuire</u>.  In <u>McGuire</u> the court was

14   looking at an earlier Attorney General instruction.

15            Mr. Deprimo is correct, it is not the clinic

16   employee and agent exemption.  The First Circuit in footnote

17   one of <u>McGuire</u>, 386 F.3d at 52, said the Attorney General

18   had clearly construed that exemption to exclude pro abortion

19   or partisan speech.  That's the First Circuit's words.

20            Then at page 64 of the decision the First Circuit

21   held that, "The Attorney General's interpretation is clearly

22   a proper content-neutral way of interpreting the exemption."

23            The Attorney General in the January letter

24   informing folks how you should interpret these exemptions

25   was merely reiterating the guidance using the language of

1    the First Circuit, making sure as the First Circuit wanted

2    the Commonwealth to make sure of, that these exemptions

3    would not be a way to let people go into the buffer zone and

4    engage in partisan or abortion-related speech because that

5    might raise some question about the content-neutrality of

6    the statute.

7          So because the Attorney General's guidance simply

8    matches what the First Circuit has already explicitly held

9    to be content-neutrality, it is still content-neutral today.

10         While we're on the topic of the guidance letters,

11   Your Honor, plaintiffs have made a couple of other points

12   about them today.

13         **THE COURT:**  Go ahead.

14         **MR. SALINGER:**  Why don't I respond to both of those

15   as well right now.

16         First there has been a suggestion that there is no

17   longer any rational basis for the clinic employee or agent

18   exemption.  Maybe it was needed under the old act where

19   people were free to be in the buffer zone.  But it's not

20   needed at all under the current act because the current act

21   basically, to use the language from plaintiffs' proposed

22   conclusions paragraph 170 asks the Court to find that under

23   the revised act pro life advocates and virtually all other

24   persons are excluded from the zone, close quote.

25         Your Honor, this new rational basis argument is

1    really a red herring.  First, the factual premise of it is

2    wrong.  You're not excluded from being in the buffer zone

3    legally if you are a pro life advocate.  Indeed, the

4    Attorney General took pains to make clear in the recent

5    guidance letters that anyone is free to use the exemptions

6    for crossing through the buffer zone to get to the other

7    side or to go somewhere else, even if you're a pro life

8    advocate or a pro choice advocate and your point in crossing

9    through is to communicate that message on the other side.

10   You can't engage those partisan speech activities inside.

11   But the factual premise of this argument that the world was

12   excluded from the buffer zone is wrong.

13        No. two, it is rational for the Legislature to be

14   concerned that even though the statute may say people are

15   supposed to remain outside the buffer zone, it could be that

16   not everybody will comply with it.

17        Your Honor, just a few days ago there was an

18   incident, it is not in the records, we're not asking you to

19   make findings on it but just in answering the Court's

20   questions about these guidance letters.  Somebody at the

21   Boston clinic came right up to the front door, stood there

22   screaming at people, just the kind of behavior that the

23   Legislature was wanting to stop.

24        Eventually the person was able to be convinced to

25   move off.  As I understand it, there were no police there

 1    that day.

 2         We can make the same point by hypothetical, Your

 3    Honor.  The Legislature could rationally think that clinics

 4    would still under the current act have reason to want to

 5    have employees or agents in the buffer zone to greet staff,

 6    to greet patients and friends and family and help keep them

 7    safe as they come into the clinic.

 8         So the notion that there somehow is no longer a

 9    rational basis for the exemption we think just as a matter

10    of law can't fly.

11         Your Honor, there is a third point that plaintiffs

12    have made about the guidance letters.  And these go to the

13    exemption for crossing through.  In their sixth cause of

14    action they have asserted that the statute should be struck

15    down as void for vagueness.

16         And the real thrust of their claim we notice from

17    their proposed conclusions is they say this exemption to

18    cross through solely for the purpose of reaching a

19    destination other than the facility is vague because who can

20    know what that means.

21         Well, the Attorney General has in the January 2008

22    guidance letters given a very common sense greeting to that.

23    She makes clear that the exemption allows someone to walk

24    through the zone either to reach the other side or to travel

25    to someplace altogether.  And that is sufficiently definite

1    to pass muster under the due process clause.

2         We point out in paragraph 118 of our findings that

3    just as the Attorney General's previous guidance was given

4    credit and weight in McGuire in making sense out of what

5    that statute meant, so the revised guidance is entitled

6    under the Supreme Court's jurisprudence and under McGuire to

7    be relied on here.

8         The simple reason, Your Honor, why the prior

9    guidance letters didn't talk about this exemption and the

10   new one does is because even though the language of the

11   exemption didn't change, it wasn't until this lawsuit that

12   the office was aware anybody believed that the exemption was

13   hard to understand.

14        In the prior lawsuit McGuire there was no challenge

15   to that exemption.  At that point in time it seemed that the

16   plaintiffs and other protestors could understand the

17   exemption.  And we submit that the Attorney General's

18   guidance is perfectly understandable today.

19        Your Honor, going back just briefly to that Ward

20   test.  We've talked about how the statute is content-neutral

21   because it has a neutral purpose.  It's also content-neutral

22   for another reason that I cited.  It doesn't ban speech.  It

23   only restricts, has the effect of restricting the time and

24   place of speech.

25        And the Supreme Court in Hill specifically held

1    that that is an independent reason why this kind of buffer

2    zone statute is content-neutral.

3         A third independent reason is that the revised

4    statute was not adopted because of disagreement with

5    anyone's message.  This is not a statute that targets speech

6    by abortion opponents or even targets speech about abortion

7    or for that matter targets speech at all.  Instead, as I

8    said earlier, Your Honor, what this statute does is it

9    clears out the area around clinic entrances and driveways in

10   order to make them no longer be those bottlenecks that

11   threaten the public safety.

12        Your Honor, the statute is also a narrowly tailored

13   statute.  We touched on the fact that the solution matches

14   the problem.  The problem is around clinic entrances and

15   driveways.  And that's where the buffer zone applies.

16        I've already addressed the point that it is simply

17   wrong to say that plaintiffs can say, oh, eighteen feet

18   should have been enough.  That's a judgment for the

19   Legislature and not an issue of constitutional dimension.

20        I would just add on the narrow tailoring, Your

21   Honor, the point that the Supreme Court made in Hill that a

22   Legislature like the Legislature that adopted the statute

23   there is free under the Constitution to take a prophylactic

24   approach.

25        There have been suggestions that this statute is

1     somehow flawed because it affects people who haven't

2     previously broken the law.  This again really is confusing

3     this statutory case with some hypothetical other injunction

4     case.  Injunctions, of course, don't get issued unless there

5     is evidence of law breaking.  But the Legislature,

6     Legislatures often identify the public safety or other

7     public health or other problems that need to be addressed,

8     conduct that was not previously illegal and can get made

9     illegal by the statute.

10           And Hill makes clear that the First Amendment is

11    not some unusual limitation about that, that a prophylactic

12    approach that says that we've got a problem here, we're not

13    going to wait until there's a physical battery and then

14    arrest the person.  The Legislature can, indeed, say we are

15    going to in a content-neutral way clear out that buffer

16    zone.

17           Also, as in McGuire, as in Hill, as in Madsen, as

18    in these other buffer zone cases we've referred the Court

19    to, this statute leaves open ample alternative channels of

20    communication.  Individuals may communicate in any way they

21    wish as long as they're not doing it from inside a clearly

22    marked and posted buffer zone during a clinic's business

23    hours.

24           We gave the Court some evidence that there is lots

25    of communication happening outside buffer zones around

1     clinics.   Individuals holding the signs, praying, singing,

2     chanting, walking on the sidewalk, talking to people, trying

3     to and perhaps succeeding in handing out literature.   Any

4     way the people want to express themselves, they can do it as

5     long as they respect the time and place restrictions of the

6     buffer zone statute.

7            And, Your Honor, this statute is, this buffer zone

8     we are dealing with today is narrower than buffer zones that

9     have been upheld as constitutional by the Supreme Court and

10    by the First Circuit.   As I already said, it's narrower than

11    that 100-foot buffer zone around election places that was

12    upheld in Burson.   It's much narrower than the buffer zone

13    in Madsen that was a fixed 36-feet from the entire property

14    line of the clinic.

15           And it's certainly much, much narrower than the

16    buffer zone restriction put in place in Boston during the

17    2004 Democratic National Committee where protestors who

18    wanted to actually be able to communicate with convention

19    delegates were restricted to this heavily secured, walled-in

20    pen underneath some railroad tracks and weren't allowed to

21    go anywhere else near the convention area.   And that was

22    upheld as constitutional by the First Circuit in the Bl(a)ck

23    Tea Society case.

24           Now, plaintiffs makes a perfectly valid and

25    important point.   The Legislature here was dealing with

1    public safety and security problems that were not as broad

2    as the public safety and security problems that were of

3    concern at the time of the Democratic Convention.  But that,

4    of course, is why the Legislature much more narrowly

5    tailored the solution it adopted here as compared to the

6    solution upheld in Bl(a)ck Tea where protestors were barred

7    from much of, you know, many, many blocks around the

8    convention and had to just stand within this fortified

9    penned area.

10        Your Honor, one other point that I should just

11    underscore, although this is in our proposed findings at

12    paragraphs 87 to 91.  Mr. Deprimo argued again this morning

13    that somehow the Schenck case and other cases stand for the

14    proposition that there is a constitutional right to be able

15    to approach within a few feet of someone and converse in

16    normal conversational tones.

17        Your Honor, at least in this Circuit that argument

18    is squarely foreclosed by the First Circuit's Bl(a)ck Tea

19    Society decision that I just discussed.  The argument was

20    expressly made that one of the reasons that the fortified

21    pen was allegedly unconstitutional is that demonstrators

22    wanted to be able to go up and buttonhole individual

23    delegates and talk to them.  And the court held that, "There

24    is no constitutional requirement that demonstrators be

25    granted that sort of particularized access."

1          We provide citations, Your Honor, at those

2     paragraphs to Supreme Court holdings making clear that the

3     First Amendment does not guarantee the right to employ every

4     conceivable method of communication at all times and in all

5     places.

6          Here if an individual wants to hand out leaflets or

7     have close face-to-face conversations, they can do it from

8     anywhere outside a clearly marked or posted buffer zone.

9     They are free to approach individuals outside the buffer

10    zone or they're free -- and there is evidence in the record

11    that this happens -- to convince people who are inside the

12    buffer zone to come out and talk to them.

13         We've presented some evidence that this continues

14    to happen.  For example, in Brookline, you look at some

15    pictures, what they -- that might just help clarify the

16    pictures of that parking lot with the building behind it.

17    It's a private parking lot, not a public lot.  And that's

18    why protestors can't be in the parking lot.

19         But there is undisputed evidence in the record that

20    even under the revised statute protestors can and do stand

21    on the public sidewalk outside the buffer zone holding

22    signs.  And when individuals park in the parking lot,

23    encourage folks to come over and talk about alternatives to

24    abortion because there is an assumption that somebody going

25    into the building might be there for abortion-related

1    services.  And people do that.  They go over and they talk

2    to folks.

3            And so the statute does not in any way ban or bar

4    conversations.  It does not in any way ban or bar

5    leafletting.

6            Just very quickly, Your Honor, and then I'll wrap

7    up, a few more high points.

8            Your Honor, the third cause of action in this case

9    is a claim that the statute is unlawful prior restraint.

10   Bl(a)ck Tea Society again forecloses that claim.

11           The First Circuit citing specific parts of the

12   Supreme Court's decisions in Hill, in Schenck and in Madsen

13   found that the Supreme Court has explicitly rejected

14   attempts to analyze security based time, place or manner

15   restrictions as prior restraints.  And those cases are

16   controlling here.  Just as they were controlling in Bl(a)ck

17   Tea Society, they control this case.  There is no prior

18   restraint claim.  This is a time or place regulation, not a

19   prior restraint on speech because no speech is banned or

20   barred.

21           Your Honor, in the second cause of action

22   plaintiffs have separately pled a claim that this statute is

23   overbroad.  And in their proposed conclusions of law around

24   paragraph 112 they articulate this as a complaint that the

25   statute within the buffer zone limits the time or the place

1     of "all types of speech" and "all manner of speech."

2         Your Honor, here, like in Hill, the fact that the

3     buffer zone statute applies equally to all types of speech

4     and all manner of speech doesn't prove that it is overbroad.

5     It merely proves that it's content-neutral.

6         And that was the point of the analysis in the Hill

7     decision, 530 U.S. at 730 to 732.  The Supreme Court said

8     with respect to the buffer zone statute at issue there

9     responding to virtually the identical argument, they said

10    the comprehensiveness of the statute is a virtue, not a vice

11    because it is evidence against there being a discriminatory

12    governmental motive.

13        So the overbreadth claim also fails, Your Honor.

14        The sixth cause action is the vagueness claim which

15    we've already discussed, Your Honor.

16        The equal protection claim in the eighth cause of

17    action the plaintiffs again are attacking the particular

18    exemption for clinic employees or agents.  We have talked

19    about why that exemption, just as the First Circuit held in

20    McGuire, is not viewpoint discriminatory and so it goes not

21    undermine the neutrality of the statute.

22        In McGuire the First Circuit held that while if the

23    exemption passes muster in terms of viewpoint neutrality,

24    then as a matter of law it must pass muster under the equal

25    protection clause.  And the same is true in this case, Your

1    Honor.

2          Indeed, that exemption is identical in the current

3    statute.  When the Legislature made its revisions in 2007,

4    it changed the nature of the buffer zone but did not change

5    at all any of the four exemptions.  And so the First

6    Circuit's holding in McGuire applies directly here.

7          Your Honor, with respect to the fourth cause of

8    action on the free exercise of religion, I don't know

9    whether Mr. Deprimo wishes to speak to it when he gets back

10   up.  If so, I might say a few words; but we've covered this

11   in our proposed findings from around paragraphs 102 to 112.

12   I would be happy to answer questions.  But there is no cause

13   of action that can prevail here under the free exercise of

14   religion clause.

15         Very briefly, the complaint is that the statute

16   restricts where people can pray.  But the fact that somebody

17   wants to pray right by a clinic door and instead has to pray

18   a few feet away on the sidewalk as a matter of

19   constitutional doctrine is not an unlawful restriction of

20   the free exercise of religion.  Instead, to use the wording

21   the Supreme Court always comes back to, what we have here is

22   a law that is neutral and of general applicability that has

23   at most an incidental affect on the exercise of religion.

24   And such a statute is permissible under the First Amendment.

25         The last cause of action is the seventh one, Your

1    Honor.  The plaintiffs have made a claim that, there is

2    reference this morning to the Supreme Court's City of

3    Chicago versus Morales case.  The plaintiffs claim that

4    Morales gives them a constitutional right to loiter wherever

5    they want in a public space.

6         That's not right, Your Honor.  We show this in our

7    proposed findings paragraphs 125 to 127.  The three justice

8    plurality in Morales has a line or two that is dicta about a

9    right to loiter.  The First Circuit has made clear in its

10   recent decisions that -- I'm sorry.  I'm confusing two

11   things.

12        It is the Seventh Circuit that held in the Doe

13   versus City of Lafayette case that the Morales dicta cannot

14   be read as mandating that the Supreme Court established a

15   right to loiter in all places.  The Seventh Circuit in Doe

16   affirmed a city order that banned a convicted sex offender

17   from the city's parks.

18        The sex offender said, But I have the right to

19   loiter wherever I want.  The Seventh Circuit held that's not

20   right.  The city to protect public safety can restrict where

21   you loiter.

22        Similarly, here, Your Honor, the fact that somebody

23   who wants to loiter has to do it a few feet further down the

24   sidewalk does not create some independent constitutional

25   violation.

1          Your Honor, because, just to sum up, because the

2     law is content-neutral, because the law is narrowly tailored

3     to address the problem that's in that undisputed legislative

4     record, because all avenues of communication are left open

5     outside the buffer zone, the statute passes muster under

6     that three-part test that was applied in McGuire.  And it is

7     constitutional on its face.

8          **THE COURT:**  Okay.  Do you want the last word?  We

9     are not going to let you reargue the whole case again.  If

10    you want to pick a point, go ahead.

11         **MR. DEPRIMO:**  Yes, Your Honor, I do have a couple

12    of comments.

13         First of all, let me just say that the plaintiffs

14    are going to reurge all the arguments that are made in the

15    briefing in support of preliminary injunction in the event

16    that there are things I don't touch upon here.

17         Your Honor, it seems to --

18         **THE COURT:**  What did you say you are going to do?

19         **MR. DEPRIMO:**  What I said was is the plaintiffs

20    reurge all of the arguments that are contained in their

21    briefing in support of preliminary injunction because I will

22    not touch upon them all here.  I just want to make the

23    record clear that we are not waiving anything.

24         **THE COURT:**  Okay.

25         **MR. DEPRIMO:**  Okay.  Your Honor, essentially the --

1          **THE COURT:**  But you are going to confine yourself

2     to the facial analysis, not the as applied?

3          **MR. DEPRIMO:**  Yes.

4          **THE COURT:**  Okay.  Go ahead.

5          **MR. DEPRIMO:**  Your Honor, it seems to me that the

6     government's argument is essentially, Trust us, Judge, we

7     know what's best.

8          Narrow tailoring has a particular legal definition.

9     A law is narrowly tailored if the law targets the exact evil

10    that the law is designed to remedy.  That does not -- that

11    is not contained in the briefing by the Commonwealth.  It is

12    not mentioned in the conclusions of law by the Commonwealth.

13    And it wasn't mentioned in oral argument today by the

14    Commonwealth.

15         And the reason is is there is no way, there is no

16    way that the government can show the Court that the

17    regulation regulating or restricting speech in a 35-foot

18    radius from the driveways and the entrances and exits to

19    clinics is narrowly tailored to the exact evil that they're

20    looking to remedy.

21         That is crucial --

22         **THE COURT:**  What do you think that the remedy is

23    that they are looking -- I mean, the problem that they are

24    seeking to remedy?

25         **MR. DEPRIMO:**  Well, they tell us, they tell us in

1   finding of fact 20 and conclusion 53.  It's the problems are

2   immediately adjacent to the driveways and the doors.

3         **THE COURT:**  Those are choke points.

4         **MR. DEPRIMO:**  Yes, the bottleneck as they put it.

5         Here's the problem with the driveways, okay.

6   Here's a little bit of testimony in the record from abortion

7   supporters or abortion providers --

8         **THE COURT:**  Well, we are talking about public

9   safety; right?

10        **MR. DEPRIMO:**  We are talking about public safety.

11        **THE COURT:**  That is their purpose.

12        **MR. DEPRIMO:**  Well, that's what they claim their

13  purpose is.  And --

14        **THE COURT:**  Well, they articulate that.

15        **MR. DEPRIMO:**  Well, they do in this respect.

16        One thing that counsel said was, is because we say

17  it's content --

18        **THE COURT:**  Excuse me.  And then you might touch

19  upon it, the emergency preamble that is attached, does that

20  have significance?

21        **MR. DEPRIMO:**  Well, my thought is, Your Honor, just

22  because they say this is content-neutral doesn't make it so.

23  You actually have to look and see what they did.

24        **THE COURT:**  What does that have to do with what I

25  just asked you about the preamble?

1          **MR. DEPRIMO:**  Well, the claim is, in the sense of

2     the --

3          **THE COURT:**  That there was an emergency.  In other

4     words, that is an emergency preamble that takes something --

5     I have forgotten my days in the Volpe administration but

6     normally I think it is a 90-day period I think after

7     something is passed that the governor signs an emergency

8     preamble, it is immediate.

9          **MR. DEPRIMO:**  Mm-hmm.

10         **THE COURT:**  Usually that means that there is

11    something serious happening.

12         **MR. DEPRIMO:**  Right.

13         **THE COURT:**  Is that something I can take into

14    consideration?

15         **MR. DEPRIMO:**  I think you should, Your Honor.

16         There is nothing that was seriously happening out

17    there.  There was nothing that happened at a particular

18    point in time where the governor said all of a sudden we

19    need to do emergency legislation, enact this wide buffer

20    around abortion clinics.

21         I think --

22         **THE COURT:**  Well, does it have to happen or can

23    they see it coming?  I mean, are they entitled to -- as a

24    matter of fact, don't we expect them to see things coming

25    rather than wait until an existing problem?

1          MR. DEPRIMO:  Well, but you have to see it coming

2     based upon facts.  My point is that there is no facts in the

3     record to support it.

4          One of the things that I think is really crucial

5     with respect to the record, Your Honor, is the fact that it

6     is only abortion providers and supporters that talk about

7     all these problems that are around the clinics.  And they

8     don't do it with respect to facts.  They make conclusory

9     allegations.  This person was blocking.  This person was

10    impeding.  This person was harassing.  Okay.

11         These people would be expected to embellish their

12    testimony because they side with the pro choice viewpoint as

13    opposed to those who oppose abortion.

14         But when we look at the objective unbiased evidence

15    in the record, there is nothing that supports the zone.  The

16    police didn't testify that there was any problem outside the

17    abortion clinics.  They didn't say there was any impeding,

18    any blocking, any harassment, any trespass.

19         The police are there all the time.  That's the

20    testimony in the record.  They're there all the time and

21    they didn't see any of the problems that these abortion

22    providers and supporters saw.

23         Nothing in the record with respect to arrests and

24    convictions.  The law, that this particular law even under

25    the new and the old version, another subsection that we

1    don't challenge specifically, specifically says it's illegal
2    to block, impede, harass, trespass.
3          Well, if these things were happening, Judge, why
4    aren't the people who were actually violating the law being
5    prosecuted?  And if they're being prosecuted, why are there
6    no convictions?  There are no arrests and no convictions in
7    the record with respect to unlawful conduct.
8          **THE COURT:**  All right.  Wait just a second.
9          What do you say about that?
10         **MR. SALINGER:**  Your Honor, the Legislature is not
11   required to rely solely on the laws that make illegal
12   particular threatening behavior by an individual.  The First
13   Circuit addressed this in McGuire I, 260 F.3d at 48 to 49.
14   The Supreme Court addressed it in Hill and Burson.
15         Yes, there might be other ways that some more
16   narrow -- more specific behavior restrictions could be
17   applied.  The analysis in McGuire I really is controlling on
18   this point.
19         I think the metaphor that the First Circuit held
20   is, you know, those laws might stop the big fish but a lot
21   of the fingerlings will get through and you might still have
22   had problems that need to be solved.  And the First
23   Amendment allows the Legislature to establish a clear buffer
24   zone to keep out the fingerlings as well.
25         **THE COURT:**  All right.

1          **MR. DEPRIMO:**  Your Honor, what Mr. Salinger said is

2     correct, okay.

3          My point is is the lack of arrests and the lack of

4     convictions are showing that the illegal unlawful behavior

5     isn't occurring in the first place.  It is true that the

6     government can enact other types of regulations and don't

7     have to specifically rely upon blocking, impeding and

8     trespass laws.  We acknowledge that.

9          But, again, my point is the fact that people aren't

10    being charged with these violations of law, people are not

11    being convicted by these violations of law is evidence that

12    the violations of law are not occurring.

13         Police officers are trained to distinguish between

14    lawful and unlawful conduct.  The police are seeing exactly

15    the same things as the abortion providers and the supporters

16    are seeing.  But they're coming to two different

17    conclusions.  The abortion providers say harassment,

18    impeding, blocking.  The police officers sit and they're

19    looking saying no, it doesn't violate the law.

20         That's a very significant difference.  It's very

21    important that there actually be evidence in the record to

22    show that the unlawful conduct is a problem.  And that

23    doesn't exist in this particular case.

24         Restrictions on speech are fact intensive.  Whether

25    you look at Madsen or Schenck or Hill, the Court says okay,

1    what are the facts.  Do the facts warrant the regulations

2    that the government has imposed here.

3         And in this particular case, Judge, there is just

4    nothing in the record, there is no objective evidence from

5    law enforcement or any unbiased source that says that the

6    problems that the abortion providers are saying are

7    happening are actually happening.

8         **THE COURT:**  Okay.  I think I understand your

9    position on that.

10        **MR. DEPRIMO:**  One other position, Your Honor, is

11   counsel said that the Court essentially should defer to the

12   governor in determining what's best.  Well, the fact of the

13   matter is is that the reason the Court is here is to make

14   sure that the governor doesn't overstep his bounds.  That's

15   the whole point of the time, place and manner test.  That's

16   the whole point of the careful scrutiny that the Court is

17   required to undertake when looking at, when looking at

18   speech restrictions.

19        **THE COURT:**  I think I understand your position.

20        **MR. DEPRIMO:**  Okay.  Your Honor, with respect to

21   overbreadth, again, we are talking about narrow tailoring

22   here.  And even in the context of overbreadth, the

23   overbreadth question is this:

24        Does the regulation sweep within its ambit a

25   substantial amount of constitutionally protected conduct?

1    Then you look at the particular ordinance and you say, okay,

2    what's the legitimate sweep of the ordinance or the statute.

3            In this particular case the legitimate sweep is

4    what?  It is clearing out the bottleneck, as Mr. Salinger

5    said, immediately adjacent to the doors and to the

6    driveways.  Certainly blocking, impeding, trespass is

7    actually a significant interest.  That's a legitimate

8    interest of the government.

9            But let me ask the Court this question or ask the

10   Court to ponder this question.

11           How does sign display that doesn't block the door,

12   how does the statute target the evil that they say it's

13   designed to remedy?  Blocking, impeding and harassing.

14   Somebody who is simply standing there with a sign.  Someone

15   who is standing there handing out leaflets --

16           **THE COURT:**  Well, if the sign is right in your

17   face, that is one problem.  And the Legislature here set a

18   boundary that is far enough back so that that wouldn't

19   happen.

20           **MR. DEPRIMO:**  Well --

21           **THE COURT:**  I guessed the answer to your question.

22           **MR. DEPRIMO:**  Well, again, what they said was the

23   problem was right next to the door.

24           What my point is, if somebody is standing five feet

25   away from the door with a sign, they're not blocking,

1   they're not impeding.

2        THE COURT:  But then we go back to what we expect

3   of our police officers.  They are professional.  What we

4   expect from the Legislature.  They don't have to have the

5   problem at their doorstep.  They are supposed to foresee

6   ways to prevent the problem from taking our doorstep.  I

7   think that is true with all kinds of situations.

8        MR. DEPRIMO:  Let me continue with my overbreadth

9   argument.

10       Within this particular zone, okay, within a 35-foot

11  radius of a public sidewalk, traditional public forum,

12  quintessential forum for free speech, you can't engage in

13  commercial speech.  You can't engage in petition

14  circulating.  You can't solicit contributions.  You can't

15  panhandle.  You can't labor organize.  You can't labor

16  picket.  Okay.  A Girl Scout can't sell her cookies.  A Boy

17  Scout can't sell newspapers.  Somebody can't stand on the

18  sidewalk to smoke a cigarette or have a cup of coffee.

19  Somebody can't stand there on the corner waiting for a bus

20  or a ride or a taxi.

21       And my question is what does that activity have to

22  do with impeding the doors and the driveways of the clinics?

23  Nothing.  Nothing at all.

24       THE COURT:  Well, except the answer I suppose that

25  he would make, at least as far as the argument, that they

1    want to clear the way out.  In other words, instead of

2    making it a forest, they are trying to make it into an open

3    space.

4        **MR. DEPRIMO:**  Well, here's the problem then.

5    Here's another problem.  Why is that they're limiting, why

6    is it that they're limiting regulations to abortion clinics?

7    Why are they limiting it to clinics, not hospital abortion

8    clinics?  It doesn't apply to health care facilities

9    generally.  It doesn't apply to the grocery store.  It

10   doesn't apply to the shoe store or the regular office

11   building.  All of these -- the problems that they're talking

12   about here --

13       **THE COURT:**  I don't know the answer to it but I

14   take it that as far back as the McGuire case, McGuire I I

15   think is what it is called, that is where the problem was.

16   That is where the facts indicated that a remedy was

17   necessary.  You know, not at a Stop & Shop or some other

18   type of retail facility.

19       **MR. DEPRIMO:**  But my point is, Judge, is that there

20   is nothing in the record anywhere that commercial speech or

21   charitable solicitations or petition circulating or

22   entertainment or just general conversation causes any of the

23   problems that the government is seeking to remedy.

24       **THE COURT:**  No, but I think the government has the

25   right to neutralize a certain amount of property.  The fact

1    that it is a public sidewalk doesn't mean that you can be an

2    unlicensed musician or something like that.  I presume you

3    need -- you can't set up a stand and start to sell something

4    on a public sidewalk without getting licensed by someone, by

5    some city official.

6        **MR. DEPRIMO:**  Well, that's true.  And I think

7    that's a little bit -- that is not the issue that I am

8    trying to bring --

9        **THE COURT:**  No, I understand.  But, I mean, the

10   fact that this includes, this includes a ban on Boy Scout

11   cookies or Girl Scout cookies as well as what we are talking

12   about here argues that it is content-neutral.  Doesn't it?

13   The more breadth it has, the more content-neutral it is.

14       **MR. DEPRIMO:**  Content-neutrality though is not an

15   issue when you are talking about overbreadth.

16   Content-neutrality is an issue when you are talking about

17   time, place and manner.

18       **THE COURT:**  Okay.  You can only take it a bite at a

19   time.  You gave us seven interesting bites here so.

20       (Laughter.)

21       **MR. DEPRIMO:**  Well, the point, the whole point that

22   I was trying to make, Judge, is that the government has a

23   particular legitimate interest.  And the legitimate interest

24   that they have articulated here is they want to stop the

25   bottleneck at a particular precise point.

1          THE COURT:  And the issue is how far back can they

2     go to stop the bottleneck?  Are they limited to 12 feet, 15

3     feet or is 35 feet okay?  I mean, that is basically it.

4          MR. DEPRIMO:  Well, yes.  Essentially that is it.

5          THE COURT:  Okay.

6          MR. DEPRIMO:  And the government is saying, you

7     know, we can do 35 feet.  And, you know, what if they said

8     500 feet or a mile?

9          THE COURT:  They didn't.

10         MR. DEPRIMO:  They didn't.  That's right.  But the

11     question becomes where is the line.

12         THE COURT:  Maybe I would have an easier case if

13     they did that.

14         (Laughter.)

15         THE COURT:  All right.

16         MR. DEPRIMO:  Yes, Your Honor.  Thank you.

17         THE COURT:  Okay.  Anything else?  Is that it?

18         MR. SALINGER:  No, Your Honor.

19         THE COURT:  All right.  Thank you both, very fine

20     arguments that lived up to what I expected from reading your

21     briefs.

22         I will do the best I can with it and we will take

23     it under advisement.  Okay.

24         MR. DEPRIMO:  Your Honor, there is one other thing.

25     Plaintiffs would renew their motion for preliminary

1    injunction.  The plaintiffs do believe that they showed the

2    Court they have a significant likelihood of success on the

3    merits and I think --

4           **THE COURT:**  All right.  We will consider it open.

5           **MR. DEPRIMO:**  One other thing, Your Honor, too is

6    that the plaintiffs would move the Court to stay discovery

7    pending the Court's ruling on this case.

8           **THE COURT:**  I thought we already did.

9           **MR. DEPRIMO:**  I thought what the Court did was stay

10   discovery pending this hearing.  But I would like to stay

11   discovery pending the Court's resolution of the --

12          **THE COURT:**  I would like that too.  Then I won't

13   feel so rushed.  But I will try to make it a priority item

14   anyway.  We will consider -- any objection to that?

15          **MR. SALINGER:**  No objection, Your Honor.

16          **THE COURT:**  Okay.  Discovery can be stayed pending

17   the issuance of an opinion here.

18          **MR. DEPRIMO:**  Thank you.

19          **THE COURT:**  All right.  Thank you very much,

20   everybody.

21          **THE CLERK:**  Court is in recess.

22

23          (WHEREUPON, the proceedings were recessed at 11:45

24          a.m.)

25

C E R T I F I C A T E

 

 

 

I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.

 

 

 

/S/CAROL LYNN SCOTT

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377