```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2
    * * * * * * * * * * * * * *
 3  ELEANOR McCULLEN, et al      *
              Plaintiffs,        *
 4                               *
              vs.                *        CIVIL ACTION
 5                               *        No. 08-10066-JLT
    MARTHA COAKLEY,              *
 6  Attorney General for the     *
    Commonwealth of Mass.            *
 7          Defendant.           *
    * * * * * * * * * * * * * *
 8
                  BEFORE THE HONORABLE JOSEPH L. TAURO
 9                  UNITED STATES DISTRICT JUDGE
                              DAY ONE
10                          BENCH TRIAL

11  A P P E A R A N C E S

12            LAW OFFICE OF MICHAEL J. DEPRIMO
              778 Choate Avenue
13            Hamden, Connecticut 06518
              for the plaintiffs
14            By:  Michael J. Deprimo, Esq.

15
              LAW OFFICE OF PHILIP D. MORAN
16            265 Essex Street, Suite 202
              Salem, Massachusetts 01970
17            for the plaintiffs
              By: Philip D. Moran, Esq.
18

19

20

21                                 Courtroom No. 22
                                   John J. Moakley Courthouse
22                                 1 Courthouse Way
                                   Boston, Massachusetts 02210
23                                 August 24, 2011
                                   10:10 a.m.
24

25
```

**APPEARANCES, CONTINUED**

                    MASSACHUSETTS ATTORNEY GENERAL'S OFFICE
                    One Ashburton Place, 18th Floor
                    Boston, Massachusetts 02108
                    for the defendant
                    By: Kenneth W. Salinger, AAG
                        Gabrielle Viator, AAG

                        CAROL LYNN SCOTT, CSR, RMR
                         Official Court Reporter
                        One Courthouse Way, Suite 7204
                        Boston, Massachusetts 02210
                            (617) 330-1377

1              **P R O C E E D I N G S**

2          **THE CLERK:**  All rise for the Honorable Court.

3          **THE COURT:**  Good morning, everybody.

4          **VOICES:**  Good morning, Your Honor.

5          **THE CLERK:**  This is civil action No. 08-10066,

6    McCullen, et al versus Coakley, et al.

7          Counsel please identify themselves for the record.

8          **MR. DePRIMO:**  Your Honor, good morning.  Michael

9    DePrimo for the plaintiffs.

10         **MR. MORAN:**  Good morning, Your Honor.  May it

11   please the Court, Philip Moran for the plaintiffs.

12         **THE COURT:**  Good morning.

13         **MR. SALINGER:**  And, good morning, for the

14   defendants, Your Honor -- these are three of the plaintiffs,

15   not counsel.

16         **THE COURT:**  Okay.

17         **MR. SALINGER:**  I am Ken Salinger and with me is.

18         **MS. VIATOR:**  Gabrielle Viator.

19         **THE COURT:**  Okay.  Is that all the introductions?

20         Sit down, please.  Make yourselves comfortable.

21         **MR. DePRIMO:**  Your Honor, I would also like to

22   introduce the plaintiffs that are here.

23         **THE COURT:**  Sure.

24         **MR. DePRIMO:**  To Mr. Moran's right is Dr. Cyril

25   Shea, one of the plaintiffs.  To Dr. Shea's right is Mark

1   Bashour and to Mark's right is Eleanor McCullen.

2           **THE COURT:**  Nice to see all of you here today.

3           **MS. McCULLEN:**  Thank you.

4           **MR. DePRIMO:**  We also have with us in the gallery

5   Jean Zarrella and Nancy Clark.  Jean is on the left and

6   Nancy is on the right (indicating).

7           **THE COURT:**  Also plaintiffs?

8           **MR. DePRIMO:**  Also plaintiffs, Your Honor.

9           **THE COURT:**  Happy to have you here.

10          **MR. DePRIMO:**  Plaintiff Eric Cadin could not be

11  here, he's out of state and plaintiff Greg Smith is

12  recovering from heart surgery.

13          **THE COURT:**  That is too bad, I am sorry.  I hope he

14  is able to get a true recovery.

15          **MR. DePRIMO:**  He seems to be doing well but he

16  couldn't be here today.

17          **THE COURT:**  Good.  Anything else?  We are ready to

18  get started?

19          **MR. DePRIMO:**  Yes.

20          **THE COURT:**  Why don't you sit down, make yourselves

21  comfortable.

22          Now, I have been told that you I think intend to

23  try to use a --

24          **MR. DePRIMO:**  A PowerPoint presentation.

25          **THE COURT:**  -- a PowerPoint presentation.  Why do I

1    need that with this substantial record here?

2         MR. DePRIMO:  I think, Your Honor, we have seven

3    plaintiffs.  We have three different locations.  I think

4    visuals would be very helpful to the Court.

5         THE COURT:  Don't we have those visuals?

6         MR. DePRIMO:  We have the visuals in the record.  I

7    thought that as I was explaining my case that it would be

8    easier for the Court to understand if I could actually point

9    things out --

10        THE COURT:  You are talking about using it in your

11   opening statement?

12        MR. DePRIMO:  I am talking about using it

13   throughout my case.

14        THE COURT:  Is there any objection to the

15   authenticity of the images that are going to show up on

16   the -- I always forget the name.  What is it?

17        MR. DePRIMO:  PowerPoint.

18        THE COURT:  PowerPoint.

19        MR. SALINGER:  Your Honor, we haven't seen what is

20   in the presentation; but use of the material that we've

21   already stipulated to as being in the evidentiary record, of

22   course we've got no objection to those being --

23        THE COURT:  You are representing to me there is

24   nothing that you are going to try to show me that isn't in

25   the record; is that right?

1    **MR. DePRIMO:**  Yes, not only will I represent that,

2    Your Honor, but what I'm actually going to have is citations

3    to the record on the screen.

4    **THE COURT:**  Okay.  Against my better judgment I am

5    going to let you do it.

6    **MR. DePRIMO:**  Thank you.

7    **THE COURT:**  But I may cut you short if I think that

8    we are eating up too much time, okay.

9    Are you going to make an opening statement?

10    **MR. DePRIMO:**  Yes, Your Honor.

11    **THE COURT:**  All right.  Go ahead.

12    **MR. DePRIMO:**  We are just going to get right to it.

13    I just want to apprize the Court that I will be

14    supplying the Court with a copy of the PowerPoint

15    presentation on a disk.  I will also provide a copy of it to

16    opposing counsel for later reference, if you want to look at

17    the citations.

18    **THE COURT:**  All right.  Thank you.

19    Are you all set to make your opening now?

20    **MR. DePRIMO:**  Your Honor, I'm prepared to go right

21    into it.

22    **THE COURT:**  When you say "right into it," you mean

23    the opening or the case?

24    **MR. DePRIMO:**  I'm going right into my PowerPoint

25    presentation.

1          **THE COURT:**  Okay.  Go ahead.

2          You don't want to make an opening statement?

3          **MR. SALINGER:**  Your Honor, if I might just clarify,

4     since you're asking about opening statements, it's our

5     understanding that essentially what we're doing today is

6     each side is providing closing argument.  We've agreed to

7     what's in the record.

8          **THE COURT:**  I suppose that makes more sense to

9     classify it that way.  I understand what you are saying.

10          **MR. SALINGER:**  Okay.

11          **THE COURT:**  So what your presentation will be is

12     your summation as to what you think the significance of the

13     evidence has been.

14          **MR. SALINGER:**  Exactly, Your Honor.

15          **THE COURT:**  Okay.

16          **MR. SALINGER:**  Consistent with the requested

17     findings that we filed about a week and a half ago.

18          **THE COURT:**  Now, I am going to, on that subject, I

19     am going to, after this is concluded, I am going to ask you

20     to give me proposed findings of fact reference to the record

21     with specificity.  John Jones lives in Malden, record page

22     three, line two.  That is the kind of proposed findings of

23     fact that I want.  And I want them after, I want them

24     submitted after the case closes so that it is clear that we

25     are talking about a record that has been established, okay?

1          **MR. SALINGER:**  And, Your Honor, just so the Court

2     knows, the defendants filed that sort of requested findings

3     on August 15th with specific citation by document number --

4          **THE COURT:**  You know what I want.  If you are

5     satisfied that what you are giving me meets my expectations,

6     then you can rely on that but that is what I want.

7          **MR. SALINGER:**  Yes, Your Honor.

8          **THE COURT:**  Okay.  Are you ready to go?

9          **MR. DePRIMO:**  Yes, Your Honor, thank you.  Do you

10    have a screen?  Are you able to --

11         **THE COURT:**  I do.

12         **MR. DePRIMO:**  Okay.

13         **THE COURT:**  What about Meg, doesn't she have one?

14         (Whereupon, the Court and the Law Clerk conferred.)

15         **THE COURT:**  Brand-new, brilliant law clerk,

16    brilliant.

17         Go ahead.

18         **MR. DePRIMO:**  Your Honor, a little bit of

19    procedural background.  This lawsuit was filed in January

20    2008.  The lawsuit challenges the constitutionality of

21    Massachusetts General Laws 266, Section 120E 1/2, referred

22    to as "the buffer law."  We challenged both on its face and

23    as applied.

24         In August 2008 this Court ruled that the buffer law

25    is constitutional --

1          **THE COURT:**  Before we go any further, I just want

2     to say, I know that the spectators have a particular

3     interest in this case.  And I want everybody to know that I

4     don't take regular recesses but if anybody wants to take a

5     recess, including the interested parties here, just signal

6     to me that you want a recess and we will all take a recess.

7     It will probably be me taking a recess before you ask for it

8     but I don't want anybody to be uncomfortable or miss any

9     part of the presentation because of the need for a recess,

10    okay.  So just raise your hand and we will all take one.

11         All right.  Now you go ahead.

12         **MR. DePRIMO:**  Thank you, Your Honor.

13         To repeat what I just said, in 2008 this Court

14    ruled that the buffer law is constitutional on its face.  On

15    appeal the First Circuit affirmed.  The Supreme Court denied

16    plaintiffs' request for review.

17         On remand this Court took up plaintiffs' as applied

18    challenge.  The Court granted the government's motion for

19    partial judgment on the pleadings and dismissed all but one

20    aspect of plaintiffs' time, place and manner as applied

21    challenge.

22         Trial will consider a single issue:

23         Whether the law as applied gives plaintiffs ample

24    alternative avenues of communication at three Planned

25    Parenthood facilities:  Boston, Worcester and Springfield.

1          The standard of review on a facial challenge, on

2     facial challenge considers words on paper.  An as applied

3     challenge considers the practical realities of life and how

4     they impact a speaker's ability to convey her message at a

5     particular time and a particular place.

6          A facial challenge to a law requires no record or

7     factual findings.  In contrast, an as applied challenge is

8     specific to the facts of the particular individuals involved

9     in the suit.  Neither this Court nor the First Circuit made

10    any findings of fact with respect to the plaintiffs'

11    activity at the three challenged locations.

12         In its decision upholding this Court's order on

13    plaintiffs' facial challenge, the First Circuit noted the

14    limitation of its ruling, and I'm quoting McCullen v.

15    Coakley, 571 F.3d at page 180.

16         "It bears repeating at this point that we are

17    dealing exclusively with a facial challenge to the 2007 Act.

18    Thus, as long as we can envision circumstances in which a

19    35-foot buffer zone allows adequate alternative means of

20    expression, the challenge must fail."

21         At the end of its opinion the First Circuit made

22    clear that the as applied challenge is to be considered on a

23    clean slate.  Again, quoting the First Circuit in McCullen,

24    "We add a caveat...Nothing that we have said forecloses the

25    possibility that, on a better-developed record, this

1   legislative solution may prove problematic in particular

2   applications."

3       The buffer law itself permits the placement of a

4   buffer zone, and I'm quoting, "within a radius of 35 feet of

5   any portion of an entrance to, exit from, or driveway of a

6   reproductive health care facility" so long as it is "clearly

7   marked and posted."

8       Any person may enter and pass through the zone

9   solely for the purpose of reaching a destination other than

10  the abortion facility.  The length of the buffer zones in

11  this case range from 56 feet in front of the Planned

12  Parenthood in Boston to 100 feet, 5 inches at the driveway

13  entrance in front of Planned Parenthood in Springfield.

14      Plaintiffs begin with several fundamental First

15  Amendment precepts.  First, "Wherever the title of streets

16  and parks may rest, they have immemorially been held in

17  trust for the use of the public."  Frisby v. Schultz.

18      Second, "Time out of mind, public streets and

19  sidewalks have been used for public assembly and debate, the

20  hallmarks of a traditional public forum."  Frisby, 487 U.S.

21  at 480.

22      Third, streets and sidewalks "are natural and

23  proper places for the dissemination of information and

24  opinion; and one is not to have the exercise of his liberty

25  of expression in appropriate places abridged on the plea

1   that it may be exercised in some other place."  Schneider v.

2   State.

3            Fourth, "Leafletting, sign displays, and oral

4   communications are protected by the First Amendment."  Hill

5   v.Colorado.

6            Fifth, "The right to free speech, of course,

7   includes the right to attempt to persuade others to change

8   their views."

9            The analytical process.  Analyzing whether

10  alternative avenues of communication are ample at particular

11  places is guided by the following principles.

12           First, "When the government restricts speech, the

13  government bears the burden of proving the constitutionality

14  of its actions."  United States v. Playboy Entertainment

15  Group, 529 U.S. 803 at 816, 2000.

16           Quoting McCullen, "There is no particular buffer

17  zone radius that is per se permissible or impermissible --

18  everything depends on context."

19           "The government must consider the actual conditions

20  speakers encounter when it restricts their speech."  That's

21  particularly important today, Your Honor, because we are

22  talking about how this particular law is constitutional on

23  its face operates in real life with real people at real

24  locations.

25           "While the First Amendment does not guarantee the

1    right to employ every conceivable method of communication at

2    all times and in all places, a restriction on expressive

3    activity may be invalid if the remaining modes of

4    communication are inadequate."  Members of City Council of

5    City of Los Angeles v. Taxpayers for Vincent, United States

6    Supreme Court, 1984.

7            A valid time, place and manner regulation must

8    "leave open ample alternative channels for communication of

9    the information."  McCullen.  The key word there, Your

10   Honor, is "ample," not merely adequate.

11           "The essence of this question is not whether a

12   degree of curtailment of speech exists, but rather whether

13   the remaining communicative avenues are adequate."  D.H.L.

14   Associates, First Circuit, 1999.

15           Where speech regulations "call into legitimate

16   question the adequacy of the alternate route of

17   communication," the regulations are unconstitutional.

18   D.H.L. Associates.

19           "The simple fact that a speaker is permitted to

20   communicate his message elsewhere does not end the analysis

21   if the intended message is rendered useless or is seriously

22   burdened."  City of -- Weinberg v. City of Chicago.  This is

23   a Seventh Circuit case in 2002 quoting the United States

24   Supreme Court City of Ladue versus Gilleo, 1994, also

25   quoting Bay Area Peace Navy v. United States, a Ninth

1    Circuit case from 1990.

2         "The government must not substantially foreclose,

3    as a practical matter, speakers' ability to communicate

4    their message."  The Hoye case, Your Honor, challenged the

5    floating buffer zone ordinance that was adopted by the City

6    of Oakland, California.  The Ninth Circuit decided that case

7    just last month.  The court held that that ordinance was

8    constitutional on its face but unconstitutional as applied.

9         An alternative is not adequate if it "forecloses a

10   speaker's ability to reach one audience even if it allows

11   the speaker to reach other groups."  Gresham v. Peterson,

12   Seventh Circuit, 2000.

13        It is true that the First Circuit has upheld,

14   "Alternative means of communication despite diminution in

15   the quantity of speech, a ban on a preferred method of

16   communication, and a reduction in the potential audience."

17   Sullivan v. City of Augusta, First Circuit, 2007.

18        It is also true that alternatives allowing the

19   "more general dissemination of a message" are adequate where

20   the message is not directed to a targeted audience but

21   rather to the public at large.  Sullivan, First Circuit.

22        For example, in Sullivan the First Circuit found

23   adequate alternatives where the message sought to be

24   conveyed emphasized "worldwide end of war and

25   empire-building," and was directed to the public at large

1    rather than anyone in particular.

2              The plaintiffs in Sullivan sought to have a parade

3    on the streets of the City of Augusta and they weren't

4    looking to direct the message to anybody in particular but

5    whoever was on the streets and sidewalk where they were

6    marching.

7              Likewise, in Globe Newspaper v. Beacon Hill

8    Architectural Commission, the First Circuit found

9    alternatives adequate because street vendors could sell

10   newspapers to the public at large in the very spot where

11   banned news racks were not allowed.

12             Other circuits have held, and I'm quoting, "An

13   alternative is not ample if the speaker is not permitted to

14   reach the intended audience."  That's a direct quote from

15   the Ninth Circuit in Bay Area Peace Navy.  That particular

16   point of law has been adopted by the Sixth Circuit, the

17   Third Circuit and the Seventh Circuit in the cases of Saieg

18   v. City of Dearborn in the Seventh Circuit -- in the Sixth

19   Circuit, Startzell v. City of Philadelphia in the Third

20   Circuit, the Weinberg case in the Seventh Circuit.

21             These cases do not conflict with Sullivan because

22   in each of those cases the speakers were directing

23   particular messages to particular listeners at particular

24   times and places.

25             At issue in Saieg was a regulation banning

1    leafletting on a public sidewalk outside a Muslim festival.

2    The intended audience was Muslims whom the speaker sought to

3    convert to Christianity.

4            The Sixth Circuit adopted the Ninth Circuit's test,

5    i.e., "an alternative is not ample if the speaker is not

6    permitted to reach the intended audience."

7            The court struck down the ban on leafletting

8    because it was not a reasonable time, place and manner

9    regulation.

10           And in all candor to the Court, the Sixth Circuit

11   in this case actually struck it down because it was not

12   narrowly tailored but they did set forth the standard for

13   analyzing a time, place and manner regulation.  And that

14   standard was the one that was set forth by the Ninth

15   Circuit.

16           At issue in Startzell was whether Christian

17   activists proclaiming the sinfulness of homosexual conduct

18   were unconstitutionally removed from certain public streets

19   and sidewalks during a homosexual festival.  Though the

20   intended audience was homosexual persons, the Third Circuit

21   found no constitutional violation because plaintiffs'

22   disruptive conduct, derogatory comments and blocking of

23   vendors justified the police action.

24           But unlike Startzell there is no evidence in this

25   case of any disruptive conduct, any derogatory comments or

1    any type of physical obstruction or trespass.

2         In Weinberg the issue was the constitutionality of

3    an ordinance prohibiting the sale of merchandise within

4    1,000 feet of the United Center in Chicago.  Weinberg sought

5    to sell a book critical of Bill Wirtz, the owner of the

6    Chicago Blackhawks.  The Blackhawks played their home games

7    at United Center.  The Seventh Circuit found that Weinberg's

8    intended audience was Blackhawks fans, and quoting, "The

9    most opportune time and place to reach this audience is

10   outside the United Center before and after Blackhawks home

11   games."

12        Stating, "We cannot check common sense at the

13   door," the Seventh Circuit found that, "United Center is a

14   unique location for the sale of Weinberg's book."  Finding,

15   "Substantially detrimental effects on Mr. Weinberg's free

16   speech rights," the Seventh Circuit concluded that, "The

17   ordinance does not provide ample alternatives."  And the

18   court struck down that ordinance in Weinberg.

19        In Bay Area Peace Navy, at issue was a 75-yard

20   security zone imposed by the Coast Guard during Fleet Week.

21   The Peace Navy was an anti-war group that sought to protest

22   to Navy officials.  The Ninth Circuit found that the 75-yard

23   barrier insulated the intended audience from the Peace

24   Navy's message, thereby rendering Peace Navy's communication

25   ineffective.

1          The Ninth Circuit concluded its analysis by saying,

2     "The government simply has not met its burden of showing

3     that there are sufficient alternative means of communicating

4     the Peace Navy's message."

5          Finally, in Phelps-Roper the issue was the

6     constitutionality of a Missouri statute that regulated

7     picketing near funerals.  The statute criminalized picketing

8     within 300 feet of a funeral location or procession.  The

9     Eighth Circuit found that people -- I'm quoting the Eighth

10    Circuit -- who "protest or picket at or near a military

11    funeral wish to reach an audience that can only be addressed

12    at such location (sic)."

13          **THE COURT:**  "Occasion."

14          **MR. DePRIMO:**  "At such occasion."

15          The Eighth Circuit concluded that the anti-funeral

16    picketing statute "fails to afford open, ample and adequate

17    alternative channels for the dissemination of the speaker's

18    particular message."

19          These cases teach that "alternatives are not ample

20    where a speaker's ability to communicate effectively is

21    threatened."  That's Weinberg quoting United States Supreme

22    Court in Taxpayers for Vincent.

23          The Third, Sixth, Seventh, Eighth and Ninth Circuit

24    Courts of Appeal have concluded that alternative, that an

25    alternative is not ample where the speaker cannot reach a

1    particular audience with a particular message at a

2    particular time and place.  The decisions of these circuits

3    are consistent with the Supreme Court's decision in City of

4    Ladue v. Gilleo where the court noted the importance of

5    reaching an intended audience.

6         In striking down a ban on residential signs, the

7    Court said, "The audience intended to be reached by a

8    residential sign -- neighbors -- could not be reached nearly

9    as well by other means."

10        Likewise, in Hill v. Colorado, the Supreme Court

11   emphasized that, "The First Amendment protects the right of

12   every citizen to reach the minds of willing listeners and to

13   do so there must be an opportunity to win their attention."

14        Plaintiffs will show that the challenged buffer

15   zones substantially foreclose their ability to effectively

16   convey their abortion message to women seeking abortion at

17   the time and place the abortion is about to occur.

18   Importantly, "Whether an alternative is ample should be

19   considered from the speaker's point of view," not the

20   government's.  Quoting the Seventh Circuit in the Weinberg

21   case.

22        The United States Supreme Court said, "The First

23   Amendment mandates that courts presume that speakers, not

24   the government, know best both what they want to say and how

25   to say it."

1          Evidence showing that plaintiffs are able to

2     disseminate their message to the public at large will not

3     suffice to prove ample alternative avenues of communication.

4          Now I'll be presenting the facts.

5          The government offers two witnesses, Michael

6     Baniukiewicz and Kristen Metzger.  Mr. Baniukiewicz is the

7     owner of Metro Crime Prevention.  He has provided security

8     for Planned Parenthood in Boston, Springfield and Worcester

9     since 1996.  Prior to starting his own security firm

10    Mr. Baniukiewicz was a police officer for 15 years.

11         Ms. Metzger works for the Office of Attorney

12    General as an investigator.

13         Neither Mr. Baniukiewicz nor Ms. Metzger know any

14    of the plaintiffs.  They cannot identify any of the

15    plaintiffs either.  In sum, neither of the government's

16    witnesses know anything about the activities of the

17    plaintiffs in this case.  Consequently, the government has

18    offered no witnesses that can rebut plaintiffs' testimony

19    regarding plaintiffs' expressive activities and personal

20    experiences.

21         With respect to plaintiffs' intended audiences at

22    Planned Parenthood, certain facts are undisputed and

23    compelling.  This is how the government's own witness

24    describes some of them:

25         "Having an abortion is one of the most important

1    decisions a woman can make in her whole life."

2    Mr. Baniukiewicz.

3            Persons contemplating abortion are "making a

4    decision that will affect them literally until the day they

5    die."  Mr. Baniukiewicz.

6            Persons going into Planned Parenthood are "probably

7    at the most vulnerable point in their life."

8    Mr. Baniukiewicz.

9            Women contemplating abortion "have the right to

10   make an informed choice."  Mr. Baniukiewicz.

11           "Some women may be pressured into abortion by

12   boyfriends or husbands."  Mr. Baniukiewicz.

13           Some women seeking abortion "suffer from economic

14   hardship."  Mr. Baniukiewicz.

15           No pro-life literature is allowed inside Planned

16   Parenthood.  It is confiscated by security officers before

17   patrons enter the abortion facility.  Mr. Baniukiewicz, the

18   security chief of Planned Parenthood.

19           Planned Parenthood does not make available pro-life

20   literature to clinic patrons.  And that, of course, doesn't

21   surprise any of us.

22           We now turn to plaintiffs and their activities at

23   the challenged locations.  First, Your Honor, plaintiffs

24   rely on the entire stipulated factual record as evidence of

25   their activities and experiences but will highlight only

1    some of the salient facts in this presentation.

2            Much of the testimony presented as to one plaintiff

3    applies with equal force to others but will not be repeated

4    for the sake of time and simplicity.

5            We'll first take a look at Planned Parenthood in

6    Boston.

7            Eleanor McCullen is a 74-year old mother and

8    grandmother.  Eleanor seeks to persuade men and women not to

9    abort the babies, abort babies through personal counseling

10   and literature distribution.  Eleanor seeks to engage people

11   in close personal communication, in a normal conversational

12   tone, with a kind, gentle voice, and with eye contact.  This

13   method of oral communication is essential to conveying an

14   effective message.

15           In her experience a smile and eye contact put

16   people at ease.  The physical layout of the buffer zone

17   often makes close communication impossible.

18           This (indicating), Your Honor, is a street view

19   from a Google map of Planned Parenthood in Boston.  The

20   building that's in the center of the photograph is Planned

21   Parenthood.  To the left of the building, the Planned

22   Parenthood building, is Alcorn Street.  To the right of the

23   building is an alleyway.  The Court can see the vehicles

24   parked on that alley.

25           If you look closely, Your Honor, you can see a

1    portion of the western portion of the buffer zone -- this

2    photograph is actually looking northerly.  The west is to

3    the left.  You can see a portion of the buffer zone on the

4    street.

5            THE COURT:  When you talk about "left," are you

6    talking about my left or the --

7            MR. DePRIMO:  I'm talking about the left of the

8    photograph.

9            THE COURT:  You determine left from where, what --

10           MR. DePRIMO:  If we're looking directly at the

11   photograph --

12           THE COURT:  My left.

13           MR. DePRIMO:  -- you should see Star Market to your

14   left.

15           THE COURT:  That is my left.

16           MR. DePRIMO:  Yes, your left.

17           THE COURT:  I just want to make sure it is clear.

18           MR. DePRIMO:  Yes.  To your left is Star Market.

19   And in between Star Market and Planned Parenthood is Alcorn

20   Street.  And you can see it a little bit here, we'll look at

21   it more closely in another photograph, but you can see the

22   yellow buffer zone that goes into Alcorn Street.  You can

23   also clearly see that there are train or trolley tracks

24   right in front of the Planned Parenthood facility.

25           The buffer zone in front of the Planned Parenthood

1   measures 56 feet from edge to edge.  The reason it is not 70

2   feet, Your Honor, is because it's actually an open foyer.

3   It's a little bit difficult to see in this photograph but

4   the door that we're looking at is actually recessed about 12

5   feet from the front edge of the building so the buffer zone

6   actually from edge to edge on the public sidewalk is 56 feet

7   running along Commonwealth Avenue.

8        The distance from the east edge of the foyer to the

9   east edge of the buffer line is 22 feet.  As we look at the

10  photograph, we're looking north, so east is to your right.

11       The distance from the west edge of the foyer to the

12  west edge of the buffer line is 26.1 inch, 26.1 inch.  West

13  is to the left in the photograph.  We actually can't see the

14  edge of the buffer zone in this photograph because it's off

15  to the left side of the page.

16       The top of the buffer zone extends one foot from

17  the curb.  As Your Honor may recall, there are actually two

18  buffer zones in the buffer law.  The one that is being

19  challenged is the one that creates a zone within a 35-foot

20  radius of entrances, exits and driveways.

21       There is a second buffer zone that has not been

22  challenged and that creates a rectangular buffer from the

23  doorway entrance straight out to the street.

24       You can see, Your Honor, barely a white line that

25  kind of runs in the center of the photograph.  That would be

1     that second buffer zone.

2              Essentially the second buffer zone is subsumed by

3     the first one.  But what I wanted to point out, Your Honor,

4     is that even though the top of the buffer zone with respect

5     to the 35-foot radius leaves one foot at the top of the

6     zone, that second horizontal or rectangular zone actually

7     goes right to the curb.  Again, that zone has not been

8     challenged -- the rectangular zone has not been challenged

9     in this lawsuit.

10             The door to the clinic would be where the arrow is

11    at the bottom of the photograph.  You cannot see it but it

12    would be toward the bottom.

13             This (indicating) is a photograph of the western

14    side of the buffer.  It goes into Alcorn Street 4.4 inches

15    from the curb.  We're actually looking down at Alcorn

16    Street.  We're, again, we're looking north.

17             Your Honor, the arc also extends down Alcorn

18    Street.  The buffer zone actually goes around the corner and

19    extends 12 feet down from the edge of the building.  So if

20    somebody is walking up Alcorn Street south toward

21    Commonwealth Avenue and they're walking on the sidewalk

22    adjacent to the Planned Parenthood building, they will enter

23    into that zone before they turn the corner to go left into

24    Planned Parenthood.

25             This (indicating) is an example of the old versus

1     the new buffer line.  The yellow line which you can see in

2     the middle or white line that you can see toward the middle

3     of the page right next to the building is the old 18-foot

4     buffer line.  The yellow line that's more toward the bottom

5     of the page is the current 35-foot buffer line.

6          Your Honor, over the past five years Eleanor

7     McCullen and her husband have spent over $50,000 of their

8     own money to pay for whatever was needed by a woman who

9     chose to give birth rather than to abort her baby.  The

10    needs Eleanor provided for included baby showers, housing,

11    furniture, household items, heating oil, electricity, water,

12    telephone, gasoline, clothing, food, baby formula, diapers,

13    and strollers.  And I'm sure there is many, many more items

14    as well.

15         Eleanor cannot make women aware of the financial

16    help she can provide without close personal contact and an

17    opportunity for confidential discussion.  There are times

18    when a woman is walking on Commonwealth Avenue and

19    approaches the clinic from the side of the zone opposite

20    where Eleanor is standing.  Often Eleanor cannot get around

21    the zone in time to begin a conversation with the woman or

22    to place literature near the woman's hands.

23         There are also times when Eleanor is unable to

24    reach persons who walk up Alcorn Street and enter the front

25    door of the clinic because she is at the eastern edge, "she"

1       being Eleanor is at the eastern edge of the buffer zone.

2               This (indicating) is a photograph with an example

3       of where Eleanor might be standing if she was on the eastern

4       edge of the buffer zone and where a patron may be coming

5       from if they were walking up Alcorn Street.  By the time

6       that patron turns the corner, Your Honor, the patron is

7       inside the zone.  There was no way that Eleanor would have

8       any opportunity to go up to that person and talk to that

9       person.

10              In some cases this means Eleanor is completely

11      unable to convey her message to her intended audience.  In

12      other instances it means Eleanor's message must be delivered

13      faster, louder and with different content than normal.

14      This, too, sometimes renders attempts to communicate

15      ineffective.

16              The need for Eleanor to raise her voice is often

17      increased not only by the distance but by traffic and other

18      ambient noise.  The ambient noise makes it difficult for

19      people to hear Eleanor and for Eleanor to hear them.

20              Standing outside the buffer zone makes it harder

21      for Eleanor to discern who is heading for Planned Parenthood

22      as compared to just walking along on the sidewalk.  Planned

23      Parenthood is located on a very busy street, Commonwealth

24      Avenue.  My understanding is Boston University is in that

25      vicinity.  You have got all kinds of people walking up and

1   down, they're going east, they're going west.

2   Mrs. McCullen, Eleanor, has a very short time to be able to

3   try to discern whether somebody who is walking up the street

4   is maybe just walking to the university, walking to the

5   grocery store, going home or heading to the clinic.

6        When Eleanor, before the zone, Your Honor, Eleanor

7   stood right in front of that door so Eleanor would know when

8   somebody was going into Planned Parenthood because they

9   would actually be walking into the door.

10       Because the west side of the zone extends into

11  Alcorn Street, Eleanor sometimes must choose between

12  standing in the street or shouting from across Alcorn

13  Street.  This particular photograph (indicating) is a view

14  of a sidewalk on Planned Parenthood from the sidewalk

15  opposite Planned Parenthood across from Alcorn Street.  The

16  viewpoint, Your Honor, is probably close to being in front

17  of Star Market.  We're actually looking eastward towards

18  downtown Boston in this photograph.

19       On two occasions cars turning from Commonwealth

20  Avenue onto Alcorn Street brushed against Eleanor while she

21  was standing at the edge of the buffer zone.

22       This (indicating) is a photograph provided by the

23  government that shows three people simply talking, standing

24  at the edge of the buffer zone.  Cars that are pulling off

25  of Commonwealth Avenue to make a right-hand into Alcorn

1      Street, these folks are right in the path of their vehicle.

2              This next photograph shows that directly.  This is

3      another photograph that was provided by the government.  We

4      see a vehicle on the left side of the photograph.  It's

5      pulling off of Commonwealth Avenue going down into Alcorn

6      Street.  And anybody who is standing at the edge of that

7      buffer zone is in the direct path of that moving vehicle.

8              Both government witnesses testified it's unsafe to

9      stand at the edge of the buffer line on Alcorn Street

10     because it's in the path of moving vehicles.

11             Now, Eleanor distributes literature about abortion

12     and abortion alternatives in both English and Spanish.  This

13     (indicating) is one of the Eleanor's handouts.  The first

14     page here, Your Honor, shows the first day of human

15     gestation.  The second panel shows the first month.  The

16     second panel shows the second month.  The third panel shows

17     the third month, the fourth panel the fourth month -- I'm

18     sorry -- the fifth panel, the fourth month and the sixth

19     panel the fifth month.

20             As Your Honor can see, this is very detailed

21     information.  It's not the kind of information that one can

22     put up on a sign.  It's not even the type of information

23     that one could share orderly unless one might have a half an

24     hour to do so.  You certainly can't share this type of

25     detailed information within 30 seconds or one minute.

1          This (indicating) is another handout that Eleanor

2     tries to provide to women going into Planned Parenthood.

3     That is a brochure from *A Woman's Concern*.  It's a crisis

4     center.  There is contact information on the back panel.

5     You can see that on the left side of the photograph.  I've

6     got an arrow pointing to that.  Again, something that's not

7     appropriate for a sign, something very, very difficult to

8     convey to someone orally if you have only seconds to do so.

9          A third handout (indicating) from Eleanor, again,

10    *The Diary Of An Unborn Child*, three months from the date

11    that the child was conceived up to the day in December in

12    the third month when she was aborted or he was aborted.

13         This is very detailed information, Your Honor.

14    It's not the kind of information that one could put on a

15    sign; and, again, it's not the kind of information one can

16    convey orally if one has just seconds to do so.

17         This (indicating) I believe is the, this may be the

18    second page of that previous one or it may be another one

19    but, again, highly detailed information.  The text is very,

20    very small, not something that can be put up on a sign.

21    Significant events in a new life.

22         It may very well be, Your Honor, that a young

23    woman, 16, 18, 20 years old, may not really understand the

24    gestational issues of a baby, the periods of, gestational

25    periods of a baby.  This type of information is informative,

1    it's factual, it's something that these, many of these folks

2    really need to know, especially if they don't know it.

3          This (indicating), Your Honor, is another piece of

4    literature that Eleanor attempts to hand out.  It's a copy

5    of the text of the rosary, at least one decade of the

6    rosary.  This, Your Honor, is a copy or a photograph of

7    rosary beads.  Eleanor oftentimes when she's able will hand

8    out a package that contains these rosary beads with other

9    information.  That's not something one can put on a slide.

10   That's not something one can convey orally.  The only way

11   that Eleanor can get this to a person is if she can put it

12   in the person's hands.  And in many instances she's just too

13   far away to be able to reach somebody.

14         Eleanor also gives out a card with her home

15   telephone number on it in case a woman later needs

16   assistance, regardless of whether or not that woman had an

17   abortion.  Here (indicating) is a copy of the card that

18   Eleanor hands out.  It's got her home phone number on it.

19   It's got a website that somebody could access if they want

20   further information.

21         Eleanor has handed out thousands, thousands of

22   these cards.  Many of them, obviously, Your Honor, before

23   the buffer zone law took effect.

24         Eleanor frequently receives telephone calls at home

25   from women who want additional help or information.  In many

1    instances, the buffer zone makes it impossible for Eleanor

2    to place literature near the hands of her intended audience.

3          Rarely do men and women go to Eleanor when she

4    beckons them from outside the zone.  Once those, once folks

5    are inside the zone headed to the door of Planned

6    Parenthood, Your Honor, they just don't leave the zone and

7    go out to the pro-life advocates even if they urge them in

8    getting them to come out.

9          Eleanor does not hold a sign at the clinic because

10   it is too impersonal.  For the same reason Eleanor does not

11   use a sound amplification device.  Over the years, hundreds

12   of women have accepted Eleanor's offers of help.  Many have

13   given birth to their child instead of aborting.

14         Since the buffer law took effect there are, on

15   average, five to six people each day, or 480 to 586 people

16   per year that Eleanor is unable to reach.  These are 586

17   people in front of Planned Parenthood who are seeking the

18   services of Planned Parenthood, many of whom likely are

19   seeking an abortion.

20         Eleanor reaches far fewer people under the new

21   buffer law than under the previous law.  For Eleanor, close

22   personal contact is essential for her to convey a message of

23   love, hope --

24         **THE COURT:**  How do you know how many, how do those

25   figures -- what is the source of those figures?

1      **MR. DePRIMO:**  The source of those figures are

2  Eleanor's testimony in her deposition.

3      Eleanor testified that on average there are five to

4  six people a day that she cannot reach.  These people --

5      **THE COURT:**  There is no independent tracking of

6  that figure?

7      **MR. DePRIMO:**  There is no independent tracking,

8  Your Honor, but neither is there any disputed evidence in

9  the record.

10      **THE COURT:**  No, I understand.

11      **MR. DePRIMO:**  The government doesn't dispute it.

12      **THE COURT:**  I understand.  I just wanted to make

13  sure I understand.

14      **MR. DePRIMO:**  That's correct, Your Honor.

15      **THE COURT:**  Thank you.

16      **MR. DePRIMO:**  Your Honor, the next plaintiff we'll

17  discuss is Jean Blackburn Zarrella.  Jean also goes to

18  Planned Parenthood in Boston.  She's 85 years old, she's a

19  mother and a grandmother.

20      As a direct result of the information and

21  counseling Jean has provided, at least 100 women who went to

22  abortion clinics with the intent to abort left without going

23  inside or went in and then came out shortly thereafter.

24      Since the current buffer law took effect, Jean is

25  not aware of even a single woman, not a single woman who

1   chose birth over abortion as a result of Jean's counseling

2   efforts.

3          Jean attempts to persuade men and women not to

4   abort by helping them make an informed decision.  Jean

5   offers practical help and educational material as well as

6   referral information.

7          This (indicating) is one of the pieces of

8   literature that Jean hands out.  It is a very, very small

9   pamphlet.  This is an accurate size, it may be off slightly

10  but it's small, it's thin.  It's called *Fetal Facts*.  It

11  talks about the specifics of a baby, the gestational

12  process.  You can see that on the left-hand side, in the

13  left photograph.

14         On the right photograph it talks about abortion

15  alternatives at the top.  Toward, about a third of the way

16  down there are phone numbers that people can call any time

17  if they want information or further counseling.  Again, this

18  is not the kind of information that can be provided orally

19  or through a sign.

20         Not only that, Your Honor, if the information is

21  provided orally or through a sign, somebody doesn't have it

22  for future reference.  If somebody takes a pamphlet, puts it

23  in their pocket, puts it in their purse, later that evening,

24  next week, next month they can pull it out, refer to it,

25  make a phone call if they are of a mind to do that.

1           This (indicating), Your Honor, is another piece of

2    literature that Jean hands out.  This is actually the size

3    of a business card.  I have blown it up so you can see it a

4    little bit better.  There is an imprint of a tiny hand on

5    the left and it's a real practical reminder to women

6    contemplating abortion as to what a baby actually looks like

7    in the very early stages of human gestation.

8           On the right side, again, it shows what the hand

9    looks like at eight weeks.  It shows what the hand looks

10   like at twelve weeks.  It describes the hands before birth.

11          No one can see that card, Your Honor, if Jean were

12   to kind of wave it at people, it's just too small.  It's the

13   size of a business card.

14          Jean also hands out a card that is a little bit

15   larger of a weeping Virgin Mary.  There is an address and a

16   telephone number on the back of that card.  There is a

17   prayer on that card that someone might refer to.  If there

18   is a religious person who is seeking an abortion, this may

19   be something that is very comforting to them.  It's not

20   something that one could put on a card.  It's not something

21   that one can express orally within just a few seconds, which

22   is often all the time that the plaintiffs have before people

23   walk through the zone and get into the clinic.

24          Another businesslike card that Jean hands out is a

25   card that welcomes Catholics who may have strayed from the

1    church to come home.  The card has a web address on it.

2    Again, for future reference if the card holder seeks further

3    information.

4         In Jean's experience counseling is effective when

5    offered in a friendly and gentle manner from a normal

6    conversational distance of no more than six to eight feet.

7    Jean finds it necessary to stand near the path of

8    pedestrians because, unless her proffer of literature is

9    placed near their hands, most passersby won't make the

10   effort to take it.

11        Jean's experience is confirmed by Ms. Metzger, the

12   investigator for the Attorney General, who said she is more

13   likely to reach out and take a piece of literature from

14   someone placing it near her hands as she walked by as

15   compared to someone who is waving it from 35 feet away.

16        Jean's experience is also confirmed by

17   Mr. Baniukiewicz who said when people pass close by pro-life

18   advocates, they take literature that is handed to them.

19   That's not the case when pro-life advocates are 10, 20, 30,

20   50 feet away.

21        Since the buffer law took effect, there have been

22   hundreds of occasions when clinic patrons entered the marked

23   zone at the clinic from the side opposite of where Jean was

24   standing.  For example, in the photograph Jean may have been

25   at the end of the buffer line on Alcorn Street.  The patron

1    may have been coming from the opposite direction.  She may

2    have been walking west, westerly, sort of coming from the

3    downtown Boston area.  If Jean, who is 85 years old, tries

4    to walk through that buffer -- and, by the way, Your Honor,

5    it's clear in the record that no abortion speech can take

6    place inside that buffer or it's a criminal offense that can

7    land somebody in jail for three months.  Jean oftentimes

8    can't transgress that 56 feet before the woman walking

9    toward her actually gets into the zone.

10          And once Jean gets to the opposite side where she

11   can speak, the woman is gone, oftentimes inside the door.

12   As a result, Jean is often unable to reach her intended

13   audience.

14          Because of the buffer law, the closest Jean can get

15   to the entrance of Planned Parenthood is to stand at the

16   edge of the buffer line on Alcorn Street with her back

17   toward traffic.  Because the effectiveness of Jean's message

18   depends on close personal contact, she needs to stand as

19   close to people entering Planned Parenthood as she can.

20          Standing on the sidewalk opposite the buffer line

21   is unsatisfactory because it adds an additional 21 feet, 9

22   inches to the already 26-foot distance from the buffer line

23   to the open foyer of Planned Parenthood.  So if she is

24   standing on the corner opposite on the sidewalk, opposite

25   the buffer line, she is actually almost 48 feet from the

1    open foyer.  And this (indicating) is a photograph of that.

2         If, for example, Jean were to stand right at the

3    edge where the arrow is pointing, she would be about 48 feet

4    from the open foyer.

5         That's not all, Your Honor, because the door to

6    Planned Parenthood is set back 12 feet from the public

7    sidewalk.  So if Jean is standing on the sidewalk opposite

8    Planned Parenthood, opposite Alcorn Street where the buffer

9    zone is, she is nearly 60 feet away from the door.

10        In Madsen the buffer zone that was upheld via an

11   injunction was 36 feet.  This buffer zone or buffer at least

12   is nearly 60 feet.

13        And this (indicating) is a photograph with an arrow

14   as to how that's calculated.  If I'm standing in front of

15   the Star Market at the very edge of the curb, to the door

16   that's recessed 12 feet from the edge of the building it's

17   59 feet, 9 inches.

18        This means the 35-foot buffer as set forth in the

19   buffer law morphs into a 60-foot buffer when it's applied in

20   real life.

21        Every Saturday, Your Honor, Jean observes Planned

22   Parenthood escorts on the public ways adjacent to the

23   clinic.  It is of no consequence that the escorts are not

24   agents of the state or controlled by it.

25        As the Ninth Circuit noted in the Hoye case last

1    month, "As to the relevance of efforts by the escorts to

2    prevent Hoye's message from being communicated, the factual

3    predicate of an as applied challenge does not need to be

4    created by the state."

5              In the McGuire case, McGuire v. Reilly, the First

6    Circuit held that escorts were not agents of the state and,

7    therefore, the facial challenge would be upheld.  But when

8    we're talking about an as applied challenge, it is not

9    necessary for the escorts to be agents of the state.  All

10   that's necessary is that the escorts interfere with the

11   speaker's message.  It's simply an additional fact that

12   demonstrates why alternative avenues of communication are

13   not ample.

14             The impact of escorts on speaker's ability to

15   effectively convey their message is part of the ample

16   alternatives as applied analysis.  Again, citing Hoye, Ninth

17   Circuit last month.

18             Your Honor, this (indicating) is a photograph which

19   was provided to us by the government.  As the Court can see,

20   at the end of the arrow toward the bottom of the page there

21   is a Planned Parenthood escort.  She's easily identified

22   because she is wearing a blue vest.

23             In almost every instance where a person appears

24   headed to Planned Parenthood, one or more escorts approach

25   the person outside the center and then walk with the person

1    past the buffer line and up to the door of the clinic.  As

2    they walk along, the escorts talk with or even at the person

3    so as to direct their attention away from Jean and to

4    prevent them from listening to Jean's message.

5         Escorts surround, cluster, walk with, yell, make

6    noise, chatter or talk loudly as they usher people to

7    Planned Parenthood's front door.

8         Not only, this is not only Jean's experience, Your

9    Honor, but Eric Cadin and Greg Smith also observed the same

10   thing.

11        They say things like, "You don't have to listen to

12   her," or "don't pay attention her," "don't listen to her,"

13   or "she is crazy."

14        Escorts make it extremely difficult for Jean and

15   Eric Cadin to win the attention of people approaching the

16   clinic, especially when the escorts surround and talk at

17   them.

18        The experiences of plaintiffs are corroborated by

19   Planned Parenthood's security chief Michael Baniukiewicz.

20   This is what he said:

21        "If a patient is outside the zone, and they are

22   stopped outside the zone or someone is attempting to stop

23   them outside of the zone, escorts will help lead them into

24   the buffer zone where they could get into the clinic."

25        Mr. Baniukiewicz further testified that, If Planned

1    Parenthood escorts see pro-life people offering literature

2    or rosary beads to patrons, they will go to the patrons and

3    grab them by the arm and lead them into the buffer zone.  He

4    uses the term simply "lead them by the arm."

5           Next we'll talk about Eric Cadin.  Mr. Cadin is a

6    30-year old seminary student at St. John's Seminary in

7    Boston.  Formerly he was a pre-med student at Harvard.  For

8    the past six years Eric has provided information to persons

9    entering or passing by Planned Parenthood in Boston.

10          His primary audience is persons seeking abortions.

11   On several occasions women seeking abortions changed their

12   minds as a result of the information and counseling that

13   Eric provided.

14          It is extremely difficult for Eric to identify

15   persons intending to enter the clinic from a distance of 35

16   feet or more.  As I mentioned earlier, Your Honor, that's a

17   very busy area.  People are walking back and forth, up and

18   down Commonwealth Avenue.  They can be going anywhere.

19          Oftentimes somebody can't identify them as going to

20   Planned Parenthood until they've approached the door and

21   make the right or left-hand turn and actually go inside.

22   And once they do that, they're well inside the buffer zone.

23          Consequently, the zone makes it very difficult for

24   Eric to identify and converse with his intended audience

25   before they enter Planned Parenthood.

1          The effectiveness of Eric's message, his oral

2    message, depends largely on whether he can communicate from

3    a normal conversational distance.  In his experience

4    speaking in a raised voice, shouting or yelling is

5    counterproductive.

6          Eric's message is different from most other

7    pro-life counselors at the clinic because Eric is young and

8    male and most others are middled-aged or elderly and female.

9    Many people patronizing Planned Parenthood are in Eric's age

10   group and, like Eric, are of limited financial means.  For

11   this reason Eric is able to empathize with their situation

12   in a way different from someone who may be comfortably

13   middle-aged or retired.

14         When at Planned Parenthood Eric wears his clerical

15   collar so people will know that he brings a religious

16   perspective to the conversation.

17         Eric relates especially well to young men who

18   patronize the clinic, many of whom appear bewildered or

19   scared.

20         Eric especially likes to speak with persons who

21   earlier had accompanied women seeking abortion.  He attempts

22   to speak with them, he attempts to speak with them when they

23   come out to the front of the clinic to smoke cigarettes,

24   make phone calls, talk or just hang out.  These people

25   usually stand by or lean against the building toward Alcorn

1    Street within five to ten feet of the open foyer.

2            This (indicating) photograph, Your Honor, would

3    depict approximately where the companions may be standing.

4    Eric, if he's on the western side of the zone on Alcorn

5    Street next to the buffer, is at least 26 feet -- pardon

6    me -- I believe 20 feet away from those folks, 15 to 20 feet

7    depending upon where they're actually leaning against the

8    door or in the open foyer.

9            If Eric is standing on the eastern side of the

10   buffer zone, these people are 35 to 40 feet away from him.

11   Again, it he's on the east side as depicted in this

12   photograph, it's about 40 feet or so between him and these

13   companions.

14           The buffer zone makes it impossible for Eric to

15   have a friendly conversation with these people from close

16   range.

17           Greg Smith is 77 years old.  He has five children

18   and nine grandchildren.  For the past 18 years he's gone to

19   Planned Parenthood in Boston.  He prays the rosary.  He

20   displays a Crucifix.  He sings religious hymns.  And he's

21   done so nearly every Saturday for the past 18 years from

22   about 8:00 a.m. until 9:30 a.m.

23           He prays out loud so escorts, patrons and passersby

24   can hear his prayer.

25           Prior to the enactment of the buffer law, Greg's

1    customary routine when praying or displaying his Crucifix

2    was to stand still on the public sidewalk directly in front

3    of the clinic entrance about six feet from the curb.  That

4    area is now squarely inside the zone.

5            Greg wishes to pray and display his Crucifix inside

6    the zone so escorts and patrons can better see and hear his

7    message but the buffer law prevents him from doing so.

8            Your Honor, Eric or -- Greg is different from the

9    other plaintiffs.  Greg does not seek that close personal

10   oral communication as does Jean and Eleanor and Eric.

11   Nevertheless, Greg desires to be as close to that front door

12   as he can so that the people can hear him and would have a

13   close-up view of his Crucifix.

14           Next, Your Honor, I'm going to give the Court a

15   real life example of the effectiveness of close personal

16   communication.

17           This testimony comes from the government's own

18   witness Kristen Metzger.  On April 2, 2010 Ms. Metzger went

19   to Planned Parenthood in Boston and when she was there she

20   observed three pro-life counselors speaking with a young

21   woman.  The young woman was walking east on Commonwealth

22   Avenue toward Planned Parenthood when she was approached by

23   the counselors.

24           If the Court can envision looking at Planned

25   Parenthood straight ahead in front of him, Star Market is to

1    the left.  This woman would have been approaching from that

2    side.  She would have been walking in an easterly direction.

3            **THE COURT:**  Toward downtown.

4            **MR. DePRIMO:**  Toward downtown.  She would not have

5    reached Planned Parenthood yet.

6            She was approached before she reached the buffer

7    line on Alcorn Street so she had not yet entered the buffer.

8            The three counselors speak to this young woman for

9    30 minutes standing on the public sidewalk at the corner of

10   Alcorn and Commonwealth Avenue.  After they finished

11   talking, the young woman and two of the counselors walked

12   across Commonwealth Avenue to a parked car.  They got in the

13   car and they all left together.

14           Now, Your Honor, we don't know exactly where they

15   went but the testimony in the record is is that counselors

16   will oftentimes take women contemplating an abortion to a

17   crisis pregnancy center.  That may be where they went, we

18   don't know.

19           During the conversation on the sidewalk, one of the

20   counselors placed her hand on the young woman's shoulder.

21   Ms. Metzger acknowledges placing a hand on the shoulder of

22   someone is a gesture of comfort and empathy.  The young

23   woman wasn't offended by that gesture.

24           This young woman was responsive to the three

25   pro-life counselors.  She did not walk away, she listened

1    and she accepted literature.  That's the testimony of the

2    government's own witness.

3         The three women counselors spoke at close range and

4    they made eye contact.  The didn't use microphones and they

5    didn't shout.  The spoke at a normal conversational level.

6    Although Ms. Metzger was standing on Alcorn Street, she did

7    not hear the words being spoken.  She could only hear the

8    sound of voices.

9         This (indicating), Your Honor, is a photograph

10   provided by the government of that particular incident.  If

11   the Court looks closely, the woman with the white hair in

12   the brown coat has her right hand on the shoulder of the

13   young woman.  This is how the pro-life counselors

14   effectively communicate with the women seeking the services

15   of Planned Parenthood.

16        Reasons ample alternatives are lacking in Boston.

17        One, plaintiffs seek to persuade men and women to

18   reconsider abortion just moments before an abortion is about

19   to occur.  In most instances plaintiffs have a single and

20   short-lived opportunity to counsel men and women before the

21   abortions take place.  Once that opportunity is lost, it's

22   gone forever.  Once the abortion takes place, there is no

23   more opportunity for counseling.

24        Life-changing matters are personal, Your Honor.

25   They should not be -- they should be discussed face-to-face,

1    not from 20, 30, or 50 feet away.

2         An effective approach to persons seeking abortion

3    requires a smile, eye contact, gentleness and a

4    demonstration of genuine sincerity.  Plaintiffs can achieve

5    this only at close range.

6         Ambient noise sometimes makes it difficult to hear

7    plaintiffs' voices even when those voices are raised.

8         The zone makes it impossible to place literature

9    near the hands of passersby when plaintiffs are not near

10   their path.

11        Most people will not make the effort to take

12   offered literature unless it is placed near their hands.

13   Even when successfully distributed, pro-life literature is

14   confiscated and thrown away by Planned Parenthood security

15   before the patrons even get into the clinic.

16        Standing at the edge of the zone on Alcorn Street

17   puts plaintiffs in danger of grave bodily harm.  And

18   standing across Alcorn Street makes the buffer 60 feet, not

19   35 feet.

20        Escorts interfere with plaintiffs' communication

21   efforts by shielding patrons from plaintiffs' speech and

22   walking with them all the way to the door.  As a result of

23   the zone, Eleanor cannot reach nearly 600 members of her

24   intended audience each year.  Over the past three years,

25   three and a half years, that's over 2,000 people.

1          Since the zone's establishment --

2          **THE COURT:**  Where do you get that information from?

3    Her testimony?

4          **MR. DePRIMO:**  Her testimony, Your Honor, and I'm

5    simply multiplying 600 times three and a half years.  600,

6    almost, nearly 600.  I think she said the high end may be

7    about 586.  So times three and a half years is about 2,000,

8    give or take.

9          Since the zone's establishment, Jean has not been

10   able to persuade even a single woman to choose birth over

11   abortion, not one.

12         Other methods of communication, Your Honor, are

13   ineffective.

14         The counseling of a young woman on April 2, 2010

15   was the only instance, the only instance in which

16   Ms. Metzger ever saw a person respond to a pro-life message.

17         During her investigation Ms. Metzger saw people try

18   to express a pro-life message through signs, prayers,

19   shouting and distributing literature.  But she never saw any

20   response to these types of communication.

21         While observing people holding signs, Ms. Metzger

22   could not tell whether they were nice, gentle, loving or

23   hateful.

24         A person is more likely to be persuaded by a

25   speaker who is smiling from a few feet away and talking at a

1    normal conversational level as compared to a speaker yelling

2    from 35 feet away.  This is Ms. Metzger's testimony.  And,

3    Your Honor, plaintiffs contend that her testimony is binding

4    on the defendants because she is a representative of the

5    Attorney General's Office and she's the one that the

6    Attorney General selected to testify with respect to the

7    facts in the as applied challenge.

8           Face-to-face conversation is always the best way to

9    communicate with willing listeners.  That's the testimony of

10   government witness Mr. Baniukiewicz.

11          According to Ms. Metzger, a conversational distance

12   is two to three feet.

13          Mr. Baniukiewicz never saw anyone inside the zone

14   walk over to a pro-life person outside the zone.  Not a

15   single time.

16          Signs, Your Honor, are not a viable alternative.

17   Ms. Metzger never observed anyone respond to a pro-life

18   sign.  Her testimony was they just walked on by.

19          Mr. Baniukiewicz, for example, testified that he

20   doesn't even pay attention to pro-life signs.

21          Signs are not an adequate alternative for several

22   other reasons.

23          One, a sign is impersonal.  And it's vital that

24   plaintiffs be able to communicate in a very personal way.

25          Two, a sign is normally viewed momentarily for no

1    more than a few seconds.

2              Three, a sign offers only one-way communication.

3              Four, space limits the amount of a sign's content.

4    There is only so much you can put on a sign if you make it

5    legible for people to read from 35 or 50 or 70 feet away.

6              Five, a sign cannot be referred to a later time, as

7    can a piece of literature that may have a website or a phone

8    number on it.

9              Six, a sign cannot convey the personal sincerity of

10   the displayer.

11             It cannot substitute for personal warmth and

12   caring.

13             And it certainly cannot substitute for personal

14   knowledge, especially medical knowledge.  And one of our

15   plaintiffs, Your Honor, is a retired medical doctor.

16             Lastly, signs are no more than visual sound bites.

17   We live, Your Honor, in a sound bite society and that's all

18   a sign is.

19             Now, Your Honor, we will turn to Planned Parenthood

20   in Worcester, unless the Court would like to ask me any

21   questions about --

22             **THE COURT:**  Do you want to cross-examine now, did

23   you have any idea of doing something like that or are you

24   going to present something --

25             **MR. SALINGER:**  Why doesn't Mr. DePrimo finish and

1    then we will give our own closing argument, Your Honor --

2         **THE COURT:**  All right.

3         **MR. SALINGER:**  -- on all three of the claims.

4         **THE COURT:**  Very good.  We will handle it that way.

5         **MR. DePRIMO:**  Your Honor, shall I continue?

6         **THE COURT:**  Yes, please.

7         **MR. DePRIMO:**  Okay.  We are moving to Planned

8    Parenthood in Worcester now.

9         Our two plaintiffs who go to Planned Parenthood in

10   Worcester are Mark Bashour and Nancy Clark.  Mark is 52

11   years old.  He has never been married and he has no

12   children.

13        He's been going to the public ways adjacent to

14   Planned Parenthood in Worcester for the past twenty years.

15        Now, Your Honor, Planned Parenthood is a particular

16   location and it now exists at 470 Pleasant Street.  It has

17   only been there for about a year and a half.  However, there

18   has been a Planned Parenthood facility in Worcester for

19   many, many years, simply at a different location.

20        Planned Parenthood in Worcester is located in a

21   stand-alone building.  The main door is located adjacent to

22   the parking lot.  The driveway entrance is located around

23   the corner on Dewey Street.

24        There are two buffer zones.  One is on Pleasant

25   Street surrounding a concrete walkway and the other is on

1    Dewey Street at the driveway.  This (indicating) is a

2    photograph, Your Honor, actually it's a Google map of the

3    area surrounding Planned Parenthood in Worcester.  To the

4    left toward the bottom of the photograph you'll see a white

5    roof and you will see the words "Planned Parenthood."

6    That's the building, the stand-alone building that Planned

7    Parenthood is located in.

8           As we're looking left to right --

9           THE COURT:  Now, is that sign actually on the roof

10   or --

11          MR. DePRIMO:  No, it is not, Your Honor.  All the

12   graphics were placed on there by me.

13          THE COURT:  Okay.

14          MR. DePRIMO:  Okay.  And that's the same case with

15   the other photographs.

16          THE COURT:  All right.

17          MR. DePRIMO:  The graphics were placed there by me

18   to try to aid the Court in understanding our case.

19          THE COURT:  Thank you.

20          MR. DePRIMO:  There are two buffer zones.  In the

21   forefront of the photograph, Your Honor, we're looking kind

22   of east to west.  Left to right is east to west.  Up and

23   down is north/south.  So the bottom of the photograph is

24   heading north, the top of the photograph is heading south.

25   To the right is west, to the left in the photograph is east.

1          Pleasant Street is east/west, it's toward the

2     bottom of the photograph.  It runs in front of the Planned

3     Parenthood building.  Dewey Street is about two-thirds or a

4     third of the way from the right of the photograph.  It runs

5     north and south.

6          The Dewey Street buffer zone is the arrow that's in

7     the top right-hand corner.  See where it is marked in white

8     "driveway."  That's Planned Parenthoods' driveway.  It's not

9     located near the building.

10         Patrons of Planned Parenthood pull into that

11    driveway, go up the driveway and then make a left-hand turn

12    and pull into the parking lot.  The Court may see in white

13    where it says "parking lot."  The parking lot is next to the

14    Planned Parenthood building.

15         **THE COURT:**  I apologize, I am having trouble

16    getting oriented.

17         **MR. DePRIMO:**  Okay.

18         **THE COURT:**  Do you have a pointer that you can use?

19         **MR. DePRIMO:**  Yes, okay.

20         Can you see my cursor (indicating)?

21         **THE COURT:**  Yes.

22         **MR. DePRIMO:**  Okay.  This (indicating) is the

23    building that Planned Parenthood is located in.

24         **THE COURT:**  Okay.

25         **MR. DePRIMO:**  Behind it is the parking lot for

1    Planned Parenthood.

2            **THE COURT:**  I have got it.

3            **MR. DePRIMO:**  Whoops, I'm sorry.

4            Behind the parking lot is the driveway.  And there

5    is only one way to enter the driveway and that's through,

6    that's from Dewey Street.  That's where that big arrow is in

7    the right top-hand corner of the photograph.

8            You can't actually see the buffer zone in this

9    photograph because it didn't pick up the lines on the

10   street.  We will be able to see them in another photograph.

11           **THE COURT:**  Okay.  Thank you.

12           **MR. DePRIMO:**  There is a second buffer zone that is

13   in front of Planned Parenthood.  It's in the bottom of the

14   photograph towards the left in front of Planned Parenthood's

15   building.  It's located in front of their building on

16   Pleasant Street.

17           There are two buffer zones.  One in front of the

18   building on Pleasant Street, the other on Dewey Street at

19   the driveway, which is far away from the actual building.

20           Do you follow me, Your Honor?

21           **THE COURT:**  Yes, I do.  Thank you.

22           **MR. DePRIMO:**  All right.

23           The buffer on Pleasant Street measures 83 feet, one

24   inch from edge to edge.  Two metal fences are anchored in

25   front of the building.

1          This (indicating) is a photograph of the front

2     sidewalk in front of Planned Parenthood on Pleasant Street.

3     We are looking from west to east so we're looking eastward

4     right at the edge of the buffer zone.  In the bottom of the

5     photograph you can see the buffer line.

6          So from this edge straight across the sidewalk to

7     the other end is about 83 feet where the buffer ends.

8          This is another photograph of the buffer on

9     Pleasant Street.  We're looking in kind of a southeasterly,

10    from a southeasterly point of view we're across the street

11    on the sidewalk.  You can sort of see part of the buffer

12    line in the forefront of the photograph.

13         This is looking at the buffer line from a

14    southwesterly perspective from across the street.

15         One of the things I want to point out to His Honor,

16    if you look at the top left-hand portion of the photograph,

17    you can see the opening of the fence.  So we actually have

18    two metal fences that are about six feet apart.

19         This (indicating) photograph was provided by the

20    government.  It was taken I believe from the second or third

21    floor of the Planned Parenthood building.  The Court can see

22    that the crosswalk is directly inside the buffer zone.  If

23    plaintiffs are carrying a sign or wearing any kind of

24    pro-life clothing, they're forced to cross the street

25    outside the safety of the crosswalk.  If they walk into the

1    crosswalk with a sign or pro-life clothing, they're subject

2    to criminal penalties up to three months in jail.

3            The buffer zone at the driveway entrance measures

4    93 feet, 7 inches from edge to edge.

5            This (indicating) is looking into Planned

6    Parenthood's parking lot from across the street.  We are on

7    Dewey Street.  Dewey Street runs north to south.  It's

8    running from, left to right is north to south in this

9    photograph.  We're sort of across the street and we're

10   looking into Planned Parenthood's driveway.  At the very end

11   of the driveway is part of the parking lot but the main

12   portion of the parking lot is to the left and it's outside

13   the photograph.

14           This (indicating) is the buffer zone on Dewey

15   Street at the driveway looking south.  We're looking right

16   at the, we're at the northerly edge of the buffer zone

17   looking south.

18           This (indicating) is from the southerly edge of the

19   parking lot.

20           **THE COURT:**  So the parking lot is inside the buffer

21   zone or not?

22           **MR. DePRIMO:**  The parking lot itself, Your Honor,

23   is on private property.  The driveway entrance is in the

24   buffer, is inside the buffer zone.

25           **THE COURT:**  Okay.

1          **MR. DePRIMO:**  So the parking lot is probably 150 or

2     200 feet from the entrance of the driveway off of Dewey

3     Street.  And, of course, it's Planned Parenthood's property,

4     it's private property.  Plaintiffs certainly are not

5     entitled to be there.

6          When at Planned Parenthood Mark attempts to offer

7     information about human life, alternatives to abortion and

8     help to the mother and the unborn baby.

9          Mark wants to show people that he cares and to show

10    sympathy for what may be a very difficult situation or

11    decision.  It is crucial for Mark to effectively convey his

12    message before an abortion takes place so he can refer women

13    to a crisis pregnancy center across the street called

14    Problem Pregnancy.

15         I don't know if His Honor noticed in the Google map

16    photograph that we looked at earlier, and I didn't point

17    this out, but to the bottom left, bottom right of that

18    photograph it's identified where Problem Pregnancy is.

19    That's a crisis pregnancy center and that's where people can

20    be alerted to and informed of alternatives to abortion.

21         Mark attempts to speak with people at a normal

22    conversational level, with a kind, gentle voice and with eye

23    contact from a distance of three or four feet.

24         Mark has never observed any vehicle enter a Planned

25    Parenthood parking lot using the concrete walkway on

1    Pleasant Street.  This will become more important as we

2    continue.

3            The concrete walkway on Pleasant Street is never

4    used for patron vehicle access to Planned Parenthood.

5    That's the government's own testimony, security chief

6    Michael Baniukiewicz.  That walkway is not for vehicles.

7    There is one driveway entrance to Planned Parenthood and

8    it's on Dewey Street.

9            This (indicating) is looking directly at the steps

10   and actually at the main door, Your Honor.  The main door,

11   if we look at the very narrow opening in the fence, if we

12   can see that, the main door is about 35 feet I believe

13   beyond that fence to the right and most people access that

14   door coming through the parking lot.

15           If we look at the, if we look at that opening in

16   the fence from close-up, we can see that it's only about six

17   feet wide.  We can also see that the posts of that fence are

18   anchored into the cement.  They don't appear to be moveable.

19           The metal fences were installed about a year ago.

20   Before they were installed, Mark could clearly see the main

21   door of Planned Parenthood while standing on the public

22   sidewalk outside the buffer zone.

23           This (indicating) is a photograph, Your Honor, of

24   what it looked like before the fences were installed.  To

25   the left towards the bottom of the photograph we can see the

1    sign, it's kind of a brown background that's right in front

2    of this white vehicle, that sign has the text of the buffer

3    law.  And we can't actually see it in this photograph, Your

4    Honor, because of the sun but the buffer line is almost

5    right adjacent to that sign.

6         So if the Court can imagine, Mark could stand right

7    at the edge almost of that sign and look at the door.  If

8    you look directly in the middle of the photograph, you can

9    see the main entrance to Planned Parenthood.  It's right in

10   the very middle of the photograph.  It's a metal door with

11   glass.

12        Before the fence was installed, Mark also could

13   easily and clearly see persons entering the building and

14   they could see him.

15        With the fences installed, Mark can't see the main

16   door or view persons entering the building.  At most, he can

17   catch a fleeting glimpse of patrons through small, narrow

18   cutouts in the fence.

19        This (indicating) is what Mark sees now, Your

20   Honor.  If he's standing at the edge of that sign, which

21   actually is probably about three feet from where the

22   photograph was taken but at the same, kind of in the same

23   line of vision, this is what Mark sees.

24        When Mark calls out to persons walking from the

25   Planned Parenthood parking lot to the main door, he can't

1    tell whether they heard him or understood his words because

2    he can't see them.

3          The combination of fencing and buffer zone renders

4    Mark's communication attempts ineffective.  85 to 90 percent

5    of the people who patronize Planned Parenthood enter by the

6    driveway on Dewey Street.  They don't enter by the front on

7    Pleasant Street.

8          This (indicating), again, Your Honor, is another

9    photograph, the same one we looked at.  The main door, if we

10   look right in the center of the photograph, the main door is

11   actually underneath the roof of Planned Parenthood.  Planned

12   Parenthood is either two or three stories, I think it's

13   three stories but the main door is underneath that.  And

14   people park in the parking lot and they walk into the door.

15         To the right, the other arrow shows the driveway

16   entrance.  So they come up or down Dewey Street, they turn

17   into the driveway, they go the back of the parking lot.

18   They take a left and they park somewhere in the lot and then

19   they walk into the door.

20         By the way, Your Honor, in this photograph you can

21   see towards the bottom on the right where Problem Pregnancy

22   is.  It's a very short walk, my guess is it's probably 100

23   yards.

24         As I pointed out, when people park their car in the

25   parking lot, they walk directly to the main door.

1          Mr. Baniukiewicz, the government's witness,

2     testified that people "very, very rarely" enter Planned

3     Parenthood from Pleasant Street.  No woman that has parked

4     her car in Planned Parenthood's lot has ever gone over to

5     speak with Mark while he was standing on Pleasant Street on

6     the public sidewalk behind the fence.  Not one person has

7     ever spoken to him.

8          Mark gets no response at all from 99 percent of the

9     people who enter the main door by way of Planned

10    Parenthood's parking lot.  99 percent of the people ignore

11    him completely.

12         Mr. Baniukiewicz has never seen a patron park his

13    or her car in Worcester Planned Parenthood's parking lot and

14    then walk back to the street outside the buffer zone either

15    to take literature or talk with a pro-life person.

16         In the past 18 months since Planned Parenthood has

17    been at the Pleasant Street location, Mark has been able to

18    provide in-depth, one-on-one counseling to only six or seven

19    women seeking services from Planned Parenthood.  That's one

20    every three months.  One every three months.

21         With one exception, all of these women sought

22    access to the main door through the concrete walkway on

23    Pleasant Street.

24         The need for Mark to raise his voice is often

25    increased not only by the distance but also by traffic and

1    other ambient noise generated on Pleasant Street, including

2    cars, trucks, motorcycles, trash haulers, police and fire

3    sirens or even idling vehicles.  Ambient noise makes it

4    difficult for Mark to hear people and for people to hear

5    Mark.

6            Noise is not an issue when Mark is able to approach

7    listeners from a conversational distance of six feet or

8    less.  To the degree that he is able, Mark hands out

9    literature in English and Spanish describing fetal

10   development and alternatives to abortion.

11           This (indicating) particular pamphlet is one that

12   we've already looked at, the same one that Jean Zarrella

13   hands out.  Mark also hands out, as does Nancy, a pamphlet

14   that talks about the services of Problem Pregnancy.  Again,

15   Your Honor, within visual eyesight of Planned Parenthood

16   across the street, just a few steps away, this particular --

17           **THE COURT:**  You mean the Problem --

18           **MR. DePRIMO:**  I'm sorry, Problem Pregnancy, yes.

19           There is contact information on this brochure.  If

20   somebody were to take it, they could contact them at any

21   time afterwards if they had it in their possession.

22           This (indicating) is also part of that same

23   brochure and it talks about the different types of services

24   that are offered.  All the services are free and are

25   confidential.

1          People who are going into Planned Parenthood need

2   to know before they have an abortion that they can walk a

3   few feet away and get free services and free confidential

4   information.

5          Mark doesn't speak Spanish so it is imperative that

6   he stand near the path of Spanish-speaking passersby so he

7   can place his literature near their hands.

8          When Mark first began counseling at Planned

9   Parenthood in its present location, he tried to offer

10  literature from Dewey Street outside the zone directly

11  across from the driveway.

12         This (indicating) is the vantage point, Your Honor.

13  What you can see here is that the buffer zone encompasses

14  not only the entire street but it actually comes almost four

15  feet onto the public sidewalk.

16         The white line almost in the middle of the

17  photograph here (indicating) is the buffer line.  Toward the

18  top of the photograph is the driveway entrance into Planned

19  Parenthood.

20         This (indicating) is that same buffer zone looking

21  again from across the driveway but looking in a

22  southeasterly direction.

23         This (indicating) is the buffer zone looking in a

24  northeasterly direction.  Same buffer zone from across the

25  street.  And, again, Your Honor, you can see that a large

1   portion of the public sidewalk is encompassed by the zone,

2   not just the street, the entire street plus a fair amount of

3   public sidewalk.

4        This (indicating) is looking at the buffer zone in

5   a southwesterly direction, sort of on the same side as where

6   the driveway is, so we're kind of looking across the street

7   in this photograph.

8        If pro-lifers want to stand at the edge of the zone

9   and not be in the middle of the street where they can be

10  struck by a car as Ms. Metzger and Mr. Baniukiewicz

11  testified, then they need to stand at the end of that zone

12  halfway up the sidewalk.

13       THE COURT:  Why don't we take a ten-minute break

14  right now.  Is that all right for everybody?

15       MR. DePRIMO:  Yes, Your Honor.

16       THE CLERK:  All rise for the Honorable Court.

17       Court is in recess.

18

19       (Recess.)

20

21       THE CLERK:  All rise for the Honorable Court.

22       THE COURT:  Sit down, everybody.  Thank you.

23       Any time you are ready, go ahead.

24       Is everybody back?

25       THE CLERK:  Yes, Judge.

1          **MR. DePRIMO:**  Your Honor, we were discussing the

2     buffer zone and that's a driveway on Dewey Street.

3          **THE COURT:**  Yes.

4          **MR. DePRIMO:**  I just put the photograph up again

5     just to bring it back to your attention.

6          Mark found his efforts trying to distribute

7     literature at the driveway futile because people almost

8     always parked over 200 feet away from him.  With only one

9     exception, no one ever came back to take his literature.

10    Only one time, Your Honor, did someone park in that lot and

11    come back to him on Dewey Street to take a piece of his

12    literature.

13         Measuring in a straight line, it's about 325 feet

14    from Planned Parenthood's driveway entrance to the far

15    corner of Planned Parenthood's parking lot near the

16    building.

17         This (indicating) is a photograph.  Again, this is

18    the same map that we were looking at before.  On the

19    right-hand side where it says "buffer zone," that's the

20    driveway buffer zone, Dewey Street.

21         The arrow that's sort of pointing to the top corner

22    to the right, at that edge would be the edge of the buffer

23    zone or actually the edge of the driveway on Dewey Street.

24         If we kind of go to the left in the photograph to

25    the other arrow on the opposite side, that's the far corner

1    of Planned Parenthood's parking lot.

2            So in a straight line it's about 325 feet from the

3    edge of the Dewey Street driveway entrance to the far corner

4    of Planned Parenthood's parking lot.

5            If a patron pulls into the driveway and parks

6    towards the north or the northeast of Planned Parenthood's

7    parking lot, Mark can't see her exit her vehicle or see her

8    enter the main door when he's standing near the zone on

9    Dewey Street.  It's impossible for Mark to place literature

10   near the hands of anyone after they enter Planned

11   Parenthood's driveway because he's always at least 35 feet

12   away from them.

13           If Mark is on the Pleasant Street side, he is

14   forced to stand at least 75 feet from the people who park

15   their cars in Planned Parenthood's lot and then proceed to

16   the main door.  It's about 75 feet from the eastern edge of

17   that buffer on Pleasant Street to the main door.

18           In Mark's experience standing a few feet from the

19   driveway presents the best opportunity to hand out

20   literature and converse with people who are patronizing

21   Planned Parenthood.

22           Prior to the present buffer law, Mark frequently

23   handed literature to vehicle occupants entering the

24   driveway.  Now, Your Honor, that was not at 470 Pleasant

25   Street.  That was at the previous location on Lincoln Street

1    but the same principle applied.  Planned Parenthood had a

2    driveway there.  And the buffer zone, the old buffer zone

3    law did not prohibit anybody from standing within any

4    distance of the driveway.

5          If the Court may recall, the old buffer law, the

6    old buffer zone law only prohibited people from approaching

7    within six feet within that 18-foot zone.  People could

8    stand anywhere they want.  They could stand at the edge of

9    the driveway.  They could stand right next to the door.  All

10   they couldn't do was approach someone within six feet.  If

11   somebody approached them, that was lawful.  That's something

12   that Mark can't do now, nor can any of the other plaintiffs.

13         Mark was able to hand out that literature on

14   Lincoln Street when he was a few feet from the driveway's

15   edge.

16         Mark doesn't hold a sign at Planned Parenthood

17   either because in his experience it is too impersonal and,

18   therefore, not very effective for him.  For the same reason,

19   Mark doesn't convey his message over a microphone,

20   loudspeaker or megaphone.

21         In winter snow piles frame the streets, sidewalks

22   and driveway at Planned Parenthood.  Depending on the

23   severity of the winter weather, snowfall may be frequent and

24   snow piles may be as high as four feet.  Sometimes the

25   streets are messy with snow and slush and the public

1   sidewalks are not cleared.  At these times it is extremely

2   difficult to see or maneuver around the zones.

3           This (indicating), Your Honor, is a photograph of

4   this past winter.  We're looking across the street from the

5   driveway entrance to Planned Parenthood.  As the Court can

6   see, you can't see the buffer lines on the street.  You

7   can't see them near the driveway.  If someone were to stand

8   in the street trying to hand literature to somebody who was

9   in a vehicle that was moving toward the driveway, if they

10  ever slipped and fell down, you know, certainly they could

11  be run over by a moving vehicle.

12          Now, one of the things the government is going to

13  contend and argue to the Court is that people don't need to

14  stand next to the edge of the driveway.  They can stand in

15  the middle of the street at the edge of the zone.  Well,

16  this photograph shows you, Your Honor, that, one, you can't

17  see where the zone is; and, No. two, if you were to stand in

18  the middle of the street when it's snowy like this, you're

19  in real danger of serious bodily injury.

20          This (indicating) is a photograph looking south on

21  Dewey Street.  The driveway of Planned Parenthood --

22          **THE COURT:**  I suppose you might argue that law

23  enforcement wouldn't be in a position to even know the

24  violation.

25          **MR. DePRIMO:**  That may be true, Your Honor,

1    certainly.

2            **THE COURT:**  If the street is covered for the one

3    purpose, it is covered for the other too.

4            **MR. DePRIMO:**  Certainly a good defense.

5            **THE COURT:**  Go ahead.

6            **MR. DePRIMO:**  Your Honor, this (indicating) is a

7    photograph of snow piles in front of Planned Parenthood on

8    Pleasant Street.

9            One of the things that I want to point out to the

10   Court in this arrow is that snow piles certainly appear to

11   be along the entire curb area in front of Pleasant Street.

12   There may be a small opening at the crosswalk for people to

13   cross and walk through the pile onto the sidewalk but there

14   certainly doesn't appear to be any opening there for a

15   vehicle to be able to maneuver into Planned Parenthood from

16   Pleasant Street.

17           This (indicating) is another photograph that

18   depicts the sidewalk area in front of Planned Parenthood.

19   It's taken from just outside the zone.  The Court can see

20   the buffer zone sign to the left in the photograph.

21           Your Honor, Mark's approach is personal.  He

22   conveys concern and sympathy with his eyes.  Close personal

23   contact is essential for Mark to successfully convey his

24   message of hope and caring.

25           Mark needs an opportunity to place literature near

1    patrons' hands so they can easily accept it.  The Worcester

2    buffer zones prevent Mark from communicating in either of

3    those ways with 90 percent of persons entering the Planned

4    Parenthood facility.  Mark cannot reach 90 percent of the

5    people.

6         **THE COURT:**  Again, where do you get that statistic?

7         **MR. DePRIMO:**  This is Mark's own testimony and it's

8    unrebutted, Your Honor.

9         **THE COURT:**  Okay.  Go ahead.

10        **MR. DePRIMO:**  Moving to Nancy Clark.  Nancy also

11   goes to Planned Parenthood in Worcester.  She is 49 years

12   old.  Nancy has nine children.

13        Nancy's purpose in going to Planned Parenthood is

14   not to protest or to condemn, she goes there to save lives.

15        Nancy believes that women generally do not want to

16   have abortions but often feel forced by boyfriends, parents,

17   employers, and over social and economic pressures to have an

18   abortion.  That's the very same thing that the government's

19   own witness Mr. Baniukiewicz said.

20        Nancy has observed young girls and women crying as

21   they approached Planned Parenthood.  Many of these young

22   girls and women appeared distraught.

23        Nancy observed one woman who was severely bruised

24   and obviously had been beaten.  Some women are so upset

25   Nancy needs to calm them down even before she can speak with

1    them.  It is vulnerable and confused women like these that

2    Nancy seeks to help.

3         Nancy wants to show people she cares and to show

4    sympathy for what may be a very difficult situation or

5    decision.  Nancy attempts to do this by offering information

6    about human life and alternatives to abortion.  She also

7    prays.

8         Nancy wants to makes sure these women truly

9    understand their options before making an irreversible

10   choice.  Once the abortion occurs, Your Honor, it's gone,

11   it's done forever.  The woman lives with it for the rest of

12   her life.  If she's 15 years old and she lives until she's

13   75, she lives with that decision for 60 years.

14        With the buffer zone in place, Nancy usually stands

15   on the public sidewalk on Pleasant Street across the street

16   from Planned Parenthood.  She tries to station herself

17   directly in front of the main door so she can peer through

18   the metal fences to see women entering Planned Parenthood.

19        This (indicating) is a photograph, Your Honor, of

20   Nancy standing across the street on the buffer zone, from

21   the buffer zone with two other women.  This photograph was

22   provided by the government.  It was taken from the second or

23   third floor of Planned Parenthood.

24        Nancy's about a hundred feet, Your Honor, from the

25   main door at that location at the edge of the buffer zone.

1      But that's the only place that Nancy can stand that will

2      allow her even a momentary glimpse of people going into

3      Planned Parenthood through the main door.

4              The fences are positioned in a way that makes it

5      very difficult to see behind or through them.  This

6      (indicating) is what Nancy looks at, Your Honor.  When she's

7      standing directly across from the openings in the fence,

8      that's what she sees.  We're talking literally just a

9      glimpse of people going in and out of that main door.

10             If she stands to the side, Your Honor, she looks at

11     the building.  You can't see the entrance to Planned

12     Parenthood unless you stand directly in front of the opening

13     in that photograph.  And, again, all you get to see is a

14     momentary glimpse.

15             Now, obviously Planned Parenthood has the right to

16     put up fences on its own property, nobody disputes that, but

17     the fences must be considered in analyzing whether the

18     buffer zones provide ample avenues of communication.

19             The public sidewalk on Pleasant Street adjacent to

20     Planned Parenthood is 53 feet, 9 inches from the main door.

21     The sidewalk is inside the buffer zone.

22             This (indicating) is a photograph of the main door

23     looking from the main door out to Pleasant Street before the

24     fence was put up.  His Honor can see somebody, it looks like

25     there are two people in the middle of the photograph that

1    are standing across the street on the sidewalk.

2         The buffer law permits a zone to be established

3    within a 35-foot radius of entrances and exits to abortion

4    facilities as well as driveways.  Because the buffer zone on

5    Pleasant Street begins well beyond 35 feet from the main

6    door, it is not in compliance with the statute.  Therefore,

7    the Pleasant Street buffer zone is unlawful.

8         Because the Pleasant Street zone hinders Mark and

9    Nancy from effectively communicating their message, the

10   unlawfulness of the zone must be considered in determining

11   whether ample alternative avenues exist.

12        On average Nancy is able to converse with less than

13   one person per week, one person.  Rarely does she get more

14   than a fleeting look from people entering the main door.

15   Only one woman out of a hundred will make the effort to walk

16   across Pleasant Street to speak with Nancy.  95 percent of

17   the people who patronize Planned Parenthood, according to

18   Nancy, enter Planned Parenthood's driveway, park their car

19   in the lot and then walk from the lot directly to the main

20   door.  Nancy gets no response at all from 99 percent of the

21   people who enter Planned Parenthood by way of the parking

22   lot.

23        Because of noise and distance, Nancy is completely

24   unable to convey her message to Planned Parenthood patrons

25   most of the time.  To the degree she is able, Nancy hands

1    out literature describing fetal development and alternatives

2    to abortion.  We saw that literature before.  It's the same

3    literature that Mark attempts to hand out.

4         Because Nancy has no access to people who park in

5    Planned Parenthood's lot, she has no ability to hand

6    literature to them or place literature near her hands.  It

7    is especially important for Nancy to be able to offer

8    Spanish literature to Spanish-speaking people because Nancy

9    does not speak Spanish.

10        In her deposition, for example, Your Honor, Nancy

11   explained that she tried to communicate for 30 minutes to a

12   Spanish-speaking woman and had very great difficulty in

13   trying to communicate because neither one spoke the other's

14   language.

15        Literature is the only means through which Nancy

16   can effectively communicate to Spanish-speaking people.

17        Of the hundreds of hours Nancy has spent outside

18   Planned Parenthood, she was able to converse with people

19   only 5 percent of the time.  In order to best help women

20   make an informed choice about abortion, Nancy must

21   communicate with them orally from a normal conversational

22   distance.  She must also have the opportunity to place

23   literature near their hands so they can easily accept it.

24        The buffer zones prevent Nancy from communicating

25   in either of those ways with 95 percent of the people she

1    sees entering Planned Parenthood.

2          These are reasons why ample alternatives are

3    lacking in Worcester.

4          In addition to encountering many of the same

5    obstacles as the Boston plaintiffs, Mark and Nancy

6    experience the following additional frustrations to their

7    speech activities:

8          The metal fences make it virtually impossible for

9    Mark and Nancy to see patrons entering the main door or for

10   patrons to see them.  When Mark calls out to persons walking

11   from the parking lot to the main door, he cannot tell

12   whether they heard him or understood his words.

13         Mark, Your Honor, is about 75 feet away from the

14   main door.  Nancy is at least 100 feet away.  So Nancy

15   likely couldn't hear either.

16         On Pleasant Street the closest Mark or Nancy can

17   get to the main door is 75 feet.  That's the eastern edge of

18   the buffer zone on Pleasant Street.  If they stand across

19   the street, they're at least a hundred feet away.

20         90 to 95 percent of patrons enter the Dewey Street

21   driveway and park their cars in the lot.  The Dewey Street

22   entrance is over 300 feet away from the main door.  Only

23   once did a person park in the lot and then go back to accept

24   literature from Mark when he was near the Dewey Street

25   entrance.

1              The only effective way for Mark and Nancy to

2    distribute literature to persons entering Planned

3    Parenthood's driveway is to offer it to vehicle occupants a

4    few feet from the driveway's edge.

5              Mark and Nancy get no response from 99 percent of

6    the people who enter the main door after parking in the lot.

7              In the last 18 months, again, Mark was able to

8    counsel only six or seven people.  Nancy standing outside

9    the zone could communicate with only people five percent of

10   the time.

11             And now we will move to Planned Parenthood in

12   Springfield.

13             Dr. Shea is our Springfield Planned Parenthood

14   plaintiff.  He is 84 years old.  He is a grandfather.  He is

15   a father and a grandfather and a great grandfather.  He is a

16   retired orthopedic surgeon.  Dr. Shea was in the Korean War.

17   He served as a field and battalion surgeon with the Marines.

18             Planned Parenthood in Worcester is located in one

19   of three buildings at a large medical complex.  Five

20   driveways provide ingress and egress to the medical complex.

21             This (indicating) is a Google photograph, Your

22   Honor, of the complex at Planned Parenthood in Springfield.

23   I will try to describe it as best I can.

24             This complex is located on the corner of Wason

25   Avenue and Main Street.  Main Street runs north and south.

1    It's running back and forth across the bottom of the

2    photograph.  You can sort of see it at the very bottom.

3    Wason Avenue runs east and west.  It's to the left side of

4    the photograph.

5           If the Court looks at the top left-hand side of the

6    photograph, there's a buffer zone, that's the main driveway

7    for people who are entering and presumably parking and going

8    into Planned Parenthood's facility.

9           There are three buildings, Your Honor, at this

10   complex.  One building is sort of, it's on the left-hand

11   side sort of maybe a third of the way up.  It has American

12   Red Cross written across it.  The white is the roof of the

13   building.

14          If the Court would look directly above that

15   building, it sees -- the Court would see the words "main PP

16   driveway."  That's the main driveway to Planned Parenthood

17   according to security chief Michael Baniukiewicz.  He also

18   says that that area there sort of in between American Red

19   Cross and sort of going to the top of the photograph is the

20   main parking lot for Planned Parenthood.  That's

21   Mr. Baniukiewicz's testimony.

22          Toward the top of the photograph not quite in the

23   middle there is kind of a rectangular building, kind of a

24   thin, rectangular building.  I wrote the words "Planned

25   Parenthood" on the roof of that building.  Can the Court see

 1   that?

 2           **THE COURT:**  No.

 3           **MR. DePRIMO:**  There is an arrow pointing that says

 4   "main door."  "Main door" is in yellow.  It would be sort of

 5   to the left.  Let me see if I can use my cursor.

 6           Do you see that (indicating), Your Honor, my

 7   cursor?

 8           **THE COURT:**  Yes.

 9           **MR. DePRIMO:**  Planned Parenthood is located in this

10   building that's got sort of the grayish brown roof.

11           **THE COURT:**  Okay.

12           **MR. DePRIMO:**  Attached to this building with the

13   grayish brown roof are two towers.  That's sort of one

14   building.  The second building is the American Red Cross

15   building, sort of to the left toward the bottom, more toward

16   the bottom from where Planned Parenthood is.

17           And then the third building, Your Honor, is to the

18   far right of the photograph.  We can only see part of it.

19   The white sort of -- that runs from halfway all the way up

20   to the top, that white is the roof of the third building.

21           So what we're looking at here, Your Honor, are sort

22   of parking spaces and a parking lot that services all three

23   of these buildings.

24           Now, there are five buffer zones that are located

25   at this complex because there are five driveways.  Two of

1     them are on Wason Avenue.  And the Court can actually see

2     the arc of the buffer zone in the photograph if it looks

3     very closely.  If the Court looks on Wason Avenue to the

4     left, sort of toward the lower left-hand side of the

5     photograph, kind of where my cursor is?

6           **THE COURT:**  Yes.

7           **MR. DePRIMO:**  The Court can see the line there

8     where the buffer zone is.  That's the eastern buffer zone

9     that's on Wason Avenue.

10          As I push my cursor up Wason Avenue there is

11    another buffer zone right here (indicating).  That's the

12    buffer zone on the western portion of Wason Avenue.

13          And then as I pull my cursor down to the bottom of

14    the page and then sort of pull it toward the right, the

15    Court can see three arcs in succession along Main Street.

16    And you've got arrows there pointing to the buffer zone.

17          So three buffer zones on Main Street, two buffer

18    zones on Wason Avenue.

19          Ready?

20          **THE COURT:**  Yes.

21          **MR. DePRIMO:**  Your Honor, over 20 separate medical

22    businesses are located in that complex as is a Subway

23    restaurant.

24          This (indicating) is the business directory for 355

25    (sic) Main Street.  Planned Parenthood is located in this

1    particular building.  We can see that Baystate Reference

2    Laboratories is in this particular building.  Hand Center of

3    Western Massachusetts, NovaCare Hand and Upper Extremity

4    Rehabilitation, NovaCare Rehabilitation and Physical

5    Therapy, Pioneer Valley Surgicenter, Planned Parenthood

6    League of Massachusetts, Valley Medical Associates and

7    Valley Women's Health Group.

8            This (indicating) is the sign on the other side of

9    the building.  It's got the same businesses on it.  Again,

10   355 (sic) Main Street.

11           By the way, Your Honor, at this medical complex are

12   three addresses:  3500 Main Street, 3550 Main Street and

13   3640 Main Street.  Three addresses, one large medical

14   complex.

15           Here (indicating) is a sign on the building that

16   houses the American Red Cross.  Also a sign that, for

17   Baystate Cardiovascular Program.

18           These are signs here (indicating) that point to an

19   ear, nose and throat office.  Also kind of a sandwich sign

20   that talks about the blood donor center at the Red Cross.

21           Buffer zones at multipurpose office buildings are

22   constitutionally suspect.  For example, in Hoye the Ninth

23   Circuit observed, "In Hill the Supreme Court expressly

24   invited as applied challenges where," quoting the Supreme

25   Court, that should not be in double quotes there, "'Special

1     problems arise because clinics have particularly wide

2     entrances or are situated within multipurpose office

3     buildings.'"

4          The Supreme Court in <u>Hill</u>, even though it upheld

5     that floating buffer zone in that case, said that even a

6     floating buffer zone is constitutionally suspect at a

7     multipurpose office building.  That's what we're dealing

8     with in Springfield.

9          Because the medical complex houses 20 separate and

10    distinct businesses, it is impossible for Dr. Shea to know

11    which business or businesses a person intends to patronize

12    when the person enters the medical complex.  It is,

13    therefore, impossible for Dr. Shea to identify with

14    particularity who might be patronizing Planned Parenthood

15    unless he is told.  So unless somebody in a vehicle or

16    somebody comes over to him and says, hey, look, I'm going

17    into Planned Parenthood, there is no way for Dr. Shea to

18    know that.

19         Kristen Metzger agrees that it's not possible, it's

20    not possible to identify which business these people intend

21    to patronize.

22         As I mentioned, there are five wide arcs

23    surrounding each of the five driveways.  Signs containing

24    the buffer law are situated in two of the five arcs, one on

25    Main Street and the other on Wason Avenue.

1          The first buffer zone is at the west driveway

2     entrance off Wason Avenue.  That's the one that's directly

3     in front of the building housing Planned Parenthood.  A sign

4     with the buffer statute language is situated at that

5     location.

6          This (indicating) is looking into that driveway and

7     parking lot.  The building in the background is the building

8     that houses Planned Parenthood.  The arrow points to the

9     text of the buffer law.  You can see the white line in the

10    forefront.  That's the buffer zone.

11         The buffer zone measures 100 feet, 5 inches in a

12    straight line from edge to edge along the public sidewalk.

13    A 100-foot buffer zone, Your Honor.  The maximum buffer zone

14    is 36 feet.

15         The driveway entrance is 206 feet, 5 inches from

16    the main door.  It's over 200 feet from the driveway

17    entrance to the door where people enter into Planned

18    Parenthood.  And the testimony in the record is that Planned

19    Parenthood is on the second floor of that building.

20         The buffer zone makes it impossible to get close to

21    that driveway entrance.

22         The buffer zone is 35 feet of the eastern line or

23    the western line of the buffer zone is 35 feet away from the

24    edge of the driveway.  The distance from the top of the arc

25    to the curb opposite the driveway is 12 feet, 5 inches.

1          That's (indicating) a photograph of Dr. Shea with a

2     sign standing at the top of the buffer zone.

3          This (indicating) is a photograph of the buffer

4     zone looking northeast from across the street.

5          This (indicating) is looking west at that same

6     buffer zone.  You can see in the middle of the photograph to

7     the right 355 (sic) Main Street.

8          The second buffer zone is at the east driveway

9     entrance off Wason Avenue.  This (indicating) is a

10     photograph of that particular buffer zone.  That buffer zone

11     is 95 feet, 5 inches in a straight line from edge to edge.

12          This (indicating) is a photograph looking easterly

13     from the western edge of that particular buffer zone.

14     People are turning off of Main Street in the background onto

15     Wason Avenue.

16          This (indicating) is looking at the eastern buffer

17     zone looking southwest from the eastern edge of that zone.

18          The third buffer zone is at the south driveway off

19     Main Street.  And, Your Honor, if you recall the original

20     Google map, what I'm doing is I'm starting at the top of

21     that map on Wason Avenue and going down and around to Main

22     Street.  So the first buffer zone that I'm talking about

23     would have been in the top left-hand corner of that

24     photograph, the second in the bottom left-hand corner of

25     that photograph, the next, sort of to the bottom on the

1    left, then in the middle, then to the right, just to make it

2    clear.

3            This (indicating) is a photograph of the southern

4    driveway.  That buffer zone measures 99 feet, 9 inches in a

5    street line from edge to edge.

6            Here's (indicating) a photograph of that buffer

7    line.  You'll notice across the street, Your Honor, there

8    are no sidewalks and that's a very hilly area and it's

9    fenced off.

10           The fourth buffer zone is at the middle driveway

11   entrance off of Main Street.  There is a sign with the

12   buffer statute language posted or situated at that location

13   and there is a photograph of that sign.

14           The middle buffer zone measures 99 feet, 1 inch in

15   a straight line from edge to edge.

16           A photograph (indicating) of the second or the

17   middle buffer zone on Main Street.

18           According to Mr. Baniukiewicz, Planned Parenthood

19   patrons very rarely use the Main Street driveway entrance.

20   The sidewalk, the sidewalk at the middle driveway off Main

21   Street is at least 316 feet, 2 inches from the door of

22   Planned Parenthood.  That's over 100 yards and that's over

23   the length of a football field.

24           This (indicating) is looking back at 355 (sic) Main

25   Street where Planned Parenthood is housed from the edge of

1        the middle buffer zone.   About 350 feet more or less.

2               Kristen Metzger testified that the distance from

3        the door to the Main Street sidewalk is 352 feet, 2 inches.

4        And it depends, Your Honor, where exactly you're measuring.

5        If you're measuring in the middle of the buffer zone, it may

6        be 316.   If you measure off to the other edge, it's 350.

7               Again, a little bit different vantage point looking

8        at the building housing Planned Parenthood from the Main

9        Street buffer zone.   We can see it's well in the background.

10              These photographs were provided by the government.

11              The fifth buffer zone is located at the northern

12       driveway off Main Street.   This (indicating) is a photograph

13       of this buffer zone looking north.

14              A photograph (indicating) of the buffer zone

15       looking south.   You can see Dr. Shea standing next to the

16       3640 Main Street sign.

17              The northern buffer zone measures 100 feet, 2

18       inches in a straight line from edge to edge along the public

19       sidewalk.

20              Now we'll discuss Dr. Shea's activities.

21              When Dr. Shea is at Planned Parenthood, he attempts

22       to persuade men and women not to abort their babies by

23       helping them make an informed decision.

24              Dr. Shea's intended audience is persons seeking

25       abortions.   To help these women make an informed decision,

1    Dr. Shea tries to offer medical information on the risks of

2    surgery and the gestational process of human beings.

3    Dr. Shea is a medical doctor.

4          When at Planned Parenthood, Dr. Shea often dangles

5    a sign from his neck that states, "They're killing babies

6    here."  This (indicating) is a photograph of the sign

7    Dr. Shea wears.

8          Dr. Shea often walks back and forth on the L-shaped

9    public sidewalk that frames the medical complex.

10          Prior to enactment of the buffer law, he often

11   walked with his sign.  The perimeter of the sidewalk on

12   Wason Avenue is 514 feet, 10 inches.  The blue line, the

13   blue arrow on the left-hand side is the perimeter of the

14   sidewalk, 514 feet along Wason Avenue.

15          The perimeter on Main Street is 906 feet, 2 inches.

16   The arrow at the bottom of this photograph is the perimeter

17   along Main Street, 906 feet.  Together that's about 1420

18   feet of public sidewalk, 1421 feet of public sidewalk that

19   surrounds the medical complex, or at least is adjoining to

20   it.

21          Dr. Shea cannot avoid the zones by walking in the

22   grassy areas or parking lots of the medical complex because

23   private property, no trespassing signs are situated at every

24   driveway entrance to the complex.

25          Main Street is a major thoroughfare in Springfield

1   and is often busy with vehicular traffic, including cars,

2   trucks, heavy construction equipment, vans, motorcycles and

3   buses.

4          Because there is so much dangerous traffic,

5   Dr. Shea is reluctant to cross the street merely to avoid

6   the zones because he fears for his safety.

7          This (indicating) is Wason Avenue.  We can see on

8   the right side of the photograph it looks like a dump truck

9   is coming down the street.

10          This (indicating) is a photograph I believe, Your

11   Honor, provided by the government.  That shows three

12   vehicles traveling on Wason Avenue.

13          This (indicating) is a photograph, again, provided

14   by the government, that shows a van on Wason Avenue right in

15   front of the driveway entrance.

16          This (indicating) is Main Street with a large truck

17   driving across right through the buffer zone.

18          More vehicle traffic on Main Street.

19          Your Honor, as Dr. Shea understands the law, the

20   existence of the five zones means he cannot walk with his

21   sign along much of the public sidewalk adjacent to the

22   medical complex without risking arrest and incarceration.

23          Though no warning signs are situated inside three

24   of the five zones, Dr. Shea does not know whether he can

25   lawfully enter them.

1          All five white arcs are nearly identical in size

2     and shape.  We've looked at this photograph before, Your

3     Honor.  There are no graphics on this.  I left it blank so

4     the Court can clearly see along the streets where the buffer

5     zone arcs are and how they look almost identical.  Three

6     along Main Street on the bottom of the photograph, two of

7     them on Wason Avenue along the left edge of the photograph.

8          The white arcs confuse Dr. Shea.  No one has

9     informed Dr. Shea that he may enter or walk through one or

10    more of those three zones with his sign without risking

11    arrest and incarceration.

12         At times frequent noise created by vehicles makes

13    even face-to-face conversation difficult.  It makes oral

14    communication at a distance impossible.  This is Dr. Shea's

15    own testimony.

16         Dr. Shea never shouts because he believes it

17    irritates strangers and, therefore, is counterproductive.

18    To the degree he's able, Dr. Shea hands out literature in

19    English and Spanish describing fetal development,

20    alternatives to abortion, the risks of abortion, and

21    contraceptives.

22         This (indicating) is one of the pieces of

23    literature that Dr. Shea tries to hand out.  The Court can

24    see that it's very heavily annotated.  There are endnotes on

25    the back of the pamphlet.  There is contact information on

1    the back of the pamphlet.

2         This (indicating) is the center part of that same

3    pamphlet.  It contains very detailed, a very detailed

4    biological chronology of a human life.

5         As a medical doctor Dr. Shea is very well qualified

6    to discuss fetal development.

7         This (indicating) is another handout that Dr. Shea

8    attempts to give out.  It's for a crisis pregnancy care

9    center called Bethlehem House.  We can see that there is

10   contact information on this brochure.  We can see also, Your

11   Honor, that there are many free services that are provided

12   at this particular pregnancy care center.  And there are

13   other services as well that are offered.

14        This (indicating) is another piece of literature

15   that Dr. Shea hands out called "Choice or Child."  This is

16   the back of that particular pamphlet.  It discusses myths

17   versus facts.  Who better than a medical doctor to be able

18   to discuss myths versus facts when it talks about, talking

19   about human life.  There is also contact information on this

20   particular piece of literature.

21        This (indicating) is another handout of Dr. Shea's.

22   It's the story of Hope, a woman who was conceived in rape

23   and her mother, despite the rape, chose to give birth.  It's

24   footnoted.  There is contact information on this particular

25   brochure.

1              This (indicating) is the same pamphlet, the other

2       side of it.

3              This (indicating) is another handout that talks in

4       terms of contraception called, "Abortion in Disguise."  It

5       has contact information.  It's very heavily documented with

6       endnotes.

7              This type of information, Your Honor, is not the

8       type of information one can put on a sign nor is it the type

9       of information that one can convey in a very short oral

10      communication.

11             This (indicating) is the same pamphlet I believe,

12      the inside of it.

13             This (indicating) is another pamphlet for Rachel's

14      Vineyard Weekends.  This is sort of a spiritual journey for

15      women who have had abortions.  Women who regret it, woman

16      who are hurting because of abortion.  There is a schedule on

17      this of when these particular seminars take place.  There is

18      contact information so people can call.

19             Post abortion counseling.  This is the same

20      brochure, the other side.

21             Dr. Shea does not speak Spanish so he can

22      communicate to Spanish-speaking people only through

23      literature.

24             We saw this piece of literature earlier in English.

25      This is the same piece of literature in Spanish.  At least I

1    think it is but I don't speak Spanish so I don't know.

2            Again, same piece of literature (indicating), the

3    other side in Spanish.

4            This is the Bethlehem Pregnancy Care Center

5    pamphlet, again, in Spanish.  Contact information, free

6    services, other services.

7            The only way that Dr. Shea can communicate with

8    Spanish-speaking people is through Spanish literature.  90

9    percent of the people patronizing the businesses of the

10   medical complex arrive by car and park in one of several

11   lots.

12           The government's own witness Mr. Baniukiewicz

13   admitted because of the distance between the public sidewalk

14   and the entrance to Planned Parenthood, the only opportunity

15   for pro-life communication is at the west driveway on Wason

16   Avenue.  This is the security chief for Planned Parenthood.

17   That's his admission.

18           No one has ever parked her car and returned to the

19   sidewalk area where Dr. Shea was to take his literature.

20           Less than five percent of the persons who park

21   their cars return to the public sidewalk for literature or

22   pro-life counseling.  Those are Dr. Shea's observations that

23   he experiences.

24           Since the buffer zones were established two or

25   three years ago, Dr. Shea has distributed no more than two

1    or three pieces of literature.  That's one, that's less than

2    one piece of literature per year in three and a half years.

3           Ms. Metzger did not observe anyone park their car

4    in either Worcester or Springfield parking lots and then

5    walk back to pro-life persons on the public sidewalk.

6           Ms. Metzger admitted it's much easier for vehicle

7    occupants to pause briefly at the driveway, roll down their

8    windows and then accept literature rather than parking their

9    car and then making the long walk back to the public

10   sidewalk.

11          It is Dr. Shea's desire to give his literature to

12   every person patronizing Planned Parenthood.

13          The buffer zones prevent Dr. Shea from offering

14   literature at the edge of the driveways near the path of

15   vehicles.  Thus, the zones make it virtually impossible for

16   Dr. Shea to distribute literature.

17          Though people can see it, Dr. Shea's sign is not a

18   substitute for personal individual counseling.  His desire

19   is to persuade, not merely to be seen.

20          And as the Supreme Court told us earlier in this

21   presentation, people have the right to try to persuade

22   people, not merely to be seen.

23          In Dr. Shea's experience, persons are persuaded

24   through gentle and informative one-on-one counseling at

25   close range.  It is impossible for Dr. Shea to convey fetal

1    development or the risks of abortion in only a few

2    sentences.

3              As a retired medical doctor and military surgeon,

4    the knowledge and perspective Dr. Shea brings to a

5    conversation is considerably different from the knowledge

6    and perspective other pro-life councilors can bring.

7              In winter, Your Honor, snow piles frame the

8    sidewalks and driveways of the medical complex.

9              This (indicating) is a photograph of Dr. Shea this

10   past winter at the west edge of the east buffer zone on

11   Wason Avenue.  The Court can see that there is a snow pile

12   between the street and the sidewalk.  On both sides of the

13   sidewalk actually.

14             Here is another photograph (indicating).  This is

15   the corner of Main Street and Wason Avenue.  The sidewalk is

16   clear but as Your Honor can see, there are large piles of

17   snow on either side of this sidewalk.

18             This (indicating) is looking north along Main

19   Street, sort of the middle of the middle driveway on Main

20   Street.  You can see lots of snow on the sidewalk and,

21   again, we see piles of snow framing those sidewalks.

22             This (indicating) is a photograph sort of at the

23   edge of the driveway at the west -- the eastern driveway on

24   Wason Avenue.

25             With piles of snow, Your Honor, there are very few

1    areas of the sidewalk where Dr. Shea can walk with his sign

2    without violating the buffer law because he can't access the

3    sidewalk except through forbidden driveways.  If Dr. Shea

4    had the sign dangling from his neck and walked through the

5    buffer zone at the driveway just to get to the sidewalk, he

6    would be in violation of the law and could go to jail for

7    three months.

8         Reasons ample alternatives are lacking in

9    Springfield.  In addition to the same, many of the same

10   obstacles as the Boston and Worcester plaintiffs, Dr. Shea

11   experiences these additional hindrances to his speech

12   activities:

13        Planned Parenthood is in a diverse medical complex

14   serviced by five driveways.  It is impossible to tell which

15   vehicle occupants are intent on patronizing Planned

16   Parenthood.  90 percent of the people park in the driveway.

17   No one has ever parked their car in the medical complex

18   parking lot and then returned to Dr. Shea to take his

19   literature.

20        Less than five percent of persons who park their

21   cars return to the public sidewalk for literature or

22   pro-life counseling.  That means that 95 percent of the

23   people who park their cars simply park and then walk

24   directly into the building housing Planned Parenthood.

25        Dr. Shea has no opportunity to reach 95 percent of

1    the people who park in this parking lot.

2          Dr. Shea has only distributed two or three pieces

3    of literature in the last two or three years.  It is

4    undisputed that the only opportunity for effective pro-life

5    communication is at the west driveway on Wason Avenue.

6    That's the driveway directly in front of the building

7    housing Planned Parenthood.

8          The only place that Dr. Shea can engage in

9    effective oral speech or literature distribution is to stand

10   a few feet from the edge of the west Wason Avenue driveway.

11   That area is squarely within the buffer zone.

12         The multiple buffer zones prevent Dr. Shea from

13   peacefully and quietly walking back and forth along the

14   entire public sidewalk when his abortion-related sign is

15   dangling from his neck.

16         Dr. Shea can't even walk on a public sidewalk

17   without risking arrest under this buffer law as it applies

18   to Planned Parenthood in Springfield.

19         Dr. Shea is 84 years old.  It was unreasonable for

20   the government to force him to choose between crossing busy

21   streets or risking arrest for violating the buffer law

22   simply because he has an abortion-related sign with him as

23   he peacefully walks up and down the public sidewalk.

24         In its proposed findings and conclusions that have

25   already been submitted to the Court, the government concedes

1    that the buffer law cannot be enforced at three, at the

2    three challenged driveways in Springfield where buffer law

3    signs are not situated.

4        Wrapping up, Your Honor, plaintiffs' ability (sic)

5    to effectively convey --

6        **THE COURT:**  Inability.

7        **MR. DePRIMO:**  -- their messages to large

8    segments --

9        **THE COURT:**  Plaintiffs' inability.

10        **MR. DePRIMO:**  Plaintiffs -- let me rephrase.

11        Plaintiffs' inability to effectively convey their

12    messages to large segments of their intended audiences is

13    undisputed.  Undisputed.

14        In all important respects, the government's own

15    witnesses corroborated plaintiffs' testimony.  The

16    government has presented no testimony with respect to which

17    methods of communication are effective and which are not.

18    No experts, no fact witnesses.  With the exception of Greg

19    Smith, plaintiffs have demonstrated that close, personal

20    contact is vital in order to communicate effectively with

21    Planned Parenthood patrons.

22        When communicating orally, plaintiffs need to be

23    within a normal conversational distance so they can smile,

24    make eye contact and demonstrate sincerity and compassion.

25        When distributing literature, plaintiffs need to

1    stand near the path of passersby or vehicles so the

2    literature can be easily accepted.

3            The buffer zones prevent plaintiffs from

4    communicating effectively, again, with large segments of

5    their intended audience.

6            For the foregoing reasons, the buffer law should be

7    declare unconstitutional as applied in each of the

8    challenged locations and its enforcement should be

9    permanently enjoined.

10           And that's all we have at this time, Your Honor.

11           **THE COURT:**  All right.  Are you ready to go?

12           **MR. SALINGER:**  Yes, good afternoon, Your Honor.  I

13   am expecting it will take me 30 to 40 minutes to present our

14   closing argument.  Shall I proceed?

15           **THE COURT:**  Go ahead.  Would you rather take a

16   luncheon recess now and then begin?

17           **MR. SALINGER:**  Whatever is your preference, Your

18   Honor.  If you --

19           **THE COURT:**  Well, you say 30 or 40 minutes.  I am

20   going to break into your presentation at one o'clock if I

21   let you start now.

22           **MR. SALINGER:**  Well, then perhaps we should take a

23   lunch break.

24           **THE COURT:**  Yes, I would rather not break into

25   your --

1              **MR. SALINGER:**  Great.

2              **THE COURT:**  Why don't we -- let's see, it's 12:30.

3    Why don't we try to come back at 1:45, okay.

4              **MR. SALINGER:**  We will be here at 1:45.  Thank you,

5    Your Honor.

6              **THE CLERK:**  All rise for the Honorable Court.

7              Court is in recess.

8              (Luncheon recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON PROCEEDINGS**

2          **THE CLERK:**  All rise for the Honorable Court.

3          **THE COURT:**  Good afternoon, Everybody.

4          **VOICES:**  Good afternoon, Your Honor.

5          **THE COURT:**  Please be seated.  Sorry to keep you

6    waiting.

7          We are ready to go I guess.

8          **MR. SALINGER:**  Yes, Your Honor.

9          Your Honor, our affirmative case is based primarily

10   on the plaintiffs' own testimony, testimony of their

11   depositions, we examined them, subsequent testimony that was

12   submitted through declarations.  That evidence is bolstered

13   by the testimony by Kristen Metzger whose name you heard.

14   She's an investigator who works for the Attorney General's

15   Office.

16         If I may, I'd like to --

17         **THE COURT:**  She testified in one of the other

18   cases; didn't she?

19         **MR. SALINGER:**  Ms. Metzger, no.

20         **THE COURT:**  No?  All right.

21         **MR. SALINGER:**  I thought it might be most helpful,

22   Your Honor, if I summarized for each clinic what our

23   affirmative case is, what the evidence shows, and then at

24   the end I've got a few really rebuttal points about why some

25   of the points that plaintiffs are raising we submit are not

1      relevant.

2             The context, as you know, is that in December of

3      2010 Your Honor ruled that there is one issue left to be

4      decided in this case and that's the question of whether the

5      buffer zone statute as applied at the three clinics now at

6      issue in the complaint leaves open adequate alternative

7      channels of communication.

8             The First Circuit in the <u>Sullivan versus Augusta</u>

9      decision, for example, among others, tells us what the

10     standard of that is, the standard of the adequacy of

11     alternative channels is whether people can still have an

12     opportunity to get their message out.  Plaintiffs' own

13     testimony demonstrates that they can and do share their

14     messages outside the buffer zones at the Boston, Worcester

15     and Springfield clinics and, thus, that evidence shows that

16     the Act as applied leaves open ample and adequate

17     alternative channels of communication.

18            So starting with the Boston clinic, I thought I'd

19     follow plaintiffs' lead and work from east to west.

20         **THE COURT:**  Go ahead.

21         **MR. SALINGER:**  You'll recall the photos of the

22     clinic building there on Commonwealth Avenue.  Just a tiny

23     bit more context.

24            The evidence shows that all clinic patients enter

25     on foot through that front door which faces out onto

 1    Commonwealth Avenue.   The sidewalk there is about 25 feet

 2    wide and the buffer zone, you saw pictures of it arcing

 3    around the front door, so if you were standing there on

 4    Comm. Ave. looking at the building like the picture showed,

 5    to the right the full width of the sidewalk is open and

 6    plaintiffs can go there, to the left on the other side of

 7    Alcorn Street, so right in front of the Star Market on the

 8    corner, that entire 25-foot wide sidewalk is open to the

 9    plaintiffs.

10         And right in front of the clinic the zone arcs out

11    and you saw there was space on both sides between the edge

12    of the buffer zone and the edge of the sidewalk, including

13    right on the corner of Alcorn Street, there is a strip there

14    where Ms. McCullen and other plaintiffs testified that they

15    do, in fact, from time to time stand right in that spot as

16    they're conversing with people who they think may be heading

17    to or just left the clinic.

18         Now, Ms. McCullen, as you heard, what she wants to

19    do is she wants to go stand on the sidewalk outside the

20    Boston clinic, try to speak with women who may be going to

21    the clinic, ideally women who are pregnant, and attempt to

22    convince them that if they were going to Planned Parenthood

23    for abortion services not to have an abortion.

24         Ms. McCullen's own testimony at her deposition is

25    that since the buffer zone law was changed in November of

1    2007, she continues to be very successful doing just that.

2    She has many, many conversations with women on the sidewalk.

3    And by Ms. McCullen's own reckoning, probably at least 80

4    times between November of 2007 and when she was deposed just

5    a few months ago she has, in fact, succeeded through those

6    conversations in convincing women not to have an abortion,

7    exactly what she says she wants to do.

8         Ms. McCullen's method is to try to strike up

9    conversations with people who are passing by on the

10   sidewalk.  She testified that she usually teams up with

11   another woman whose name is Mary O'Donnell.  Usually

12   Ms. McCullen will stand on one side of the clinic so people

13   walking down the buffer zone -- I'm sorry -- walking down

14   the sidewalk toward the clinic from one direction, she can

15   approach, Mary O'Donnell will be on the other side and can

16   approach women who are walking from the other direction.

17        Ms. McCullen testified that typically she is able

18   to make some sort of offer of help to women, most of whom

19   are not interested in talking to her.  They hear

20   Ms. McCullen's message but they make clear no, I'm not

21   interested and they go on their way.

22        A fair number of women stop and talk with

23   Ms. McCullen.  She's very successful in having those

24   conversations.  She's testified that sometimes she has

25   conversations for just a few moments.  She hands out

1    literature, as you heard.  You saw the various pamphlets

2    that she hands out and you heard that she includes in that a

3    business card with her phone number.

4          Her conversations often get to the point where

5    women will go with her to a car.  She gets there early in

6    the morning.  She usually goes Tuesday and Wednesday

7    mornings and she goes before other people are parked so she

8    gets the very first spot nearest to the clinic and women

9    will often walk with Eleanor she testified to continue a

10   conversation with her in her car.

11         The literature, her testimony is most days that

12   she's there at least 15 or 20 people will accept from her

13   the literature that she's offering, including that card with

14   her phone number.  And she also testified that quite

15   frequently women who have taken that literature with her

16   business card will call her at home on that phone number and

17   continue a conversation.

18         So despite the buffer zone that prevents

19   Ms. McCullen from standing right next to the doorway the way

20   she would prefer to, she is, in fact, able to offer and

21   share the message that she wants to on that sidewalk outside

22   the Boston clinic.

23         When she parks her car, I should also note, she has

24   some signs on it so that's another way that she

25   communicates.  Plaintiffs' counsel noted that Ms. McCullen

1    doesn't like to stand with a sign but she also testified

2    that on the car right near the clinic, that first spot, she

3    has magnetic signs affixed that say, "Abortion stops a

4    beating heart."  And she has a larger sign that she has on

5    the ground on the sidewalk leaning against the car right by

6    the curb there which at the top says, "Pregnant?" with a

7    question mark, it has a picture of a woman, lists the name

8    of A Woman's Concern, this is alternative help that

9    Mr. DePrimo referred to, and has a phone number.

10        And Ms. McCullen testified that all of that can be

11   seen by people walking past the car, either through the

12   buffer zone to the other side or into the clinic.  So in all

13   of these ways Ms. McCullen can and does communicate her

14   message outside the Boston clinic.

15        Plaintiff Jean Zarrella.  Similarly she wants,

16   according to her testimony, to offer help and literature to

17   women who may be pregnant.  Ms. Zarrella typically goes on

18   Saturday mornings to the Boston clinic.  Saturday mornings

19   happen to be a popular day for other anti-abortion

20   protestors, councilors, prayer groups of different kinds, to

21   also go to the Boston clinic.  And so Ms. Zarrella observes

22   many other people succeeding in offering and sharing their

23   message outside the Boston clinic.

24        Ms. Zarrella testified that her practice when a

25   woman is walking near her is to ask, "May I help you."  And

1    she also testified that women almost always respond to her

2    typically by saying "no" and continuing to walk but that

3    doesn't indicate that Ms. Zarrella can't communicate her

4    message.  That indicates that the woman has no interest in

5    further conversation which, of course, is that woman's

6    constitutional right.

7          Ms. Zarrella testified that she offers literature

8    and about half the women who go by her take the literature

9    from her.  And so, again, this is another way where she can

10   and does communicate her message on the public sidewalk

11   outside the Boston clinic.

12         Ms. Zarrella is often joined by a woman on Saturday

13   mornings who comes equipped not only with signs but with

14   metal holders that she can place on the sidewalk outside the

15   buffer zone that will hold up the sign while the woman is

16   trying to communicate and converse with people on the

17   sidewalk.  And the sign that that woman usually brings that

18   Ms. Zarrella sees so many Saturday mornings says, "Take my

19   hand, not my life."

20         Ms. Zarrella testified that she regularly sees and

21   can hear other anti-abortion protestors or counselors

22   holding signs, handing out literature, speaking with women

23   walking by on the sidewalk and praying out loud in a group

24   in a manner that Ms. Zarrella standing on the other side of

25   the buffer zone can hear.  So she's not only testified to

1      her own ability to share a message there on the sidewalk

2      outside the buffer zone but observes other people doing it

3      most Saturdays.

4             Your Honor, a third plaintiff who is interested in

5      communicating outside the Boston clinic is Gregory Smith.

6      Mr. Smith wants to pray out loud, typically with others, and

7      be seen and heard by passersby while engaged in prayer, and

8      he successfully does that.

9             He goes there most Saturday mornings according to

10     his testimony.  He typically gathers there with a group of

11     ten or more people and they pray together in unison out loud

12     so that they can be clearly heard by passersby.  That's

13     Mr. Smith's testimony.

14            Mr. Smith, he has a fairly large Crucifix that he's

15     mounted to the top of an eight-foot pole and his practice

16     when he's standing on the edge of the buffer zone praying

17     out loud so passersby can hear him is he'll hold that tall

18     pole with the Crucifix way up high where anyone walking by

19     can see it.  That's what he wants to do.  That's what the

20     law allows him to do and that's what he, in fact, does do.

21            Mr. Smith explained that on the second Saturday of

22     each month, typically a much larger group of people gathers

23     outside the Boston clinic to pray out loud in public and

24     Mr. Smith's practice is he brings on those days a loud

25     speaker with a microphone so that whoever is leading the

1    prayer can use the loud speaker so that their voice can be

2    heard by the entire group of individuals praying there on

3    the edge of the buffer zone but also by anybody passing by,

4    going into the clinic or just going about other business and

5    walking down the sidewalk next to Commonwealth Avenue.

6         Mr. Smith testified that he has frequently, when

7    he's there on Saturday mornings, seen anti-abortion

8    counselors at work on the sidewalk, some holding large signs

9    which he testified typically attract attention.  These signs

10   are not signs that nobody can see, they actually get a

11   response from passersby.  The response is often quite

12   negative, especially if a woman is going into the clinic and

13   is being accompanied by somebody else, a friend, a family

14   member, some companion.

15        It's not unusual according to Mr. Smith's testimony

16   for the companion to react very negatively to the signs of

17   the counselors outside the buffer zone but that only

18   confirms that the message is being heard.  Certainly there

19   is no First Amendment right to force passersby to have a

20   positive response or any response.  There is only the right

21   to offer a message so that willing listeners can receive it.

22   The fact that lots of people react negatively demonstrates

23   that the message is being communicated.

24        Your Honor, the fourth plaintiff whose activities

25   are focused at the Boston clinic is Mr. Eric Cadin.  He,

1    like, Ms. McCullen and Ms. Zarrella, wants to speak with

2    pregnant women ideally who are going to the clinic and try

3    to persuade them not to have an abortion.  He too is

4    successful in striking up conversations on that sidewalk as

5    he wants to do.  His testimony is that most days he's there

6    at least ten people will actually stop and engage in

7    conversation with him.

8         Most other people ignore him or make clear that

9    they don't want to speak with him.

10        **THE COURT:**  What about the testimony that I asked

11   counsel about, where the figures came from, 5 percent, 90

12   percent, do you know what I am talking about?

13        **MR. SALINGER:**  Yes.  Your Honor --

14        **THE COURT:**  Are you getting to that?  Are you going

15   to cover that?

16        If you are, you can wait to do it but --

17        **MR. SALINGER:**  I don't -- I can't really answer the

18   question of where the 5 or the 90 percent comes from.

19        **THE COURT:**  Well, he said it is the testimony of

20   the deponent, whoever --

21        **MR. SALINGER:**  The testimony I have in mind, Your

22   Honor, is testimony about questions from Mr. DePrimo to

23   plaintiffs along the lines of how many times have you seen

24   somebody in the buffer zone and called out to them and they

25   haven't responded or how many times have you seen people on

1       the other side of the buffer zone and they haven't

2       responded.

3               Your Honor, if the numbers that Mr. DePrimo was

4       citing mean anything, we suggest they simply demonstrate

5       that a lot of people, perhaps the vast majority of people

6       who are going to the Boston clinic or these other clinics,

7       simply have no interest in the message that plaintiffs are

8       offering.  That's not indicating that there is some

9       constitutional problem.  That just means that when

10      plaintiffs share and offer their message, a lot of people

11      say no, please, don't bother me or have even more negative

12      reaction.

13              But if I'm right in surmising that the numbers

14      Mr. DePrimo was talking about were based on estimates about

15      how many people do not react, that simply shows that people

16      who can certainly hear and see plaintiffs don't want to have

17      anything to do with them.  That, of course, is the

18      constitutional right of those patients going to the clinic

19      or passersby having nothing to do with the clinic, they

20      don't need to pay attention to plaintiffs' message if they

21      don't want to.

22              What the Constitution asks is very narrow and

23      simply that there be adequate channels of communication

24      available so that plaintiffs can offer their message and

25      willing listeners who want to stop and talk, who want to

1    come out of the buffer zone or in Worcester or Springfield

2    want to leave the private property where they parked their

3    cars and go talk to plaintiffs can do so.

4           But if, in fact, it is the case that most people

5    who go into the clinic have no interest in having that

6    communication, that's not showing a constitutional

7    deficiency.  That's simply the reality that apparently most

8    people encountering many of these plaintiffs don't want to

9    talk to them and have no interest in their message.

10          **THE COURT:**  Okay.  Thank you.

11          **MR. SALINGER:**  Your Honor, the number that I was

12   starting to come up with that prompted your question was the

13   testimony of Mr. Cadin, his experience when he's trying to

14   strike up conversations on the sidewalk by Comm. Ave.

15   outside the Boston clinic.  His testimony is that most days

16   he is there at least ten people will, in fact, stop and

17   converse with him, which is his goal, to have conversations.

18          The vast majority of people walking by are not

19   interested in that conversation but he's able to have

20   conversations with the people who care to and want to stop

21   and talk.  Mr. Cadin also testified that most days he's

22   there and he's offering literature, the kind of literature

23   that plaintiffs' counsel displayed, most days 20 or 30 women

24   will take a pamphlet from Mr. Cadin.

25          And so there, too, he wants to offer up literature,

1    he can do so and people who want to take it, his own

2    testimony confirms those people do take it.

3           Mr. Cadin testified that his ultimate goal

4    persuading pregnant women not to have an abortion, he

5    continues to have success at that despite the change in the

6    buffer zone law back in November of 2007.  His own testimony

7    is that since that time through this work of trying to talk

8    to people on the sidewalk by Comm. Ave., he's convinced at

9    least ten women not to have an abortion.

10          And he's also, he testified, convinced at least

11   five women who had been intending to go to Planned

12   Parenthood instead to go to A Woman's Concern.  So, once

13   again, what he's trying to do he, in fact, is able to do as

14   the Act is applied.

15          I mentioned how there is the larger prayer group on

16   the second Saturday of each month.  Mr. Cadin testified that

17   from time to time he joins that group and engages in a

18   prayer vigil.  And he through his testimony describes the

19   group praying on the edge of the buffer zone, testified that

20   he has from time to time seen people as part of that group

21   holding signs that say things like, "Abortion is murder,"

22   signs that can be read and are read by people passing by on

23   the sidewalk.

24          Your Honor, the fifth bit of evidence that we want

25   to draw your attention to about the Boston clinic comes from

1    Ms. Metzger.  She visited the clinic one day, happened to go

2    on Good Friday in 2010, which I believe was April 2nd.  And

3    on that Good Friday there was quite a large group of people

4    engaged in prayer around the buffer zone.  At least one of

5    the pictures that you saw earlier, there was a very large

6    group of people right on the edge of the buffer zone and you

7    could see in that photo there was a white infant-sized

8    casket on a stand and there was an eight-foot tall wooden

9    cross.  And there was Mr. Smith with his Crucifix on his

10   eight-foot tall pole.  That was a picture that Ms. Metzger

11   took on that Good Friday in front of the Boston clinic.

12        And she testified that when she was there she could

13   easily not only see the prayer group but she could hear what

14   was being said from well across the other side of the buffer

15   zone confirming that people who communicate their message in

16   this fashion can be seen and heard.

17        Ms. Metzger saw quite a few signs that day which

18   she could easily read as she was walking down the sidewalk

19   or even standing on the opposite side of the buffer zone

20   from where the sign was.  The signs said things like,

21   "They're killing babies here," "Abortion exploits women,"

22   "It's a baby, not a choice," "Pregnant, free help for mother

23   and baby," and "Love creates, nourishes and protects your

24   baby's life."  All of these messages were ones that

25   Ms. Metzger could easily and did see and she documented them

1   in photos which are part of the record evidence that has

2   been filed with the Court.

3          Ms. Metzger testified when she was deposed by

4   Mr. DePrimo that as she was walking down the sidewalk that

5   Good Friday morning, several women who she quickly figured

6   out were there to try to engage in anti-abortion counseling

7   called out to her.  They said, "Your baby has a heart beat"

8   And, "Abortion is forever."

9          Now, Mr. DePrimo showed you and described to you in

10  some detail Ms. Metzger's observations about some of those

11  same sidewalk counselors stopping a woman and having a

12  30-minute long conversation with that woman on the sidewalk

13  on the other side of Alcorn Street right in front of the

14  Star Market.  You saw the picture taken by Ms. Metzger.  And

15  Ms. Metzger observed all of this begin to happen, observed

16  it happen.

17         Ms. Metzger happened to be up on the roof of the

18  clinic building taking a few photos about 30 minutes later

19  when she saw two of the women counselors and the woman being

20  counseled cross the street together, get in a car and drive

21  away.

22         And I repeat all of that because I really want to

23  underscore what Mr. DePrimo said in describing all that

24  observation.  He said, and I quote, "This is how pro-life

25  counselors effectively communicate."

1          Well, Ms. Metzger was able the one day she visited

2     to observe pro-life counselors, in plaintiff's words,

3     "effectively communicate," notwithstanding the buffer zone.

4     And as I described, Ms. McCullen, Ms. Zarrella and Mr. Cadin

5     who are trying to do similar kinds of communications can and

6     do have those kinds of conversations there on the sidewalk

7     outside the buffer zone.  And so there are ample alternative

8     channels available in Boston.

9          Turning to the Worcester clinic, Your Honor,

10    Mr. DePrimo is right to emphasize that the Worcester clinic

11    has only been in this location since December of 2009 so

12    whatever happened somewhere else has nothing to do with how

13    the law is being applied in Worcester today.  We're really

14    dealing with the past year and a half or so.

15         As you heard, most patients, unlike in Boston where

16    most patients walk down the sidewalk, in Worcester those

17    patients drive to that clinic.  And you saw various photos

18    with the building with the Planned Parenthood label on top

19    and saw how people drive down Dewey Street, turn into the

20    driveway, there's sort of an L-shaped parking area and

21    that's where they park.

22         I emphasize all of that because, to state the

23    obvious, but the record confirms this, all of that is

24    private property.  And so the inability of plaintiffs to go

25    up to women as they're parking their cars, as they're

1    getting out of their parked car, as they're walking from the

2    parked car to the front door has nothing to do with the

3    buffer zone statute.  If there was no buffer zone,

4    plaintiffs still could not approach patients going to the

5    Worcester clinic who parked their car because that's all on

6    private property.  And so any complaints by plaintiffs that,

7    well, we can't go right up to those women, it's a function

8    of how the property there is configured and the fact that

9    most patients drive to get there.

10          Nonetheless, the testimony of Mr. Bashour and

11   Ms. Clark and some confirming testimony of Ms. Metzger

12   demonstrates that in Worcester as well plaintiffs can and do

13   share their message and willing listeners engage with them

14   whereas unwilling listeners ignore them.

15          Mr. Bashour's practice according to his testimony

16   is to stand on the Pleasant Street side of the clinic, he

17   prefers to stand on the sidewalk on the same side of the

18   street as the clinic building, right on the edge of the

19   buffer zone.  His testimony was he stands in that spot

20   because then even women who are coming from the parking area

21   which is behind the clinic building relative to Pleasant

22   Street up to the clinic door can see him through that metal

23   fence so he positions himself where he can see them and they

24   can see him.  And his practice is from that position to call

25   out offers of help.

1          Ms. Metzger who visited the Worcester clinic on two

2     different occasions, once in September of 2010 and then one

3     more time in July of 2011, both times she ended up parking

4     behind, because that's what Mr. Bashour was describing,

5     walking from her car to the building door and she could hear

6     people calling out to her from Pleasant Street in the

7     general area where Mr. Bashour stands.  So the evidence

8     confirms that when Mr. Bashour calls out with offers of

9     help, he can be heard.

10          Any person who wanted to come out and speak with

11     him could do so.  He testifies that that basically never

12     happens; but, again, nobody has to talk to Mr. Bashour.

13     That's their constitutional right.

14          Now, Mr. Bashour said, you know, some people

15     approached the clinic on foot and typically they will go in

16     through that entrance gap through the metal fences that you

17     saw in the pictures.  And when people walk by him, he tries

18     to make offers of help.

19          Mr. Bashour testified that women who pass by him on

20     the sidewalk, it's clear that they hear his offer but they

21     almost always make it clear to him that they have no

22     interest in talking to him.  So he is able to convey his

23     message but the listeners are not interested.  That's their

24     right.  It does not demonstrate a violation of the First

25     Amendment.

1        Nonetheless, Mr. Bashour testified that since

2   Planned Parenthood moved its Worcester clinic to this

3   location in December of 2009, through his work from the

4   sidewalk next to Pleasant Street he has helped to convince

5   five or six women not to have an abortion.  Further evidence

6   that he is, in fact, able to share his message and have the

7   kinds of communications that he says he is looking for.

8        Mr. Bashour testified that when he's outside the

9   clinic, he offers literature.  Some people do take it.  Most

10  refuse to.  But he is able to and does attempt to

11  communicate in that way.

12       Mr. Bashour when he is there, he has seen other

13  protestors or counselors who are present holding

14  anti-abortion signs that he can read.  And he has noticed

15  that those signs typically elicit reactions from passersby.

16  Sometimes positive reactions, sometimes quite negative

17  reactions, but the signs are, indeed, an effective way to

18  communicate.  People see them and they respond to them.

19       And Mr. Bashour also testified that on various

20  occasions he has seen and heard large groups of people

21  standing outside the buffer zone near the Worcester clinic

22  praying out loud in a way that passersby can hear them.

23       Plaintiff Nancy Clark is also interested in

24  speaking with women outside the Worcester clinic.  Her

25  practice is also to stand on Pleasant Street but she prefers

1    to stand instead of where Mr. Bashour does on the side of

2    the street next to the clinic building, she likes to stand

3    across the street.  And her practice is to call out offers

4    of help.

5           Now, Mr. DePrimo correctly pointed in his closing

6    argument to Ms. Clark's testimony that only about one

7    percent of the women she calls out to will cross the street

8    and come talk to her.  Your Honor, we think that that fact

9    has significance that Mr. DePrimo is not acknowledging.  It

10   shows that women who hear Ms. Clark calling out hear her

11   message and, in fact, want to talk to her will do so.

12   Perhaps 99 percent of the women who hear the offer of help

13   aren't interested, they don't want help from Ms. Clark.  But

14   people who hear her and want to engage in conversation with

15   her, not only are they free to do so but Ms. Clark's

16   testimony confirms that, in fact, they do do so.

17          Ms. Clark testified that since December of 2009 she

18   has convinced at least four women who were heading to the

19   Planned Parenthood clinic instead to go across the street to

20   the Problem Pregnancy organization.  Ms. Clark also

21   testified that sometimes, not always but sometimes she'll

22   hold a sign and she gets lot of reactions, typically very

23   negative.  Again, she's communicating a message.  She's just

24   not getting the reaction that she wants.

25          But Ms. Clark at her deposition recalled a time

1    where she was standing across the street from a clinic with

2    her sign and a young woman who had been inside the clinic

3    building came out, crossed the street to where Ms. Clark was

4    standing and asked about the sign, asked why Ms. Clark was

5    holding the sign and got into a conversation with Ms. Clark.

6        And according to Ms. Clark's testimony, as a result

7    of that conversation, the young woman decided not to return

8    to the Planned Parenthood clinic.  So further confirmation

9    from Ms. Clark herself that she can convey her message and

10   that listeners who want to respond positively can and will

11   do so.

12       Ms. Clark testified that she can and does hand out

13   literature on the sidewalk and she, like Mr. Bashour, has

14   seen large groups pray out loud outside that buffer zone in

15   a way that anyone passing by can hear.

16       Both Mr. Bashour and Ms. Clark gave testimony of

17   seeing a gentleman who typically goes to the Worcester

18   clinic Thursday mornings, he dresses up as death or the Grim

19   Reaper.  He's got a long-handled scythe, maybe six or seven

20   feet.  There are photos in the record.  You will be able to

21   see them yourself, Your Honor.  He wears a black cloak, a

22   hood and a cloak that goes down to ground level.  He has

23   what appear to be white gloves and a white face.

24       And Ms. Bashour, I'm sorry, Ms. Clark and

25   Mr. Bashour, in their declarations, they take pains to

1   distinguish what, the message they're trying to communicate

2   from what they believe the figure of death, the Grim Reaper

3   is trying to communicate.  And they say that they think that

4   gentleman is trying to communicate a message of, to use

5   their words, "death and judgment," and that's not what

6   they're trying to communicate.

7          But, Your Honor, what this evidence shows is that

8   this someone like the Grim Reaper character who wants to

9   convey a message of death and judgment outside the Worcester

10  clinic is able to do so notwithstanding the buffer zone

11  legislation being applied and he's able to do it quite

12  effectively from just his presence there.

13         I mentioned two visits by Ms. Metzger confirming

14  that these messages can be seen and heard so a little bit

15  more detail about those.

16         The first visit in September of 2010, that was the

17  first time Ms. Metzger had been to the clinic.  And when she

18  turned onto Dewey Street, she wasn't quite sure where the

19  entrance to the clinic parking lot, where that driveway was.

20  You might recall from the photos immediately on the corner

21  of Pleasant and Dewey Street there is another property.

22  There is a little parking area there.  That's not the

23  Planned Parenthood clinic property.  The clinic building is

24  adjacent going up Pleasant street to that building and the

25  driveway is just past that property.

1          Well, that day Ms. Metzger paused in her car to try

2     to figure out where she was supposed to turn and immediately

3     two women approached the car, one on each side, offering

4     literature and offering help and they thrust four different

5     kinds of pamphlets through the windows of Ms. Metzger's car.

6     Those pamphlets are in evidence along with Ms. Metzger's

7     testimony explaining them.

8          Ms. Metzger then drove on in through that driveway

9     that you saw the pictures of and she parked in that private

10    parking area and walked from there to the actual door of the

11    building.  And as she did so, she could hear women calling

12    to her from the Pleasant Street side, from the other side of

13    those metal fences, calling out to her, "We love you,"

14    "Please come talk to us," and, "There are other options."

15    And Ms. Metzger testified to all of that.

16         Ms. Metzger returned one other time to the

17    Worcester clinic July of this year.  She happened to see the

18    Grim Reaper figure that day.  That's why there are photos in

19    the record.  She saw protestors holding signs outside both

20    the Pleasant Street and the Dewey Street buffer zones which

21    she could easily read not only as she was coming down the

22    street but she could read one of the signs which said, "God

23    loves you, Mom and Dad" when she was in the parking lot near

24    Dewey Street there because the person holding the sign was

25    directly across the road.  The other sign she saw read,

1    "Abortion is a bad sin."

2           That day after she parked, she could see the signs

3    from the parking lot.  She also testified that she could

4    hear protestors calling out to her while she was in the

5    parking lot.  She then went into the clinic building and

6    when she left a little while later that day and she was

7    still on the private property but just coming out the door,

8    she could hear a woman yelling from across the street where

9    Clark stands and, indeed, it may have been Ms. Clark because

10   we saw a photo earlier of that scene.  Mr. DePrimo said that

11   one of the three women standing there was Ms. Clark.

12          But my point is that Ms. Metzger as she came out

13   the door could hear a woman calling from across Pleasant

14   street saying, "Anything you need, we can help you, come

15   across the street."  So this confirms that when someone

16   stands where Ms. Clark prefers to and calls out the sorts of

17   things that she does, people who are going into or coming

18   out of the actual clinic building can hear that and if they

19   wish to follow up on the offer of help or information, they

20   easily can go across the street.

21          Ms. Clark's testimony, as we discussed, is perhaps

22   one percent of the people actually do that, which, you know,

23   there are some fields, telemarketing and others that would

24   think a one percent response rate is quite positive.

25          But the point for the narrow question before the

1    Court is that notwithstanding application of the buffer zone

2    statute at the Worcester clinic, plaintiffs and others can

3    and do successfully share their message in a way that it can

4    be heard by willing listeners who are going to or leaving

5    the Worcester clinic.

6         The Springfield clinic --

7         **THE COURT:**  What about the percentage of people who

8    are unable to get the message?  I mean, is that interwoven

9    in this case somehow?

10        **MR. SALINGER:**  Well, actually, Your Honor, there is

11   no evidence that people are unable to get the message.  I

12   think what you have in mind is Mr. DePrimo arguing, well,

13   nobody ever comes out of the parking lot to talk to

14   Mr. Bashour and only one percent of women who are called out

15   to by Ms. Clark are willing to cross the street to talk to

16   her.  Well, that doesn't mean they haven't gotten the

17   message.  That means that almost all of the women who get

18   the message are not interested in having further

19   communication.

20        Ms. Metzger's testimony, what she could see and

21   what she could hear from the parking lot and as she walked

22   from the parking lot to the door of the building, what she

23   could see and hear as she was leaving the building confirms

24   that the messages that are being called out are received.

25        The fact that most people don't respond in a way

1    that plaintiffs want to respond to them doesn't demonstrate

2    any sort of constitutional violation because, of course,

3    plaintiffs don't have a constitutional right to compel

4    everybody going to or leaving the clinic, in fact, to pay

5    attention to them.  They don't have a right to compel people

6    to come to them and have a conversation from a few feet

7    away.  They do have the --

8         THE COURT:  I understand that argument but there is

9    a legitimate position that you are not supposed to draw

10   those boundaries to reduce the opportunities for success of

11   the plaintiffs.  Isn't that a fair --

12        MR. SALINGER:  The -- well, let me answer in terms

13   of the facts, Your Honor, since I think that's perhaps what

14   would be most useful.

15        The fact is that on the Pleasant Street side,

16   whether there is a buffer zone there or not, after one, a

17   pedestrian goes from Pleasant Street and walks through that

18   entranceway in the fence up to the clinic door, that's all

19   private property where, whether there is a buffer zone or

20   not, plaintiffs can't go to.

21        The fact that most patients who drive there, and

22   most of them do, come off of Dewey Street and then park in a

23   place in a private parking area that is behind buildings

24   and, thus, there is not a direct line of sight either from

25   Dewey Street or from Pleasant Street, that's not a creation

1     of the statute.  That's not some unconstitutional state

2     action.  That just happens to be the layout of private

3     property.  That also would be true whether the buffer zone

4     statute existed or not.

5          And, similarly, Mr. DePrimo was depicting some

6     calculations that measured a straight line distance if you

7     were on the edge of the driveway on Dewey Street and you

8     were trying to figure out how far away the furthest parking

9     spot was, I think he had calculated that to be something

10    like 325 feet.  But, again, that's not caused by the buffer

11    zone statute.  That's just the layout of this private

12    property that with the buffer zone statute or without the

13    buffer zone statute plaintiffs would not be allowed to go

14    into that parking lot.

15         So all that the buffer zone does in Worcester is,

16    around the driveway, it makes sure that the driveway is free

17    and clear and people who want to keep going can do so.

18    Ms. Metzger testified, and she's got some photos, that, you

19    know, if somebody chooses, as some protestors do, to stand

20    on the edge of the buffer zone sort of opposite the driveway

21    entrance or just as one who is driving down Dewey Street and

22    a patient is slowing down to make that turn to the driveway,

23    the passenger side door is just a few feet away from

24    somebody standing on the sidewalk outside the buffer zone.

25         And so if there was a willing listener who saw

1    somebody and said, oh, I'm really interested, here's

2    somebody who is offering help, I want to stop and talk to

3    them, they could stop.  They could put down their window and

4    accept literature.  They could pull over and have a

5    conversation.

6         All that plaintiffs have shown is that the vast

7    majority of people going to the clinic, they're going to the

8    clinic for some sort of medical service.  It's usually not

9    abortions.  Sometimes it is an abortion procedure.  But

10   they're not interested in accepting offers of help from

11   plaintiffs or others.  And so the buffer zone statute is not

12   interfering with the conveyance of a message and the mere

13   fact that a lot of people don't want to hear the message,

14   that's their choice but it has nothing to do with the buffer

15   zone.

16        **THE COURT:**  Okay.  Go ahead.  Thank you.

17        **MR. SALINGER:**  So turning to the Springfield

18   clinic, if I may.

19        First, let me clarify, I'm not sure it actually

20   matters for the case but in terms of the number of buffer

21   zones, remember that the Act itself does not automatically

22   bar anybody from going anywhere.

23        But what the statute now provides is that it's

24   permissible to have a buffer zone around a driveway or a

25   clinic entrance or exit but in order for the limitations of

1   the Act to take effect, the buffer zone needs two things.

2   It has to be clearly marked, you know, like one of these

3   painted arcs, and it has to be posted so people know what

4   that means.

5        And the parties have stipulated that although there

6   are arcs, some fresh, three of them not so fresh, drawn or

7   marked in some way around all five of these entrances, only

8   at two of the entrances are they posted so we're only

9   talking about two buffer zones under the Act.

10       Of course, to state the obvious, we're dealing with

11  an as applied challenge.  Well, the Act as applied in

12  Springfield right now, there may be arcs drawn around the

13  other three but if they're not posted, then they do not

14  constitute buffer zones under the statute.

15       None of the plaintiffs have been arrested or

16  proclaimed that a police officer has ever even spoken to

17  them and asked them to leave an area under the new buffer

18  zone.

19       But just to clarify, in Springfield we're talking

20  about two clearly marked and posted buffer zones.  One is on

21  Main Street.  There are three driveway entrances and I

22  believe the middle one has a clearly marked and posted

23  buffer zone and on Wason Avenue the second driveway in as

24  you're driving from Main Street.  And that's the entrance

25  that the record shows us, that's the entrance that clinic

1   patients will typically use because that's the closest

2   entrance to the building that houses the Springfield clinic.

3           The distance the record shows between the front

4   door of that building and the public sidewalk of Wason

5   Avenue is just over 200 feet.  And so even more so than at

6   the Worcester clinic, a lot of what you heard this morning

7   from the plaintiffs about the Springfield clinic is, well,

8   there is no way to approach people as they get out of their

9   cars and go to the door.  There is no way to be sure who is

10   going to the clinic.  None of that is a result of the Act.

11   It's a result of the fact that this is all private property

12   and there are fairly expansive parking lots that separate

13   the public roadway from the building where the clinic is

14   located.  But those facts cannot make the statute as applied

15   unconstitutional.  That's simply the fact that private

16   property is private property.

17           There is one plaintiff, Dr. Shea, who is interested

18   in communicating around the Springfield clinic and his

19   testimony is that what he wants to do is wear a sign, you

20   saw photos, the sign on a rope around his neck that says,

21   "They're killing babies here."  And according to Dr. Shea's

22   later declaration he wears that sign in the hope that it

23   will encourage people going to the clinic to stop and have

24   conversations with him and seek help from him.

25           There is no doubt that Mister -- I'm sorry --

1   Dr. Shea effectively communicates with his sign.  His own

2   testimony is that many people react to his sign,

3   occasionally positively.  Many times he gets negative

4   reactions but he's able to have that communication.

5          Dr. Shea, of course, is not the only anti-abortion

6   protestor or counselor who spends time outside the

7   Springfield clinic.  Dr. Shea sees others and his own

8   testimony, he estimates that as much as 5 percent of the

9   time people who come off of Wason Ave. or parking outside

10  the clinic will come out and talk to somebody on the

11  sidewalk who is holding a sign offering help.

12         Now, as you heard, Dr. Shea testified that nobody

13  comes and talks to him.  We don't know.  Maybe that's a

14  function of the fact that he's chosen to wear a sign that

15  says, "They're killing babies here," the sort of thing that

16  Mr. Bashour and Ms. Clark says is a message of death and

17  judgment rather than a message of help and counseling.

18  Maybe others who have signs offering help and counseling are

19  more likely to convince people who want to converse with

20  them to leave the parking lot and do so.

21         But Dr. Shea and others have those opportunities

22  and the buffer zone is not interfering with them.

23         Ms. Metzger visited the buffer zone or visited the

24  Springfield clinic once and when she did, she saw a number

25  of protestors right on the edge of the buffer zone near that

1    Wason Avenue entrance.  She noted a sign that said, for

2    example, "Abortion hurts women.  Choose life."  She saw

3    somebody else holding a large picture of the Virgin Mary and

4    these people were waving to people driving by.  And so that

5    also confirms that somebody who is going to the clinic as

6    Ms. Metzger was can, in fact, as they're driving by see and

7    read these signs.

8           Now, Mr. DePrimo on behalf of Dr. Shea articulated

9    a concern that sometimes what Dr. Shea wants to do, instead

10   of standing near the place where he knows clinic patients

11   are most likely to go, what he wants to do is walk down the

12   sidewalk and he can't walk through the buffer zone while

13   displaying his sign.

14          Well, although that may be true, of course he could

15   choose to walk through the buffer zone to get to the other

16   side, the clear exemption for that.  Not only that --

17          **THE COURT:**  With the sign?

18          **MR. SALINGER:**  All he would have to do is turn the

19   sign around so it's facing him rather than --

20          **THE COURT:**  Okay.

21          **MR. SALINGER:**  And if he wants to do that, he can.

22   If he doesn't want to, he doesn't have to.

23          So to summarize our affirmative case before making

24   a few quick rebuttal points, Your Honor --

25          **THE COURT:**  Are you going to talk about the

 1    multitask building that is there?

 2          **MR. SALINGER:**  Well --

 3          **THE COURT:**  And what the practical as well as

 4    constitutional implications might be?

 5          **MR. SALINGER:**  Your Honor, I'm struggling a little

 6    bit because this is a new argument that we hadn't heard

 7    before today.  But I wasn't hearing any constitutional

 8    import.  Of course, the one claim left is a constitutional

 9    claim --

10          **THE COURT:**  I thought he cited a case where they

11    said that a multitask building is suspect.

12          **MR. SALINGER:**  He cited a recent Ninth Circuit case

13    that he mostly cited for reasons that disagreed with First

14    Circuit precedent.  That's a different issue which I'll turn

15    to in a moment, if I may.

16          We're going to go back and reread this new Hoye

17    case in the Ninth Circuit.  And if I can better answer Your

18    Honor's question with a short written submission, I will do

19    so.

20          But my main point I think in response, Your Honor,

21    is the difficulty that Dr. Shea or anybody else would have

22    in being able to tell who was a clinic patient or visitor as

23    opposed to somebody going to visit some other business in

24    the building wouldn't be any different if there was no

25    buffer zone there.

1          If Dr. Shea stood right next to the driveway, as he

2     says that he wants to, he still would have no idea who of

3     the many people driving by him and parking on private

4     property and going into a private building is going to the

5     clinic versus not going to the clinic.  So it's hard to see

6     given the factual circumstances at issue here where

7     Dr. Shea's testimony and Ms. Metzger's testimony makes clear

8     that he has the ability to convey a message either to people

9     driving by or to people in the parking lot from the public

10    sidewalk outside the buffer zone.

11         **THE COURT:**  You are saying he just can't know who

12    his audience is.

13         **MR. SALINGER:**  That's right.  That would be true

14    with or without the buffer zone.  That wouldn't be changed

15    by the buffer zone.

16         **THE COURT:**  All right.

17         **MR. SALINGER:**  But we will reread the Ninth

18    Circuit's decision and if we could provide more help for

19    legal guidance, we'll do so promptly.

20         **THE COURT:**  We will welcome it, thank you.

21         **MR. SALINGER:**  Your Honor, as I tried to make clear

22    in this summary, each of the plaintiffs, their own testimony

23    confirms that the kind of communications, the kind of

24    message they want to offer, they can offer them, they do

25    offer them.  The messages are heard outside the clinics and

1    people who happen to be passing by or people going to the

2    clinic or leaving the clinic who want to follow-up and

3    engage with the plaintiffs, not only can they do so, as Your

4    Honor found during the first phase of this case, you made

5    findings that the Buffer Zones Act is constitutional on its

6    face because there were all these opportunities to

7    communicate.

8         But, in fact, the record evidence demonstrates that

9    those communications happen where there is a willing

10   listener.  They don't happen where the passerby or the

11   person going to the clinic hears the offer of help or sees

12   the sign and wants to have nothing to do with it.  That's

13   not some unconstitutional result of the Act.  That instead

14   reflects the listener's constitutional right to turn away

15   from the message and say, no, please leave me alone, I'm not

16   interested.

17        Your Honor, I'm going to shift, if I may, to a few,

18   what I call rebuttal points.  A lot of plaintiffs'

19   affirmative case that was, as it was presented this morning

20   is about the extent to which the buffer zone statute

21   constrains the time or place in which plaintiffs can offer

22   their message.

23        First of all, Your Honor, that, of course, is true

24   of any time, place or manner restriction.  If there were a

25   law that didn't restrict speech at all, the First Amendment

1    would never be implicated and we wouldn't be here.  The mere

2    fact that a time, place or manner restriction restricts

3    speech doesn't make it unconstitutional.

4           The one remaining issue, since it's already been

5    decided by this Court and then on appeal by the First

6    Circuit that the statute is content neutral and that it

7    serves a substantial governmental interest in enhancing

8    public safety, Your Honor ruled in December the one

9    remaining question is the adequacy of alternative avenues of

10   communication.  And so I just want to underscore again the

11   reference I started with to this First Circuit decision

12   Sullivan versus Augusta which in turn cites quite a number

13   of earlier decisions.

14          Sullivan is a 2007 decision.  And the court

15   emphasized there that the question on this prong of

16   intermediate scrutiny for a time, place and manner

17   restriction, the question is whether the remaining avenues

18   of communication are adequate, not "whether a degree of

19   curtailment of speech exists."

20          Plaintiffs, their case is about the second part,

21   the thing that the First Circuit says is irrelevant.  They

22   say, well, there are ways in which the buffer zone statute

23   as applied curtails our speech because what we really want

24   to do is everything we're doing now but we want to do it

25   standing right next to the clinic entrance or right next to

1    the driveway or right next to the spot in Worcester where

2    the walkway leaves the public sidewalk.

3         Your Honor, that's not an as applied challenge.

4    That's the issue that the Court already decided and the

5    First Circuit already decided in terms of the facial

6    challenge.  There is no constitutional right for the

7    plaintiffs to stand there, at least where, as in this case,

8    standing outside the buffer zone still enables them to offer

9    up their message in a way that it can be heard by people and

10   willing listeners can respond to it.

11        I know you're familiar not only with this case but

12   with the prior buffer zone cases.  I do want to just correct

13   a point that was made by plaintiffs' counsel about the

14   Madsen case.  Mr. DePrimo was wanting to draw the Court's

15   attention to the total length of buffer zones drawn on the

16   ground at the Boston, Worcester or Springfield clinics, how

17   long they were and he kept contrasting it with the Supreme

18   Court's Madsen decision where he said there the court only

19   approved a 36-foot buffer zone.

20        But, Your Honor, the 36-foot buffer zone in that

21   case, unlike here where the buffer zone just gets drawn

22   around a driveway or an entrance, there the 36 feet was

23   around the entire property line.  And so if in Madsen one

24   had done what Mr. DePrimo is asking the Court to do in this

25   case and measure the buffer zone from one end all the way to

1   other, it would have been many hundreds of feet.  That was a

2   much larger buffer zone than what's at issue in this case.

3   And it was upheld by the United States Supreme Court.

4        But there is a non-buffer zone case that I wanted

5   to draw the Court's attention to.  And this is Heffron

6   versus International Society for Krishna Consciousness case,

7   a 1981 decision by the United States Supreme Court.  And it

8   had to do with the Minnesota State Fairgrounds.  The ISKCON,

9   the Krishna Group, what they wanted to do at the fair was to

10   sell literature.  And the fair rules said, well, you can

11   only offer things for sale if you buy a booth and you make a

12   sale from a fixed location.

13        The case went up on First Amendment grounds to the

14   First Circuit and the First Circuit held that as applied

15   this was not an unconstitutional restraint of speech even

16   though what the plaintiffs wanted to do was go anywhere on

17   the fairgrounds and offer literature for sale and they could

18   not do that.  The court said, that's okay, they had adequate

19   and ample alternative channels of communication.  They could

20   sell literature from a booth on the fairgrounds.  They could

21   sell literature outside the fairgrounds to people going to

22   or leaving the fair, or they could go anywhere they wanted

23   on the fairgrounds, talk to people and try to convince them

24   to come to the booth to buy literature.

25        Plaintiffs said, well, we don't want to do those

1    things.  We want to walk around the fairgrounds selling

2    literature.  And the Supreme Court held just because you

3    can't communicate in a precise way and a precise location

4    that you want to, that does not make a time, place or manner

5    restriction unconstitutional where you have adequate

6    alternative ways to communicate.

7          And the evidence confirms that in this case

8    plaintiffs had adequate alternative ways to communicate.

9          A second rebuttal point, Your Honor.  The

10   plaintiffs again today were talking about their desire to

11   interact from a normal conversational distance.  This

12   probably sounds familiar to Your Honor because you dealt

13   with it during the facial challenge.  You held and then the

14   First Circuit held that there is no First Amendment right to

15   position yourselves so that everybody going to a clinic has

16   to pass within a few feet of you so that you can guarantee

17   that everybody at least for a moment is within a normal

18   conversational distance.

19         But, furthermore, the evidence in this case, as

20   I've summarized for Your Honor, shows that there is nothing

21   about the Act as applied that bars plaintiffs from

22   interacting with willing listeners, and often with unwilling

23   listeners in Boston, from just a few feet away.  And anybody

24   who wants to in Boston stop on the sidewalk and have a

25   conversation or in Worcester or Springfield, anybody who has

1    parked on private property who wants to go out and have a

2    conversation from a few feet away can do so and plaintiffs'

3    own testimony indicates from time to time people do do so.

4         What plaintiffs cannot do, however, and Your Honor

5    made this ruling in December, plaintiffs can't retry or

6    reargue the findings that this Court and the First Circuit

7    has already made in this case with respect to there being no

8    absolute right to position oneself from a normal

9    conversational distance and force even people who really

10   have no interest in talking to you to pass very close to you

11   as they're trying to get into a clinic entrance.

12        The third point, Your Honor, I've touched on a few

13   times but I just want to highlight it as a rebuttal point,

14   the distinction I keep making that the law makes between

15   willing and unwilling listeners.  The Supreme Court has said

16   over and over that the First Amendment gives the listener

17   the right and some burden to pay no attention if they don't

18   want to hear the message.

19        Many of the practical complaints articulated this

20   morning by the plaintiffs really are nothing more than

21   people who hear offers of help, don't want to hear anything

22   else, don't want anything to do with the plaintiffs.

23   Unwilling listeners, Your Honor, are free to do that.  And

24   the dismay by the plaintiffs that there are just a lot of

25   people who are going to these clinics who don't want to hear

1     the message, the help, the anti-abortion message that

2     plaintiffs and others are offering does not demonstrate a

3     First Amendment violation.

4           Fourth rebuttal point, Your Honor, and I have seven

5     in total in case you're wondering how long I'm going to go

6     on.  We're halfway there on the rebuttal points.

7           Mr. DePrimo brought the Court's attention to

8     concerns that if one stands in the middle of the street, on

9     Alcorn Street, that could be unsafe because there is traffic

10    moving by.  And he showed some pictures of pedestrians

11    crossing over and cars stopped waiting for them to cross.

12          Your Honor, the Act as applied doesn't require or

13    force anybody to stand in the middle of moving traffic.

14    Plaintiffs are smart and reasonable people and have the

15    common sense to know that one should stand on the sidewalk

16    if you're trying to converse with people going by.  And the

17    Boston clinic where this is really, this complaint is really

18    focused on, as I explained earlier, there is plenty of space

19    that plaintiffs can and do use in safety on the sidewalk to

20    converse.

21          If they are positioning themselves in the middle of

22    Alcorn Street, that side street next to the Boston clinic,

23    that's not something they're being forced to do by the Act.

24    Perhaps what plaintiffs are implicitly trying to do is

25    reargue a different finding that this Court and the First

1    Circuit has already made and that's the finding that the Act

2    serves the substantial interest in enhancing public safety.

3    Perhaps they're trying to say, no, the Act as applied

4    doesn't increase public safety, it makes things less safe

5    because it's telling us to go stand in the middle of moving

6    traffic.

7          Well, they can't as a matter of law retry that

8    point and factually the assertion that the Act is forcing

9    them to go stand in traffic is just wrong.

10         Fifth rebuttal point, Your Honor, and this has to

11   do with the supposed behavior or misbehavior of the Planned

12   Parenthood escorts outside the Boston clinic on Saturday

13   mornings.

14         I say Saturday mornings because the record

15   indicates that's when the escorts were there.  They're there

16   because, as I mentioned, Saturdays is the day that attracts

17   large numbers of protestors to the sidewalk outside the

18   clinic.

19         Your Honor, Ms. Zarrella, the testimony that she's

20   given in this case is very similar, in some respects it's

21   word for word identical to testimony she gave in a prior

22   case already decided by the First Circuit, the McGuire case

23   where she's also a plaintiff.

24         And here's the point where I said that Ninth

25   Circuit case Hoye based on Mr. DePrimo's reading of it is

1        inconsistent with First Circuit precedent.  Mr. DePrimo as I

2        understood it said Hoye stands for the proposition that if a

3        clinic escort is somehow misbehaving, then that constitutes

4        action of the state that can violate the First Amendment.

5                Well, the First Circuit rejected that position in

6        McGuire II.  I thought Mr. DePrimo said McGuire was only

7        dealing with the prior version of this Act on its face and

8        not as applied.  If that's what I heard, that's incorrect.

9                McGuire I, the first decision by the First Circuit,

10       was only a facial challenge.  McGuire II was a reprise of

11       the facial challenge and also dealing with the Act as

12       applied.

13               And the court explained in some detail and

14       eloquently why the concerns raised by Ms. Zarrella there and

15       raised again in this case by Ms. Zarrella don't demonstrate

16       that the Act as applied is unconstitutional.

17               The First Circuit said that what was being

18       described sounded like private jousting between private

19       parties but that that's not state action.  And even if

20       clinic escorts are misbehaving, as a matter of law that does

21       not demonstrate, cannot demonstrate that the government is

22       violating the First Amendment.

23               Your Honor, furthermore, this Court has already

24       ruled in the first phase of this case that on its face the

25       buffer zone statute does not permit advocacy of any kind in

1    the zone.  This Court ruled that the exemption that allows

2    employees to remain within the zone does not allow the

3    clinic escorts with pro-choice viewpoints to express their

4    views in the zone.

5         If there were escorts who were doing that in

6    violation of the Act, going back to the First Circuit's

7    ruling in McGuire II, the First Circuit held a violation of

8    the Act by a private party can't make the statute

9    unconstitutional.  And that's really just, plaintiffs are

10   trying to retry and reargue the point that at least one of

11   them, Ms. Zarrella, already tried and lost in the McGuire

12   case.

13        There is no longer any claim of viewpoint

14   discrimination in this case.  Your Honor, back in December

15   you granted the defendants' motion for judgment on the

16   pleadings on Counts 2 through 8 and one of those claims was

17   the claim that the exemption for clinic employees as applied

18   constitutes impermissible viewpoint discrimination.  That

19   claim is already out of the case because Your Honor ruled

20   the allegations in the complaint that there was misbehavior

21   by clinic escorts couldn't demonstrate viewpoint

22   discrimination given the ruling in McGuire II in the absence

23   of an allegation that police were, had -- knowing about this

24   and were selectively enforcing the law preventing plaintiffs

25   from engaging in advocacy within the zone but allowing,

1    knowingly allowing the escorts to do so.

2           Your Honor, the evidence that has been presented by

3    the plaintiffs on this point is no different, no more robust

4    than the allegations that Your Honor has already determined

5    failed as a matter of law, although Mr. Cadin and

6    Ms. Zarrella each recalled, to use their wording, Occasions

7    where a police officer was present but did nothing, close

8    quote.

9           There is no evidence in the record that either of

10   them ever complained to police, that police were ever aware

11   of any unlawful advocacy by escorts within the zone or that

12   police knowingly were allowing behavior by clinic escorts

13   that they were forbidding by plaintiffs or other

14   anti-abortion counselors or protestors.

15          So exactly like in McGuire II and exactly like this

16   Court's ruling in this case in granting the motion for

17   judgment on the pleadings on this claim, all of this

18   evidence of what clinic escorts may or may not be doing does

19   not establish a claim of viewpoint discrimination and it's

20   irrelevant to the one issue that's left in the case which is

21   the adequacy of alternative channels of communication.

22          If there were, as Mr. DePrimo tried to suggest,

23   some interference by private individuals, like clinic

24   escorts, the First Circuit has already held in McGuire II

25   that can't establish that the statute, either on its face or

1       as applied, is unconstitutional.

2              Your Honor, my last two rebuttal points I think are

3       each quite short.  One has to do with the fact that it snows

4       in Massachusetts.  You saw pictures about piles of snow near

5       the Worcester and Springfield clinics this winter.  There

6       was a lot of snow this winter.  There was a lot of snow

7       everywhere.  There was snow inside the buffer zone.  There

8       was snow outside the buffer zone.  That doesn't mean the Act

9       as applied is unconstitutional.

10             And we actually managed to find a case that

11      basically says that, a Second Circuit case.  It happens to

12      be involving a time, place or manner restriction that said

13      street musicians can play in subway stations but they can't

14      use amplifiers.  And given the noise levels down there the

15      plaintiffs are saying, well, that's no good.  And the

16      Metropolitan Transit Authority, part of their response was,

17      well, there are adequate alternative channels of

18      communication.  Go above ground and play wherever you want

19      in public places.

20             Plaintiffs argued, well, that's not adequate

21      because, you know, it rains and it snows and there are a lot

22      of times we just can't be out and play music.  And the

23      Second Circuit held as a matter of law that the fact that

24      inclement weather happens and can make an alternative

25      channel less desirable does not mean that the alternative

1    channel is inadequate constitutionally.

2          But in any case, here, since we're -- everything is

3    above ground, it's even easier than the Second Circuit case

4    because whether there was a buffer zone there or not, the

5    snow piles are the snow piles and the Act just has nothing

6    to do with it.

7          Your Honor, finally, plaintiffs are arguing a very

8    small question of state law that has nothing to do with the

9    one remaining federal constitutional question.  This has to

10   do with the Worcester clinic.  Plaintiffs you heard this

11   morning are saying that the buffer zone on the Pleasant

12   Street side they contend is not allowed under the Act

13   because they contend that the walkway going through that

14   narrow gap in the metal fences is not an entrance, only the

15   actual door to the building is an entrance and so the buffer

16   zone shouldn't be there.

17         And as you will see when you review our findings,

18   we make two main -- ask the Court to make two main findings

19   in response, we make two main points in response.

20         No. one, first it's not so obvious that plaintiffs

21   are right.  The Act doesn't define "entrance."  It certainly

22   doesn't define it as a door of the building.  In the normal

23   meaning of the word "entrance," an egress that allows access

24   would seem to cover not just a door in a building but that

25   narrow gap in the fences that people have to walk through.

1     But our main point is this is beside the point.

2              First of all, it's a question of state law, not a

3     question of federal constitutional law.

4              Secondly, there has never been a claim in the

5     complaint or the amended complaint that any buffer zone as

6     drawn violates the Act.

7              And, thirdly, the record evidence demonstrates that

8     none of the defendants in this case, neither Attorney

9     General Coakley nor the three District Attorneys for Suffolk

10    and Worcester and Hampden Counties have any responsibility

11    for the drawing of buffer zone lines.  That's done by local

12    municipal officials, typically Public Works people.  So if

13    they had a claim, it would be a state law claim.  It

14    wouldn't be against this defendant and it's certainly not

15    part of this case.

16             And so the Court doesn't need to decide whether

17    they're right or not in order to resolve the one narrow

18    remaining question, which is are there adequate ways for

19    plaintiffs outside the buffer zone near the Boston,

20    Worcester and Springfield clinics to offer their message in

21    a way that passersby can see it and hear it and if the

22    passersby want to stop and get literature from plaintiffs or

23    want to converse with them or want to ask Dr. Shea to tell

24    them why he's wearing the sign that says, "They're killing

25    babies here," can they do that?  The evidence shows that

1    they can.

2            And so, Your Honor, given the prior ruling in this

3    case, given what the record evidence shows, we're asking the

4    Court to declare that the Act not only on its face but also

5    as decided in this phase as applied is constitutional.

6            **THE COURT:**  Thank you.

7            Do you want to be heard some more?

8            **MR. DePRIMO:**  Thank you, Your Honor.

9            An as applied challenge considers the facts in real

10   life.  Snow is part of real life.  Escorts is part of real

11   life.  Moving traffic is part of real life.

12           I'm going to address counsel's points I think in

13   reverse, it may be easier.

14           With respect to the Worcester clinic, the

15   government says that it's not relevant whether or not the

16   walkway is an entrance or not and that that buffer zone is

17   really just a question of state law that the Court need not

18   address.

19           The question in this case, the only remaining issue

20   in this case is whether there exists ample alternative

21   avenues of communication.  By the way, the standard is

22   ample, Your Honor.  It's not merely adequate.  It's not

23   merely that there are alternatives available somewhere.  The

24   question is are they ample in order for the speaker to

25   effectively convey his or her message to the intended

1    audience.  That's the issue.

2            The plaintiffs could rent billboards.  The

3    plaintiffs could rent an airplane and have an airplane pull

4    a banner.  The plaintiffs can take out television ads.  The

5    plaintiffs can go with a megaphone on the Boston Common.

6    Certainly those are alternative avenues of communication but

7    they won't be effective for the plaintiffs to try to reach

8    the people they're trying to reach at abortion clinics at

9    the time and place that they're trying to reach them.

10           Now, with respect again to the Worcester clinic and

11   whether or not --

12       **THE COURT:**  Now, who says they won't be effective?

13   What is the basis for your assertion that they won't be

14   effective?

15       **MR. DePRIMO:**  As I pointed out earlier in my

16   PowerPoint presentation, Your Honor, the testimony of the

17   plaintiffs and the government witnesses is that they cannot

18   effectively reach people -- the government's position is it

19   doesn't matter whether or not people actually hear your

20   message.  The mere fact that they can hear you is enough.

21           The government --

22       **THE COURT:**  I didn't get that argument.

23       **MR. DePRIMO:**  Pardon?

24       **THE COURT:**  I didn't hear him say that.

25       **MR. DePRIMO:**  Okay.  For example, Mr. Salinger had

```
1    mentioned that he had heard that Ms. Metzger had heard

2    people calling out from across the street in Worcester.

3    Well, that may be.  But Ms. Metzger also testified that when

4    she was standing right on Alcorn Street when those three

5    women were counseling that young woman on the corner, she

6    heard them, she heard voices but she couldn't make out the

7    words that they were speaking.

8         And the uniform testimony in this case is that the

9    only way to effectively convey an abortion message at an

10   abortion clinic is through close, personal communication.

11        Do people see signs?  Of course they see signs.  As

12   Mr. Salinger pointed out, most of the --

13        THE COURT:  But you can't -- the fact that there

14   may be these boundaries doesn't justify entering private

15   property.

16        MR. DePRIMO:  Oh, of course not, Your Honor.

17   That's precisely the point.  As a matter of fact, I'm going

18   to sort of jump ahead a little bit and address your point.

19        THE COURT:  Well, do it as you are prepared.  Don't

20   let me get you all jumbled.

21        MR. DePRIMO:  Well, I'm just sort of rebutting so I

22   can do it this way.

23        THE COURT:  Go ahead.

24        MR. DePRIMO:  Mr. Salinger pointed out that at the

25   Worcester clinic, for example, it's about 325 feet from the
```

1    entrance of the driveway to the main door at Planned

2    Parenthood and that's private property.  Yes, it is private

3    property.

4           Do the plaintiffs have the right to go on private

5    property?  Absolutely not.  But the Court, and the

6    government actually, must consider those real life

7    circumstances in determining whether or not ample

8    alternative avenues exist with respect to the buffer zone.

9           The fact of the matter is -- and I didn't hear

10   Mr. Salinger mention this.  He stayed away from this

11   particular point.  It's virtually impossible to hand

12   literature to people unless they pass by you.

13          As a matter of fact, one of the -- the testimony of

14   Ms. Metzger in her deposition was that she had come out of

15   the Boston clinic, took a left and started walking down

16   toward sort of the center of Boston.  And as she exited the

17   buffer zone, there was a pro-lifer there and that pro-lifer

18   right next to her path offered her a piece of literature.

19   And what did Ms. Metzger do?  She reached out and she took

20   it.

21          Your Honor, we've all been in that circumstance.

22   We're walking down the street and some leafleteer, some

23   handbiller no matter what, it doesn't matter what he's

24   trying to do, it might be trying to sell a product.  It

25   might be political.  It doesn't matter.  If the person is

1    standing right next to our path and we're walking by, what's

2    our instinct?  Our instinct is to reach out and grab it.

3    Maybe we'll look at it.  Maybe we won't.  But the fact of

4    the matter is that leafleteer was able to get it into the

5    hands of the recipient.

6         When we see somebody who is 35 feet away,

7    handbiller, and we're walking down the street, we don't make

8    an effort to walk over to that person.  That's just human

9    nature.  But if the person is right there right in our path,

10   we'll reach out and we will grab that piece of paper.

11        What is significant about this is what the Court

12   said in Hill v. Colorado.  Hill v. Colorado was merely an

13   8-foot buffer.  It was a floating buffer.  And the Court

14   emphasized that that 8-foot buffer could be problematic with

15   respect to literature distribution.

16        But then the Court noted that on that statute

17   nothing prohibited any leafleteer from standing right next

18   to the path of passersby and offering their literature so

19   somebody can come out and grab it.  That's what is absent in

20   many instances in this case.

21        Can the plaintiffs reach some people?  Of course

22   they can, Your Honor.  There has never been any dispute that

23   the plaintiffs can talk to people outside any of these

24   clinics.

25        THE COURT:  Well, how many do you deem to be the

1   requirement in order to pass constitutional muster?

2        **MR. DePRIMO:**  Well, the standard that the Supreme

3   Court uses is ample alternative avenues of communication.

4        **THE COURT:**  I know but how do you define that?

5        **MR. DePRIMO:**  I don't know how to define it, Your

6   Honor, but I can say this to the Court.

7        **THE COURT:**  Well, do you have a suggestion?

8        **MR. DePRIMO:**  My suggestion is this, my suggestion

9   is this:

10       When it's one percent of the people that you're

11  trying to reach give you any response at all, that's not

12  enough.  When 99 percent of the people you're trying to

13  reach don't even bother to look your way, and Mr. Salinger

14  characterizes those people as simply unwilling listeners,

15  they don't want to pay attention to you.  Well, Your Honor,

16  the fact of the matter is people have the right to

17  communicate to unwilling listeners as well.

18       Now, if you put somebody far enough away from an

19  unwilling listener --

20       **THE COURT:**  But you don't have a right to a

21  response.

22       **MR. DePRIMO:**  They don't have a right to a

23  response, that's true.  I agree with that.  The fact of the

24  matter is there are many people outside the buffer who may

25  be approaching the abortion clinic, for example, in Boston

1      from the same side that Eleanor or Jean is on and Jean is

2      able to talk to that person before they get into the zone.

3              And as Mr. Salinger pointed out, many of these

4      people may just say I don't want to talk to you, I don't

5      want your literature.  And, of course, that's their right.

6      They don't have to talk to Eleanor or Jean or anybody else.

7      They can just move on by.

8              But the fact of the matter is, Your Honor, speakers

9      have the right to be able to try.  And when somebody is 60

10     feet on the other side of a buffer zone, and as

11     Mr. Salinger pointed out when he was talking about Dr. Shea,

12     when you're in that buffer zone, you better not mention the

13     word "abortion" because if you do, buddy, you're going to

14     jail.  That's basically the attitude of the government.

15             So if Eleanor is on one side of the zone and

16     somebody is approaching from the other, Eleanor can't go

17     through that zone silently and reach that person before that

18     person walking toward her actually gets into that zone and

19     likely inside the clinic.

20             I don't know, Your Honor, exactly how much is

21     required but I'm pretty confident that when you can't reach

22     99 percent of the people you're trying to reach, that means

23     that alternative avenues aren't ample.

24             **THE COURT:**  Reach or convince?

25             **MR. DePRIMO:**  Not reach at all, Judge.  The fact of

1    the matter is if you're a hundred feet away from somebody

2    and you're calling from a hundred feet away and you're

3    behind a metal fence, I mean, how could somebody possibly

4    effectively communicate to somebody under those particular

5    circumstances?  It's simply not possible.

6         Can their voices possibly be heard?  Sure.  But as

7    Mark pointed out, when he's on that fence and he's calling

8    out, he doesn't know whether or not people have heard him.

9    He doesn't know whether or not they understood his words.

10   Maybe they heard something.

11        How does somebody know who is walking from the

12   Planned Parenthood clinic in Worcester, for example?  They

13   pull into the parking lot, they get out of their car and

14   they start walking to the main door.  There is a fence

15   between Mark and this person.  There is a fence between

16   Nancy and this person.  This woman hears a voice, this man

17   hears a voice who is going into Planned Parenthood.  They

18   have no idea who this person is.  They can't see this

19   person.  They hear a voice.  They may hear something.  This

20   person doesn't necessarily even know that the person across

21   the street or on the sidewalk is trying to reach her.  All

22   she does is hear a voice if, indeed, she hears it at all.

23        Getting back, Your Honor, to the walk-away in front

24   of the Worcester clinic where Mr. Salinger said it's

25   irrelevant as to whether or not this is a legitimate buffer

1    zone.  He points out that the word "entrance" is not defined

2    under the statute.

3            Well, I have got two responses for that.  If that's

4    true, then perhaps the statute is unconstitutionally vague

5    if, in fact, somebody can put a buffer zone around something

6    that clearly is not properly a buffer zone.

7            No. two is the word "driveway" is part of the

8    buffer law.  35-foot radius around entrances, exits and

9    driveways.  Well, clearly a driveway provides ingress and

10   egress in and out of the facility.  There is no question

11   about that.

12           So putting the word "driveway" in the statute would

13   make it superfluous if they meant the word "entrance" to

14   mean simply ingress and egress.  So I think Mr. Salinger's

15   argument fails there.

16           Now, the point that I raised that is because it

17   impacts alternative avenues of communication.  When Mark

18   stands at the edge of that buffer zone, the closest he can

19   get is 75 feet.  If the buffer zone is not there, at least

20   he can stand in front of that fence on the public sidewalk.

21   Is he still a good distance away?  Yes, he is.  He is 53

22   feet from the door to the public sidewalk.  I believe that

23   that's the accurate figure.

24           Well, Your Honor, life is hard.  I concede that.

25   He has no right to be closer if it's private property and

1    Planned Parenthood doesn't invite him on.  But the

2    government shouldn't compound it.  The government's attitude

3    is, well, you know, you can't hear from fifty -- if it's too

4    hard to hear from 53 feet, what difference does it make if

5    you're a hundred feet away.

6         Well, that's not the answer that the government

7    should be giving.  The fact of the matter is is that buffer

8    zone is clearly unlawful under the law, the one that's on

9    the Pleasant Street side of Worcester, and that directly

10   impacts the ability of the plaintiffs to be able to have at

11   least the best alternative or one of the best alternatives

12   that they can have on Pleasant Street.  It completely takes

13   it away.

14        Snow.  Snow is a fact of life.  But all of these

15   circumstances of life have to be considered on an as applied

16   challenge.  If the snow is such that somebody can't get to,

17   somebody is unable to reach an intended audience, that's at

18   least a fact that should be considered.

19        Now, Your Honor had made an excellent point earlier

20   and that is that the snow is on the ground and you can't see

21   the buffer zone.  Then perhaps it truly, you know, you truly

22   cannot enforce it.

23        But as I was thinking over lunch, clearly we know

24   that the buffer zone is 35 feet away from the driveway.  And

25   we know that it's an arc.  And it may be very difficult to

1    determine exactly where that arc is in the middle of the

2    street.  But even if the snow is completely covering the

3    buffer zone lines on the sidewalk next to the driveway, it

4    would seem to me it would be a tough argument to make to a

5    judge that, hey, Judge, the snow was on the sidewalk, I

6    didn't know where the buffer line was.

7         If somebody knows it's 35 feet from the edge of the

8    driveway and they're standing within two feet of the edge of

9    the driveway, it seems to me that the fact that there is

10   snow there wouldn't be a very good defense with respect to,

11   you know, not knowing where the buffer line was.

12        **THE COURT:**  I don't want to try that case with you

13   back and forth, we could spend the rest of the afternoon --

14        **MR. DePRIMO:**  Yes. I'm going to move along.

15        **THE COURT:**  I think I could make a contrary

16   argument that might --

17        **MR. DePRIMO:**  I'm going to move on with respect to

18   that, with respect to that particular point.

19        Escorts.  Mr. Salinger apparently misunderstood

20   what I was saying with respect to Hoye.  Hoye did not say

21   that escorts are agents of the state.  What Hoye said was

22   that it's irrelevant whether or not they're agents of the

23   state.

24        And as far as McGuire II is concerned, what the

25   McGuire II court, probably McGuire I held as well as

1    McCullen held, was that escorts are not agents of the state.

2            Well, that's true and we don't contend that

3    particular point.  We are not saying that escorts are agents

4    of the state.  What we're simply saying is that the fact

5    that the escorts are there and they're interfering with the

6    ability -- with the attempts of the plaintiffs to reach

7    their intended audience is a fact, one of the facts that the

8    Court should consider.

9            McGuire II was an as applied challenge but ample

10   alternative avenues of communication was not an issue in

11   McGuire.  So the First Circuit has not addressed whether or

12   not the factual impact that escorts have in real life on the

13   ability of a speaker to reach their intended audience -- I'm

14   losing my train of thought here.

15           The First Circuit has not addressed that particular

16   point.

17           But the fact of the matter is on an as applied

18   challenge the Court considers all of the circumstances, all

19   of the facts surrounding the speaker's ability to reach the

20   audience.  And in real life in Boston escorts are part of

21   that analysis.  That's what Hoye stands for.

22           Hoye simply says that, hey, look, you can't ignore

23   the fact that the escorts are there and the escorts are

24   interfering with this, with Hoye's attempts to communicate.

25           With respect to normal conversational distance, the

1    reason I raised that point, Your Honor, is that we are in an

2    as applied challenge here.  We are considering specific

3    facts.  And there may not be any particular right to a

4    normal conversational distance under the Constitution.

5    However, Ms. Metzger said that a normal conversational

6    distance was two to three feet.  Both she and

7    Mr. Baniukiewicz made plain that when they're discussing

8    important matters or they're talking in a friendly manner to

9    somebody, they do it face-to-face close together.

10            And that's the problem with the buffer zone.  These

11   are very important matters that the plaintiffs are trying to

12   discuss with their intended audience on a very critical

13   issue to the lives of these women going into the clinic.

14   And it's not something that can be done effectively from 35

15   or 50 feet away.  It simply can't happen.

16            In real life, Your Honor, we don't talk that way.

17   None of us have regular conversations with people from a

18   distance of 20, 30, 40, 50 feet.  We talk to somebody

19   generally face-to-face, two feet, three feet, four feet

20   away.  And that's what the plaintiffs say is effective in

21   trying to persuade women --

22            **THE COURT:**  Is that where you say that I should go

23   with the decision here?  We should have boundaries limited

24   to three or four feet?

25            **MR. DePRIMO:**  What I am saying, Your Honor --

1        **THE COURT:**  No, but, I mean, if the answer to that

2   is no, say no, give me some relief.

3        I mean, you argue three or four feet.  You are

4   talking about conversational tones, which is a very

5   legitimate argument.  I just wondered if you take the next

6   step, is that the remedial step that I have to take?

7   Recognize that practical aspect of the conversation?

8        **MR. DePRIMO:**  I think that under the facts of this

9   particular case, we're talking about the evidence in this

10  particular case.

11       When we're talking about the facial challenge, as

12  the First Circuit said, the First Circuit said can we

13  envision a circumstance in which a 35-foot buffer zone could

14  be constitutional?  Sure.

15       What if, in Boston, for example, that door is

16  recessed 12 feet from the public sidewalk?  What if it was

17  recessed 35 feet from the public sidewalk?

18       The buffer zone would be the entire recessed

19  walkway so that speakers, leafleteers would be able to stand

20  right at the edge of that door, right at the path of where

21  people were going in and out and be able to hand out that

22  literature and be able to talk to people from that short

23  conversational distance and not violate the buffer zone.

24       So are there circumstances under which a 35-foot

25  buffer zone would be constitutional?  Yes, but in my view

1   the circumstances are extremely narrow and certainly not in

2   any of the buffer zones that are challenged in this

3   particular case.

4           **THE COURT:**  Okay.

5           **MR. DePRIMO:**  With respect to safety, Your Honor,

6   we didn't bring that up to challenge the Court's prior

7   ruling on the facial challenge with respect to whether or

8   not there are safety occurrences or whether or not the

9   buffer zones enhances public safety versus actually creates

10  hazards.  That's not what we're saying.

11          We're saying this -- and Mr. Salinger made the

12  correct point, the same point we're trying to make -- a

13  speaker has a choice.  The speaker can stand at the edge of

14  that buffer right in the direct path of traffic, that's

15  choice No. one, and then be, I think we said 22 or 26 feet

16  from the open foyer, all right.

17          Or, if that person is safety conscious, that person

18  can retreat and go across the street and stand on the public

19  sidewalk in front of Star Market.  What does that do?  That

20  adds another 22 or 23 feet to the buffer zone.  So the

21  buffer zone is not 35 feet anymore, the buffer zone in real

22  life there is now 60 feet.

23          That's the point we were making with respect to the

24  vehicles.  It forces safety conscious speakers to actually

25  get pushed farther back from the area, the entrance to the

1    door.  That's the point that we were making with respect to

2    safety.  And that's actually compelling, Your Honor.

3         And as far as Madsen is concerned, Madsen is a

4    distinguishable case in this respect.  Madsen was an

5    injunction case.  The facts were extremely messy.  You had

6    trespass.  You had obstruction.  You had harassment.  You

7    had a terrible factual record.  All kinds of arrests.

8    Blocking, all right.

9         Your Honor, there is no evidence whatsoever, none,

10   zero, of any illegal activity in this case.  There is no

11   allegation of trespass.  There are no allegations of

12   obstruction.  There are no allegations of harassment.  There

13   are no allegations of any criminal activities whatsoever.

14   We're talking about law-abiding citizens in this case.  And

15   Madsen dealt with lawbreakers.  So those are two very

16   different cases.

17        With respect to Sullivan, it is true that Sullivan

18   talked in terms of the general dissemination of a message.

19   And if there are other outlets than the one that you're

20   seeking, then it satisfies, supposedly, according to the

21   government's reading, it satisfies the standard for ample

22   alternative avenues of communication.

23        If this Court reads Sullivan the way the government

24   would ask them to read it, meaning that as long as there is

25   some type of outlet for the general dissemination of the

1    message, then the First Circuit would be in conflict with

2    five of its sister courts.   Five circuits as I pointed out

3    during my PowerPoint presentation have ruled that avenues of

4    communication are not adequate or ample if, in fact, a

5    speaker cannot reach his or her intended audience.

6         And that's what the evidence has been all about

7    today, Your Honor.   It's the ability to try to reach this

8    particular person, okay, who's making literally, literally a

9    life and death decision.   Somebody may die in this case,

10   Your Honor, not in this case.   If a woman is going into

11   Planned Parenthood to abort her baby, there is going to be a

12   death of a human being at that point.

13        And all we're saying is is that under those

14   circumstances there needs to be an opportunity for true,

15   effective communication.   Sure, people can see a sign.   For

16   example, as Mr. Salinger pointed out, Dr. Shea wears a sign.

17   He wears a sign that says, "They're killing babies here."

18   That's a very simple statement and it's very easily

19   understood.

20        But Dr. Shea also seeks to tell people about human

21   gestation.   He also seeks to tell them about the risks of

22   surgery.   And those two messages are very different than the

23   simple message he has on his sign.

24        So, sure, signs can be used to convey certain

25   messages.   They cannot be used to convey others.

1           I think what's most significant about this case,

2     and I didn't hear the government really touch upon this --

3           **THE COURT:**  What about this particular audience

4     argument you are making?  In other words, the intended

5     audience of the speaker, that message has to reach those

6     ears and no others?  Maybe the rest of the Commonwealth ears

7     but that one person that is the intended audience, or part

8     of it -- well, yes, that was the intended audience doesn't

9     hear and that makes it fail?

10          **MR. DePRIMO:**  I think <u>City of Ladue versus Gilleo</u>,

11    which was a U.S. Supreme Court case, speaks to that.  In

12    that case, if I remember my facts correctly, a woman wanted

13    to put in the window of her house some kind of a little sign

14    that said something about, I believe, the war in the Gulf.

15    She was opposed to it.  And there was an ordinance in the

16    City of Ladue that said you can't have any signs, any

17    residential signs.  And the court went to great pains to

18    say, you know, sometimes a particular place and a particular

19    message is extremely important.

20          Who is this woman trying to reach when she put that

21    sign in her window?  The court said she was trying to reach

22    her neighbors.  She wasn't trying to reach the people

23    downtown.  She was trying to reach her neighbors.  And the

24    Court ruled that that ordinance of the City of Ladue was

25    unconstitutional.

1              And as they point out, you know, certainly there

2        are other avenues of communication.  She could have took out

3        an ad in the newspaper.  She could have gone and protested

4        down at City Hall.  There are lots of things that she could

5        have done but she wanted to reach her neighbors.  And the

6        Supreme Court said she had a right to do that and that's why

7        that City of Ladue ordinance was unconstitutional.

8              **THE COURT:**  Okay.  You may have touched on this, I

9        don't think so, what about his argument that there is, in

10       these multitask buildings that there is no way that your

11       client could know which office the intended recipient of the

12       conversation was going to?

13             **MR. DePRIMO:**  Well, if you're standing by the

14       driveway and you're able to beckon somebody to roll down

15       their window --

16             **THE COURT:**  They don't roll the window down.

17             **MR. DePRIMO:**  Sure.  I understand that, Your Honor.

18       If people don't want to roll the window down, then these are

19       unwilling listeners and neither Dr. Shea or anybody else has

20       the right to force their communication on --

21             **THE COURT:**  No, but, I mean, just the idea -- I am

22       going to read that case again, the Ninth Circuit case.

23             **MR. DePRIMO:**  The Hoye case?

24             **THE COURT:**  Hoye, yes.  Just because a building has

25       six or seven or ten offices, that doesn't make it

1    constitutionally suspect; does it?

2         MR. DePRIMO:  Actually, Your Honor, the Hoye case

3    was quoting the United States Supreme Court.

4         THE COURT:  You said that, yes.

5         MR. DePRIMO:  The U.S. Supreme Court said that wide

6    entrances or multipurpose buildings create a problem that

7    the court needed to look at very, very closely.

8         I don't know, I don't recall as I'm standing here

9    whether or not they used the term "constitutionally

10    suspect."  They may have or that may simply have been me.

11         But there is no question that in Hill v. Colorado

12    they said that when you've got a multipurpose office

13    building, that's going to have an as applied challenge and

14    the Court has to look very, very closely at it there.

15         THE COURT:  Okay.

16         MR. DePRIMO:  Now, again, with respect to -- and I

17    don't know if I answered His Honor's question, but with

18    respect to the inability to identify people who are going

19    into the clinic --

20         THE COURT:  Yes, go ahead.

21         MR. DePRIMO:  -- and which business they're going

22    to patronize, that's why you need to be close to the

23    driveway so that you can ask people coming in, for those

24    people who choose to roll down the window and talk with you,

25    then you can find out where they're going to patronize.

1      For those people who choose to just pass on by, and

2  many people do, I don't dispute that there are many, many

3  people, Your Honor, who would choose even if you're standing

4  at the driveway to just kind of go on in and don't want any

5  literature, they don't want to hear anything, and that's

6  their right.  You can't force anything upon them.

7      But the fact of the matter is is that we don't know

8  how many of those folks are willing listeners as compared to

9  unwilling listeners.  What we know is --

10      **THE COURT:**  But you don't even know which ones of

11  them are the audience.

12      **MR. DePRIMO:**  We don't, and that's why everybody is

13  the audience.  That's the problem.  That's why we have such

14  a problem in Springfield.

15      If we simply talk about the west driveway on Wason

16  Avenue, the driveway that's right in front of Planned

17  Parenthood, anybody who goes in that driveway, we'll assume

18  for the moment for purposes of my argument that they're

19  going into that building.  Well, there are six or seven or

20  eight businesses in there so we don't know whether or not

21  they're going to Planned Parenthood.  They could be going

22  into any of those.

23      But the only way to determine that is to have a

24  conversation with people.  And the problem with the buffer

25  zone is it puts the onus on the recipient.  The recipient

1    has to go park the car and then walk all the way back to the

2    sidewalk.

3           You know, there are many willing listeners who

4    would be willing to stop, roll down the window, as

5    Ms. Metzger pointed out, you know, you roll down the window,

6    you take some literature, you talk briefly.  It only takes a

7    couple of moments.  It doesn't take much effort on the part

8    of somebody.  But these same people who might be willing to

9    roll down their window and accept literature and talk are

10   not going to park their car and then walk back perhaps 100

11   or 150 feet to talk to somebody out on the sidewalk.  And

12   that's what the problem is.

13          The government's own witness, the security chief

14   for Planned Parenthood, Michael Baniukiewicz, said the only

15   opportunity for pro-life communication is at the driveway in

16   front of Planned Parenthood.  The fact of the matter is

17   there shouldn't be buffer zones at any of those other

18   driveways for any reason.

19          As a matter of fact, Mr. Baniukiewicz made clear

20   that the security cameras for Planned Parenthood were only

21   on two driveways, one being the one on west Wason Avenue,

22   the west driveway on Wason and then the main entrance.

23          Now, somebody must have thought that those other

24   three driveways should have buffer zones around them because

25   somebody painted those lines on the street and presumably it

1    was the City of Springfield.  They own the streets, unless

2    they're state streets and then the defendants clearly are

3    obligated.

4         I don't know whether or not Main Street is owned by

5    the City of Springfield or by the State of Massachusetts;

6    but, nevertheless, a government entity owns that street.

7    They painted the lines and they left those lines there.

8         Now, the government wants to put the burden on

9    Dr. Shea.  Dr. Shea, there is no sign right within the arc

10   of three of those zones, you should know that you can't be

11   charged if you walk there.  Well, you know, Dr. Shea was

12   able to practice medicine for 40 years and those buffer

13   zones confused him.

14        And the fact of the matter is at least since this

15   past February the government has known that those driveways

16   have been at issue and the government has not informed me or

17   Dr. Shea or anyone else that I know of that those buffer

18   lines should be covered up or marked over or painted over or

19   signs posted saying this is not a real buffer zone.

20        The fact of the matter is for the last eight months

21   the government has allowed Dr. Shea to be under the

22   impression that he may or he may not be arrested if he goes

23   in three of those five zones.

24        We're not asking the Court to order the State of

25   Massachusetts to paint over those lines or the City of

1    Springfield.  We're asking the Court to enjoin the

2    prosecutor for the County of Hampden, the one who would

3    prosecute the buffer law at those locations, enjoin them

4    from being able to prosecute the buffer law in those three

5    places.  That's perfectly appropriate in this particular

6    case.

7         And the fact is if the government concedes, as they

8    have, that those are not real buffer zones, it seems to me

9    that the government wouldn't have any problem with an order

10   from this Court saying that the buffer zone can't be

11   enforced at those three locations.

12        With respect to the difference -- I may have

13   touched on this but I have it in my notes and I'm working

14   backwards.

15        With respect to the 325 distance at Worcester

16   between the edge of the driveway and the main door, it is

17   private property.  Can the plaintiffs go on there?  No, they

18   can't.  Planned Parenthood can exclude from their property

19   anybody that they want to.  But that's a fact of real life

20   in this case.

21        The only opportunity on Dewey Street, and perhaps

22   anywhere, for the plaintiffs to be able to talk to somebody

23   effectively is at that driveway entrance on Dewey Street.

24        Your Honor, the 325 feet is a natural buffer zone,

25   right?  Once they pass there, there is 325 feet between the

1    pro-life people on the public sidewalk and that main door.

2    We don't have to have another 35 feet.  If that's all we

3    need, and I believe that the government said, Mr. Salinger

4    said that all they want to do is make sure it was clear,

5    clear for passage at the driveway on Dewey Street.

6        Well, you don't have to have people standing 35

7    feet away from the driveway's edge in order to make sure

8    cars can go in or out.  You just have to stand a foot or two

9    feet from the edge.

10        The fact of the matter is, Your Honor, in Worcester

11    there really is no opportunity to effectively communicate a

12    message.  It is just not possible.

13        The fact that somebody may hear a voice, I was

14    actually astounded, Your Honor, when Mr. Salinger trumpeted

15    the fact that one person came out and spoke with Nancy

16    Clark.  In a year and a half Nancy was able to speak with

17    one person.  That proves she can effectively convey her

18    message.

19        The fact that Mr. Bashour was able to speak with

20    six or seven people in a period of a year and a half

21    demonstrates his message is effective.

22        That Eleanor McCullen may have been able to

23    convince 80 women not to abort, and I'm not so sure that's

24    in the record, I'm going to have to go back and look; but,

25    nevertheless, let's assume for purposes of argument that

1    that is in the record.  We also know that there are 2,000

2    women or thereabouts that she was not able to reach because

3    these women were either on the opposite side of the zone or

4    whatever.  The fact of the matter is that she's entitled to

5    be able to convey her message and reach her audience in

6    pretty much every instance.

7          Now, with respect to Mrs. McCullen perhaps going

8    out there with a woman named Mary Donovan I believe or Mary

9    O'Donnell, I believe that's -- Mr. Salinger raised that.

10   Mrs. McCullen's First Amendment rights are her own.  What

11   the government is trying to do is force her to exercise her

12   First Amendment rights vicariously through somebody else.

13   Basically their argument is, well, if you're on one side of

14   the zone and Mary O'Donnell is on the other side, well,

15   there you go, you've got the whole zone covered.

16         Well, that's not good enough.  Mrs. McCullen's

17   First Amendment rights are her own and the government can't

18   force her to exercise those rights through somebody else.

19         Neither are messages fungible, because it sounds

20   like, as I was listening, that the government was saying,

21   well, you know, we hear all these different -- we see all

22   these different signs and we hear all these messages.  And

23   it seems to me that the import of that is, well, you know,

24   if you've heard one pro-life message, you've heard them all.

25   It doesn't really matter which one you hear.

1          Well, that's not the law either.  The law is a

2     particular individual has a right on his or her own to

3     express his or her own message.  So the fact that there are

4     other people out there and they're able to convey messages

5     and they --

6          **THE COURT:**  In this situation you don't think that

7     your clients -- I am not trying to have you violate any

8     attorney/client relationship -- but is it their feeling that

9     they want the message conveyed by them or are they happy

10    just to have the message conveyed?  Are they looking for

11    results or are they looking for personal vindication?

12         **MR. DePRIMO:**  Your Honor, the declarations in the

13    record by the plaintiffs are clear that their message is

14    often different from the messages of other people, that

15    there are times they can be effective when another person

16    cannot.  So it's important that they be able to convey their

17    message.

18         As I pointed out with Dr. Shea, he's a medical

19    doctor.  The information that he could provide to somebody

20    with respect to medical issues is very different than what a

21    non-doctor can provide.  So the person conveying the

22    message, the person's knowledge, the person's experiences

23    and background, the person's delivery.  Some people are very

24    quiet and very gentle.  Other people are very loud and

25    boisterous.  People respond differently to the way that the

1   message is delivered.

2          And as I quoted the Supreme Court earlier, the

3   Supreme Court says the speaker knows best what to say and

4   how to say it, not the government.  Well, the government is

5   telling this Court that it knows best because you can see

6   people with different signs and people doing different

7   things, the message must be effective.  Well, that's simply

8   not what the facts show in this case.  The facts show that

9   in order to effectively convey a message to be effective, to

10  change people's minds, to persuade, you have to have close

11  communication and that's lacking in this particular case.

12         THE COURT:  Okay.  Are you just about ready to wind

13  it up?

14         MR. DePRIMO:  I think so, Your Honor.  I think I'll

15  stop here.  Thank you.

16         THE COURT:  What about you, anything else?

17         MR. SALINGER:  One very short point, Your Honor.

18         THE COURT:  Go ahead.

19         MR. SALINGER:  Plaintiffs suggested that although

20  the alternative channels of communication available in this

21  case may be adequate, they're not ample and that's not good

22  enough because the constitutional standard requires ample

23  alternatives, not adequate alternatives.

24         Your Honor, in our proposed findings we cite to not

25  one but three different First Circuit decisions holding that

1    the essence of the question that the Court must decide is

2    "whether the remaining communicative avenues are adequate."

3          That's paragraph 12 of our proposed findings,

4    footnote 21, where we cite the <u>Sullivan</u> case, the <u>DHL</u>

5    <u>Associates</u> case and the <u>National Amusements</u> case.

6          **THE COURT:**  Okay, thank you.  Very well done by

7    everybody.  I appreciated the very professional way in which

8    you handled yourself.  I will do the best I can with it.

9          I think what we should do is set up a schedule for

10   these proposed findings of fact.  You will probably want an

11   updated transcript of this hearing.  So when will they get

12   that, Carol?  Tomorrow morning?

13          (Laughter.)

14          (Whereupon, the Court and the court reporter

15          conferred.)

16          **THE COURT:**  She expects you will have the

17   transcript of this hearing three weeks from today or

18   thereabouts.  And then it seems to me if I give you a month

19   after that to give me further proposed findings of fact

20   reference to the record, and I will take it under advisement

21   at that point.  Does that seem all right?

22          **MR. DePRIMO:**  Yes, Your Honor.

23          **MR. SALINGER:**  You do have ours, Your Honor.  We

24   will see what is --

25          **THE COURT:**  Well, you want to make sure that

1   they -- that is why I don't like to have them before the

2   case is over because sometimes they just don't quite get the

3   nuances.

4         You look it over and if you are satisfied --

5         **MR. SALINGER:**  If we need to supplement, we will.

6         **THE COURT:**  Yes.  If you are satisfied, just send a

7   little note saying you are satisfied.

8         Anything else?

9         **MR. DePRIMO:**  Your Honor, could we have a hard date

10   as to when they're due?

11         **THE COURT:**  Yes.  Three weeks from today is what?

12         **THE CLERK:**  September 14th.

13         **THE COURT:**  September 14th the transcript will be

14   available.  And then 30 days after that?

15         **THE CLERK:**  October 12th.

16         **THE COURT:**  October 12th proposed findings.  Is

17   that enough time?

18         **MR. DePRIMO:**  That's fine with us, Your Honor.

19         **MR. SALINGER:**  Yes, Your Honor.

20         **THE COURT:**  October 12th.

21         All right.  Is that it?

22         **THE CLERK:**  Yes, Judge.

23         **THE COURT:**  Okay.  Thank you very much.  You are

24   all excused.

25         **THE CLERK:**  All rise for the Honorable Court.

1          Court is in recess.

2          (WHEREUPON, the proceedings were recessed at 2:45

3     p.m.)

C E R T I F I C A T E


        I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.



        /S/CAROL LYNN SCOTT



        _____

                    CAROL LYNN SCOTT
                  Official Court Reporter
                John J. Moakley Courthouse
              1 Courthouse Way, Suite 7204
               Boston, Massachusetts 02210
                    (617) 330-1377



**DATE: October 5, 2011**