UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ELEANOR MCCULLEN, et. al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 08-10066-JLT |
| | * | |
| MARTHA COAKLEY, et. al., in their official | * | |
| capacities only, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM

February 22, 2012

TAURO, J.

I.      Introduction

        This case concerns a recently revised Massachusetts statute, Massachusetts General Laws

Chapter 266, § 120E1/2 ("Act"), which establishes a thirty-five-foot fixed buffer zone around

driveways and entrances of reproductive health care facilities ("RHCFs").  Presently at issue is

Plaintiffs' challenge to the Act as applied to their speech activities at three RHCFs in Boston,

Worcester, and Springfield.  For the reasons given below, this court finds that the Act as applied

is a valid regulation of the time, place, and manner of Plaintiffs' speech.  For that reason,

Judgment shall be entered in favor of Defendants on all counts.

II.     Background[1]

        A.      The Parties

―――――――――――――――

        [1] This court assumes familiarity with its previous decision in this case, McCullen v.
Coakley ("McCullen I"), 573 F. Supp. 2d 382 (D. Mass. 2008) but, nonetheless, presents a
condensed background.

1

Plaintiffs Eleanor McCullen, Jean Blackburn Zarrella, Gregory A. Smith, Eric Cadin, Mark Bashour, Nancy Clark, and Cyril Shea are Massachusetts residents who regularly engage in pro-life counseling outside RHCFs.  Defendant Attorney General Martha Coakley is the chief lawyer and law enforcement officer of the Commonwealth of Massachusetts.  Defendants Conley, Early, and Mastroianni are the District Attorneys for Suffolk, Worcester, and Hampden Counties where the clinics at issue in this action are located.  As such, Defendants bear responsibility for enforcing the Act.  They are sued in their official capacities only.[2]

B.    Procedural History

On January 16, 2008, Plaintiffs filed the Complaint, which advanced eight counts under 42 U.S.C. § 1983: (1) Free Speech—Time, Place, and Manner; (2) Free Speech—Substantial Overbreadth; (3) Free Speech—Prior Restraint; (4) "Free Speech – Free Association – Free Exercise Hybrid"; (5) Free Speech—Viewpoint Discrimination; (6) Due Process—Vagueness; (7) Due Process—Liberty Interest; and (8) Equal Protection.[3]

After a Status Conference held on April 23, 2008, and without objection from the Parties, this court ordered that the matter proceed on the merits in two stages: (1) a Bench Trial on Plaintiffs' facial challenge; and (2) a bench trial on Plaintiffs' as-applied challenge.[4]

On May 28, 2008, this court held the first bench trial, on Plaintiffs' facial challenge.[5]  In an August 22, 2008 decision, this court held that the Act survived all three facial challenge

---

[2] See Am. Compl. 3-4 [#112].

[3] Compl. ¶¶ 13-22 [#1].

[4] Order [#34].

[5] McCullen I, 573 F. Supp. 2d at 386.

standards.[6]  The Court of Appeals for the First Circuit held a de novo review and affirmed this court's decision,[7] and the Supreme Court denied Plaintiffs' petition for certiorari at this stage of the case.[8]

On September 17, 2010, Plaintiffs filed a Motion for Leave to File Amended Complaint and a Motion to Permit Arguments as to Facial Invalidity.  On October 7, 2010, Defendants filed a Motion for Judgment on the Pleadings on the As-Applied Claims in Counts Two Through Eight. On December 2, 2010, this court heard oral arguments on all three Motions and took them under advisement.  On December 29, 2010, this court issued a Memorandum denying Plaintiff's Motion to Permit Arguments as to Facial Invalidity, and allowing Defendant's Motion for Judgment on the Pleadings.  Plaintiffs were allowed to amend the complaint to include claims regarding RHCFs in Springfield and Worcester and to include new plaintiffs who would make allegations regarding speech activities at those clinics.  Plaintiffs were also permitted to amend the complaint to include four District Attorneys in their official capacities, consistent with the expansion of the geographic scope of the complaint.

On February 25, 2011, Plaintiffs filed the Amended Complaint, and on March 11, 2011, the Commonwealth filed its Answer.  On May 11, 2011, the parties entered a Stipulation of Dismissal Covering the Claims by Carmel Farrell Regarding the Brookline Clinic.  The effect of the Amended Complaint and the Stipulation is that Plaintiffs now challenge the constitutionality of

---

[6] Id. at 425.  This court held that the Act was constitutional under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment.  Id.

[7] McCullen v. Coakley ("McCullen II"), 571 F.3d 167 (1st Cir. 2009).

[8] McCullen v. Coakley ("McCullen III"), 130 S. Ct. 1881 (2010).

the Act as applied at the RHCFs in Boston, Worcester, and Springfield.  On August 24, 2011, a

bench trial was held on Plaintiffs' as applied claims, and the court took the matter under

advisement.

III.    Discussion

    A.    Legal Standard

    This court has already found the Act to be a content neutral time, place and manner

restriction, and upheld it as facially valid.  In so doing, the court found that the Act survived

intermediate scrutiny because it is (1) justified without reference to the content of the regulated

speech; (2) narrowly tailored to serve a significant governmental interest; and (3) leaves open

ample alternative means of communication.[9] It has already been established that the

Commonwealth of Massachusetts has a "substantial and legitimate content-neutral interest in

protecting public safety at RHCF entrances and driveways, because '[i]t is a traditional exercise of

the States' police powers to protect the health and safety of their citizens.'"[10]  In light of this

court's December 29, 2010 opinion, the only issue that remains to be decided is "whether the

statute as applied at the clinics specified in the complaint leaves open adequate alternative

channels of communication."[11]

    A valid time, place, and manner restriction, by its nature must burden some First

Amendment activity for the purpose of advancing the State interest at stake.  As Justice Souter,

emphasized, in his concurring opinion in Hill v. Colorado, however, prior cases "'quite clearly

---

[9] McCullen I, 573 F. Supp. 2d at 402 (setting out the standard for intermediate scrutiny).
[10] Id. at 410 (quoting Hill v. Colorado, 530 U.S. 703, 715; 120 S.Ct. 2480, 2489 (2000)).

[11] Memorandum and Order [#111] at 9.

4

hold that restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'"[12] Indeed,"the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."[13]  As this court pointed out in the facial challenge phase of this case, "[t]ime-place-manner regulations routinely make particular forms of expression impracticable without raising constitutional concerns."[14]  The question is not, "'whether a degree of curtailment' of speech exists, but rather 'whether the remaining communicative avenues are adequate.'"[15]  Alternative methods, therefore, need not be perfect substitutes for Plaintiffs' desired manner of communication.

It is well established that, "only the government can violate First Amendment rights," and that, "every First Amendment claim thus requires state action in some sense."[16] As the First Circuit has emphasized, "The First Amendment is concerned with government interference, not private jousting in the speech marketplace."[17]  In order for the Act to violate the First Amendment as it is applied to Plaintiffs, the lack of adequate alternative means of communication must be

---

[12] Hill at 736 (quoting Ward v. Rock Against Racism 491 U.S. 781, 791, 109 S. Ct. 2746 (1989); (also quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897 (1985)).

[13] Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981) (Citing Adderley v. Florida, 385 U.S. 39, 47-48 (1996)); Poulos v. New Hampshire, 345 U.S. 395, 405 (1953); see Cox v. Louisiana, 379 U.S. 536, 554 (1965)).

[14] McCullen v. Coakley, 571 F.3d 167, 180 (1st Cir. 2009).

[15] Sullivan, 511 F.3d at 44 (quoting D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 59 (1st Cir. 1999), and quoting in turn Nat'l Amusements, Inc. v. Town of Deadham, 43 F.3d 731, 745 (1st Cir. 1995)).

[16] McGuire v. Reilly ("McGuire II"), 386 F.3d 45, 60 (1st Cir. 2004) (citing Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001); Hudgens v. NLRB, 424 U.S. 507, 514-21 (1976) (First Amendment claim required state action; claim against private shopping center for preventing peaceful labor picketing failed because shopping center was not a state actor); Yeo v. Town of Lexington, 131 F.3d 241, 248, 255 (1st Cir. 1997)).

[17] McGuire II, 571 F.3d at 60.

traceable to state action. As the First Circuit pointed out in <u>McGuire II</u>, when it upheld the

Commonwealth's previous buffer zone law, "there is no state action if what the plaintiff is really

aiming at are the acts of private persons that are actually illegal under the statutory scheme,

because then the acts do not reflect the policy of the state."[18]  To succeed here, Plaintiffs' facial

challenge must demonstrate that the act, as applied by the state, does not leave open adequate

alternative means of communication. That other barriers to communication not attributable to the

state may exist is irrelevant to the First Amendment analysis.

Much like the Plaintiffs in the <u>McGuire II</u> case, the Plaintiffs in this action challenge the

Act as-applied after it has already been upheld as a facially valid time-place-manner restriction.

As in that case, "The fact situation that plaintiffs are involved in here is the core fact situation

intended to be covered by this buffer zone statute, and it is the same type of fact situation that was

envisioned by this court when the facial challenge was denied."[19]  Plaintiffs are, therefore,

precluded from "argu[ing] that they are different types of actors, or that they are involved in a

different type of fact situation, from the ones on the basis of which the law was already upheld

facially."[20]

In upholding the Act as facially valid, this court found that the Act left open ample

alternative means of communication. The court noted that,

> as long as Plaintiffs - or anyone for that matter- remain outside the
> zone, they may freely talk to individuals entering and exiting the
> RHCFs, as well as people inside the zone. The Act also does nothing
> to prevent patients from leaving the zone to speak with protesters or
> counselors. Moreover, individuals may continue to display signs and
> photographs, hand out literature, talk, pray, chant, sing or engage in

---

[18]<u>Id.</u>, 571 U.S. at 60 (citing <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 940-41 (1982)).
[19]<u>McGuire II</u>, 571 U.S. at 61.
[20]<u>Id</u>.

> any other form of lawful communication or protest outside of the buffer zone.  Importantly, most, if not all of this expressive activity, can be seen and heard by people entering and exiting the buffer zone, and also by people inside the buffer zone.[21]

As the Supreme Court has emphasized, "[t]he First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests."[22] This court has also found in McCullen I that, "[a]lthough slightly closer physical interaction may partially enhance one's ability to sidewalk counsel RHCF patients, there is no constitutional right to that level of particularized access."[23]

The First Circuit, "has upheld . . . alternative means of communication despite diminution in the quantity of speech, a ban on a preferred method of communication, and a reduction in the potential audience."[24]  In analyzing alternative channels of communication, it is clear that, "'[e]ven protected speech is not equally permissible in all places and at all times,'"[25] and "the law does not require that alternative channels be 'perfect substitutes.'"[26] With these constraints in mind, the court now turns to the question of how the Act is applied at the three RHCFs at the heart of Plaintiffs' complaint.

---

[21]McCullen v. Coakley, 573 F. Supp. 2d 382, 413 (D. Mass. 2008).

[22]Madsen v. Women's Health Center, Inc., 512 U.S. 753, 772-73 (1994).

[23]McCullen I, 573 F. Supp. at 415.

[24]Sullivan v. City of Augusta, 511 F.3d 16, 44 (1st Cir. 2007) (citing Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 192-94 (1st Cir. 1996)); see also D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 59 (1st Cir. 1999)) ("The essence of this question is not 'whether a degree of curtailment' of speech exists, but rather 'whether the remaining communicative avenues are adequate.'" (quoting Nat'l Amusements, 43 F.3d 731, 745 (1st Cir. 1995)).

[25]Snyder v. Phelps, 131 S.Ct. 1207, 1218 (2011) (quoting Frisby v. Schultz, 487 U.S. 474, 479 (1988)).

[26]Int'l Action Cent. v. City of New York, 587 F.3d 521, 528 (2d Cir. 2009) (quoting Mastrovincenzo v. City of New York, 435 F.3d 78, 101 (2d Cir. 2006)).

B.    Application[27]

Plaintiffs challenge the application of the Act at three RHCFs: one in Boston, one in

Worcester, and one in Springfield.[28]   This court has already found that the Act, on its face, leaves

open ample alternative means of communication because protestors may engage in any form of

communication with their intended audience so long as they do not do so inside a clearly marked

and posted buffer zone during clinic business hours.[29]   The First Circuit, in its de novo review of

this court's ruling, similarly found that:

> To begin, the 2007 Act places no burden at all on the plaintiffs'
> activities outside the 35-foot buffer zone.  They can speak, gesticulate,
> wear screen printed T-shirts, display signs, use loudspeakers, and
> engage in the whole gamut of lawful expressive activities.   Those
> messages may be seen and heard by individuals entering, departing, or
> within the buffer zone.
>
> Additionally, the Plaintiffs may stand on the sidewalk and offer either
> literature or spoken advice to pedestrians, including those headed into
> or out of the buffer zone.  Any willing listener is at liberty to leave the
> zone, approach those outside it, and request more information.

From the evidence contained in the Joint Trial Record, it is clear that the Act, as applied at each

of the three challenged RHCFs, leaves open ample adequate alternative means of communication.

This court will examine each clinic location in turn.[30]

---

[27]The Parties stipulated to the content of the record at trial. [#128].  All citations are, accordingly, made to that record.

[28]See Am. Compl. [#112].  Plaintiffs dismissed all claims regarding the Brookline clinic. See Stipulation of Dismissal [#126].

[29]McCullen v. Coakley, 573 F. Supp. 2d 382, 413-15 (D. Mass. 2008).

[30]At oral argument in this case, Plaintiffs asserted that inclement weather should be taken into account in determining whether the Act is constitutional as applied.  See e.g. Trial Tr. [#150] at 67-69. It is clear, however, that inclement weather makes communication more difficult regardless of whether there is a buffer zone in place. The fact that it rains and snows cannot, therefore, make a facially valid time, place and manner restriction unconstitutional as applied.  See Carew-Reid v. Metropolitan Transilt Auth., 903 F.2d 914, 919 (2d Cir. 1990) (holding that street musician who was subject to an ordinance banning amplified music on subway platforms had

1.    <u>Boston Clinic</u>

A.    <u>Clinic Layout and Buffer Zones</u>:[31]

Planned Parenthood: Greater Boston Health Center ("Boston PP") is a stand-alone building located at 1055 Commonwealth Avenue in the Allston-Brighton neighborhood of Boston.[32]  It sits on the corner of Commonwealth Avenue and Alcorn Street.  All patients must enter Boston PP through the Commonwealth Avenue entrance.[33]  The Commonwealth Avenue entrance is set back approximately 12 feet from the sidewalk inside a recessed open foyer.  Clinic staff and patrons must cross the public sidewalk to enter Boston PP's front door.

There is a clearly marked and posted buffer zone around Boston PP's Commonwealth Avenue entrance:

> This buffer zone is an arc that begins to the left of the building entranceway, as one looks out from the clinic, at a point 22 feet, 7 inches from the eastern edge of the foyer entrance; the buffer zone then arcs to a point one foot away from the edge of Commonwealth Avenue directly opposite that foyer edge.  In accord with the act, the buffer zone then extends for the width of the open foyer in straight lines the extra foot to Commonwealth Avenue.  The buffer zone then jogs back to one foot away from Commonwealth Avenue, at a point directly opposite the western edge of the foyer (to the right of the front door as one looks out from the entranceway), arcs across the corner of the sidewalk to a point that is even with the edge of the building and about four feet, four inches into Alcorn Street, and finally continues back across the Alcorn Street sidewalk until it hits the side of the building roughly twelve feet north from the corner of the building.[34]

---

adequate alternative channels of communication, and rejecting Plaintiff's argument that above-ground venues were inadequate because "inclement weather often precludes performing above ground").

  [31]All clinic measurements are taken from the Parties' <u>Stipulation Regarding Buffer Zone Measurements</u> ("Stip.") [#129].

  [32]Stip. [#129] at 1.

  [33]Baniukiewicz Tr. [#137] at 79-80, 89-90.

  [34]Defendants' Proposed Findings of Fact [#147] at 9-10 (Stip. [#129] ¶¶ 3-9).

Plaintiffs and others who wish to communicate with clinic patrons may do so while standing: (1) on the wide sidewalk to the east of the Commonwealth Avenue entrance; (2) in the fairly narrow strip between the top of the buffer zone and Commonwealth Avenue; and (3) while standing on the sidewalk across Alcorn Street.[35]  Boston PP places a large orange barrel in the street in order to keep traffic away from protesters standing outside the buffer zone at the corner of Alcorn Street and Commonwealth Avenue.[36]  On days when large numbers of protesters are expected at the Boston PP, the Boston Police place barriers several feet into Commonwealth Ave, which creates extra room for people who wish to engage in communicative activities directed at clinic patrons.[37]

There is also a clearly marked and posted buffer zone around Boston PP's rear garage entrance, but Plaintiffs do not engage in protest or other communication in that location.[38]

### B.  Speech Activities

Plaintiffs Eleanor McCullen, Jean Blackburn Zarella, Gregory A. Smith, and Eric Cadin all engage in protest and counseling at Boston PP.  Each plaintiff's activities at Boston PP will be addressed in turn.

### i.  Eleanor McCullen

Plaintiff Eleanor McCullen engages in sidewalk counseling outside Boston PP on Tuesday and Wednesday mornings between seven and eleven a.m.[39]  She frequently works with another

---

[35] McCullen Tr. [#130] at 45-58, 68, 72; Metzger Tr. [#138] at 84-86; Metzger Dep. Ex. 11 [#138-11].

[36] Baniukiewicz Tr. [#137] at 12-13; Zarrella Tr. [#132] at 32-33.

[37] Zarella Tr. [#132] at 38-39; Baniukiewicz Tr. [#137] at 84-85.

[38] [#129] ¶¶ 4&10. McCullen Decl. [#139]. ¶¶ 6 & 8; McCullen Tr. [#130] at 5-7.

[39] McCullen Tr. [#130] at 5.

sidewalk counselor Mary O'Donnell.[40]  Ms. McCullen attempts to identify women or couples

going to the clinic, and offers those individuals help and alternatives to abortion.[41]  Ms.

McCullen's goal is to engage women in conversations, and to convince them to come to a "Safe

Center" instead of going in to Planned Parenthood.[42]  She also hands out pamphlets with

information about alternatives to abortion and available services.[43]  Each morning that she

engages in sidewalk counseling, Ms. McCullen hands out between fifteen and twenty pamphlets.[44]

Ms. McCullen and Ms. O'Donnell coordinate their counseling efforts so that one of them can

reach clinic patrons entering Boston PP from either side of the buffer zone.[45]

Ms. McCullen estimates that about once a week she convinces a woman to come to a safe

center instead of going in to Planned Parenthood.[46]  Since the buffer zone law went into effect in

November of 2007, Ms. McCullen estimates that, through her sidewalk counseling, she has been

able to persuade eighty women not to have abortions.[47]  Ms. McCullen does not carry a sign when

she is at the clinic, but she does place three signs on her car, which she parks directly in front of

the clinic.[48]  Two of the signs read, "Abortion stops a beating heart," and another offers

pregnancy help.[49]  On Tuesday and Wednesday mornings when Ms. McCullen goes to Boston PP,

there are no clinic escorts or police officers present.[50]  She has observed others outside the clinic

---

[40]Id. at 6.

[41]Id. at 6-10.

[42]Id. at 10.

[43]Id. at 15-19.

[44]Id. at 13.

[45]Id. at 13-14.

[46]Id. at 10.

[47]Id. at 29-31.

[48]Id. at 50.

[49]Id. at 50. See also McCullen Tr. [#130] Exhibit 5.

[50]Id. at 32.

engage in counseling and prayer, as well as other forms of protest.[51]

ii.    Jean Blackburn Zarella

Plaintiff Blackburn Zarella goes to Boston PP between seven a.m. and about ten a.m. on Saturdays, and she also occasionally goes for a short time on Wednesday mornings.[52]  While she is at the clinic, Ms. Zarella aims to speak with and offer help to women who are planning to have an abortion.[53]  Ms. Zarella reaches out to clinic patrons by saying, "May I help you? I have a lot of help available."[54] Clinic patrons always respond to this offer of help, by saying either "yes" or "no."[55]  Ms. Zarella also testified that, on days she is at Boston PP, between one and four women entering the clinic will stop and speak with her.[56]  When a woman does stop to speak with her, Ms. Zarella offers the woman literature to show what help is available.[57]  In addition to her counseling, Ms. Zarella also hands out literature, and about half of everyone who passes by accepts literature from Ms. Zarella.[58]  She also prays near the clinic, sometimes silently, and sometimes aloud.[59]  On some days, Ms. Zarella is joined by another counselor who puts up anti-abortion signs around the buffer zone.[60]

On the second Saturday of every month, there is a rosary vigil outside Boston PP.[61]  At the vigil approximately thirty people gather to say twenty decades of the rosary.[62]  People

---

[51]See id. at 31-45.
[52]Zarella Tr. [#132] at 6-7.
[53]Id. at 7-8.
[54]Id. at 8.
[55]Id. at 8.
[56]Id. at 8-9.
[57]Id. at 9.
[58]Id. at 11.
[59]Id. at 12.
[60]Id. at 28-29.
[61]Id. at 38.
[62]Id. at 38.

participating in the rosary vigil stand outside the buffer zone in a police barrier, and often carry large signs.[63]  One regular vigil participant also carries a crucifix on a large pole.[64]  Annually, on Good Friday, Ms. Zarella and other protesters also say the fourteen stations of the cross out loud.[65]

### iii.    Gregory A. Smith

Plaintiff Gregory Smith goes to Boston PP once a week on Saturday mornings between eight and nine-thirty a.m.  When he goes to Boston PP, there are usually about ten or more other people engaging in protest activities outside the clinic.[66]  Mr. Smith carries a crucifix on an eight-foot pole outside the buffer zone while he prays the rosary out loud, and in unison with the other people gathered at the clinic.[67]  Other people gathered outside the clinic on Saturday mornings display signs.[68]  On the second Saturday of the month there is a larger group of people outside Boston PP, and Mr. Smith uses a loudspeaker to amplify the prayer.[69]  Mr. Smith has testified that his goal in holding the crucifix and praying outside Boston PP is to "support[] in prayer [the] counselors so that they have success in talking the girls out of killing their babies."[70]  People entering the clinic see Mr. Smith's crucifix and hear the prayers.[71]  It is not uncommon for passerby who object to the pro-life message to shout at Mr. Smith and others engaged in prayer or counseling outside Boston PP.[72]

---

[63]Id. at 39-41.
[64]Id. at 41.
[65]Id. at 43.
[66]Smith Tr. [#133] at 6-7.
[67]Id. at 7-8.
[68]Id. at 13.
[69]Id. at 39-40.
[70]Id. at 18.
[71]Id. at 57.
[72]Id. at 21-23.

iv.   Eric Cadin

Eric Cadin is a student at St. John's Seminary in Brighton.[73]  He goes to Boston PP about

once a month when class is in session, and once a week when it is not.[74]  When Mr. Cadin is

outside Boston PP, he tries to speak with women going in for an abortion and their companions.

His goal is to, "let [the women entering the clinic] know that there is all sorts of help available for

them and that I and the people at these centers, and anyone else who is present at these things,

really does care about them and wants to help them, and help their child."[75]  On an average

morning, Mr. Cadin will engage ten or more different women or couples in conversation.[76]  Mr.

Cadin also hands out literature that advises clinic patients about information and services that are

available.[77]  On a typical morning outside the clinic, he hands out about twenty to thirty pieces of

literature to people passing by.[78]  Occasionally, Mr. Cadin holds a sign, but he mostly attempts to

engage people in conversation.[79]  Since the Act came into force in November, 2007, he estimates

that, through his counseling activity, he has convinced more than ten women not to have

abortions.[80]

C.   Other Observations at Boston PP

Michael Baniukiewicz, who heads Planned Parenthood's security operations, has observed

protesters outside Boston PP to hold prayer vigils, distribute literature, and display signs.[81]  The

---

[73]Cadin Tr. [#131] at 6.
[74]Id. at 6.
[75]Id. at 21.
[76]Id. at 14.
[77]Id. at 18.
[78]Id. at 19.
[79]See id. at 14.
[80]Id. at 24-25.
[81]Baniukiewicz Tr. [#137] at 81-83.

protesters' signs can be easily read from "just about anywhere on the street within the buffer zone area."[82] On the second Saturday of each month, a large number of people gather at Boston PP, and the Boston Police put up barriers to protect the protesters.[83] Mr. Baniukiewicz testified that he can hear protesters and counselors calling out to clinic patrons from his post inside the front door of the clinic.[84]  Three or four times a day a clinic patron will walk in to Boston PP with pro-life literature that they have been handed.[85]

Kristen Metzger is an investigator with the Massachusetts Attorney General's Office.[86] On April 2, 2010, Ms. Metzger visited Boston PP.[87]  That day was Good Friday, and Ms. Metzger observed a group of about seventy-five people gathered reciting a Catholic prayer.[88]  She also saw a group of three counselors engage a young Hispanic woman in conversation.[89] After the conversation the young woman got in to a car with the counselors and they drove away together.[90] While she was at the clinic, Ms. Metzger was able to hear protesters' pro-life statements, and she was able to read their signs.[91]

D.     Availability of Adequate Alternatives[92]

---

[82]Id. at 82.
[83]Id. at 85.
[84]Id. at 85-86.
[85]Id. at 87-88.
[86]Metzger Tr. [#138] at 6.
[87]Id. at 9.
[88]Id. at 9, 19.
[89]Id. at 14.
[90]Id. at 17.
[91]Id. at 9-19.
[92]At oral argument in this case, Plaintiffs addressed at length the activities of clinic escorts at Boston PP. See Trial Tr. [#150] at 39-41.
As the First Circuit held in McGuire v. Reilly, "The First Amendment is concerned with government interference, not private jousting in the speech marketplace." McGuire II, 386 F.3d 45, 60 (1st Cir. 2004) (finding that "'enforcement' of a state statute by purely private individuals, without some involvement by state officials, does not constitute state action.").  Plaintiffs rely on

In light of the testimony in this case, it is clear that adequate alternative means of communication exist for Plaintiffs to communicate their pro-life message at Boston PP. While it is beyond doubt that a "degree of curtailment" exists because of the application of the buffer zone law at Boston PP, it is also evident that Plaintiffs are still effective in communicating their message to their intended audience: women going to Planned Parenthood for abortion services.[93] As the Supreme Court emphasized in Hill v. Colorado, ""The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases. It is an aspect of the broader "right to be let alone" that one of our wisest Justices characterized as 'the most comprehensive of rights and the most valued by civilized men.'""[94]

The evidence in this case demonstrates that, even though the buffer zone exists, the plaintiffs are still successful in convincing a number of women not to have abortions.[95] Individuals

the Ninth Circuit's recent opinion in Hoye v. City of Oakland for the proposition that the activities of clinic escorts must be taken into account in an as-applied challenge.

The Hoye case is, however, distinct from this case in several important ways. First, the plaintiff in Hoye did allege that a facially neutral buffer zone law was being enforced against pro-life advocates, but not against pro-choice clinic escorts, thus meeting the state action requirement. Hoye 653 F.3d 835, 855 (9th Cir. 2011) ("[P]laintiffs are generally required to show the existence of an unconstitutional policy by extrapolating from a series of enforcement actions. They must argue, in effect, that these actions demonstrate that the municipality is enforcing against them a rule that is distinct from the constitutionally valid enactment."). Second, the Ninth Circuit found that, in determining whether the attempts of escorts to drown out Plaintiff's speech foreclosed ample alternative channels of communication, "[Plaintiff] will bear the burden of showing that it is the Ordinance's requirement . . . not the activities of escorts alone, that deprives im of ample alternative means of communication." Id. at 859.

Because this court is bound by the First Circuit's holding in the McGuire II case, and because Plaintiffs have not alleged state action in the manner set out above, the activities of clinic escorts are not relevant to Plaintiffs' as-applied challenge and are, therefore, not addressed in this opinion.

[93]See Trial Tr. [#150] at 22.

[94]Hill v. Colorado, 530 U.S. 703, 716-17 (2000)(quoting Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)).

[95]McCullen Tr. [#130] at 29-30.

16

entering the clinic can read Plaintiffs' signs, and clinic patients can hear Plaintiffs' prayers.

Plaintiffs successfully hand out literature to people walking toward the clinic from either direction,

and Plaintiffs' requests for conversation can be heard by clinic patrons both before and after they

enter the buffer zone.  That more people don't accept Plaintiffs' offers is not an indication that

adequate alternative means of communication do not exist, but rather shows that many members

of Plaintiffs' audience are simply unreceptive to Plaintiffs' message.

As the depositions submitted to the court and the arguments at trial show, Plaintiffs can be

seen and heard by both willing and unwilling listeners approaching the main entrance to Boston

PP.  The record does not indicate that there are any barriers that would prevent willing listeners

from stepping outside of the buffer zone to engage in a more in-depth conversation with the

Plaintiffs in this case.  It is evident that while Plaintiffs may indeed suffer some curtailment in their

avenues of communication because of the buffer zone law, they are still able to effectively reach

their intended audience.  It is clear from the case law that, " restrictions on the time, place, or

manner of protected speech are not invalid 'simply because there is some imaginable alternative

that might be less burdensome on speech.'"[96] The Act as applied at Boston PP, therefore, leaves

open adequate alternative means of communication for Plaintiffs' message.

2.    Worcester Clinic

A.    Clinic Layout and Buffer Zones

Planned Parenthood: Central Massachusetts Health Center ("Worcester PP") is located at

470 Pleasant Street in Worcester, Massachusetts.[97]  The clinic is on Pleasant Street, near the

---

[96]Hill, 530 U.S. at 736 (Souter, J. concurring) (quoting Ward 491 U.S. at 717 (quoting in turn United States v. Albertini, 472 U.S. 675, 689 (1985))).
[97]Stip. [#129] at ¶ 12.

intersection with Dewey Street, and it has been at this location since December 2009.[98]  The

entrance to the clinic's parking area is around the corner on Dewey Street.[99]  The main door to

the Worcester PP building is recessed under the overhang of the building, and is accessible from

the parking lot or from a walkway that leads out to Pleasant Street.[100]

> The walkway leads from the door through two metal fences to the
> sidewalk along Pleasant Street next to the clinic building; that
> sidewalk is eight and a half feet wide.  The fences are staggered, with
> one closer to Pleasant Street than the other.  For a pedestrian to
> access the Worcester clinic's main door from Pleasant Street, she
> must walk through a fairly narrow gap in the two fences, which are six
> feet, one inch apart at their nearest point.  The door is fifty-three feet,
> nine inches from the public sidewalk on Pleasant Street, measured in
> a straight line.[101]

Most clinic patients drive to Worcester PP and park in the lot before walking to the clinic

entrance.[102]

There are two marked and painted buffer zones at Worcester PP: one on Pleasant Street,

and one on Dewey Street.[103]  The buffer zone on Pleasant Street surrounds the entrance to the

concrete walkway leading to Worcester PP's front door.[104]  It begins thirty-five feet to the left of

the walkway, and extends thirty-five feet to the right of the walkway.[105]  It extends in to Pleasant

Street, but does not reach the sidewalk on the other side.[106]  The arc on Dewey Street surrounds

the driveway entrance to the Worcester PP parking lot.[107]  The buffer zone arc is a total of ninety-

---

[98]Id. at ¶¶ 12-13; Bashour Tr. [#136] at 4.
[99]Stip. [#129] at ¶ 12.
[100]Id. at ¶ 14.
[101]Defendants' Proposed Findings of Fact [#147] at 24 (citing Stip. [#129] at ¶¶ 14, 17).
[102]Bashour Decl. [#145] ¶ 29; Clark Decl. [#144] ¶ 23.
[103]Stip. [#129] at ¶ 15.
[104]Id. at ¶ 16.
[105]Id. at ¶ 17.
[106]Id.
[107]Id. at ¶19.

three feet, seven inches from edge to edge along the Dewey Street sidewalk.[108]  At its widest

point, the buffer zone extends five feet, eight inches beyond the street curb opposite the

driveway.[109]

        B.      <u>Speech Activities</u>

      Plaintiffs Nancy Clark and Mark Bashour submitted deposition testimony and declarations

detailing their speech activities at Worcester PP.

        i.      <u>Nancy Clark</u>

      Plaintiff Nancy Clark has been going to the Planned Parenthood clinic in Worcester two to

three days a week since the clinic opened in December of 2009.[110]  She generally goes to the

clinic in the mornings between nine-thirty and eleven,[111] and she usually stands by the clinic and

prays.[112]  She also attempts to start conversations with girls entering the clinic, and to encourage

clinic patrons to visit Problem Pregnancy, a pro-life counseling center located across the street

from Worcester PP.[113]  Ms. Clark successfully begins a conversation with a girl outside the clinic

about once a week.[114]  She also distributes pamphlets.[115]  On days when she isn't engaging in

counseling, Ms. Clark prays the rosary while holding a sign that says "Face It, Abortion Kills."[116]

When Ms. Clark holds the sign, clinic patrons and others seem to notice the sign and respond to it

in both positive and negative ways.[117]  On one occasion, a girl noticed Ms. Clark holding the sign,

---

[108]<u>Id.</u>

[109]<u>Id.</u>

[110]Clark Tr. [#135] at 5-6.

[111]<u>Id.</u> at 7.

[112]<u>Id.</u> at 7.

[113]<u>Id.</u> at 7-9.

[114]<u>Id.</u> at 14-15.

[115]<u>Id.</u> at 15.

[116]<u>Id.</u> at 16.

[117]<u>Id.</u> at 17-18.

came out of the clinic to speak with Ms. Clark, and ultimately decided not to have an abortion.[118]

Ms. Clark estimates that she has convinced approximately four girls not to have an abortion since

she began counseling outside Worcester PP.[119]  She has also spoken with four or five women

outside Worcester PP who then decided to accompany Ms. Clark to Problem Pregnancy.[120]

Ms. Clark testified at her deposition that many times clinic patrons don't want to speak

with her or don't want the pamphlets she offers.[121]  During Catholic Lent, protesters outside

Worcester PP engage in "40 Days of Life," where they pray for an end to abortion.[122] Participants

in the "40 Days of Life" often pray aloud and sometimes use a microphone to amplify their

prayer.[123]  On Thursdays, a man named Ray dresses up as the grim reaper and stands outside

Worcester PP.[124]  Ms. Clark has observed people react to Ray in his costume in both positive and

negative ways.[125]  Different protesters and counselors at the Worcester PP stand in different

locations around the clinic and are varied in their activities.[126]

ii.    Mark Bashour

Plaintiff Mark Bashour has gone to Worcester PP about twice a week since the clinic

moved to its current location in December 2009.[127]  He generally stands on Pleasant Street on the

same side of the street as the clinic.[128]  Although most patients drive to the Worcester PP, on

---

[118]Id. at 18-19.
[119]Id. at 28.
[120]Id. at 42.
[121]Id. at 13-16.
[122]Id. at 24-25.
[123]Id. at 24-26.
[124]Id. at 49.
[125]Id. at 50-51.
[126]See id. at 49-60.
[127]Bashour Tr. [#136] at 4-5.
[128]Id. at 15-16.

occasion a woman or her boyfriend will leave the private parking lot to speak with Mr. Bashour.[129]  He estimates that he has had a "good conversation" with a clinic patron about six or seven times since December 2009.[130]  Mr. Bashour also distributes literature outside the clinic, and successfully hands his pamphlets to someone "[a] couple of times a week."[131]  Mr. Bashour also engages in prayer outside Worcester PP, either silently or aloud, alone and with others.[132]  About five or six times, Mr. Bashour has participated in bringing a woman who was on her way to Worcester PP to Problem Pregnancy instead.[133]  Mr. Bashour describes his goal as, "to save as many lives as possible, because every time a child is aborted, we have a death."[134]  In a typical day, he will call out to between eight and twelve women in an attempt to start a conversation.[135]  In his deposition, Mr. Bashour testified that ten to fifteen percent of the time the women he calls out to respond to his efforts in either a positive or a negative way.[136]  He sometimes talks to other counselors outside Worcester PP, and has observed other counselors bring women to Problem Pregnancy.[137]  He is also familiar with other protestors who go to Worcester PP to either pray or hold signs that convey an anti-abortion message.[138]

> C.    Other Observations at Worcester PP

At Worcester PP, Michael Baniukiewicz has observed protesters hold signs and hand out

---

[129]Id. at 16-17.
[130]Id. at 17.
[131]Id. at 23.
[132]Id. at 24-25.
[133]Id. at 27-30.
[134]Id. at 37.
[135]Id. at 76-77.
[136]Id. at 78-80.
[137]Id. at 66-67.
[138]See id. at 68-76.

information.  He has also observed one man dressed up as the grim reaper.[139]  Protesters' signs

can be read from twenty to thirty feet away, and the protesters can be heard from Worcester PP's

parking lot.[140] On days when abortions are being performed, three or four patrons, on average,

enter the clinic with pro-life literature[141]

Ms. Metzger visited Worcester PP in her capacity as an investigator for the Attorney

General's office on September 10, 2010.[142]  When Ms. Metzger parked in a lot near the

Worcester PP facility, she and her investigative partner were approached by a counselor who

handed them pro-life literature and urged them to go across the street to Problem Pregnancy.[143]

While in the parking lot at the Worcester PP facility, Ms. Metzger could hear people calling to her

from behind the facility's fence asking her to come talk to them.[144]

Ms. Metzger made a second visit to Worcester PP on July 7, 2011.[145]  On that date, she

observed about nine people standing on the sidewalk surrounding the buffer zone on Pleasant

Street in front of the clinic.[146]  One of the individuals was wearing a grim reaper costume, and

another held a sign that read "abortion is a bad sin."[147]  On the opposite side of the sidewalk there

were two women and a man, and there was a man across from the Dewey Street entrance with a

sign that read, "God loves you mom and dad."[148]  When Ms. Metzger exited the clinic and stood

outside in front of the facility, she could hear a woman from across the street say, "anything you

---

[139]Baniukiewicz Tr. [#137] at 92.
[140]Id. at 93-95.
[141]Id. at 96.
[142]Metzger Tr. [#138] at 20.
[143]Id. at 23-24.
[144]Id. at 26-27.
[145]Id. at 42-43.
[146]Id. at 43.
[147]Id. at 43-44.
[148]Id. at 45-46.

need, we can help you, come across the street."[149]

        D.      <u>Availability of Adequate Alternatives</u>

In assessing the availability of adequate alternative means of communication at Worcester PP, it is necessary to keep in mind that a First Amendment violation necessarily requires State action.[150]  As the First Circuit pointed out in the <u>McGuire II</u> case, "only the government can violate First Amendment rights."[151]  Although Plaintiffs' arguments at trial drew attention to factors like the fencing on Worcester PP's clinic property, and the fact that most people park in a private parking lot,[152] these barriers to communication cannot be attributed to state action or the enforcement of the buffer zone law.  They are, therefore, not state action as required to state a First Amendment violation.

As in <u>Hill</u>, this is a case where, "'[the fact that [the Act]] may reduce to some degree the potential audience for [petitioners'] speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate.'"  The evidence in the record demonstrates that Plaintiffs' message can be heard by both willing and unwilling listeners as they enter Worcester PP.  Plaintiffs successfully engage in prayer, protest, counseling, and literature distribution.  That Plaintiffs experience both positive and negative reactions from passerby indicates that their message is being heard by their intended audience.  While most women may choose to ignore Plaintiffs' well-meaning overtures, this is not because the Commonwealth has failed to leave open adequate alternative means of communication.  Much as Plaintiffs have the

---

[149]<u>Id.</u> at 47.

[150]<u>See</u> <u>McGuire v. Reilly</u>, 386 F.3d 45, 60 (1st Cir. 2004).

[151]<u>Id.</u> (citing <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 295 (2001)); <u>Hudgens v. NLRB</u>, 424 U.S. 507, 514-21 (1976)).

[152]<u>See</u> Trial Tr. [#150] at 71-73.

right to attempt to engage others in conversation outside Worcester PP, clinic patrons who do not want to engage with Plaintiffs have a right to go about their business unmolested.[153]

As the Supreme Court has emphasized, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."[154] Here, this court has already found the Act to be a facially valid content neutral time, place, and manner restriction.  Based on the record presented, it is clear that the Act as applied at Worcester PP leaves open adequate alternative means of communication even though it might not grant the level of "particularized access" that Plaintiffs would prefer.[155]

        3.     Springfield Clinic

           A.     Clinic Layout and Buffer Zones

Planned Parenthood's Western Massachusetts Health Center in Springfield ("Springfield PP") is located at 3550 Main Street in Springfield Massachusetts.[156]  It is part of a larger medical complex, which contains three buildings, and is located at the corner of Main Street and Wason Avenue.[157]  There are seven other distinct medical businesses in this medical complex that have no affiliation with Springfield PP.[158]

---

[153]See Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).

[154]Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981) (citing Adderley v. Florida, 385 U.S. 39, 47-48 (1996); Poulos v. New Hampshire, 345 U.S. 395, 405 (1953); see Cox v. Louisiana, 379 U.S. 536, 554 (1965)).

[155]See McCullen  v. Coakley, 573 F. Supp. 2d 382, 415 (D. Mass. 2008) (discussing Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8, 13 (1st Cir. 2004), "The court held . . . that 'although the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access.'")).

[156]Stip. [#129] at ¶ 22.

[157]Id.

[158]Id. at ¶ 23.

The building that contains Springfield PP is set back three hundred sixteen feet, two inches from Main Street and two hundred six feet, five inches from Wason Avenue.[159]  There are five driveways leading into the parking area for the medical complex, and each one has a sign saying, "private property, no trespassing."[160]  Two of the driveways are surrounded by clearly marked and posted buffer zones.[161]  The remaining three driveways are surrounded by painted arcs, but because the text of the buffer zone law is not posted at those driveways, the law has no effect in those locations.[162]

The first buffer zone is located around the driveway on Wason Avenue that is nearest to Springfield PP.[163]  The zone is "roughly one hundred feet wide, including the width of the driveway itself."[164]  The top of the buffer zone arc is twelve feet, five inches from the curb of Wason Avenue.[165]  The second buffer zone surrounds the middle driveway on Main street.[166]  It is approximately ninety-nine feet wide, including the width of the driveway itself.[167]  The top of the buffer zone arc is twenty-one feet, four inches from the curb on the opposite side of Main Street.[168]

## B.    Speech Activities

Plaintiff Dr. Cyril Shea contests the application of the Act at Springfield PP.  Dr. Shea protests outside Springfield PP at least once a week on Fridays, and sometimes on Wednesdays

---

[159]Id.
[160]Id. at ¶ 24; Shea Decl. [#143] at ¶ 15.
[161]Stip. [#129] at ¶ 25.
[162]See id. at ¶¶ 28-32; see also Mass. G.L. c. 266 § 120E1/2, ¶ 9(c).
[163]Stip. [#129] at ¶ 26.
[164]Defendants' Proposed Findings of Fact [#147] at 30 (citing Stip. [#129] at ¶ 26).
[165]Stip. [#129] at ¶ 26.
[166]Id. at ¶ 27.
[167]Id.
[168]Id.

and Saturdays as well.[169]  Dr. Shea goes to Springfield PP "to pray and to indicate to the public

that abortions are taking place on that campus and to make that knowledge known."[170]  Dr. Shea

prays aloud outside Springfield PP, sometimes alone and sometimes with others.[171]  He also wears

a sign around his neck that is about three-and-a-half feet by two-an- a-half feet that reads,

"they're killing babies here."[172]  Dr. Shea stands with his sign at various locations near the

entrances to the parking lot of Springfield PP.[173]  People often react both positively and negatively

to Dr. Shea's sign.[174]  Dr. Shea has also observed other people holding signs outside Springfield

PP that convey a variety of pro-life or religious messages.[175]  On occasion, Dr. Shea has been

called over by another counselor who is speaking to a woman so that he can offer a medical

perspective.[176]  Prior to the enactment of the Act, Dr. Shea would stand on the sidewalk beside

the Springfield PP's driveway entrance, and he would wave to people in their cars and ask if they

needed any literature or help.[177]  Occasionally drivers would respond to Dr. Shea's overtures, but

more often people would keep driving in to the parking lot.[178]  Since the buffer zones were

painted at Springfield PP, Dr. Shea can recall one occasion on which a driver, angered by Dr.

Shea's sign, stopped his car and spoke to him.[179]  About five percent of people who drive to

Springfield PP and park in the private parking lot come back out to the sidewalk to receive

---

[169]Shea Tr. [#134] at 7-8.
[170]Id. at 9.
[171]Id. at 11-12.
[172]Id. at 12.
[173]Id. at 15.
[174]Id. at 13-14.
[175]Id. at 23-24.
[176]Id. at 40-45.
[177]Id. at 83.
[178]Id. at 83-84.
[179]Id. at 84.

literature or counseling from pro-life protesters.[180]

### C.   Other Observations at Springfield PP

Most patients arrive at Springfield PP by car and enter the parking lot via the driveway on Wason Avenue.[181]  Protesters at Springfield PP have been observed to hold signs and to try to slow down vehicles entering the driveway.[182]  Protesters' signs can be read from cars entering the driveway, and the protesters can be heard from the clinic parking lot.[183]  Because Springfield PP is part of a large medical complex, which is private property, protesters' activities are confined to the sidewalks surrounding the complex parking lot regardless of whether the buffer zones are in place.[184]

Ms. Metzger, as an investigator for the Attorney General's Office, visited Springfield PP on July 8, 2011.[185]  On that date, she saw two men standing in the sidewalk outside the buffer zone holding up pro-life signs.[186]  One of the men held up a pamphlet as Ms. Metzger drove by.[187] She also saw three men on Wason Avenue waving at cars that were exiting, and another man holding a framed picture of the Virgin Mary.[188]

### D.   Availability of Adequate Alternatives

As was the case with Worcester PP, Springfield PP also presents barriers to communication that are not attributable to state action.  Plaintiffs are in error when they assert

---

[180]Id. at 95-96.
[181]Baniukiewicz Tr. [#137] at 100-101.
[182]Id. at 102.
[183]Id. at 104.
[184]See id. at 105-106.
[185]Metzger Tr. [#138] at 39.
[186]Id. at 39-40.
[187]Id. at 40.
[188]Id. at 41-42.

that the buffer zone law is "constitutionally suspect" when applied to a multipurpose office building.[189] In Hill v. Colorado, the Supreme Court found that, "[s]pecial problems that may arise where clinics have particularly wide entrances or are suited within multipurpose office buildings may be worked out as the statute is applied."[190]  The buffer zone at issue in Hill was a floating buffer zone that limited the ability of protesters to approach people within a fixed radius of a clinic's entrances and exits.[191]  The Supreme Court in that case found that the buffer zone created by the Colorado statute was a facially valid time place and manner restriction.[192]The Act at issue in this case creates a fixed buffer zone akin to the one upheld by the Court in Schenck v. Pro-Choice Network of Western New York, which applied to a number of clinics that were "part of larger hospital complexes."[193]  As the Ninth Circuit has observed, "[t]he State does not design clinics with wide entrances or place them in multipurpose office buildings; instead, the only relevant state action would be the application of the statute to such factual settings."[194]  The question, therefore, remains simply whether the act as applied at this location leaves open ample alternative means of communication.

The evidence in the record shows that the Act, as it is applied at Springfield PP, leaves open adequate alternative means of communication.  Many of the barriers to communication at

---

[189]Trial Tr. [#150] at 81 (purporting to characterize Hill, 530 U.S. 703).

[190]Hill v. Colorado, 530 U.S. 703, 730, 120 S.Ct. 2480 (2000).

[191]Hill involved a statute making it, "unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . .'" Hill, 530 U.S. at 707 (quoting Colo. Rev. Stat. § 18-9-122(3) (1999)).

[192]Hill, 530 U.S. at 730.

[193]Shenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 361, 117 S.Ct. 855 (1997).

[194]Hoye v. City of Oakland, No. 09-16753, 2011 WL 3198233, *10 (9th Cir. July 28, 2011).

Springfield PP are due to the fact that the clinic is located in the center of a large parking lot, on private property, and most clinic patrons drive to their appointments. These barriers would exist regardless of whether the Act was in place or not because they are a result of Springfield PP's location on private property, not state action.

Nonetheless, it is apparent that Plaintiffs are able to convey their pro-life message to people entering the clinic and people passing by on Main Street and Wason Avenue. The testimony of Dr. Shea and Ms. Metzger demonstrates that people approaching Springfield PP are able to see protesters' signs and hear their prayers. Protesters are able to stand almost anywhere along the public sidewalk surrounding the medical complex, except for the two clearly marked and posted buffer zones. If clinic patients are receptive to Plaintiffs' message, there is nothing to stop them from leaving clinic property and engaging in conversation or accepting literature or counseling. Simply because Plaintiffs are not able to stand directly next to or in the two clinic driveways that are surrounded by buffer zones does not mean that adequate alternative means of communication do not exist. Indeed, Plaintiffs may engage in any form of communicative activity they desire anywhere else on the public sidewalk. It is clear, therefore, that the Act as applied at Springfield PP leaves open adequate alternative means of communication.

IV.    Conclusion

For the foregoing reasons, this court finds that the Act as applied to Plaintiffs' activities at the Boston, Worcester, and Springfield Planned Parenthood locations is a constitutionally valid, content neutral time, place, and manner restriction. Given this court and the First Circuit's prior rulings that found the Act to be narrowly tailored to serve a significant and legitimate governmental interest, and with respect to the evidence presented in this case, it is clear that the

Act as applied is a constitutionally valid regulation of the time, place and manner of speech.

Judgment shall enter in Defendants' favor on all counts.


IT IS SO ORDERED.


_____/s/ Joseph L. Tauro_____
United States District Judge